**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: RAILWAY INDUSTRY EMPLOYEE NO-POACH ANTITRUST LITIGATION | ) ) ) Master Docket Misc. No. 18-798 ) ) MDL No. 2850 |
| This Document Relates to: ALL ACTIONS | ) ) ) ) |

**CONSOLIDATED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

**Page**

I.      SUMMARY OF THE ACTION ................................................................. 1

II.     JURISDICTION AND VENUE ............................................................... 2

III.    THE PARTIES ........................................................................................ 3

   A.   Plaintiffs ........................................................................................ 3

   B.   Defendants .................................................................................... 4

        1.   Wabtec Defendants ................................................................. 4

        2.   Knorr Defendants ................................................................... 5

IV.     FACTUAL ALLEGATIONS ................................................................. 6

   A.   Competition for Employees in the Rail Industry ................................ 6

   B.   Defendants' No-Poach Conspiracy ................................................. 9

        1.   Wabtec – Knorr Agreements ................................................ 10

        2.   Knorr – Faiveley Agreement ................................................ 12

        3.   Wabtec – Faiveley Agreement ............................................. 12

   C.   Effects on Interstate Commerce .................................................... 13

   D.   Defendants Concealed Their Conspiracy and Anti-Competitive Conduct .......... 14

V.      CLASS ACTION ALLEGATIONS ....................................................... 15

FIRST CLAIM FOR RELIEF (Violation Of The Sherman Act, § 1) ....................... 17

PRAYER FOR RELIEF ................................................................................ 18

I.     **SUMMARY OF THE ACTION**

1.      This class action challenges an illegal conspiracy among the world's dominant rail equipment suppliers to restrain competition and reduce compensation for railway industry employees.  Plaintiffs are former employees of Defendants and bring this suit on behalf of themselves and the Proposed Class to obtain damages for the harm they suffered and to prevent Defendants from retaining the benefits of their unlawful conspiracy.

2.      Defendants Westinghouse Air Brake Technologies Corporation and Knorr-Bremse AG and their respective co-Defendant subsidiaries (referred to collectively as "Wabtec" and "Knorr," respectively herein) are the largest suppliers of rail equipment used in freight and passenger rail applications.  They compete with one another to hire and retain employees throughout the United States.

3.      However, beginning at least as early as 2009, Defendants entered into express agreements not to compete for employees.  They agreed to refrain from soliciting or hiring each other's employees without the consent of the current employer.  These "no-poach" agreements spanned several years and were monitored and enforced by executives at Defendant companies.

4.      The "no poach" agreements were not reasonably necessary to any legitimate business transaction or lawful collaboration among the companies.  Rather, Defendants' conspiracy was an ideal tool to suppress their employees' compensation that was simple to implement and easy to enforce.

5.      The no-poach agreements achieved their intended consequences.  They reduced competition for employees and suppressed employee compensation below competitive levels, harming workers in this important industry.  The conspiracy disrupted the efficient allocation of

labor that would have resulted if Defendants had competed for, rather than colluded against, their current and prospective employees.

6.      In addition to reducing compensation, Defendants' agreements denied employees access to better job opportunities, restricted their mobility, and deprived them of competitively significant information that they could have used to negotiate for better terms of employment.

7.      The conspiracy was first revealed publicly on April 3, 2018, with an announced action and proposed stipulated judgment by the U.S Department of Justice ("DOJ").

## II.    <u>JURISDICTION AND VENUE</u>

8.      Plaintiffs bring this action to recover damages and obtain injunctive relief, including treble damages, costs of suit, and reasonable attorneys' fees arising from Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

9.      The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337.

10.     Venue is proper in this judicial district pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391(b), (c), and (d) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this district and a substantial portion of the affected interstate trade and commerce was carried out in this district.

11.     Defendants are subject to the jurisdiction of this Court because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) participated in an illegal conspiracy throughout the United States, including in this District; (c) had substantial contacts within the United States, including in this District; and (d) was engaged in an illegal conspiracy that was directed at and had the intended effect of causing injury to

persons residing in, located in, or doing business throughout the United States, including in this District.

