```
 1                 IN THE UNITED STATES DISTRICT COURT
                  FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2

 3       IN RE:  RAILWAY INDUSTRY
         EMPLOYEE NO-POACH ANTITRUST         Civil Action No.
 4       LITIGATION.                         18-798

 5

                                 - - -
 6

 7          Transcript of proceedings on February 25, 2019
         United States District Court, Pittsburgh, PA,
 8       before Judge Joy Flowers Conti.

 9
         APPEARANCES:
10
         For the Plaintiffs:     Dean M. Harvey, Esquire
11                               Kathleen M. Konopka, Esquire
                                 Gerard A. Dever, Esquire
12                               Kelly K. Iverson, Esquire

13       For the United          Nickolai Levin, Esquire
         States:                 Doha G. Mekki, Esquire
14
         For the Defendants:     Mark H. Hamer, Esquire
15                               Catherine Y. Stillman, Esquire
                                 Thomas E. Birsic, Esquire
16                               Melissa J. Tea, Esquire
                                 David C. Kiernan, Esquire
17
         Court Reporter:         Barbara Metz Leo, RMR, CRR
18                               700 Grant Street
                                 Suite 6260
19                               Pittsburgh, Pennsylvania 15219

20

21

22

23

24
            Proceedings recorded by mechanical stenography;
25       transcript produced by computer-aided transcription.
```

```
1                    P R O C E E D I N G S

2                         -  -  -

3                       2:12 p.m.

4          THE COURT:  Good afternoon.  Please be seated.  This

5  is a hearing on a motion to dismiss, which was filed in the

6  multi district litigation, In Re:  Railway Industry Employee

7  No Poach Antitrust Litigation at master docket No. 18-798 MDL

8  No. 2850.

9          Will counsel please enter your appearance for the

10 record?

11         MR. HARVEY:  Good afternoon, Your Honor.  Dean Harvey

12 of Lieff Cabraser Heimann and Bernstein for the plaintiffs.

13         MS. KONOPKA:  Good afternoon, Your Honor.  Kathleen

14 Konopka also of Lieff Cabraser Heimann and Bernstein for the

15 plaintiffs.

16         MR. DEVER:  Good afternoon, Your Honor.  Jerry Dever

17 from Fine, Kaplan and Black also for the plaintiffs.

18         MS. IVERSON:  Kelly Iverson with Carlson Lynch

19 liaison counsel for the plaintiffs.

20         THE COURT:  Who is going to be arguing on behalf of

21 the plaintiffs?

22         MR. HARVEY:  I will be taking the lead, Your Honor,

23 and I will be splitting the argument with Ms. Konopka and

24 Mr. Dever depending on the questions and issues that arise.

25         THE COURT:  It's only as to specific questions?
```

1          MR. HARVEY:  That's right.

2          THE COURT:  So it won't be two people arguing the

3     same question?

4          MR. HARVEY:  That's right.

5          THE COURT:  Thank you.

6          MR. KIERNAN:  Good afternoon, Your Honor.  David

7     Kiernan with Jones Day on behalf of the Wabtec defendants.

8          MR. HAMER:  Good afternoon, Your Honor.  Mark Hamer

9     Baker & McKenzie on behalf of the Knorr defendants.

10          MS. STILLMAN:  Good afternoon, Your Honor.  Catherine

11     Stillman, Baker & McKenzie, representing the Knorr defendants.

12          MR. BIRSIC:  Your Honor, Tom Birsic from K&L Gates,

13     and I'm here with my partner, Melissa Tea, on behalf of the

14     defendants.  We will have two counsel arguing, and they will

15     split the issues.  Mr. Kiernan and Mr. Hamer will be arguing

16     the motion for the defendants.

17          THE COURT:  Okay.  Just between those two?

18          MR. BIRSIC:  Yes.

19          THE COURT:  Okay.  For the government?

20          MS. MEKKI:  Good afternoon, Your Honor.  Doha Mekki

21     on behalf of the United States.

22          MR. LEVIN:  Nickolai Levin on behalf of the

23     United States.

24          THE COURT:  And if someone is going to argue, who

25     will be it?

1          MS. MEKKI:  That will be me, Your Honor.

2          THE COURT:  This matter arises from a consolidated

3   class action complaint which was filed on October 12, 2018.

4   Plaintiffs are seeking to represent a class of plaintiffs, and

5   there's one claim for relief which is a violation of the

6   Sherman Act, 15 United States Code Section 1.

7          On November 27, 2018, all the defendants filed a

8   motion to dismiss for failure to state a claim and to strike

9   class action allegations and a brief in support of that motion

10  was filed.

11         There were responses to that filed by the plaintiffs.

12  The government filed a notice of intent to file a statement of

13  interest which was then filed, and the defendants filed a

14  reply brief in support of their joint motion.  There was also

15  a supplemental notice of a recent decision that was filed by

16  the plaintiffs.  This is the time set for the hearing.

17         Before we go into the hearing and I hear from the

18  parties, I just want to give you my preliminary assessment of

19  where we are.  The main thrust which would be the death knell

20  for this action is that the plaintiffs should have set forth a

21  market analysis, because in this situation, the rule of reason

22  would apply in how the court would analyze it, and there would

23  be insufficient factual allegations in the complaint to

24  support a rule of reason analysis.

25         The plaintiffs, joined by the government, have argued

1    to the contrary and said there is sufficient pleading for a

2    per se analysis in this case, and that's all that would be

3    done.

4         The court is mindful that in the Supreme Court

5    decision, Business Electronics Corp versus Sharp Electronics

6    Corp, 485 U.S. 717 (1988) at page 726, the Supreme Court

7    recognized there is a presumption in favor of a rule of reason

8    standard.  And under that rule of reason analysis, the

9    plaintiff bears the burden of establishing that the conduct

10   complained of produces significant anti-competitive effects

11   within the relevant product and geographic markets, in re Milk

12   Antitrust Litigation, 801 Fed. Supp. 2nd 705 (Eastern District

13   of Tennessee 2011).

14        That presumption, however, may be overcome and a

15   finding that the rule of reason applies may be made when

16   history and analysis have shown that in sufficiently similar

17   circumstances, the rule of reason unequivocally results in a

18   finding of liability -- I'm sorry, that the per se rule

19   unequivocally results in a finding of liability, Consultants

20   and Designers, Inc. versus Butler Service Group, Inc., 720

21   Fed.2d 1553 (11th circuit 1983) and that would be at page

22   1562.

23        Some of the most prominent treatises recognize that

24   when there is an agreement among employers that they will not

25   compete against each other for the services of a particular

1    employee or prospective employee is a service division

2    agreement analogous to a product division agreement, VII

3    Phillip E. Areeda, Herbert Hovenkamp, Antitrust Law, paragraph

4    352 (Fourth Edition 2013).

5         And it has been recognized that when you have

6    horizontal restraints including price fixing and market

7    division, those would be anti-competitive by their very

8    nature, Lifewatch Services, Inc. versus Highmark, Inc., 902

9    Fed.3d 323 (Third Circuit 2018).

10        So the issue is whether there is a division agreement

11   here which is analogous to a market division, and my

12   understanding of the case law is that employees for this

13   analysis are treated as the product, and when you are dividing

14   and having a division of the services, which would be the

15   employees, the products, that would be analogous to a market

16   division, and therefore, per se rule could plausibly apply.

17        That's what the court has to determine at this stage.

18   Is it plausible?  Not that it in fact meets that standard.

19        Now, the risk for the plaintiffs in this type of

20   situation is then, after you go through discovery and you are

21   in a summary judgment situation, maybe there's not sufficient

22   facts to support that and perhaps you wouldn't apply the per

23   se, but at this stage of the proceedings, which is just at the

24   motion to dismiss, my initial sense would be that it would be

25   sufficient to pass muster at this stage in terms of a per se

1    analysis if the plaintiffs and the government are correct that

2    the employees are akin to products, and once you have service

3    division in terms of the employees, that is sufficient.

4           Then when we get to the class action issues, there

5    are a couple problems that I have there.  Mainly, this would

6    be for the plaintiffs to address, and that is they are linking

7    here skilled labor, and I don't know what skilled labor means

8    in this context, because you could have someone who's working

9    on a line making a piece of equipment that might qualify as

10   skilled even though they are an hourly employee.

11          You may have all salaried employees and there could

12   be some proof that could come later, and again, at this stage,

13   when I'm looking at the class allegations, I'm not necessarily

14   looking for plausibility but whether it would be possible for

15   them to show this on a fully developed motion for a class

16   certification, so I just am not clear about who all the

17   employees are, because if you would have an hourly employee

18   like a janitor that would have no special technical skills

19   that might be relevant, I just don't know that it would be

20   possible for the antitrust violations to reach down and sweep

21   in clerical or hourly employees who are not performing any

22   special technical skill.

23          So I'm trying to assess how that could be possible at

24   all, you know, in the real world when you are looking at this

25   class, and there were no cases where all employees, including

1    clerical, non-skilled employees or hourly versus salaried.

2         The case law that I saw where there was more than

3    technical skills that were being addressed even in dicta would

4    have looked at some salaried employees so that if you start

5    out at a certain level, you may be at X rate and you can go up

6    in your salary ranges up to a different level and there may be

7    a progression, so that if you are within the same salary team,

8    you may be compressed because of the highest one is going to

9    be lower, then they ratchet it down.

10        So maybe plausibly or possibly you could show

11   something like that, but I just don't know how it's possible

12   to have all of these employees together, so I have a great

13   deal of difficulty with that.

14        The second main issue that was raised by the

15   defendants has to do with the timing of the conspiracies.

16   There are allegations about bilateral agreements, and as I

17   understand it, the allegations are, and I'll just use the

18   abbreviations for the defendant's names, Wabtec and Knorr

19   began their agreement no later than some point in 2009, so

20   that's the first bilateral agreement.

21        The second bilateral agreement that's identified is

22   Knorr and Faiveley which began no later than 2011.

23        Then there's the third one where Wabtec merged with

24   Faiveley, so Faiveley became Wabtec or vice versa, and there

25   was already the agreements in place with Knorr, so you could

1    argue all three of the prior entities were now combined, were

2    now somehow related because Faiveley had an agreement with

3    Knorr and Wabtec had an agreement with Knorr.

4         And then the fourth situation was sometime in 2015,

5    Wabtec and Faiveley merged, and it's clear at that time until

6    at least the DOJ action, the Department of Justice action,

7    where you would have now Wabtec and Knorr definitely together.

8         So you would have four iterations, and maybe you'll

9    stop after the third one if it's sufficient to show Wabtec and

10   Faiveley had an agreement and Faiveley and Wabtec separately

11   had agreements with Knorr.  Maybe that's enough to circle the

12   loop up.  Maybe you could have just three iterations, but it

13   would be clear to this court that there's no allegations about

14   Faiveley until 2011, so how can you hold all those employees

15   of Knorr back to 2009?  It's just not going to work.

16        And then you had Knorr and Faiveley but not Wabtec

17   and Faiveley, so those iterations can affect what the class

18   would be, and so maybe you need various subclasses here to

19   address the time frames and particular agreements that were in

20   issue.