## III.   THE PARTIES

### A.   Plaintiffs

12.   Stephen Baldassano was employed by Defendant Knorr Brake from approximately March 1998 to December 2012, and from approximately January 2017 to October 2017.  Plaintiff Baldassano performed his duties as a Project Manager and Manager of Systems and Sales for Knorr Brake in and is a citizen and resident of the State of Maryland.

13.   John Brand was employed by Defendant NY Air Brake as a Senior Manager of Systems and Software Engineering from approximately May 2013 to August 2016.  Plaintiff Brand performed his duties as a NY Air Brake employee in and is a citizen and resident of the State of Texas.

14.   David Escalera was employed by Defendant Wabtec as a Field Service Technician from approximately July 2011 to January 2015, in the State of California.  Plaintiff Escalera is a citizen and resident of the State of Massachusetts.

15.   Brian Lara was employed by Defendant Wabtec as a Machinist from approximately November 2011 to January 2017.  Plaintiff Lara performed his duties as a Wabtec employee in and is a citizen and resident of the State of Pennsylvania.

16.   Patricia Lonergan was employed by Wabtec as a Positive Train Control Manager from approximately October 2013 to April 2015.  Plaintiff Lonergan performed her duties as a Wabtec employee in and is a citizen and resident of the State of Colorado.

B.    **Defendants**

1.    **Wabtec Defendants**

17.    Defendant Westinghouse Air Brake Technologies Corporation ("Wabtec Corp.") is a Delaware corporation with its headquarters in Wilmerding, Pennsylvania. With over 100 subsidiaries collectively and more than 18,000 employees, Wabtec Corp. is the world's largest provider of rail equipment and services with global sales of $3.9 billion in 2017. Wabtec Passenger Transit is a business unit of Wabtec Corp. that develops, manufactures, and sells rail equipment and services for passenger rail applications. It is based in Spartanburg, South Carolina. Wabtec Global Services is a business unit of Wabtec Corp. that offers maintenance, repair, and support services. It has several locations throughout the United States.

18.    Defendant Wabtec Railway Electronics, Inc. ("Wabtec Railway") is a Delaware corporation with its headquarters in Germantown, Maryland. It designs, develops, manufactures, and repairs electronic products used to improve railroad operations and safety. Wabtec Railway is a wholly-owned subsidiary of Wabtec Corp.

19.    Defendant Ricon Corporation ("Ricon") is a California corporation headquartered in San Fernando, California. Ricon designs and manufactures wheelchair lifts and ramps for commercial, paratransit, transit, motorcoach, and passenger rail vehicles. Ricon is a wholly-owned subsidiary of Wabtec Corp.

20.    Defendant Railroad Controls, L.P., is headquartered in Fort Worth, Texas, and is one of the largest railroad signal construction companies in the United States. It is a wholly-owned subsidiary of Wabtec Corp.

21.    Defendant Xorail Inc. provides railroad signal engineering and design services. It is a wholly-owned subsidiary of Wabtec Corp.

22.     Defendant Faiveley Transport, S.A. ("Faiveley") had been a French société anonyme based in Gennevilliers, France.  On November 30, 2016, Wabtec Corp. acquired Faiveley, making Faiveley a wholly-owned subsidiary of Wabtec Corp.  Before the acquisition, Faiveley was the world's third-largest rail equipment supplier behind Wabtec and Knorr. Faiveley had employees in 24 countries, including at six U.S. locations.  It developed, manufactured, and sold passenger and freight rail equipment to customers in Europe, Asia, and North America, including the United States, with revenues of approximately €1.2 billion in 2016.

23.     Defendant Faiveley Transport North America Inc. ("Faiveley NA") was a wholly-owned subsidiary of Faiveley.  Prior to its acquisition by Wabtec Corp., Faiveley conducted business in the United States primarily through Faiveley N.A.  Faiveley N.A. is a New York corporation headquartered in Greenville, South Carolina and is now a wholly-owned subsidiary of Wabtec Corp.