21        I would be interested to know if anyone feels that

22   you had to have all three together or you couldn't have

23   recovery, rather than, as I understood the thrust of the

24   defendants' arguments, that you have to look at whose

25   employees are affected during those time frames to see what

1     the recoveries could be, so that's where you may need some

2     refinement in the class definition.

3              The other issue that has come up with the

4     subsidiaries.  There's an agreement that the one subsidiary

5     is, by agreement, going to be out and that was --

6              MR. HARVEY:  Ricon.

7              THE COURT:  Yes.  Ricon.  What was the name?

8              MR. HARVEY:  R-i-c-o-n.

9              THE COURT:  Yes, Ricon.  All the agreements by both

10    sides so that entity should not be a named defendant.  There

11    is a dispute with respect to Bendix, and in some of the most

12    recent briefing that came in, it was articulated by the

13    defendants that Bendix would only be in under an aiding and

14    abetting theory, and if that's the case, the case law does not

15    support that that subsidiary could be a direct defendant in

16    the case.  That's MCI Telecommunications Corp versus Graphnet,

17    Inc., 851 Fed. Supp. 126 (District of New Jersey 1995) and Top

18    Rank, Inc. versus Haymon, 2015 Westlaw 994, 8936 at *16

19    (Central District California October 16, 2015).

20             In that decision, the court concluded that aiding and

21    abetting is not an independent theory of civil liability under

22    the Sherman Act.  Each of those decisions cites various other

23    decisions for support, and that sort of strikes the court as

24    being the most rational approach here to the Bendix analysis,

25    because if you have the parent entity which is the one that

1    had the direct agreements with the defendants, then the
2    subsidiary would just be a matter of evidence that would be
3    coming in that could be presented at trial, but the subsidiary
4    is really the same participant as the parent for purposes of
5    the antitrust analysis, because you can't conspire with
6    yourself, and if there's no direct evidence that Bendix had a
7    separate agreement with the other parties, it wouldn't support
8    a per se violation by Bendix.  Perhaps for the parent entity,
9    but that's where the direct agreement is that supports the per
10   se analysis.
11         So my preliminary assessment would be that Bendix
12   should likely be out as well if they are only in here on an
13   aiding and abetting, but it would be without prejudice for
14   that evidence to come in.  So that's, I think, sort of the
15   global view that I have at this time with respect to the
16   positions that have been raised by the parties, and I'll turn
17   first to the defendants to hear your position.
18         I don't want to interfere with your full presentation
19   here, but I thought it would be helpful to you to get a sense
20   of my overall view having reviewed all of your submissions.
21         MR. KIERNAN:  Your Honor, may I approach?
22         THE COURT:  Yes, you may.
23         MR. KIERNAN:  Your Honor, what I will be addressing
24   today, unless you would like us to go in a different order --
25         THE COURT:  I don't want to interfere with your

1    preparations.  You can give your preparation.  I just thought

2    you might want to be informed about my overall assessment.

3                 MR. KIERNAN:  Terrific.  I will be addressing the

4    overarching conspiracy claim as well as the class allegations,

5    and my colleague, Mr. Hamer, will be handling the per se

6    versus rule of reason and the Bendix, because Bendix is

7    associated with Knorr.

8                 And the reason we thought to do it in that order is I

9    understand that the Department of Justice may have some

10   arguments on per se versus rule of reason so we thought let's

11   get through the class allegations overarching conspiracy

12   because there may be three counsel talking about per se versus

13   rule of reason.

14                THE COURT:  Okay.  Did you understand my thought

15   about how you would break them up because there are

16   differences, and I think your argument about how can the

17   employees of Faiveley be involved from 2009 at least until

18   2011, and then when you get to 2011, you still don't have

19   Faiveley tied into Wabtec, although maybe there could be some

20   arguments made, but it's not as crystal clear.

21                MR. KIERNAN:  Right.  What I heard, Your Honor, just

22   as I was listening to this is, and it's one reason we brought

23   the motion to dismiss on these issues, is underlying all of

24   these issues that we're discussing is there is a mismatch

25   between the factual allegations in the complaint and the

1    actual causes of action in claims.

2              Taking, for example, the overarching conspiracy

3    versus bilaterals.  Like the Department of Justice, the

4    plaintiffs' factual allegations challenge three bilateral

5    agreements.  I'm going to walk through those in a minute, but

6    their class allegations cover all employees for all time

7    which, in essence, is an allegation of an overarching

8    conspiracy.

9              The only way that plaintiffs could find liability

10   against all defendants from 2009 to the present is if there

11   was an overarching conspiracy, but they don't have any factual

12   allegations supporting overarching conspiracy.

13             With respect to the class, we see a similar type

14   strategem in the complaint where, although the plaintiffs had

15   detailed allegations about skilled employees, project

16   managers, machinists, when you get to the class allegations,

17   they now seek liability for all employees across all 50

18   states.  Frankly, it's the same with per se versus rule of

19   reason.  The reason why they are alleging per se is if they

20   allege rule of reason, they are required to --

21             THE COURT:  I understand that.

22             MR. KIERNAN:  -- a relevant market, and if they have

23   to allege a relevant market, that will underscore why the

24   class allegations will not survive a motion to dismiss.  They

25   will not survive a motion to dismiss, so we need to clean up

1    the complaint.

2            THE COURT:  You do understand it's very rare for a

3    court to strike the class allegations at this stage of the

4    proceedings?

5            MR. KIERNAN:  I'm familiar with both of your orders

6    that Your Honor related to that, but I'm going to explain why

7    this case is one of those rare instances where the class

8    allegations should either be stricken or at a minimum modified

9    or amended which is in the court's discretion to do under 23

10   (2)(d).

11           Let me start with the overarching conspiracy and I

12   want to walk through those specific bilateral agreements,

13   because one of the descriptions was just slightly off.  So

14   there's the Wabtec/Knorr.  That was no later than 2009.

15   Faiveley is not alleged to have been a party to that

16   agreement.  There are no communications with Faiveley.

17   There's no knowledge alleged by Faiveley of that agreement.

18           Then in 2011, plaintiffs allege Knorr and Faiveley

19   had an agreement.  There's no allegations that Wabtec was a

20   party to that agreement or Wabtec had knowledge of that

21   agreement.

22           Then in 2014, the plaintiffs allege that Wabtec and

23   Faiveley had an agreement.  Again, Knorr -- there's no

24   allegations that Knorr knew about the agreement, that Knorr

25   was a party to the agreement, that Knorr participated in the

1       agreement.  As you noted in 2015, Wabtec acquired Faiveley.

2               What they, like the DOJ, the complaint alleges and

3       challenges just those three bilateral agreements, but the

4       class allegations in the causes of action seek to hold

5       Faiveley liable for the agreement between Wabtec and Knorr

6       back in 2009.  They also seek to hold Wabtec liable for the

7       agreement between --

8               THE COURT:  You are winning on that.

9               MR. KIERNAN:  I'm winning on it?  Then I will move

10      on, Your Honor.  But the other reason this is relevant not

11      only to understand the liability is also for the class

12      allegations, so in addition to dismissing any or striking any

13      of the overarching conspiracy allegations, the plaintiffs

14      would also have to re-allege or re-plead the class

15      allegations, because right now, as we discussed, the class

16      allegations seek to represent all employees at Faiveley for

17      agreements that Faiveley was not a party to, and whether that

18      results in subclasses or, as I think you were mentioning could

19      these be three different or perhaps even more different

20      classes of employees, if it survived the motion to dismiss,

21      something would have to be done to clarify and tie the

22      employee absent class members to the specific agreement at

23      issue.

24              I'm going to move on to the class allegations.  Your

25      Honor, the reason why this is one of those rare cases is the

1    plaintiffs in this case would not be able to meet the Rule 23

2    requirements.  As the case law makes clear, the burden still,

3    even at a motion to strike phase, the burden remains with the

4    plaintiff.

5         THE COURT:  By the way, whoever's phone went off

6    needs to go out.  It's somebody on the phone?  That reminds

7    me, who is on the phone?  You need to enter your appearance.

8         Who is on the phone?

9         MR. SALAHI:  You have Yaman Salahi for plaintiffs

10   from Lieff Cabraser.  I would just remind whoever else is on

11   the phone to please mute their line.

12        THE COURT:  That's the problem.  We're getting

13   unmuted phone information.  Who else is on the line?

14        MS. NYLEN:  Hi.  Leah Nylen from MLex.  I'm a

15   reporter.

16        THE COURT:  It was up to the parties if they wanted

17   to provide that information so you did.  Who else is on the

18   line?  So if you are on the line, if you are not one of the

19   parties who are speaking, you need to mute your line because

20   we are hearing cell phones ringing.  We are hearing some other

21   background noise and it's distracting.  So please mute your

22   line.  Thank you.

23        MR. KIERNAN:  Thank you, Your Honor.  Appreciate it.

24   On a motion to strike, the burden remains with the plaintiff

25   to show that they can meet the Rule 23 requirements.  It is

1    undisputed that one of the requirements in addition to the

2    Rule 23(a) factors, the plaintiffs have to show under 23(b)(3)

3    that antitrust injury will be predominant, that individual

4    issues will not predominate or overcome an issue with respect

5    to antitrust injury.

6            Weisfeld sets it out pretty plainly that the

7    plaintiffs have to show a common method for antitrust injury.

8    They will not be able to do that with this class, and I want

9    to take it through two because we have been focusing on the

10   unskilled, but they have the same problem with the skilled for

11   the very reason that you identified, which is we don't have a

12   definition for skilled labor in this case.

13           Plaintiffs have not explained how --

14           THE COURT:  It's really more of an ascertainability

15   issue.  If you use the word skilled, who is skilled so you can

16   ascertain them?

17           MR. KIERNAN:  Let's say it was -- you could imagine

18   if it were all project managers, you could have a class of all

19   project managers.  You have a class of all manager of sulfur

20   engineers like two of the named plaintiffs.  In one of the

21   cases we cite in the Walmart case, it was all assistant

22   managers in various stores, so you had a very discrete title.

23   You knew which employees were at issue, which labor markets,

24   which job opportunities, their salary, compensation,

25   information.  You knew exactly what could be studied.

1          Here what we have is the plaintiffs seek to represent

2    project managers, manager of sulfur engineers, technicians,

3    machinists, positive train control managers, plus other

4    skilled employees across all 50 states, so the five named

5    plaintiffs are located in five different states, five

6    different states.

7          They have no facts explaining why the suppression of

8    compensation of say Plaintiff Baldassano who is a project

9    manager in Maryland would show a suppression of compensation

10   of Plaintiff Escalera who is a field service technician in

11   Massachusetts.  There are no allegations in the complaint

12   explaining how they would do that or why we should presume

13   that impact to a project manager in one state would tell us

14   anything.

15         THE COURT:  I need you to address when you are

16   looking at the class -- motion to strike the class at the

17   pleading stage, it's not the Iqbal Twombly standard.  It's

18   really is it possible that they could all be together.

19         MR. KIERNAN:  Let's say it's possible that all the

20   skilled employees could be together.  That's what the

21   Department of Justice alleged and focused on.  They focused on

22   the same job titles that are represented by the named

23   plaintiffs and skilled employees, however they would define

24   that in discovery.  They certainly couldn't show, and it's not

25   possible that they would have an all employee class that would

1      cover both skilled and unskilled, and it's why, Your Honor,

2      and I've done maybe five of these types of cases, and I've not

3      been in a case yet where a class was certified with all

4      employees.  I've seen it tried.  I was in the High-Tech case.