### 2.     **Knorr Defendants**

24.     Defendant Knorr-Bremse AG is a privately-owned German company with its headquarters in Munich, Germany.  Knorr-Bremse is the world's second largest provider of rail and commercial vehicle equipment.  In 2017, Knorr had annual revenues of approximately $7.7 billion.  Knorr-Bremse holds several wholly-owned subsidiaries in the United States.

25.     Defendant Knorr Brake Company LLC ("Knorr Brake") is a Delaware corporation with its headquarters in Westminster, Maryland.  It manufactures train control, braking, and door equipment used on passenger rail vehicles.  Knorr Brake is a wholly-owned subsidiary of Knorr-Bremse.

26.     Defendant New York Air Brake LLC ("NY Air Brake") is a Delaware corporation with its headquarters in Watertown, New York.  It manufactures railway air brakes and other rail equipment used on freight trains.  NY Air Brake is a wholly-owned subsidiary of Knorr-Bremse.

27.     Defendant Bendix Commercial Vehicle Systems LLC ("Bendix") is a Delaware corporation with its headquarters in Elyria, Ohio.  Bendix develops and supplies active safety technologies, air brake charging and control systems, and components for commercial vehicles.  Bendix is a wholly-owned subsidiary of Knorr-Bremse.  Bendix served as a recruiter for Knorr Brake for certain employment needs.

28.     Upon information and belief, co-conspirators presently unknown to Plaintiffs performed acts and made statements in furtherance of the conspiracy and the alleged anticompetitive conduct.  Plaintiffs reserve the right to name some or all of these persons and entities at a later date when their identities become known to Plaintiffs.

## IV.     FACTUAL ALLEGATIONS

### A.     Competition for Employees in the Rail Industry

29.     Wabtec and Knorr are the world's two largest rail equipment suppliers and each other's top rival in the development, manufacture, and sale of equipment used in freight and passenger rail applications.  Until its acquisition by Wabtec in 2016, Faiveley was the world's third largest supplier.

30.     Defendants are some of the largest employers in the rail industry.  For example, by the end of 2017, Wabtec and its subsidiaries employed approximately 18,000 full-time employees worldwide.  In 2016, Wabtec added approximately 5,700 employees through the acquisition of Faiveley.  By the end of 2017, Knorr and its subsidiaries employed approximately 27,700 employees worldwide, including approximately 5,000 employees in the Americas.

31.     There is high demand for and limited supply of skilled employees who have rail industry experience.  As a result, critical jobs in the rail industry can remain vacant for months while firms try to recruit and hire individuals with the requisite skills, training, and experience for a job opening.  Employees within the rail industry, like those working for the Defendants, are key sources of potential talent to fill these openings.

32.     Defendants employ a variety of recruiting techniques, including using internal and external recruiters and staffing agencies to identify, solicit, recruit, and otherwise help hire employees.  Defendants also receive direct applications from individuals interested in employment opportunities.

33.     Directly soliciting employees from other rail industry employers is a particularly efficient and effective method of competing for qualified employees.  Soliciting involves communicating directly—whether by phone, e-mail, social and electronic networking, or in person—with another firm's employee who has not otherwise applied for a job opening.  Such direct solicitation can be performed by individuals of the company seeking to fill the position or by outside recruiters retained to identify potential employees on the company's behalf.  Firms in the rail industry rely on direct solicitation of employees of other rail companies because those individuals have the specialized skills necessary and may be unresponsive to other methods of recruiting.

34.     In a properly functioning and lawfully competitive labor market, rail industry employers compete with one another to attract highly-skilled talent for their employment needs. This competition benefits employees because it increases the available job opportunities.  It also improves an employee's ability to negotiate for a better salary and other terms of employment.