5              THE COURT:  That's still limited to salary employees.

6      I read that opinion carefully, and from the beginning, they

7      were just talking about salaried employees as opposed to

8      hourly employees that may be what typically happens with

9      janitorial staff and that kind of thing.

10             MR. KIERNAN:  Right, and there were no issues about

11     clerical staff or mail room clerks, any hourly employees to

12     speak of.  These were highly skilled technical employees.

13             THE COURT:  That's what ultimately the plaintiffs

14     move forward on.

15             MR. KIERNAN:  That's right.  In part, because the

16     court had noted the first round of class, and we had to do

17     this twice, Your Honor, which is one of the reasons why we

18     moved to strike is it is an expensive exercise to go through

19     the entire class cert hearing, the briefing, the hearing, the

20     economist to get rid of an all employee class, and we have to

21     do it all over again when they assert now we want to do a more

22     limited class.  We want to avoid that at the pleading stage.

23     That's why we move to strike these class allegations now.

24             When you look at their complaint, and particularly

25     paragraphs 31 through 38 of the complaint, this is where they

1    set forth their theory of antitrust liability, their theory of

2    impact.  What they allege is their theory is based on the

3    premise that the specialized skilled employees are, quote, "in

4    high demand for and limited supply of skilled employees who

5    have rail industry experience.  As a result, critical jobs in

6    the rail industry can remain vacant for months."

7            That does not describe a janitor, a clerical person,

8    an administrative assistant, any hourly employee.

9            THE COURT:  Their argument on that is it's a

10   compression theory, that if the higher people are lower paid,

11   that's going to trickle down uniformly through some type of

12   program that the company would have in terms of setting pay

13   scales.

14           MR. KIERNAN:  So let's go on through paragraphs 31

15   through 38.  That's what they put in their opposition.  That's

16   not in their complaint.  If they put that in the complaint, we

17   can address that, but they did not put that in their

18   pleadings.  They go on to state, "Firms in the rail industry

19   rely on direct solicitation of employees of other rail

20   companies because those individuals had the specialized skills

21   necessary and may be unresponsive to other methods of

22   recruiting.  In a properly functioning, lawfully competitive

23   labor market, rail industry employers compete with one another

24   to attract highly skilled talent."

25           Throughout the allegations, Your Honor, that is their

1    focus.  Paragraph 35, I think, puts it best, and this is the

2    entire theory of their antitrust impact liability.  "By

3    soliciting and hiring employees from other rail industry

4    employers, a company is able to take advantage of the efforts

5    its rival has expended in identifying and training employees.

6    By contrast, hiring employees directly out of a training

7    program comes with none of those benefits."

8         There are no allegations related to unskilled

9    employees, and the DOJ, their focus was on skilled employees.

10   They focus almost entirely on project management, engineering,

11   sales and corporate officers.  Those were the job titles,

12   after investigating the various agreements and how they were

13   implemented.  They filed a complaint.  There was ultimately a

14   final judgment and that's what they focused on, skilled

15   employees, namely project management, engineering, sales and

16   corporate officers.

17        With respect to the argument that we saw in the

18   opposition, you are right, their basic argument is that but

19   for the conduct, but for these agreements, skilled employees

20   would have been recruited by one of the other defendants and

21   that would have caused one of the other defendants to either

22   increase that employee's pay or start increasing other

23   employees' pay within that title, within those skilled job

24   titles, and then it may trickle over to others, and they

25   allege in paragraph 38 that one reason it may trickle over is

1     because many rail industry workers are highly specialized and

2     integrated into teams tied to specific functions.

3            Some workers who move to a position at different

4     companies may bring the others with them.  They are not

5     bringing the janitors and the cafeteria workers over to the

6     other company, or if they are, there are certainly no

7     allegations in the complaint about that.

8            So what we have here is a blunderbuss class that

9     includes all employees across not only the five states where

10    the plaintiffs were employed but across all 50 states.

11           They are not skilled employees.  There's no theory of

12    harm set forth in the complaint that makes any sense.  The

13    focus of the specific allegations are on the skilled

14    employees, not on unskilled employees.

15           So at a minimum, Your Honor, whether it's -- our

16    belief is that the class allegations should be stricken for

17    both skilled and unskilled, but to the extent that the skilled

18    employees could go forward, at a minimum, they should have to

19    modify their class allegations to include the skilled

20    employees that they seek to represent in this case.

21           If they are going to seek -- I don't think it's

22    possible -- to represent any others, they are required under

23    Rule 23 -- let's focus on Rule 23 -- to provide specific

24    allegations that support including them in class allegations.

25           Your Honor, I'll end with, you know, the point that

1    we raised before that when you look at all the no poach cases,

2    there's close to a dozen of them, or antitrust cases involving

3    employee wages, all of them have a limited class, and then you

4    take those, the ones that have been limited to specific types

5    of employees, there are several like the Weisfeld case, the In

6    Re Comp, managerial cases, the nurses cases, where the court

7    denied class because the individual issues have been

8    predominant over the common issues.

9         THE COURT:  Those were at the class certification

10   stage.

11        MR. KIERNAN:  They were at the class stage, but what

12   they underscore is if it fails at the class stage for even a

13   limited job title, it underscores why they will not be able to

14   show a class of all employees.  It's just not going to be

15   possible, and our belief is, to avoid the frankly millions of

16   dollars and the court's time spent on doing what we did in the

17   High-Tech case, which was -- and frankly, in the Seaman versus

18   Duke case, where we litigate class for all employees, which

19   they'll never be able to do, we'll get a decision that denies

20   class, and we're going to have to go through it all over

21   again.

22        Instead, what the plaintiffs should do is what they

23   did in the DreamWorks case, which is they limited at the start

24   to specialized employees.  The Intuit case I was involved in,

25   they limited at the start to the skilled employees rather than

1    alleging this blunderbuss class action.

2         THE COURT:  Thank you.

3         MR. KIERNAN:  Any questions, Your Honor?

4         THE COURT:  No.  Thank you.  Somebody else is going

5    to address the rule of reason?

6         MR. KIERNAN:  Would you like Mr. Hamer to address the

7    rule of reason now?

8         THE COURT:  No.  Let's deal with the class

9    allegations first and we'll come back to the rule of reason at

10   the end.

11        MR. HARVEY:  Good afternoon, Your Honor.  I think

12   it's important in light of Mr. Kiernan's argument to take a

13   step back and ask ourselves why are we here today.  We are

14   here because these defendants entered into an agreement not to

15   compete for each other's employees period.

16        There is no allegation in the DOJ's complaint or

17   certainly in the quotations from the documents, from the DOJ's

18   complaint that the defendants, at the time of engaging in

19   their misconduct, saw fit to limit the restriction to only

20   skilled employees.  They decided to restrict competition for

21   all employees.

22        THE COURT:  You are saying it's possible that if a

23   janitor wanted to move and work for the other company, they

24   would be precluded from doing that and that would affect the

25   janitor's salary even though they are not skilled in the sense

1    of having a special skill in the industry?

2           MR. HARVEY:  In the scenario you just described,

3    absolutely, because the individual has tried to move and was

4    denied it, but I would take a step back and make it even more

5    difficult for me.  What if the janitor never applied?  It's an

6    hourly janitor working at Wabtec.  Has no idea of any

7    restriction.  How is that person -- how is it possible that

8    that person was injured?

9           In answering that question, let's first think about,

10   at class certification, how would any member of the class --

11   not even a class certification.  If that janitor filed his own

12   action, how would that person prove his individual claim?  He

13   would first have to prove the violation.

14          That evidence would be identical to any member of the

15   class because you are proving an agreement that restricted

16   competition for all employees.  That's going to be the

17   dominant -- I would say predominant issue at trial.  Same for

18   everybody, from the most skilled engineer to the least skilled

19   janitor.

20          Second impact, now any member of the class is not

21   going to, and it's certainly not our theory of the case, that

22   to establish injury has to prove that they personally would

23   have received a call, would have accepted that job.

24          THE COURT:  You would have to prove antitrust impact.

25          MR. HARVEY:  Right.  So where does that impact come

1        from?  It comes from proving up a pay structure within the

2        firm that, you know, I think as is the case in almost any firm

3        and certainly corporations as large and sophisticated as these

4        defendants, compensation decisions are not made in one-off

5        negotiations.  They are a very formal process that occur once

6        a year generally, and those in charge of determining the

7        budget for compensation for the following year get together in

8        a room.

9               This is a very important decision involving the most

10       senior managers of the company, and they figure out, well, do

11       we need to raise comp for this year?  Well, what's going on

12       with the cost of living?  What's going on with competition for

13       our employees?  But for this agreement, there would have been

14       more competition.  In that room --

15              THE COURT:  For who?

16              MR. HARVEY:  For the employees.  Now --

17              THE COURT:  That's what I'm struggling with here.

18       How is it possible, in the real world, if you are working as a

19       janitor in this courthouse and a company down the street, you

20       find a position where they are going to pay two dollars more

21       an hour.  So you go over there, but an employee in that

22       department -- I just think it's not possible that somebody at

23       the janitorial level is going to be affected by no-poach

24       agreement unless they were janitorial companies, and that's

25       what they were doing and they were supplying janitorial

1    services and then it would be analogous to what we have here.

2            It just doesn't strike the court that it's possible,

3    unless you had such a compression, and I was trying to

4    envision all these highest level people sitting down and

5    saying, oops, our janitors, other than a cost of living, which

6    is not tied to this compete, so other than for a cost of

7    living or looking at we can't get good janitors because the

8    company down the street is hiring them so we need to raise our

9    prices, what is it about the higher level salaried people who

10   they want to keep and they don't want the other company that's

11   in their bilateral agreement to have those employees be able

12   to poached?

13           Nobody is worrying about poaching the janitors, so

14   you would have to say somehow the salaries that are being paid

15   to the higher level employees, there's some kind of a chain

16   that will come down compressing the salaries because of the

17   highest top, and I can't think that that's possible.

18           MR. HARVEY:  Well, that's an empirical question, and

19   it's an empirical question which we will answer with expert

20   analysis of defendant's own data.  This is a question capable

21   of an answer.

22           THE COURT:  Why should we go through that if it

23   doesn't come within the range of possibility at this stage?

24   That's what the defendants are arguing here, and we have the

25   Supreme Court has come out, that's what Iqbal and Twombly was

1    all about, although we are not applying that in the class

2    allegation issue, but clearly the Supreme Court has been

3    concerned as the rules committee and the new rules that have

4    been adopted with the cost of litigation, and if it's going to

5    cost money to run that down, to have your experts, their

6    experts, everybody looking at that, if it's not just possible,

7    if you can tell me, Your Honor, there's X company or Y company

8    or there's literature out there that once you compress

9    salaries at the high level, it goes down to the janitors, if

10   there's something out there that could bring it within the

11   range of possibility, even though it's not actuality when you

12   look at the facts, they didn't have that for these companies,

13   but I can't even get there, because I can't see that it's

14   possible in the real world.