35.     By soliciting and hiring employees from other rail industry employers, a company is able to take advantage of the efforts its rival has expended in identifying and training the employees, while simultaneously inflicting a cost on the rival by removing an employee on whom the rival may depend.  By contrast, hiring employees directly out of a training program comes with none of those benefits, and the hiring institution must invest significant resources in identifying, assessing, and training new employees.  For these reasons and others, lateral hiring is a key form of competition.

36.     Competition for workers via lateral hiring has a significant impact on compensation in a variety of ways.  First, when employers become aware of attractive outside opportunities for their employees, the threat of losing employees to competitors encourages employers to preemptively increase compensation to increase morale, productivity, and retention.  If employers do not react to competition, their employees may seek positions that offer more generous compensation and benefits elsewhere, be receptive to recruiting by a rival employer, and/or reduce their productivity and morale.  Once an employee has received an offer from a rival, retaining the employee may require a disruptive increase in compensation for one individual, if retention is possible at all, and cascading (and unplanned) pressures on compensation of other employees where internal equity and fair pay analysis would demand similar raises.  Employers therefore have an incentive to preempt lateral departures by paying all employees well enough that they are unlikely to seek or pursue outside opportunities. Preemptive retention measures thus lead to increased compensation for all employees.

37.     The availability of desirable positions at competing employers also forces employers to reactively increase compensation to retain employees who are likely to join a competitor.  This can occur both when a particular employee or group of employees becomes

interested in switching employers and the current employer responds by offering a compensation increase to retain them, or when an employer responds to overall attrition rates among its employees by increasing compensation levels.  In the former case, even a targeted increase designed to retain specific employees may put upward pressure on the entire compensation structure.

38.     Because many rail industry workers are highly specialized and integrated into teams tied to specific functions, some workers who move to positions at different companies may bring with them others from their teams.  Just as competition forces employers to preemptively or reactively raise compensation to retain employees who might otherwise seek employment elsewhere, it also encourages increased compensation for related workers.  Thus, increased movement of one category of employee not only increases the compensation for those employees, but also for the categories of employees who are likely to also seek parallel lateral positions, with similar higher compensation and benefits.

39.     The positive compensation effects of hiring employees from competitors are not limited to the particular individuals who are solicited or who seek new employment.  Instead, the effects of hiring from competitors (and the effects of eliminating lateral hiring, pursuant to agreement) commonly impact all employees of the participating companies.

40.     Defendants' conspiracy restrained competition for employees and disrupted the normal bargaining and price-setting mechanisms that apply in the labor market.

**B.     Defendants' No-Poach Conspiracy**

41.     Over a period spanning several years, Wabtec, Knorr, and Faiveley entered into no-poach agreements to eliminate competition among them for employees.  These agreements were executed and enforced by the companies' senior executives and included the companies'

U.S. subsidiaries.  The no-poach agreements were not reasonably necessary to any separate, legitimate business transaction or collaboration between the companies.

### 1.     **Wabtec – Knorr Agreements**

42.     Wabtec and Knorr entered into pervasive no-poach agreements that spanned multiple business units and jurisdictions.  Senior executives at the companies' global headquarters and their respective U.S. passenger and freight rail businesses entered into no-poach agreements that involved promises and commitments not to solicit or hire one another's employees.

43.     Beginning no later than 2009, Wabtec's and Knorr's senior executives entered into an express no-poach agreement and then actively managed it with each other through direct communications.  For example, in a letter dated January 28, 2009, a director of Knorr Brake wrote to a senior executive at Wabtec Corp.'s headquarters, "[Y]ou and I both agreed that our practice of not targeting each other's personnel is a prudent cause for both companies.  As you so accurately put it, 'we compete in the market.'"

44.     Although the no-poach agreement was between Wabtec and Knorr's U.S. passenger rail subsidiary, it was well known to senior executives at the parent companies, including top Knorr executives in Germany who were included in key communications about the no-poach agreement.

45.     In furtherance of their agreement, Wabtec and Knorr informed their outside recruiters not to solicit employees from the other company.  For example, Knorr Brake used Bendix, a Knorr subsidiary and Knorr Brake sister company, as a recruiter for certain employment needs.  Knorr Brake directed the Bendix recruiters to refrain from soliciting employees from Wabtec.