15           MR. HARVEY:  Sure.  So let me provide two real world

16   examples.  How labor markets work can be surprising, and so

17   one example was from the High-Tech case which Mr. Kiernan --

18           THE COURT:  That was about salaried people initially.

19           MR. HARVEY:  No.  Well, let me provide one example

20   here and that is that there was at least one documented

21   instance in which one company enforced the no-poach agreement

22   as to a food worker.  The other company wanted to hire someone

23   from the cafeteria, and it went up to the most senior level of

24   the company, and they said you can't do that because of our

25   no-poach agreement.  So it does happen.

1          Secondly, another real world example from the Duke
2    UNC case that Mr. Kiernan mentioned which we are lead counsel
3    for.  In that case, certainly at class certification, it was
4    not part of the certified class, but you are asking me a
5    different question which is, is it possible.
6          There was a very interesting document produced, which
7    is public, where Duke and UNC, they are the two defendants,
8    there's an internal document at UNC that said Duke has decided
9    to increase the pay for its minimum wage workers, the lowest,
10   most unskilled workers in their workforce.  They've decided to
11   increase their pay by five percent, and at UNC, this person
12   saw the article, forwarded it to the CEO of the entire health
13   system, and said should we do the same, should we match, and
14   if we do, what will that do to the pay for everyone above
15   them.
16         There it's going in the other direction, but you
17   would imagine that for the least skilled people perhaps out of
18   the box without seeing evidence of that kind, you may think
19   what does it matter?  There's a wider labor market for those
20   kinds of people.  They wouldn't care less what Duke is paying
21   because there's so many competitors out there, when in fact
22   they do.  It's an empirical question that can sometimes have
23   surprising answers.
24         I think here -- we are counsel in all those cases,
25   and we faced this decision when we were pleading our case.  We

1    had a lot of discussion about it.  The reason why we pled it

2    the way we did is that it reflects the scope of defendant's

3    own misconduct.

4         So our question was, out of the box, should we limit

5    the class before we get the pay data, before we know as a

6    matter of fact if pay is shared, which is a question that we

7    will confirm or refute based on the pay data that we get, and

8    if we -- suppose we were to say only skilled workers in this

9    class.  We're going to take everyone out from the outset.

10   What would happen?  Undoubtedly, the defendants would draw

11   that line we were just talking about.

12        THE COURT:  They would do it in the discovery.  They

13   wouldn't give you any of the other information.

14        MR. HARVEY:  Exactly.  It's very ambiguous where you

15   draw that line.  They would draw it very narrowly.  We would

16   choose it widely.  We would have disputes with the special

17   master.  I don't think it's practical.

18        Also with respect to the questions of burden, I'm not

19   sure what burden he's talking about.  If this were a discovery

20   dispute and we wanted the data and they didn't want to give it

21   to us, the question would be is it relevant.  I would say

22   certainly it is.  If they don't want to produce it, they have

23   to explain the burden.

24        Now, I haven't heard any argument that the pay data

25   for these hourly lower skilled employees is maintained

1    separately.  It would be an entirely different project to pull

2    data for those employees compared to these.  It would multiply

3    our costs by a factor of five, so on and so forth.  You have

4    to justify assertions of burden with specific facts, and we

5    haven't heard that, and so I think -- the question here is, is

6    it conceivable.  Is it possible?  I should say the standard is

7    the burden is on defendants to prove that it is impossible.

8        We are not there.  We are not there.  And believe me,

9    once we have the pay data and the evidence, we will not

10   overreach.  We have gone through these cases several times.

11   We have a lot of experience with them.  We will provide to the

12   court in our class certification motion the class that we

13   think is cohesive, where we have one damages model that can

14   prove up damages for every member of that class, and we may

15   decide that we will limit it, but we will do it based upon

16   information like lists of job titles which we don't have, like

17   internal documents that describe -- for example, it may very

18   well be the case that there's a different HR process for

19   skilled workers versus unskilled and that cascading phenomenon

20   you described, you could say it really cuts off at that level,

21   so this is the class and these people probably weren't

22   injured.

23       That may happen, but I would respectfully submit that

24   we should not do that on the pleadings in a vacuum.  So unless

25   Your Honor has any more questions on that issue, I'll move on.

1          THE COURT:  I'm still struggling with that, but I do

2     understand that there's a line as to where you would go in

3     terms of whether it's skilled or salaried.  Anybody can be

4     affected, but there might be -- let's pick up the janitors in

5     that.  There are some industries where they pay lower scales

6     just to begin with, and so if you are working like for a

7     nonprofit and doing janitorial service for a nonprofit, maybe

8     there's higher pay out there if you go for another -- work for

9     a for profit as opposed to a nonprofit.  I don't know.  But

10    it's hard to see that the janitorial level worker could be --

11    could have an antitrust impact.

12         MR. HARVEY:  I'll tell you how we prove this up in

13    our other cases.  We used what are called sharing regressions.

14         THE COURT:  Have you ever had this for all employees?

15         MR. HARVEY:  Yes.  We are -- and I would like to

16    correct a comment Mr. Kiernan made.  He said that no no-poach

17    case seeks an all employee class.  That's not correct.  The

18    franchise no-poach cases, which we are counsel in several of

19    those, two of them had advanced beyond the pleadings, the

20    McDonald's and Jimmy John's.

21         THE COURT:  Those are the rule of reason cases,

22    weren't they?

23         MR. HARVEY:  No, they are -- in both of those cases,

24    the court said that the -- well, for instance, in McDonald's,

25    the court said the per se rule may apply.  It will depend on

1     the facts as they come in, but it appears likely at the

2     pleadings that the quick look will apply.  We can talk about

3     quick look if you like.  It gets complicated.

4              THE COURT:  That's not an issue here.

5              MR. HARVEY:  Right.  Same in Jimmy John's.  There,

6     the proposed class includes entry level McDonald's workers.

7     That is the class that has advanced beyond the pleadings in

8     both of those cases.

9              THE COURT:  That includes the janitors?

10             MR. HARVEY:  If they are employees at McDonald's,

11    yes, it does.  I'll say we don't know who their lower skilled

12    employees are.  It may be the case that they do what a lot of

13    firms do, including our law firm, we don't have our own

14    janitors.  We subcontract them.  We don't pay them ourselves

15    directly.  They are not a member of the class.  These are only

16    people who are paid directly as part of the same system.

17             THE COURT:  I understand.

18             MR. HARVEY:  I'll say out of the box, if you ask me

19    to predict what would our class certification motion include,

20    it probably would not include the equivalent of a janitor, but

21    standing here before we know the facts or evidence, it doesn't

22    make sense from our perspective to limit the case in that way

23    before we see the facts or the evidence.

24             THE COURT:  Do you want to talk about the different

25    time frames and the different bilateral agreements and how

1    that affects your class definition?

2           MR. HARVEY:  Yes.  I first want to clarify from the

3    arguments we heard what claims are affected by this issue.

4    These are claims only by employees of Faiveley in 2009 and

5    2010.  Nothing else is affected by this issue.  That is

6    because there are two defendants here today, Knorr and Wabtec.

7           THE COURT:  Why would Wabtec have any allegation to

8    Faiveley employees until 2014?

9           MR. HARVEY:  Well, I agree that -- what I meant to

10   say if I didn't say it was that it affects the claims at

11   issue, so I agree with you that if it turns out that Faiveley

12   was not involved in any no-poach agreement until 2011, then at

13   class certification we would not likely -- it would be

14   unlikely for us to seek to include employees of Faiveley from

15   2009 and 2010.

16          That means no other defendant in the case has any

17   liability to those employees.  As to everybody else, their

18   claims are the same.  They are now all employees of either

19   Wabtec or Knorr, the two defendants before you today, and if

20   Faiveley existed or not, if it were just, say, one agreement

21   between Wabtec and Knorr, it wouldn't change anything about

22   our analysis or the legal standard.

23          THE COURT:  Just address this question:  From 2009

24   starting you have Wabtec and Knorr.  Then in 2011, you have

25   Knorr and Faiveley, and it's not until 2014 that you have

1    Wabtec entering into some agreement with Faiveley, so

2    between -- for Faiveley's employees, Wabtec would not be

3    liable, but they wouldn't be liable anyway -- no.  They would

4    be.  How can Wabtec be on the hook for any harm to Faiveley's

5    employees until 2014?

6           MR. HARVEY:  That is a question of whether Wabtec

7    understood it was joining something broader than its

8    individual agreement with Knorr.  It doesn't have to know

9    specifically about the agreement in order to be held liable

10   for it.

11          Like any conspiracy, for example, the classic example

12   from first year criminal law, the driver of the getaway car

13   can be liable for the murder of the teller inside the bank

14   even though the driver of the getaway was not in the bank

15   because the driver of the getaway car is part of a conspiracy

16   that can have these as consequences.

17          Now, there's no doubt that Knorr entered into a

18   conspiracy with Wabtec to eliminate competition for its

19   employees.  The question is will the evidence show that Wabtec

20   understood it was joining some broader effort beyond that one

21   agreement, and that will be a question of the evidence.

22          I think at this stage, given that all three companies

23   had agreements with the other companies and that they were --

24   they were proceeding contemporaneously with very similar

25   elements, to me, it appears likely, beyond plausible, likely

1      that Wabtec understood there was something else going on, but

2      we'll depose the executives.  We'll get the documents and

3      figure it out.

4              THE COURT:  Even though they may have understood

5      that, was Wabtec not poaching or following a no-poach with

6      Faiveley and vice verse until 2014?

7              MR. HARVEY:  Based upon the agreements alleged by the

8      DOJ and what we have been able to determine before we filed

9      our complaint -- I'll note as a footnote that since we filed

10     our complaint, we now have the DOJ production which we've gone

11     through, so if we would write the complaint again, it would

12     look different.  Based upon what we know now in the complaint

13     there is no alleged direct agreement between Wabtec and

14     Faiveley before 2014.

15             Should I continue?

16             THE COURT:  Yes.

17             MR. HARVEY:  As a practical matter, it makes no

18     difference to the discovery produced.  It makes no difference

19     to the damages models, and at class certification, if we

20     determine that --

21             THE COURT:  Wouldn't it make a difference to the

22     individual defendant that Wabtec wouldn't have to be producing

23     or reviewing materials related to Faiveley until 2014 so it

24     would reduce the burden there?

25             MR. HARVEY:  Well, in antitrust conspiracy cases, and

1    there are many cases that has this proposition, the date of

2    the start of the conspiracy is not the start of relevant

3    evidence for the case, in part because you want to know why

4    these companies entered into the agreement in the first place.

5    Was there competition going on beforehand that was driving up

6    compensation that provided the motivation for the agreement?

7         To prove damages, for example, you ideally want to go

8    back to a point prior to the conspiracy so you can compare how

9    pay worked before the conspiracy period with during the

10   conspiracy period.  That's a before/during analysis which is

11   the kind of gold standard for a case like this.

12        So we are currently involved in meeting and

13   conferring with defendants about the scope of discovery.  We

14   would certainly ask for the same documents.  If Wabtec wants

15   to argue that it shouldn't have to produce documents as of a

16   certain date based upon the allegations, they can make that

17   argument, but that's a discovery dispute.  It's not -- I don't

18   think it's an issue that is before the court today.