46.     Wabtec's and Knorr's no-poach agreement also foreclosed the consideration of unsolicited applicants employed by Wabtec or Knorr without prior approval of the other firm. Knorr Brake President Richard Bowie told an employee considering hiring a Wabtec employee, "we don't do that," and that "I'm not taking any of his guys [referring to the Wabtec President in South Carolina] and he's not taking any of our guys."  In a 2010 internal communication, a senior executive at Knorr Brake stated that he would not even consider a Wabtec candidate who applied to Knorr Brake without the permission of his counterpart at Wabtec.

47.     Wabtec's and Knorr's no-poach agreements also reached the companies' U.S. freight rail businesses.  In July 2012, for example, a senior executive at NY Air Brake informed a human resources manager that he could not consider a Wabtec employee for a job opening due to the no-poach agreement between Wabtec and Knorr.  This message was similarly conveyed to other NY Air Brake human resources personnel during the Class Period.

48.     Wabtec's and Knorr's senior executives actively policed potential breaches of their companies' no-poach agreements and directly communicated with one another to ensure adherence to the agreements.  For example, in February 2016, a member of Knorr's executive board complained directly to an executive officer at Wabtec regarding an external recruiter who allegedly solicited a Knorr Brake employee for an opening at Wabtec.  The Wabtec executive investigated the matter internally and reported back to Knorr that Wabtec's outside recruiter was responsible for the contact and that he had instructed the recruiter to terminate his activities with the candidate and refrain from soliciting Knorr employees going forward due to the existing no-poach agreement between the companies.

### 2.     Knorr – Faiveley Agreement

49.     Beginning no later than 2011, senior executives at Knorr and Faiveley reached an express no-poach agreement that included a commitment to contact one another before pursuing an employee of the other company.  In October 2011, a senior executive at Knorr Brake explained in an e-mail to a high-level executive at Knorr-Bremse that he had a discussion with an executive at Faiveley's U.S. subsidiary that "resulted in an agreement between us that we do not poach each other's employees.  We agreed to talk if there was one trying to get a job[.]"

50.     Executives at Knorr Brake and Faiveley NA actively managed the agreement through direct communications.  For example, in or about 2012, a senior executive at Knorr Brake discussed the companies' no-poach agreement with an executive at Faiveley NA while at a trade show in Berlin, Germany.

51.     Knorr Brake President Richard Bowie issued a directive to high level executives and human resources personnel to refrain from recruiting Wabtec and Faiveley employees because the companies had agreed to not poach each other's employees.  In October 2012, executives at Faiveley NA stated in an internal communication that they were required to contact Knorr Brake before hiring a U.S. train brake engineer.

52.     Knorr and Faiveley continued their no-poach agreement until at least 2015, when Wabtec announced its proposed acquisition of Faiveley.

### 3.     Wabtec – Faiveley Agreement

53.     Beginning no later than January 2014, senior executives at Wabtec and Faiveley NA entered into a no-poach agreement in which the companies agreed not to hire each other's employees without approval from the other company.

54.     Wabtec and Faiveley NA executives actively managed and enforced their agreement with each other through direct communications.  For example, in January 2014, Wabtec Passenger Transit executives refused to engage in hiring discussions with a U.S.-based project manager at Faiveley NA without first getting permission from Faiveley NA executives. In an internal e-mail to his colleagues, a Wabtec Passenger Transit executive explained that the candidate "is a good guy, but I don't want to violate my own agreement with [Faiveley NA]." Wabtec Passenger Transit hired the project manager after receiving permission from Faiveley NA.  One month later, a Wabtec Passenger Transit senior executive informed his staff that hiring Faiveley NA's employees was "off the table" due to the agreement not to engage in hiring discussions with each other's employees without the other's prior approval.

55.     In July 2015, Wabtec and Faiveley publicly announced their intent to merge. Wabtec closed its acquisition of Faiveley on November 30, 2016.  Presently, Faiveley is a wholly-owned subsidiary of Wabtec.