19        THE COURT:  Do you have any response to this

20   argument?

21        MR. KIERNAN:  Very briefly, Your Honor.  With respect

22   to the class, janitor and the hourly employees, in the Duke

23   case, the Seaman versus Duke, they sought to represent faculty

24   and nonfaculty.  The nonfaculty were in fact skilled, and the

25   court denied the class, and the reason the court denied the

1   class was because the evidence that would be required to show

2   impact was so different for the nonfaculty than it would be

3   for the faculty, and that's the same would be true here with

4   skilled and unskilled.  They don't have any way of showing.

5          THE COURT:  Couldn't you then just have two separate

6   classes, and you would have the one set of classes, and you

7   would then have to have clearly a plaintiff that would

8   represent their interests, but isn't that how that could be

9   resolved?

10         MR. KIERNAN:  That could be.  I don't know why that

11  wasn't resolved in the Duke case in that fashion, but in this

12  case and certainly in the High-Tech case, where hourly

13  employees were never a part of it, and the reason why they are

14  not part of it was for the very reason you described.

15         The job markets are so broad, unless you have that

16  situation like the two janitorial companies or the fast food

17  example, in the Jimmy John's and McDonald's cases, which have

18  not been certified.  As counsel said, they got through the

19  pleading stage.  They are going to fight for another day as to

20  whether the class will be certified for entry level positions.

21         But in Jimmy John's and McDonald's, two cases not

22  briefed in here, but I'll spend 30 seconds on it.  In those

23  cases, the plaintiffs alleged how the agreements in those

24  cases would have affected the hourly employees which describes

25  the majority of the McDonald's and Jimmy John's employees.

1          Here, if you go back through the allegations,

2    paragraphs 31 to 38, there is no discussion of how any hourly

3    union unskilled labor has been impacted by these alleged

4    agreements, and it's why, if you compare, and we cited to the

5    DOJ complaint, the DOJ, they focus on skilled employees

6    throughout, after investigating the agreements and the

7    implementation.

8          I don't have any further comments, Your Honor.

9          THE COURT:  How about the timing issues?

10         MR. KIERNAN:  The timing issues, other than I think

11   Your Honor raised some of the -- our positions with our

12   trouble with these agreements and, you know, what I heard is

13   we don't have evidence and we don't know and we can't allege

14   under Rule 11 that Wabtec did have knowledge of the

15   Knorr/Faiveley agreement.  We can't allege that.

16         What we want to do is get discovery, have a fishing

17   expedition, not only on whether or not hourly employees in

18   California can be part of this case, but we also want a

19   fishing expedition on whether or not Faiveley had any

20   knowledge four or five years before of a Wabtec/Knorr.

21         They had an obligation at the pleading stage to

22   allege under Rule 11 the facts that they had.  The only facts

23   that they are alleging based on the DOJ complaint is that

24   there were agreements, three bilateral agreements between

25   Wabtec and Knorr, Knorr and Faiveley and later Wabtec and

40

1    Faiveley.  And on those grounds, any allegations that there's

2    an overarching conspiracy should be stricken from the

3    complaint, and they need to modify or amend the class

4    allegations to tie the class and the employees to the exact

5    agreement for which they are seeking to represent these class

6    members.

7         THE COURT:  The agreement says all employees.  That's

8    the way I understand their argument.

9         MR. KIERNAN:  That's the allegation in the complaint,

10   but, Your Honor, that gets us, on the timing issue, with

11   respect to Faiveley --

12        THE COURT:  I'm not talking about the timing issue.

13   I'm talking about the other issue.  They are saying the

14   agreement speaks for itself, and that's the problem that the

15   defendants have.  They said all employees, and they are taking

16   you at face value and saying, well, let's look and see.

17        That's what you said, and we know you did it for the

18   skilled because we have this X, Y, Z examples, but the

19   agreement says all employees, and if it's per se, it's per se,

20   and so we should be able to look into that, and maybe later

21   on, the class will be refined to exclude that because you

22   can't show an impact of the conspiracy on those.  Even though

23   they said all employees, they only applied to skilled

24   employees.

25        MR. KIERNAN:  Your Honor, we don't check our common

1    sense at the door, so we look at these facts and it just

2    defies common sense that these agreements had any impact or

3    applied to janitors, line workers, cafeteria, clerical, and as

4    I said, the Department of Justice filed a complaint, the

5    plaintiff's complaint is a near mirror image of that, other

6    than expanding it to all employees.  They pretty much copied

7    and pasted all the allegations with respect to skilled labor.

8    That's what this case is about.  We should just do that now.

9         The reason is what we heard is there's not going to

10   be much burden.  We just pull some data from various

11   databases.  We're talking about 11 different defendants with

12   offices not only in the five states that are alleged in the

13   complaint but they are seeking all 50 states, so we're going

14   to be required for over a combination of all the defendants,

15   over 15, 18,000 employees, hourly and salaried trying to find

16   all their comp information, personnel records, et cetera, from

17   2009.

18        THE COURT:  I think their argument would be, okay,

19   let's say that's a big burden, but in our discovery

20   conferences, we would maybe pick one or two regions or subsets

21   within regions and look at those, because if you can't show it

22   there, you wouldn't be able to show it elsewhere, and you are

23   not going to have to show it all at once all across the board,

24   so targeted discovery, and if you don't find anything there,

25   then you wouldn't be able to get further discovery on certain

things.

MR. KIERNAN: Optimistic because I think what the response from the plaintiffs would be is, well, if we just take a sample out of California, what about Maryland? That's a different office over there, different janitors.

THE COURT: I'm not saying limited suggests one. It may not be 50. It may be five, for example.

MR. KIERNAN: Hope springs eternal, Your Honor.

THE COURT: I understand.

MR. KIERNAN: The bigger issue is it's just not plausible, and at a minimum, they should have to go back to the drawing board, look at their complaint and make decisions now. They don't want to make the decision now. They have enough facts. They have a requirement under the rules to make good faith allegations with respect to impact across this class, and at this stage, as Weisfeld and Kohl's, Dieter all make clear, they have the burden to show that they can meet the Rule 23 elements.

They can't make it with hourly and unskilled labor. They haven't done it. They haven't done the work or what I think is it's not possible for them to do it.

THE COURT: Your suggestion is that they would eliminate non-skilled hourly employees?

MR. KIERNAN: Correct.

THE COURT: Thank you. Do you want to be heard any

43

1    further on that?

2         MR. HARVEY:  Very briefly, Your Honor.  Thank you.

3         THE COURT:  That's the friendly suggestion from the

4    defendants.

5         MR. HARVEY:  I think we have been maligning lower

6    paid individuals this afternoon.  We have been treating

7    janitors --

8         THE COURT:  They are very important to the morale of

9    the company.  They should be highly valued.  I don't want any

10   impression to be given that way.  It's just that when these

11   agreements are being made, is it possible that that level of

12   salary would be impacted by the agreement, the level of salary

13   for the non-skilled hourly employees?

14        MR. HARVEY:  Absolutely.  It is possible.  The

15   question now under Twombly is did misconduct occur?  Do you

16   get to go down the expensive road of antitrust discovery,

17   which is extensive, it is expensive, it is burdensome on the

18   parties.  Do you get to go down that road if you haven't

19   alleged a plausible conspiracy?  That's what Twombly is about.

20        Once you plausibly allege that the defendants have

21   engaged in an antitrust conspiracy which we certainly have,

22   then you get discovery.  You get to figure out how broad that

23   is, and if it's expensive, the defendants should have thought

24   of that before they engaged in criminal conduct.

25        I'm sorry.  I don't have a lot of sympathy for them.

1    We will work with them to minimize the burden.  We have no

2    interest in engaging in a fishing expedition or anything else.

3    What we are trying to do is, based on defendants' own data,

4    who was harmed?  Can we have one damages model that will prove

5    up harm for that group of people, and we will provide that

6    with supporting evidence, including expert analysis,

7    testimony, documents and so forth at class certification.

8            Occasionally, Mr. Kiernan has slipped into saying

9    that we have the burden of proving up Rule 23 on the

10   pleadings.  Of course no.  They are the moving party.

11           THE COURT:  It's a question of whether what you are

12   asserting is possible.

13           MR. HARVEY:  Yes, and they have the burden to prove

14   that it is impossible.

15           THE COURT:  I understand.

16           MR. HARVEY:  I don't have the burden to prove it's

17   possible at this stage, and I would say Mr. Kiernan certainly

18   has not carried his burden on the pleadings that it was

19   impossible.  They argue you should use your common sense.

20   Let's not hear from the experts.  Let's not look at the

21   documents.

22           Sure, we agree to eliminate competition for all

23   employees.  Yeah, we did that, but let's not bother to figure

24   out whether we really meant what we said.  Let's at the

25   pleadings narrow the case to a smaller group of people than we

1    agreed to harm because of common sense.  No.

2         There are cases where, the McDonald's case and the

3    Jimmy John's case, for example, where lower skilled employees

4    are the entire class.  There are no senior level management,

5    engineers in the fast food franchise cases.  These are people

6    who, for example, at McDonald's have gone to a place called

7    Burger University which exists and they learn the McDonald's

8    system and they come back and they are more valuable to

9    McDonald's than they are to other places.  Lower skilled

10   employees, for example, clerical staff, we're also maligning

11   the clerical staff today apparently.

12        THE COURT:  They are valuable services.

13        MR. HARVEY:  I didn't mean to impute that to the

14   court, my apologies.  I was only reacting to arguments of the

15   defendants today.  Clerical workers have firm specific skills.

16   They are more valuable to a firm after working there five

17   years than they are on day one.  Why is that?  Because they

18   learn the systems of that company.  They make relationships

19   within the company.

20        The company learns that they are either a fantastic

21   employee that needs rewarded and kept or they are awful and

22   they wouldn't mind if they leave.  If they are still there

23   after five years, they are more valuable, much more so than

24   someone off the street that you've never met where you're

25   taking them on faith based on a piece of paper that they have

1    written that they know what they are doing.  Can those workers

2    be harmed by such an agreement where, if their pay is

3    determined in the same way as part of the same system as more

4    skilled people?  Absolutely, it's possible.  We'll see if it's

5    likely.  We'll see if it actually has taken place.

6            So that's my comment on that, unless the court has

7    any further questions.

8            A couple of quick notes of clarification.

9    Mr. Kiernan wasn't sure why the court did not certify the

10   staff with the faculty in the Duke case.  The reason why,

11   again, was a reflection of the facts and the evidence.  At the

12   time of class certification, there was no evidence that the

13   agreement itself included faculty.  All the evidence was --

14   I'm sorry, that the agreement itself included staff.

15           All of the evidence were examples of the university's

16   enforcing the agreement as to faculty.  That's one thing about

17   the agreement itself.  Here we know that the agreement

18   included all employees.  It's one way to distinguish the two.

19           The second is that it turned out that staff were paid

20   as part of an entirely different HR system than faculty.  When

21   we attempted to certify faculty and staff, we proved up

22   damages for the faculty and we had a separate analysis which

23   was kind of akin to a pass-through analysis to establish how

24   the staff were paid because we didn't have the same data as

25   faculty, so it was an entirely different way of proving up

1    their damages.  For those two reasons, the court said you can

2    have faculty class, but not the staff class.  Here we already

3    know that the agreements included all employees, and the

4    second question, where does one pay system end and another one

5    begins, we'll figure out in discovery.