### C.     <u>Effects on Interstate Commerce</u>

56.     During the relevant time period, Defendants employed members of the Proposed Class throughout the United States, including in this judicial district.

57.     The conspiracy substantially reduced competition for labor in the rail industry and suppressed the efficient movement and compensation of rail industry employees, harming Plaintiffs and members of the Proposed Class. The harm extended not only to those who did or would otherwise have sought to change companies, but also to those who had no intention of seeking other employment because the no-poach agreements enabled Defendants to maintain suppressed compensation levels generally.

58.     Thus, Defendants' no-poach agreements and related conduct substantially affected interstate commerce for employee services and caused antitrust injury throughout the United States.

### D.     **Defendants Concealed Their Conspiracy and Anti-Competitive Conduct**

59.     Members of the Proposed Class did not and could not have discovered through the exercise of reasonable diligence that Defendants were engaged in the conspiracy until at least April 3, 2018, when the DOJ publicly filed its complaint and settlement of its investigation against Defendants.

60.     Defendants conducted their conspiracy in a manner deliberately designed to avoid detection.  Knowledge of the agreements was closely held by senior executives and recruiters of the Defendant companies who relied on direct and non-public communications with one another to manage and enforce the no-poach agreements, including in-person discussions and private email communications.  None of the relevant communications within and among Defendants alleged herein were public before the DOJ filing.

61.     Additionally, rather than disclose their agreed-upon refusal to hire employees of a rival company without that company's permission, Defendants devised internal procedures by which implicated applicants could be discreetly flagged.  Once flagged, the company President decided whether to seek permission from the rival company to hire the individual.  The applicant was not told, much less consulted, about this process.

62.     Knorr's Code of Conduct, which was provided to and applies to all of its worldwide employees, misleadingly states that Knorr is "committed to observing the regulations on fair competition.  In particular, in order to avoid infringing anti-trust legislation, it is not permitted to conclude agreements with competitors on [i] prices, margins, costs, volumes,

- 14 -

production performance, tendering, sales or other factors that influence the behavior of the

company, [ii] non-competition, false tendering or [iii] apportionment out of customers, markets,

areas, production programs etc."

63.     Wabtec Global Services also states in its Policies and Procedures that: "Wabtec

recognizes that its employees are our most important asset and that the products and services that

we provide to our customers are only as good as the employees who produce them.  Therefore, it

is in the best interest of Wabtec, its customers and its shareholders to maintain the most talented

and motivated employees available.  It is our sincere belief that the key ingredient to developing

and maintaining such a skilled and motivated workforce is the fair and equitable treatment of

employees in the workplace.  We believe that each employee is entitled to respect as an

individual.  We expect our employees to treat their fellow employees with the same respect and

consideration that they would expect."

64.     Defendants' secretive maintenance and enforcement of the conspiracy and

misleading and false statements to current and prospective employees deliberately and

effectively concealed their misconduct until DOJ's public announcement of its investigation and

complaint.

## V.     CLASS ACTION ALLEGATIONS

65.     Plaintiffs bring this action on behalf of themselves and all others similarly situated

(the "Proposed Class") pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and

23(b)(3).  The Proposed Class is defined as follows:

> All natural persons employed by, or hired through staffing
> agencies or vendors to work for, Defendants or their wholly owned
> subsidiaries, in the United States, at any time from the start of the
> conspiracy (no later than 2009) to the present.  Excluded from the
> class are senior executives and personnel in the human resources,

recruiting, and legal departments of the Defendants, and employees hired outside of the United States to work outside of the United States.

66.     Plaintiffs do not, as of yet, know the exact size of the Proposed Class because such information is in the exclusive control of Defendants.  However, based upon the nature of the trade and commerce involved, and the reported numbers of total employees, there are thousands of Class members.  Joinder of all members of the Class, therefore, is not practicable.

67.     The Class is ascertainable from Defendants' records.

68.     Plaintiffs' claims are typical of the claims of the Proposed Class as they arise out of the same course of conduct by Defendants and the same legal theories.