6         The other comment that I wanted to respond to was

7    that we have no allegations in the complaint about harm to all

8    employees and that's not true.  For example, in paragraph 36,

9    we are very clear that the very mechanism I've been talking

10   about today, that is the top down mechanism when pay is set

11   affects all employees.

12        The third, going back to the overall conspiracy

13   argument, Mr. Kiernan expressed concern with undue burden on

14   Wabtec if it has to search for documents relative to Faiveley

15   prior to 2014.  Well, I think that argument may have something

16   to be said for it if Wabtec did not enter into the misconduct

17   until 2014, but Wabtec entered into the very first agreement

18   in 2009 with Knorr, so as a practical matter, how does this

19   discovery process work?

20        We are currently in negotiations over custodians.

21   They will pull e-mails from those custodians.  This dispute

22   will have no impact on what custodians are pulled.  And then

23   we discuss a list of search terms that are applied on those

24   e-mails.  I can't imagine a search term that would be

25   different because of this dispute.  Those search terms are

1    run.  The responsive documents are pulled and produced.

2            I would submit that the burden on Wabtec would not

3    change at all depending on this issue.  They would do the

4    exact same discovery process, so I don't see the burden.

5            I think unless the court has any further questions --

6            THE COURT:  I'm fine.

7            MR. KIERNAN:  Your Honor, can I make one note as

8    Mr. Hamer is approaching the bench?  I think this is clear

9    from the record, but given that I've heard it twice, and I

10   don't normally do this, but neither my client nor I have

11   maligned any of Wabtec's employees or any employees of Knorr

12   or Faiveley.

13           THE COURT:  At any level.

14           MR. KIERNAN:  And the comment was unfair.  The case,

15   as they allege, is about skilled employees which is what they

16   allege and the Department of Justice, and we highly appreciate

17   all of our employees, including unskilled.  Skilled just

18   refers to, as they define it and the Department of Justice,

19   employees who gain skills unique to the railroad industry.

20   Ones who may not have the same opportunities outside of the

21   industry than others who are unskilled who have much broader

22   opportunities outside the railroad industry.  Thank you, Your

23   Honor, for letting me have that moment.

24           MR. HAMER:  Good afternoon.  Your Honor, I'd like to

25   address the rule of reason argument.  First though on the

1    Bendix argument, we agree with the court's observations.

2    Don't have any comments there unless the plaintiffs do, and we

3    are happy to address those if they argue it.

4         On the rule of reason issue, I'll try to be very

5    brief, we are respectful of the court's views and would ask,

6    if that is the court's decision, that it be very clear in the

7    ruling that of course the issue can be revisited later in the

8    litigation as the record develops.

9         THE COURT:  Yes.

10        MR. HAMER:  That it could be rule of reason or per

11   se, first of all, and second of all, consistent with some of

12   the case law, including In Re Brokerage where the third

13   circuit suggested the plaintiffs plead at their peril, so if

14   they made a choice today to plead only per se, we don't want

15   to hear a year from now that they want to transform it into a

16   rule of reason case.  They have an opportunity now to plead

17   that and have chosen not to.

18        THE COURT:  I think that becomes a question of

19   prejudice at that stage.

20        MR. HAMER:  Yes, Your Honor.  So if I can just

21   briefly address the substance of it.  For the reasons

22   Mr. Kiernan said, it is an important issue.  We fully

23   recognize that most courts have deferred the issue until a

24   more fully developed record and have not passed judgment on

25   per se or rule of reason at this juncture.  The reason it's

1    important here in this case is for all the same reasons we

2    have been talking about today.  Those same issues, in effect,

3    the relevant market.

4            It's not obvious in this case where plaintiffs

5    believe the effects to have occurred.  Pleading a relevant

6    market would require them to make a choice and tell us how

7    broadly it is, how many employees are in or out of the class,

8    is this a market that only involves these two defendants or

9    does it involve other employers in the railway industry or

10   beyond that.  Since the geographic footprint of these parties

11   is very different, many classes of employees are not likely to

12   compete even among the defendants.

13           Those are things that a relevant market allegation

14   would require the plaintiffs to make a choice on that would

15   substantially narrow and focus this case for all the same

16   reasons we have been talking about.  So the plaintiffs want to

17   avoid that here by labeling this as a per se case, and the

18   allegation or the analogy to customer allocation cases is kind

19   of a spine of much of that argument.

20           Addressing that, the labels don't always give us the

21   answer, and we would like to get beyond that label.  The

22   reason we say that is there are a couple of examples where the

23   courts have been faced with similar arguments for plaintiffs.

24   Bogan versus Hodgkins, the second circuit case we discussed in

25   our briefs, was a case where there was a no-poach arrangement

1       and the plaintiffs analogized it to a supplier agreement, and

2       the second circuit said that the facts don't bear that

3       interpretation.  They don't comprise the entire set of

4       suppliers for their services.  They got beyond the label and

5       looked at the effects.

6               U.S. versus Brown, the third circuit case from 1993,

7       was a case among the ivy league schools to fix the method by

8       which financial aid was distributed.  The DOJ alleged that to

9       be a price fixing type of restraint.  The courts still said

10      that the rule of reason should apply and rejected the argument

11      that per se should apply to that.  The only point is that,

12      contrary to what plaintiffs say, simply labeling it as one

13      type of restraint doesn't answer the question.

14              I would focus on the language Mr. Harvey said

15      earlier, and I wrote it down to get it correct here.  He said,

16      "How labor markets work can be surprising."  He said that in

17      the past argument.  That's exactly right.  It's important not

18      to make categorical judgments about restraints.  It's

19      important to look at how they operate, and plaintiffs are

20      asking for a categorical judgment with the per se rule.

21              The logic by which we are asking the court to

22      consider --

23              THE COURT:  I have a question for you.  This is a

24      hypothetical.  You are in a fairly large metropolitan area and

25      there are five manufacturers of widgets and it's important

1     that you have skilled workers to make those widgets, so two

2     out of the five enter into a no-poach agreement.  They are

3     friendly.  They see each other at their clubs or whatever, so

4     they talk about it and they say at least we'll eliminate the

5     competition between us.  We still have three others out there

6     that will be mainly competing, but at least it's between us.

7     We'll have the no-poach agreement for all our employees.

8             So they enter into an express no-poach agreement such

9     as is alleged in this case.  The fact that there are three

10    others out there in that existing market, would that defeat

11    the per se approach at the pleading stage?

12            MR. HAMER:  My reaction to that --

13            THE COURT:  Is it just per se illegal?  You can't do

14    that no matter how big or how wide or how many other

15    participants in that market there are.

16            MR. HAMER:  My answer to that would be for this type

17    of restraint for a non-solicitation or no-poach agreement, you

18    have to look at the effects, so it could very well be the case

19    that there isn't any effect on competition among those five

20    employers.  There's no effect on wages.  There's no effect on

21    the ability of those employees to move and find alternative

22    employment.

23            What it says to me is that should be something that

24    the rule of reason should address.  The way I come at that

25    answer is thinking about Eichorn, so the third circuit applied

1    the rule of reason.  What the courts have been telling us is,

2    to determine whether the per se rule should apply, it has to

3    be immediately obvious that there's harm to competition and

4    you have to have a history, you have to have seen cases before

5    you in the past applying the rule of reason, and it becomes

6    clear that it's anti-competitive.  You don't need to apply it

7    again, in other words.  You can take a shortcut and make it

8    per se.

9              THE COURT:  I think the government's argument is it's

10   so pernicious that that's why the rule of reason would apply.

11   The only reason for the agreement is to stifle competition.

12             MR. HAMER:  So the reason I mentioned Eichorn is

13   simply because if, to address that point, if the court has

14   examined the effect and found an absence of anti-competitive

15   effect, it should give us pause as to whether the per se rule

16   should apply.

17             THE COURT:  That may be in a fully developed record

18   as opposed to at this stage.

19             MR. HAMER:  Exactly, Your Honor.  Exactly.  So our

20   only point is we want the ability to develop that full record

21   and apply the rule of reason to have the trier-of-fact assess

22   what the effects are.  It's not clear to us there's a

23   categorical answer that's it's always going to impact

24   competition.

25             Eichorn looked at the restraints after determining

1    the rule of reason applied and said that he didn't find an

2    effect on the cost of labor in the market or even the ability

3    of the plaintiff to find alternative employment.  That's not

4    the considerable judicial experience that would warrant per se

5    treatment in the future of such cases.  Bogan, that I

6    mentioned earlier, same situation.  Summary judgment was

7    affirmed by the second circuit finding no obvious

8    anti-competitive effect from the no-poach agreements.

9         That's not to say that there couldn't be that

10   outcome.  Of course there could.  The whole trial would be

11   about weighing those issues and determining what the outcome

12   should be.  Our point is simply that shouldn't be foreclosed

13   by labeling it per se.  It should allow a full assessment of

14   rule of reason as the trend of the Supreme Court and the third

15   circuit has been towards.

16        THE COURT:  But the plaintiff is limiting itself at

17   this stage to the per se which could be at their peril later

18   depending on a prejudice argument.

19        MR. HAMER:  Yes, Your Honor.  Thank you for

20   mentioning that.  As my initial comment suggested, we

21   recognize that that is often the outcome of many of the cases

22   at the pleading stage.  We just request that that point be

23   clear in the order.

24        We do feel this is important here in this case

25   because often you can tell what the relevant market is.  The

example you gave is pretty clear.  They are all in one
location.  You know who the competitors are.  You know what
they are selling.  You know where they are.  The geographic
market is clear.  Here, it's very opaque.  We have no idea who
is in or out of the market, both at an employee level,
position level and employer level.  Geographically, it's not
obvious at all why the employees would be competing among
these employers, which suggests that the effect that they're
suggesting exists may not exist, and that suggests that per se
is not the outcome.  Per se conclusively presuming an effect
is not the answer here in this case for these restraints.

So I'll stop there unless the court has further
questions.

THE COURT:  That's fine.  Thank you.

MR. HAMER:  Thank you, Your Honor.

MR. HARVEY:  What is at issue now is not the standard
that will necessarily apply at trial.  It is whether we have
sufficiently alleged a per se violation of the antitrust laws,
and what have we alleged?  We have alleged that the defendants
entered into an agreement to eliminate competition for each
other's employees that had no other purpose.  It wasn't part
of any other agreement.  Its only purpose was to eliminate
competition.  That is known as a market allocation agreement.
That's exactly what it is.  I won't compete there if you won't
compete here.  That is, by definition, a market allocation

1    agreement.  That is per se unlawful.

2              If it turns out that the no-poach agreement between

3    Knorr and Wabtec was part of some joint venture and they can

4    establish it was reasonably necessary to this incredibly

5    productive joint venture, then we may very well be in some

6    other world at trial.  That's assuming -- I want to be

7    cognizant of your comment about we're proceeding at our peril.