69.     Plaintiffs will fairly and adequately represent the interests of the Proposed Class and have no conflict with the interests of the Proposed Class.

70.     Plaintiffs have retained counsel experienced in antitrust, employment, and class action litigation to represent them and the Proposed Class.

71.     The case raises common questions of law and fact that are capable of Class-wide resolution, including, but are not limited to:

a.      whether Defendants agreed not to solicit or hire each other's employees;

b.      whether such agreements were *per se* violations of the Sherman Act;

c.      whether Defendants have fraudulently concealed their misconduct;

d.      whether and the extent to which Defendants' conduct suppressed compensation below competitive levels for railway employees;

e.      whether Plaintiffs and the Proposed Class suffered antitrust injury as a result of Defendants' agreements;

f.      the type and measure of damages suffered by Plaintiffs and the Proposed Class; and

g.      the nature and scope of injunctive relief necessary to restore a competitive market.

72.     These common questions of law and fact predominate over any questions affecting only individual members of the Proposed Class.

73.     Defendants have acted on grounds generally applicable to the Proposed Class, thereby making final injunctive relief appropriate with respect to the Proposed Class as a whole.

74.     This class action is superior to any other form for resolving this litigation. Separate actions by individual Class members would be enormously inefficient and would create the risk of inconsistent or varying judgments.  There will be no material difficulty in the management of this action as a class action.

## <u>FIRST CLAIM FOR RELIEF</u>
### (Violation Of The Sherman Act, § 1)

75.     Plaintiffs reallege and incorporate by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

76.     Defendants, by and through their officers, directors, employees, or other representatives, entered into and engaged in unlawful agreements in restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  Specifically, Defendants agreed to restrict competition for Class members' services through refraining from soliciting or hiring each other's employees, thereby fixing and suppressing the compensation of Class members.

77.     Defendants' agreements have included concerted action and undertakings among the Defendants with the purpose and effect of: (a) fixing the compensation of Plaintiffs and the Class at artificially low levels; and (b) eliminating, to a substantial degree, competition among Defendants for rail industry employees.

78.     Defendants' combinations and conspiracy injured Plaintiffs and the members of the Proposed Class by suppressing their compensation and depriving them of free and fair competition in the market for their services.

79.     Defendants' conduct and conspiracy are *per se* violations of Section 1 of the Sherman Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually, and on behalf of a Class of all others similarly situated, request that the Court enter judgment against Defendants, including:

A.     This action is certified as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, with Plaintiffs as the designated Class representatives;

B.     Defendants have engaged in a conspiracy in violation of Section 1 of the Sherman Act, and Plaintiffs and the members of the Proposed Class have been damaged and injured in their business and property as a result of this violation;

C.     Plaintiffs and the members of the Proposed Class recover threefold the damages determined to have been sustained by them as a result of the conduct of Defendants;

D.     Plaintiffs and the members of the Proposed Class recover the costs of suit, including reasonable attorneys' fees and expenses, as well as, prejudgment and post-judgment interest as provided for by law or allowed in equity;

E.     Injunctive relief, declaring the no-hire agreement among Defendants unlawful and

enjoining Defendants from enforcing the agreement or entering into similar agreements going

forward;

      F.      All other relief to which Plaintiffs and the Class may be entitled at law or in

equity the parties.

<h3 align="center">JURY DEMAND</h3>

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a jury trial for all

claims and issues so triable.