8    Subject to that qualification.

9              The argument here is --

10             THE COURT:  You have to amend your complaint.  That's

11   the issue.  That's a question of the timing and I can't

12   totally prejudge it, but the longer it goes on, the more

13   difficult it can be.

14             MR. HARVEY:  One of the first things we'll figure out

15   is whether these agreements were part of anything else, and

16   we'll act promptly.

17             Why would the court engage in a rule of reason

18   inquiry to figure out whether an agreement whose sole purpose

19   was to eliminate competition is anti-competitive?  Of course

20   it's anti-competitive.  That's its purpose.  That's what we've

21   alleged, and everything we know about it is that's the reason

22   they entered into it, to suppress the pay of the employees.

23             I want to respond to the specific arguments that

24   Mr. Hamer made.  First, with respect to my comment that labor

25   markets are surprising, they are surprising in that individual

1    employers can exercise much more market power over their own

2    employees than you might think.  These kinds of agreements can

3    be much more pernicious, can suppress pay much more than you

4    may think if your frame of reference is a conspiracy about

5    products.  There are many reasons for that, which I would be

6    happy to get into, but I don't think it's necessary at this

7    point.

8              It certainly provides no reason to think that a

9    market allocation agreement in this context would be pro

10   competitive.  To the contrary, it provides only further reason

11   to presume that it's anti-competitive.

12             With respect to the cases Mr. Hamer cited, in the

13   Bogan case in the second circuit that was an unusual case

14   where the restraints were only within the same brand.  They

15   were all within the same insurance company brand, and they had

16   this kind of arrangement where different levels of a hierarchy

17   can hire their own employees, and there was an understanding

18   that a certain level of this hierarchy had restrictions with

19   respect to hiring from other levels of the same hierarchy.

20             That's very different from this case where of course

21   Wabtec and Knorr are not part of the same hierarchy.  They are

22   not franchisees of the same franchisor.  They are completely

23   distinct companies with a different identity, different

24   brands, complete separation as a corporate matter, and

25   moreover, in the Bogan case, because of this, there was a

1    prominent vertical dimension to the agreement.  Whereas, here,
2    it's purely horizontal which is an important distinction in
3    antitrust.

4            With respect to the Brown case, that was a case in
5    which the DOJ challenged an arrangement among the ivy league
6    schools to affect how financial aid is given to the students,
7    and the argument by the universities there was, first, this is
8    not a naked restraint, meaning that it's not a restraint on
9    trade on its own, it's part of this larger enterprise of
10   deciding how much financial aid to give particular students.

11           The universities argued that this arrangement
12   succeeded in giving more financial aid to more students in a
13   more equitable way, and the circuit court there held that,
14   well, if you can prove that, then you may get the benefit of
15   rule of reason, but that's a factual question.  We'll see.

16           In the Eichorn case in the third circuit, what was at
17   issue in Eichorn was a different situation from this.  It was
18   a no hire agreement that was one ancillary to the sale of a
19   business, and it was limited to an eight month period.  Here,
20   there's no allegation that Wabtec and Knorr were contemplating
21   selling one to the other.  These agreements were not tailored
22   to a specific time or scope of employees based upon the pro
23   competitive activity.

24           Instead, they were, as we have been discussing
25   earlier today, all employees with no limit until the end of

1    time until we say otherwise.  That is not what is at issue in

2    Eichorn.  If there was any doubt of that, the third circuit

3    itself clarified in the Weisfeld case, which Mr. Hamer also

4    mentioned.  That was the class certification decision.

5    Weisfeld misapplied the Eichorn decision by saying exactly

6    what the defense is arguing today.  That means that no-poach

7    agreements are always rule of reason full stop, and the third

8    circuit, in affirming the denial of class certification, said

9    we don't need to reach this because it's a class certification

10   decision, but what was at issue in Weisfeld was very different

11   than what was at issue in Eichorn, and a different legal

12   standard may apply.

13        So the third circuit, I think, made it clear, and

14   this was nearly 20 years ago, that it had already anticipated

15   that no-poach agreements could be per se in lawful market

16   allocation agreements and yet in the notice of supplemental

17   authority we provided, the tenth circuit makes that point

18   exactly, that this is -- and that case, I think, makes the

19   point really well, because it wasn't an agreement that

20   eliminated all competition in the market.  It was a sliver.

21   It eliminated a sliver of competition for customers.

22        It was a customer non-solicitation agreement that

23   only affected a small portion of relevant customers.  They

24   competed for all kinds of other customers, and the question

25   was, is that per se or rule of reason.  The district court

1    thought, well, maybe this is a different industry, maybe

2    because the agreement sounds a little different, I'll apply

3    the rule of reason, and the tenth circuit said no.  It doesn't

4    matter if there's still some other form of competition

5    somewhere.  If there's a naked restraint of competition, it's

6    a market allocation agreement and it's per se, and the

7    district court followed suit in the decision that came out

8    just last week, and I think it's a great analysis.

9            I think on per se, unless the court has any further

10   questions, I don't have anything else.

11           THE COURT:  No.  I'll hear from the government.

12           MS. MEKKI:  Good afternoon, Your Honor.  Thank you

13   for the opportunity to be heard.  May it please the court?  My

14   name is Doha Mekki, and I represent the United States of

15   America.

16           The United States filed a statement of interest in

17   this matter to express its views about the law applicable to

18   horizontal market allocation agreements affecting labor and to

19   urge the court to reject defendants' extraordinary proposition

20   of law that defendants would like the court to adopt, and

21   that's that all no-poach agreements should be assessed under

22   the rule of reason.

23           Such a broad categorical rule would ignore important

24   and sound legal and economic reasoning, treating market

25   allocation agreements affecting labor the same as any other

1    horizontal market allocation under Section 1.

2         I'd like to explain further, and as I've read the

3    briefing and heard argument today, it seems that a number of

4    labor antitrust issues are being muddled, and if it would be

5    helpful to the court, I'd like to lay some foundation and talk

6    about the different kinds of cases that are coming up in the

7    briefing.

8         THE COURT:  Okay.

9         MS. MEKKI:  At the outset, the horizontal market

10   allocation is just an agreement to divide a market.  It can be

11   done by territory.  It can be done by customer.  It can be

12   done by labor.  The Supreme Court has longstanding precedent

13   that all such agreements are per se violations of Section 1.

14   That was true in its decision in Palmer versus BRG of Georgia

15   and it was true in the United States versus Topco.

16        And the third circuit has also recognized that

17   horizontal market allocations are paradigmatic examples of per

18   se violations under Section 1 and that came from In Re

19   Insurance Brokerage Antitrust Litigation.

20        It's also important to note that the United States

21   has criminally prosecuted horizontal market allocations under

22   Section 1 precisely because they are per se unlawful under

23   Section 1, and a number of courts of appeals have affirmed

24   those convictions.  For example, in the second circuit,

25   United States versus Koppers which was a case about the

1    allocation of territories in the sale of road tar, the fifth

2    circuit, United States versus Cadillac, where that case is

3    about the allocation of garment providers, and the sixth

4    circuit has a very interesting case, United States versus

5    Cooperative Theaters that addresses the hypothetical that Your

6    Honor posed to Mr. Hamer earlier about what would happen if

7    there were five manufacturers and only two of them entered

8    into a naked no hire agreement.

9         There, there were two movie theaters that entered

10   into an agreement to allocate customers, and indeed the

11   companies were found criminally liable by the district court,

12   and that was affirmed by the court of appeals.  So to answer

13   your hypothetical, Your Honor, very directly, no, it would not

14   matter, and that agreement would be per se unlawful under

15   Section 1.

16        Just to continue, the ninth circuit affirmed the

17   conviction in United States versus Brown, which was a case

18   about the allocation of billboard sites.

19        That case in particular is very important because the

20   allocation of billboard sites is what we, as antitrust

21   lawyers, refer to as input markets.  So they are materials,

22   products, services that companies use in order to create an

23   output, and that's important because labor is an example of an

24   input market.

25        It's no defense to a horizontal market allocation

1      agreement that the agreement has never been considered per se

2      unlawful in a new industry or a new type of market, and indeed

3      we get that explanation from the Supreme Court in Arizona

4      versus Maricopa County, where the court explains that judicial

5      experience with the per se category stems from experience with

6      a particular type of restraint.

7              So the government would urge the court to consider

8      the alleged agreements in this case as just a species of

9      horizontal market allocation in a new per se category as the

10     defendants have asked the court to consider.

11             THE COURT:  Are you in agreement with the court's

12     understanding that labor is treated akin to a product?

13             MS. MEKKI:  Yes, Your Honor.  We completely agree

14     with Your Honor's position at the outset and would only

15     underscore our belief in exactly the leading antitrust

16     treatise that Your Honor cited at the outset, that an

17     agreement among employers not to hire certain employees is

18     akin to a product division agreement.

19             The issue before the court today is whether

20     plaintiffs have sufficiently alleged facts to support a per se

21     violation under Section 1.

22             THE COURT:  Just to be clear, you are not taking the

23     position on the class allegations?

24             MS. MEKKI:  Respectfully, Your Honor, no, we are not

25     taking a position on frankly any issue other than the

1    application of the per se rule.

2         As I was saying, a number of district courts have

3    faced the exact issue before the court today, whether

4    plaintiffs have alleged facts sufficient to go on to discovery

5    under the per se theory, and indeed there have been several.

6    There's United States versus eBay.  There's In Re High-Tech

7    Antitrust Employees and there's In Re Animation Workers.

8         To get into the cases that are cited in defendants'

9    briefing in support of their view on what rule should apply, I

10    categorize them in two buckets.  They are inapposite largely

11    for the following two reasons:  They either deal with

12    restraints that aren't horizontal at all, so, for example,

13    they might deal with an intrafirm agreement like Bogan, or

14    they deal with a franchise like Mumford versus GNC, which I

15    understand was before Your Honor some years ago.

16         The other category of inapposite case is cases under

17    the Ancillary Restraints Doctrine like the Eichorn case that

18    Mr. Hamer referred to.  Just to take a step back, the

19    Ancillary Restraints Doctrine is important to understand.

20    There, a restraint that is horizontal and would ordinarily be

21    condemned under the per se rule is subject to analysis under

22    the rule of reason if it is reasonably necessary to a separate

23    legitimate transaction or collaboration.

24         Eichorn is really the paradigmatic example of the

25    Ancillary Restraints Doctrine.  There was a narrowly tailored

1    no hire agreement that was ancillary to the sale of the

2    company, so that's not the case before the court today at all.

3          My final point, Your Honor, unless there are more

4    questions, it is just that the DOJ has had significant

5    experience not only prosecuting horizontal market allocations

6    but we have amassed considerable experience over the years

7    addressing cases that affect labor markets exactly like the

8    underlying case, United States versus Knorr Bremse and Wabtec

9    and through United States versus Adobe, Apple, Google, Intel,

10   Intuit and Pixar, United States versus Lucasfilm, United

11   States versus eBay and the underlying case, it is our view

12   that labor markets really should not be treated any

13   differently under Section 1.