Dated: October 12, 2018

Respectfully submitted,

By:    */s/ Roberta D. Liebenberg*
        Roberta D. Liebenberg

Roberta D. Liebenberg (31738) (*pro hac vice*)
Gerard A. Dever (85291) (*pro hac vice*)
Adam J. Pessin (92325) (*pro have vice* forthcoming)
FINE, KAPLAN AND BLACK, R.P.C.
One South Broad Street, Suite 2300
Philadelphia, PA  19107
Telephone:  (215) 567-6565
Facsimile:  (215) 568-5872
rliebenberg@finekaplan.com
gdever@finekaplan.com
apessin@finekaplan.com

By:    */s/ Dean M. Harvey*
        Dean M. Harvey

Kelly M. Dermody (*pro hac vice* forthcoming)
Dean M. Harvey (*pro hac vice*)
Lin Y. Chan (*pro hac vice* forthcoming)
Kathleen Konopka (*pro hac vice* forthcoming)
Michael K. Sheen (*pro hac vice* forthcoming)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008
kdermody@lchb.com
dharvey@lchb.com
lchan@lchb.com
kkonopka@lchb.com
msheen@lchb.com

*Interim Co-Lead Class Counsel*

Thomas G. Foley, Jr. (*pro hac vice* forthcoming)
Robert A. Curtis (*pro hac vice* forthcoming)
FOLEY BEZEK BEHLE & CURTIS, LLP
15 W. Carrillo Street
Santa Barbara, CA 93101
Telephone: (805) 962-9495
Facsimile: (805) 962-0722
tfoley@foleybezek.com
rcurtis@foleybezek.com

Richard E. Donahoo (*pro hac vice* pending)
Sarah L. Kokonas (*pro hac vice* forthcoming)
Judith L. Camilleri (*pro hac vice* forthcoming)
DONAHOO & ASSOCIATES, PC
440 W. First Street, Suite 101
Tustin, CA 92780
Telephone: (714) 953-1010
Facsimile: (714) 953-1777
rdonahoo@donahoo.com
skokonas@donahoo.com
jcamilleri@donahoo.com

Steve W. Berman (*pro hac vice*)
Shana E. Scarlett (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
steve@hbsslaw.com
shanas@hbsslaw.com

Linda P. Nussbaum (*pro hac vice* forthcoming)
Bart D. Cohen (*pro hac vice* forthcoming)
NUSSBAUM LAW GROUP, P.C.
1211 Avenue of the Americas, 40th Floor
New York, NY 10036-8718
Telephone: (917) 438-9102
lnussbaum@nussbaumpc.com
bcohen@nussbaumpc.com

Samuel J. Strauss (*pro hac vice*)
TURKE & STRAUSS LLP
613 Williamson Street #201
Madison, WI 53703
Telephone: (608) 237-1775
Facsimile: (608) 509-4423
sam@turkestrauss.com

D. Aaron Rihn (85752)
ROBERT PIERCE & ASSOCIATES, P.C.
707 Grant Street, Suite 2500
Pittsburgh, PA 15219
Telephone: (412) 214-7477
arihn@peircelaw.com

Joel R. Hurt (85841)
FEINSTEIN DOYLE PAYNE & KRAVEC, LLC
429 Fourth Avenue
Law & Finance Building, Suite 1300
Pittsburgh, PA 15219
Telephone: (412) 281-8400
Facsimile: (412) 281-1007
jhurt@fdpklaw.com

Christopher T. Micheletti (*pro hac vice*)
Qianwei Fu (*pro hac vice*)
Heather T. Rankie (*pro hac vice* forthcoming)
ZELLE LLP
44 Montgomery Street, Suite 3400
San Francisco, CA 94104
Telephone: (415) 693-0700
cmicheletti@zelle.com
qfu@zelle.com
hrankie@zelle.com

Jason S. Hartley (*pro hac vice* forthcoming)
Jason M. Lindner (*pro hac vice* forthcoming)
HARTLEY LLP
550 West C Street, Suite 1750
San Diego, CA 92101
Telephone: (619) 400-5822
Facsimile: (619) 400-5832
hartley@hartleyllp.com
lindner@hartleyllp.com

*Counsel for Plaintiffs and the Proposed Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the October 12, 2018, a true and correct copy of the foregoing

Consolidated Class Action Complaint was filed with the Clerk of Court using the CM/ECF

system, which will send notification of such filing to all counsel of record.


                                        */s/  Roberta D. Liebenberg*
                                        Roberta D. Liebenberg