14         And so if there are no questions from the court, I

15   would like to conclude by again thanking the court for the

16   opportunity to be heard and urging the court to find that

17   plaintiffs have adequately alleged a per se violation under

18   Section 1.

19         THE COURT:  Thank you.

20         MR. HAMER:  Your Honor, I'll be very brief.  I just

21   wanted to touch on a couple of points that were mentioned.  So

22   first of all, with Mr. Harvey's comments, he mentioned the

23   absence of any issues about pro competitive effects.  We're

24   obviously at the pleading stages.  One of the reasons we can't

25   talk about those issues and that's something for a later time.

1          The Bogan case he mentioned, he distinguished it

2     because it was an intrafirm agreement, but the court said, as

3     we mentioned in our reply brief expressly, that even if the

4     agreement were intrafirm, between two firms not the same

5     corporate family or the same brand, we would still not afford

6     it per se illegal treatment because the harmful effect on

7     competition was not clearly apparent, which is the main point

8     that we have here about this.

9          Rule of reason applies if you are not sure what the

10    effect is going to be.  If you are sure what the effect is, if

11    it really is clear from prior cases that the effect on

12    competition is an anti-competitive effect, you don't need to

13    apply the rule of reason.  There are several examples where

14    no-poach agreements have been examined and the effect hasn't

15    been seen.

16         On the Eichorn case, which both Mr. Harvey and

17    Ms. Mekki mentioned --

18         THE COURT:  Those are the ones where the government

19    was arguing there were the ancillary aspects.

20         MR. HAMER:  Exactly, Your Honor.  In Eichorn, the

21    no-poach agreement was ancillary to the sale of the business,

22    and that was part of the discussion about whether the rule of

23    reason or per se applied.  After determining they should apply

24    rule of reason, the third circuit looked at the restraints and

25    it didn't conclude that because there was really bad effect

1   and there was a good pro competitive effect, the pro

2   competitive effect of being attached to a sale of a business

3   outweighed the anti-competitive effect.  It looked for the

4   anti-expectative effect and said the following:  "Because

5   market realities reflect that the no hire agreement did not

6   have a significant anti-competitive effect on the plaintiff's

7   ability to seek employment within this broader

8   telecommunications market, nor that it fixed the cost of labor

9   in the industry, we conclude that it was not an antitrust

10  violation under the rule of reason."

11          The reason that's important, those words from the

12  third circuit, is that you have to have, and it's also in the

13  Eichorn case, you have to have "experience with a particular

14  type of restraint that enables the court to predict with

15  confidence that the rule of reason will condemn it."

16          Our only point is you can analogize no-poach

17  agreements to customer allocations, market allocations, but

18  the specific --

19          THE COURT:  Could all of this be fodder for a summary

20  judgment issue or trial issues as opposed to pleading issues?

21          MR. HAMER:  Yes, Your Honor.  Yes, absolutely.  Our

22  only point is we certainly want the ability under the rule of

23  reason to make these arguments and identify where the effects

24  are and frankly require the plaintiff to explain where they

25  think the effects are.  That's --

1          THE COURT:  You don't have to do that if they make

2     sufficient allegations of a per se violation.

3          MR. HAMER:  Correct, Your Honor.  The reason we are

4     urging the court to consider it here in this case is because

5     there's so many concerns about where the relevant market is

6     and where the effects are.  We think it's important to find

7     out now from the plaintiffs where they believe the effects

8     have occurred.  It's not obvious to us where the relevant

9     market is.

10          If I could briefly address the Weisfeld case.  The

11     third circuit, in affirming that decision, did not decide

12     that, in a naked per se no-poach case -- a naked no-poach

13     case, the per se rule should apply.  That issue was raised on

14     appeal, but the court didn't pass judgment on it.

15          THE COURT:  Because there was no antitrust impact.

16          MR. HAMER:  Exactly right, Your Honor.  The Kemp case

17     that was mentioned a couple of times from the tenth circuit,

18     what I take away from that case is it was a criminal, a

19     criminal allocation case, where initially the district court

20     did not apply the per se rule.  They applied the rule of

21     reason, and it went up to the tenth circuit.  It took three

22     decisions for the per se rule to be applied.

23          That simply tells me that it's not always -- it's not

24     always obvious that the per se rule should apply, and when

25     there's any doubt, if anything is clear from the cases, the

1    rule of reason is the default.  That's the presumption that

2    should be applied to the restraints and the starting point,

3    unless the plaintiffs can demonstrate why it's so obviously

4    harming competition the per se categorical rule should apply

5    to it.

6              THE COURT:  What about all the treatise riders in

7    those cases that look at it as a market allocation and

8    therefore that's per se and it's been found in repeated cases

9    if you have a horizontal agreement, that the market allocation

10   situation can be a per se?

11             MR. HAMER:  We appreciate and understand that, Your

12   Honor.  Only comment there is that there have been a couple of

13   cases, Weisfeld and Molinari, where there were naked no-poach

14   agreements and the court still applied the rule of reason.  We

15   certainly --

16             THE COURT:  At the pleading stage?

17             MR. HAMER:  The Molinari case was at the pleading

18   stage.  There were two Molinari cases.  The first one

19   determined whether the per se or rule of reason applied.  They

20   determined that rule of reason applied naked no-poach

21   agreement.  The second decision dismissed the claim for

22   failure to plead irrelevant market for many of the same

23   defects, Your Honor, that are present in this case.  We urge

24   the court to look at that case from 2012 from this district

25   court.

1              We are certainly not making a categorical statement

2       that all no-poach agreements should be heard under the rule of

3       reason.  We are just talking about this case.  In this case,

4       there are a lot of concerns about where the effect really is

5       and whether there is an effect here.  That's transparent from

6       the pleading, from all the things we are talking about on all

7       these issues today.  That tells me the rule of reason should

8       apply so the effects can and should be weighed.  Thank you.

9              THE COURT:  Would you like to address the Molinari

10      case?

11             MR. HARVEY:  I would.  The Molinari case is not a

12      naked horizontal market allocation case.  It's a case

13      concerning a vertical vendor agreement that only restricted

14      the vendors that could work at one company, so the analysis

15      there focused on -- characterized the allegations as a single

16      product market because there was only one company at issue.

17             It's distinguishable from this case in a number of

18      different ways and says nothing about what's at issue here,

19      which is an agreement between two horizontal competitors that,

20      on the pleadings, have no purpose other than eliminating

21      competition with each other.  That's a per se violation.  I

22      won't go through all of defendants' cases, but I'll say that

23      the defendants did not cite to a single case that involved a

24      naked horizontal market allocation where anything other than

25      the per se standard applied.  Not a single case.  So the

1    defendants want this court to be the first.  I think the court

2    should decline that invitation.

3         One other thing I'll mention is that the specific

4    cases that defendants put the most emphasis on tend to be

5    those from 20 years or so ago that predated what I think is

6    fair to say is a modern consensus among not just the U.S.

7    Department of Justice but the Federal Trade Commission, over

8    ten states' attorney generals, the leading antitrust treatise,

9    as we discussed earlier, that these kind of agreements are

10   market allocations and should be analyzed as such.

11        That has been the consensus view of every court to

12   have looked at this since the U.S. DOJ's landmark enforcement

13   action against Google, Apple and so forth in 2010.  Since

14   then, the courts have been uniform on this question.  In the

15   ninth circuit in the northern district of California, in the

16   seventh circuit in McDonald's, in the fourth circuit in Duke.

17   I don't think the third circuit should create a circuit split

18   on this issue.  There's certainly no reason to do that on the

19   pleadings.

20        THE COURT:  Okay.  Anything further from the

21   government?

22        MS. MEKKI:  I think we are fine for now.  If it would

23   be helpful to discuss any of the cases, Molinari, Bogan, et

24   cetera, for the court, we are happy to do so.

25        THE COURT:  I think the plaintiffs' counsel has

1    already addressed that.

2         MS. MEKKI:  Nothing further.

3         MR. HAMER:  Your Honor, just one point.  To be clear,

4    by my silence, I didn't mean to accept what Mr. Harvey said.

5    We don't necessarily agree that the labor is an input market

6    here.  We reserve all the arguments on that for later in the

7    case when we have a record to address.

8         I do dispute that Molinari is not a naked horizontal

9    agreement.  There are multiple parties involved in that

10   situation and certainly Weisfeld without question was

11   horizontal, interbrand competitors agreeing not to solicit

12   each other's employees.  Nothing further.

13        THE COURT:  Okay.  So I'm going to order the

14   transcript at the joint cost of the parties.  I think we have

15   another status conference that will be coming up next month,

16   so we'll be working on this in the interim, and you've already

17   received the DOJ materials; is that correct?

18        MR. HARVEY:  Yes, Your Honor.

19        THE COURT:  Did the DOJ materials uncover some of the

20   effects going down to the non-skilled hourly workers?  Is

21   there more that you need to gather?

22        MR. HARVEY:  Well, the question of the impact to

23   the --

24        THE COURT:  This is for the class allegations.

25        MR. HARVEY:  Yes.  With respect, I don't think there

1    are any unskilled workers.  I think if you are paying someone

2    to do a task, they have some skill that's worth something.

3         THE COURT:  We are talking about somebody that has a

4    unique skill in the railway industry.  I agree.  I think

5    somebody who may be in the clerical level is very skilled at

6    what they are doing and there are certainly skills in the

7    janitorial level in terms of how you approach cleanliness, the

8    tools you use and that kind of thing.  There's lots of

9    different skills, but I think when we're talking about skilled

10   workers in this context here for this case, we are dealing

11   with somebody who has some unique skill pertinent to the

12   railway industry.

13        MR. HARVEY:  I think -- sorry to push back again, but

14   every employee of a company who is experienced in that company

15   has company specific skills that are valuable, and that is

16   even more specific than the railway industry.  It's specific

17   to the company, so I don't accept the premise, but with

18   respect to the question of what have we seen from the

19   materials, I don't think we've seen anything specific to a

20   janitor or to a clerical staff worker.

21        I don't believe we've gone through all those

22   documents with that specific question in mind, so I want to be

23   cautious about it, but let me also say that the question of

24   whether people lower on the hierarchy were impacted by the

25   agreement is largely proved by the pay data and doing a

1    30(b)(6), for example, of people in charge of the HR system,

2    figuring out are they indeed part of the same pay system or

3    not, those are the kinds of -- types of evidence that we have

4    used in the past to decide that question and I would expect

5    that to be very relevant here.

6          What we have seen though is, in several documents,

7    very clear that the agreement pertained to all employees.  We

8    have not seen any exception, any carve-out.  These are written

9    documents exchanged between the parties, so there appears to

10   be no reason to doubt at this stage that the misconduct itself

11   concerned every employee at the companies.

12          THE COURT:  So at this stage, I'll take this under

13   advisement.  I've ordered the transcript, and we'll be

14   together -- it may not necessarily need to be in person unless

15   there's some basis for argument or some contention between the

16   parties.  We can do it by phone.  Thank you all.  This hearing

17   is adjourned.

18          (At 4:10 p.m., the proceedings were adjourned.)

19                 C E R T I F I C A T E

20          I, BARBARA METZ LEO, RMR, CRR, certify that the
     foregoing is a correct transcript from the record of
21   proceedings in the above-entitled case.

22

23   __\s\ Barbara Metz Leo__              ___03/04/2019___
     BARBARA METZ LEO, RMR, CRR           Date of Certification
24   Official Court Reporter

25