# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| IN RE: RAILWAY INDUSTRY ) EMPLOYEE NO-POACH ANTITRUST ) LITIGATION ) ) ) This Document Relates to: **All Actions** ) | Master Docket: Misc. No. 18-798<br><br>MDL No. 2850 |

## OPINION

CONTI, Senior District Judge

### I.    Introduction

In this multi-district antitrust putative class action, plaintiffs[1] allege defendants,[2] their employers, violated the Sherman Act, 15 U.S.C. § 1, by entering into unlawful "no-poach" agreements pursuant to which defendants agreed to not hire or solicit each other's employees. Defendants, who are railway equipment suppliers and their subsidiaries, filed a joint motion to (a) dismiss the consolidated class action complaint under Federal Rule of Civil Procedure 12(b)(6), and (b) strike the class action allegations under Federal Rule of Civil Procedure 12(f) (ECF No. 124). Plaintiffs oppose the motion. (ECF No. 152.)

---

[1]    Plaintiffs Stephen Baldassano ("Baldassano"), John Brand ("Brand"), David Escalera ("Escalera"), Brian Lara ("Lara"), and Patricia Lonergan ("Lonergan") in this opinion will be collectively be referred to as "plaintiffs."

[2]    Defendants Westinghouse Air Brake Technologies Corporation ("Wabtec"), Wabtec Railway Electronics, Inc., Ricon Corporation ("Ricon"), Railroad Controls, L.P., Xorail Inc., Faiveley Transport, S.A. ("Faiveley"), Faiveley Transport North America Inc. ("Faiveley N.A."), Knorr-Bremse AG ("Knorr"), Knorr Brake Company LLC ("Knorr Brake"), New York Air Brake LLC ("NY Air Brake"), and Bendix Commercial Vehicle Systems LLC ("Bendix") in this opinion will be collectively referred to as "defendants."

The parties dispute whether the rule of reason or per se violation analysis should be applied to defendants' alleged "no-poach" agreements and whether the factual allegations in the consolidated complaint are sufficient to show plausibly that beginning at least in in 2009 all defendants were engaged in a conspiracy in violation of the antitrust laws. The parties also dispute whether the allegations in the consolidated class action complaint are sufficient to show that it is possible for plaintiffs to satisfy their burden at the class certification stage with respect to the Federal Rule of Civil Procedure 23 requirements of typicality and predominance.

For the reasons set forth in this opinion, the motion to dismiss will be granted in part and denied in part. The court agrees with plaintiffs that the no-poach agreements as plead in the consolidated complaint, i.e., plead as market allocation agreements that were not ancillary to any other agreements with proper business purposes, may be considered per se violations of § 1. Thus, plaintiffs were not required to set forth factual allegations sufficient to show plausibly the relevant market in which the antitrust impact occurred. The motion to dismiss will be denied without prejudice with respect to this issue.

The court, however, agrees with defendants that plaintiffs failed to set forth factual allegations to show plausibly that all defendants were engaged in an overarching "no-poach" conspiracy from 2009. At best, plaintiffs plead three bilateral conspiracies, which plausibly culminated in an overarching conspiracy among all defendants beginning at the earliest in 2014 when Wabtec and Faiveley N.A. entered into the third bilateral no-poach agreement. Plaintiffs did not set forth factual allegations sufficient plausibly to show that Ricon or Bendix were participants in the overarching conspiracy

or any of the bilateral conspiracies. The motion to dismiss will, therefore, be granted without prejudice with respect to plaintiffs' allegations that beginning in at least 2009 all defendants were engaged in a "no-poach" conspiracy in violation of the antitrust laws and with respect to all allegations against Ricon and Bendix.

With respect to defendants' motion to strike class allegations, plaintiffs in the consolidated class action complaint did not allege sufficient facts to make a prima facie showing that the predominance requirement of Rule 23 is satisfied or that discovery is likely to produce substantiation of plaintiffs' allegations with respect to predominance. Plaintiffs in the consolidated class action complaint allege that defendants conspired to restrict the hiring and soliciting of **all** their employees. Plaintiffs, however, did not set forth factual allegations sufficient to make a prima facie showing that defendants' agreements caused **all** employees of defendants harm (antitrust impact) that can be proven on a class-wide basis or that discovery will likely substantiate plaintiffs' conclusory allegations that the common issues in this case will predominate over the individual questions raised by plaintiffs' proposed class of **all** employees. Even if plaintiffs satisfied their burden at this stage with respect to the Rule 23 requirement of predominance, their class definition is overbroad and lacks precision. The motion to strike class allegations will, therefore, be granted without prejudice to plaintiffs filing a motion for leave to file an amended consolidated class action complaint.

## II.     Procedural History

On October 12, 2018, plaintiffs filed a one-count consolidated class action complaint against defendants. (ECF No. 88.) On November 27, 2018, all defendants filed a joint motion to dismiss for failure to state a claim and to strike class action

allegations and a brief in support of the motion. (ECF Nos. 124, 129.) On January 11,

2019, plaintiffs filed a response in opposition to the motion to dismiss. (ECF No. 152.)

On January 25, 2019, the United States Department of Justice ("DOJ" or the

"government") filed a "Notice of Intent to File a Statement of Interest." (ECF No. 155.)

On February 8, 2019, the government filed its statement of interest. (ECF No. 158.) On

February 13, 2019, defendants file a reply brief in support of their motion. (ECF No.

165.) On February 22, 2019, plaintiffs filed a notice of supplemental authority. (ECF No.

172.)

On February 25, 2019, the court held a hearing on the joint motion to dismiss and

strike class action allegations. (Hearing Transcript ("H.T.") 2/25/2019 (ECF No. 176).)

The government with leave of court participated in the hearing. (Id.; ECF Nos. 168,

171.) The court heard from the parties and the government, ordered the transcript at

the joint cost of the parties, and took the matter under advisement.

On June 3, 2019, plaintiffs filed a second notice of supplemental authority. (ECF

No. 189.) On June 5, 2019, defendants filed a response to plaintiffs' notice of

supplemental authority. (ECF No. 190.)

### III. Factual Allegations in the Consolidated Class Action Complaint which are Accepted as True for the Purpose of Resolving the Motion to Dismiss

#### A. General Allegations

The named plaintiffs are former employees of defendants. (ECF No. 88 ¶ 1.)

Plaintiffs allege that defendants were "among the world's dominant rail equipment

suppliers" and members of a conspiracy "to restrain competition and reduce

compensation for railway industry employees." (Id.) Wabtec, Knorr, and their respective

co-defendant subsidiaries "are the largest suppliers of rail equipment used in freight and passenger rail applications." (Id. ¶ 2.)

## B. Plaintiffs

Baldassano was employed by defendant Knorr Brake from approximately March 1998 to December 2012, and from approximately January 2017 to October 2017. (ECF No. 88 ¶ 12.) Baldassano performed his duties as a Project Manager and Manager of Systems and Sales for Knorr Brake in Maryland. (Id.)

Brand was employed by defendant NY Air Brake, a wholly-owned subsidiary of Knorr, as a Senior Manager of Systems and Software Engineering from approximately May 2013 to August 2016. (Id. ¶¶ 13, 26.) Brand performed his duties as a NY Air Brake employee in Texas. (Id.)

Escalera was employed by Wabtec as a Field Service Technician from approximately July 2011 to January 2015, in California. (Id. ¶ 14.)

Lara was employed by Wabtec as a Machinist from approximately November 2011 to January 2017. (ECF No. 88 ¶ 15.) Lara performed his duties as a Wabtec employee in Pennsylvania. (Id.)

Longergan was employed by Wabtec as a Positive Train Control Manager from approximately October 2013 to April 2015. (Id. ¶ 16.) Lonergan performed her duties as a Wabtec employee in Colorado. (Id.)

## C. The Wabtec Defendants

Wabtec has more than 100 subsidiaries and more than 18,000 employees. It is the world's largest provider of rail equipment and services with global sales of $3.9 billion in 2017. (ECF No. 88 ¶ 17.) Wabtec Passenger Transit is a business unit of

Wabtec that develops, manufactures, and sells rail equipment and services for passenger rail applications. (Id.) Wabtec Global Services is a business unit of Wabtec that offers maintenance, repair, and support services. (Id.)

Wabtec Railway Electronics, Inc. is a wholly-owned subsidiary of Wabtec that designs, develops, manufactures, and repairs electronic products used to improve railroad operations and safety. (ECF No. 88 ¶ 18.)

Ricon is a wholly-owned subsidiary of Wabtec that designs and manufactures wheelchair lifts and ramps for commercial, paratransit, transit, motorcoach, and passenger rail vehicles. (Id. ¶ 19.)

Railroad Controls, L.P. is a wholly-owned subsidiary of Wabtec and one of the largest railroad signal construction companies in the United States. (Id. ¶ 20.)

Xorail Inc. is a wholly-owned subsidiary of Wabtec and provides railroad signal engineering and design services. (Id. ¶ 21.)

On November 30, 2016, Faiveley was acquired as a wholly-owned subsidiary of Wabtec. (ECF No. 88 ¶ 22.) Before the acquisition, Faiveley was the world's third-largest rail equipment supplier behind Wabtec and Knorr. (Id.) Faiveley had employees in twenty-four countries, including at six locations in the United States. (Id.) It developed, manufactured, and sold passenger and freight rail equipment to customers in Europe, Asia, and North America, including the United States, with revenues of approximately €1.2 billion in 2016. (Id.)

Faiveley N.A. was a wholly-owned subsidiary of Faiveley prior to Faiveley's acquisition by Wabtec. (ECF No. 88 ¶ 23.) Prior to Wabtec's acquisition of Faiveley,

Faiveley conducted business in the United States primarily through Faiveley N.A. (Id.) Faiveley N.A. is now a wholly-owned subsidiary of Wabtec. (Id.)

### D. The Knorr Defendants

Knorr is a privately-owned German company and the world's second largest provider of rail and commercial vehicle equipment. (ECF No. 88 ¶ 24.) In 2017, Knorr had annual revenues of approximately $7.7 billion. (Id.) Knorr has several wholly-owned subsidiaries in the United States. (Id.)

Knorr Brake is a wholly-owned subsidiary of Knorr and manufactures train control, braking, and door equipment used on passenger rail vehicles. (ECF No. 88 ¶ 25.)

NY Air Brake is a wholly-owned subsidiary of Knorr and manufactures railway air brakes and other rail equipment used on freight trains. (Id. ¶ 26.)

Bendix is a wholly-owned subsidiary of Knorr and develops and supplies active safety technologies, air brake charging and control systems, and components for commercial vehicles. (ECF No. 88 ¶ 27.) Bendix served as a recruiter for Knorr. (Id.)

### E. Competition for Employees Among Rail Equipment Suppliers

Wabtec and Knorr, top rivals in the development, manufacture, and sale of equipment used in freight and passenger rail applications, are some of the largest employers[3] in the rail industry. (ECF No. 88 ¶¶ 29-30.) They compete with each other to hire and retain employees throughout the United States, i.e., lateral hiring is a key form

---

[3]    For example, by the end of 2017, Wabtec and its subsidiaries employed approximately 18,000 full-time employees worldwide. (ECF No. 88 ¶ 30.) In 2016, Wabtec added approximately 5,700 employees through the acquisition of Faiveley. (Id.) By the end of 2017, Knorr and its subsidiaries employed approximately 27,700 employees worldwide, including approximately 5,000 employees in the Americas. (Id.)

of competition between Wabtec and Knorr. (Id. ¶¶ 2, 35.) There is high demand for and limited supply of skilled employees who have rail industry experience. (Id. ¶ 31.) Critical jobs in the rail industry can remain vacant for months while firms try to recruit and hire individuals with the requisite skills, training, and experience for a job opening. (Id.) Employees within the rail industry are key sources of potential talent to fill these openings. (Id.)

Defendants employ a variety of recruiting techniques, including using internal and external recruiters and staffing agencies to identify, solicit, recruit, and otherwise help hire employees. (ECF No. 88 ¶ 32.) Defendants also receive direct applications from individuals interested in employment opportunities. (Id.) Directly soliciting employees from other rail industry employers is a particularly efficient and effective method of competing for qualified employees. (Id. ¶ 33.) Soliciting involves communicating directly—whether by phone, e-mail, social or electronic networking, or in person—with another firm's employee who has not otherwise applied for a job opening. (Id.) Direct solicitation can be performed by individuals of the company seeking to fill the position or by outside recruiters retained to identify potential employees on the company's behalf. (Id.) Firms in the rail industry rely on direct solicitation of employees of other rail companies because those individuals have the specialized skills necessary and may be unresponsive to other methods of recruiting. (ECF No. 88 ¶ 33.)

In a properly functioning and lawfully competitive labor market, rail industry employers compete with one another to attract highly-skilled talent for their employment needs. (Id. ¶ 34.) The competition benefits employees because it increases the available job opportunities and improves an employee's ability to negotiate for a better

salary and other terms of employment. (Id.) By soliciting and hiring employees from other rail industry employers, a company is able to take advantage of the efforts its rival has expended in identifying and training the employees, while simultaneously inflicting a cost on the rival by removing an employee on whom the rival may depend. (ECF No. 88 ¶ 35.) By contrast, hiring employees directly out of a training program comes with none of those benefits, and the hiring institution must invest significant resources in identifying, assessing, and training new employees. (Id.)

Plaintiffs allege that the competition between employers, e.g., Wabtec and Knorr and their subsidiaries, for employees provides significant benefits to the employees. Plaintiffs explain:

> Competition for workers via lateral hiring has a significant impact on compensation in a variety of ways. First, when employers become aware of attractive outside opportunities for their employees, the threat of losing employees to competitors encourages employers to preemptively increase compensation to increase morale, productivity, and retention. If employers do not react to competition, their employees may seek positions that offer more generous compensation and benefits elsewhere, be receptive to recruiting by a rival employer, and/or reduce their productivity and morale. Once an employee has received an offer from a rival, retaining the employee may require a disruptive increase in compensation for one individual, if retention is possible at all, and cascading (and unplanned) pressures on compensation of other employees where internal equity and fair pay analysis would demand similar raises. Employers therefore have an incentive to preempt lateral departures by paying all employees well enough that they are unlikely to seek or pursue outside opportunities. Preemptive retention measures thus lead to increased compensation for all employees.
> …
> The availability of desirable positions at competing employers also forces employers to reactively increase compensation to retain employees who are likely to join a competitor. This can occur both when a particular employee or group of employees becomes interested in switching employers and the current employer responds by offering a compensation increase to retain them, or when an employer responds to overall attrition rates among its employees by increasing compensation levels. In the former case, even a targeted increase designed to retain specific employees may put upward pressure on the entire compensation structure.

Because many rail industry workers are highly specialized and integrated into teams tied to specific functions, some workers who move to positions at different companies may bring with them others from their teams. Just as competition forces employers to preemptively or reactively raise compensation to retain employees who might otherwise seek employment elsewhere, it also encourages increased compensation for related workers. Thus, increased movement of one category of employee not only increases the compensation for those employees, but also for the categories of employees who are likely to also seek parallel lateral positions, with similar higher compensation and benefits.

The positive compensation effects of hiring employees from competitors are not limited to the particular individuals who are solicited or who seek new employment. Instead, the effects of hiring from competitors (and the effects of eliminating lateral hiring, pursuant to agreement) commonly impact all employees of the participating companies.

(ECF No. 88 ¶¶ 39-36.)

## F. Defendants' No-Poach Agreements[4]

Beginning at least in 2009, Wabtec and Knorr allegedly entered into a no-poach agreement (ECF No. 88 ¶ 43.) No later than 2011, Knorr and Faiveley (prior to Faiveley's acquisition by Wabtec) allegedly entered into a no-poach agreement. (Id. ¶ 49.) Finally, no later than January 2014, Wabtec and Faiveley N.A. (prior to Faiveley's acquisition in 2016 by Wabtec) allegedly entered into a no-poach agreement. (Id. ¶ 53.) The agreements were executed and enforced by the companies' senior executives and included the companies' subsidiaries in the United States. (Id. ¶ 41.) According to plaintiffs, the companies agreed to refrain from soliciting or hiring each other's employees without the consent of the current employer in order to: (a) fix compensation

---

[4] The descriptions of the agreements and their import are taken from the consolidated class action complaint. The court expresses no opinion about the merits of those allegations.

of plaintiffs at artificially low levels; and (b) substantially eliminate competition among defendants for rail industry employees. (Id. ¶¶ 3, 77.) According to plaintiffs, the agreements are per se violations of antitrust law. (Id. ¶ 79.)

The agreements spanned several years and were monitored and enforced by executives of defendants. (ECF No. 88 ¶ 3.) The agreements substantially affected interstate commerce for employee services by causing: competition to be reduced for employees; suppressed employee compensation below competitive levels; employees to be denied access to better job opportunities; employee mobility to be restricted; and employees to be deprived of information they could use to negotiate for better terms of employment. (Id. ¶¶ 5-6, 58.) Plaintiffs allege that defendants concealed[5] their conspiracy and anti-competitive conduct. (ECF No. 88 ¶¶ 59-64.) On April 3, 2018, however, the conspiracy was publicly revealed with an announced action and proposed stipulated judgment by the DOJ. (Id. ¶ 7.)

---

[5]    Plaintiffs allege:

> Knowledge of the agreements was closely held by senior executives and recruiters of the Defendant companies who relied on direct and non-public communications with one another to manage and enforce the no-poach agreements, including in-person discussions and private email communications.
> …
> Defendants devised internal procedures by which implicated applicants could be discreetly flagged. Once flagged, the company President decided whether to seek permission from the rival company to hire the individual. The applicant was not told, much less consulted, about this process.
> …
> Knorr's policies stated that it was committed to fair competition.
> …
> Wabtec's policies provided that it was committed to respecting its employees and the fair and equitable treatment of employees.

(ECF No. 88 ¶¶ 60-63.)

## G. Class Allegations

The proposed class is defined as follows:

All natural persons employed by, or hired through staffing agencies or vendors to work for, Defendants or their wholly owned subsidiaries, in the United States, at any time from the start of the conspiracy (no later than 2009) to the present. Excluded from the class are senior executives and personnel in the human resources, recruiting, and legal departments of the Defendants, and employees hired outside of the United States to work outside of the United States.

(ECF No. 88 ¶ 65.)

Plaintiffs allege:

- there are "thousands of Class members;"

- the class is ascertainable from defendants' records;

- their claims are typical of the claims of the proposed class;

- they will fairly and adequately represent the interests of the proposed class and have no conflict with the interests of the proposed class;

- the counsel has experience in antitrust, employment, and class action litigation; and

- class action is superior to any other form for resolving this litigation.

(ECF No. 88 ¶¶ 66-70, 74.)

Plaintiffs identify the following questions of law and fact that are common to the members of the proposed class and predominate over any questions affecting only individual members of the proposed class:

- whether Defendants agreed not to solicit or hire each other's employees;

- whether such agreements were per se violations of the Sherman Act;

- whether Defendants fraudulently concealed their misconduct;

- whether and the extent to which Defendants' conduct suppressed compensation below competitive levels for railway employees;

- whether Plaintiffs and the Proposed Class suffered antitrust injury as a result of Defendants' agreements;

- the type and measure of damages suffered by Plaintiffs and the Proposed Class; and

- the nature and scope of injunctive relief necessary to restore a competitive market.

(ECF No. 88 ¶ 71.)

## H. Damages

Plaintiffs in the consolidated class action complaint seek the following relief:

- threefold the damages determined to have been sustained by them as a result of the conduct of defendants;

- the costs of suit, including reasonable attorneys' fees and expenses, prejudgment interest, and post-judgment interest;

- injunctive relief, declaring the no-hire agreement among Defendants unlawful and enjoining defendants from enforcing the agreement or entering into similar agreements going forward; and

- all other relief to which plaintiffs and the class may be entitled at law or in equity.

(ECF No. 88 at 20-21 ¶¶ A-F.)

## IV. Discussion

### A. Motion to Dismiss

### 1. Standard of Review

A motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint. Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993). In deciding a motion to dismiss, the court is not opining on whether the plaintiff will be likely to prevail on the merits; rather, when considering a motion to dismiss, the court

accepts as true all well-pled factual allegations in the complaint and views them in a light most favorable to the plaintiff. U.S. Express Lines Ltd. v. Higgins, 281 F.3d 383, 388 (3d Cir. 2002). While a complaint does not need detailed factual allegations to survive a Rule 12(b)(6) motion to dismiss, a complaint must provide more than labels and conclusions. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). A "formulaic recitation of the elements of a cause of action will not do." Id. (citing Papasan v. Allain, 478 U.S. 265, 286 (1986)). "Factual allegations must be enough to raise a right to relief above the speculative level" and "sufficient to state a claim for relief that is plausible on its face." Id. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 556).

> The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.. . . Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

(Id.) (quoting Twombly, 550 U.S. at 556) (internal citations omitted).

The Court of Appeals for the Third Circuit has instructed that "a court reviewing the sufficiency of a complaint must take three steps." Connelly v. Lane Constr. Corp., 809 F.3d 780, 787 (3d Cir. 2016). The court of appeals explained:

> First, it must "tak[e] note of the elements [the] plaintiff must plead to state a claim." Iqbal, 556 U.S. at 675. Second, it should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth."Id. at 679. See also Burtch v. Milberg Factors, Inc., 662 F.3d 212, 224 (3d Cir.2011) ("Mere restatements of the elements of a claim are not entitled to the assumption of truth."(citation and editorial marks omitted)). Finally, "[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Iqbal, 556 U.S. at 679.

Id. "Determining whether a complaint states a plausible claim for relief will…be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679 (citing Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir. 2007)). A plaintiff must set forth "sufficient factual allegations to raise a reasonable expectation that discovery will reveal evidence" of the elements of the claim for relief. Connelly, 809 F.3d at 789; Trzaska v. L'Oreal USA, Inc., 865 F.3d 155, 162 (3d Cir. 2017).

### 2. Plausibility of claim for a per se violation of § 1 of the Sherman Act

"To establish an actionable antitrust violation, a plaintiff must show concerted action by the defendants, that this concerted action resulted in a restraint on trade, and that this restraint was unreasonable." In re Processed Egg Prod. Antitrust Litig., 206 F. Supp. 3d 1033, 1043 (E.D. Pa. 2016) (citing 15 U.S.C. § 1; Santana Prod., Inc. v. Bobrick Washroom Equip., Inc., 401 F.3d 123, 131 (3d Cir. 2005)). "'To sufficiently plead an unreasonable restraint, a plaintiff must include allegations showing that the restraint will fail under one of three rules of analysis: the rule of reason, per se, or quick look.'" Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc., Civ. Action No. 17-205, 2018 WL 3032552, at *8 (S.D. Cal. June 19, 2018) (quoting United States v. eBay, Inc., 968 F. Supp. 2d 1030, 1037 (N.D. Cal. 2013)).

### a. Rule of Reason

"The 'rule of reason' standard is more than a default rule that the courts will apply when evaluating the lawfulness of a challenged business practice." In re Processed Egg, 206 F.Supp.3d at 1044 (citing Broad. Music, Inc. v. Columbia Broad. Sys., Inc., 441 U.S. 1, 8 (1979)). In a rule of reason case, the plaintiff must prove:

"(1) that the defendants contracted, combined or conspired among each other; (2) **that the combination or conspiracy produced adverse, anti-**

**competitive effects within the relevant product and geographic markets**; (3) that the objects of and the conduct pursuant to that contract or conspiracy were illegal; and (4) that the plaintiffs were injured as a proximate result of that conspiracy."

Rossi v. Standard Roofing, Inc., 156 F.3d 452, 464-65 (3d Cir. 1998) (quoting Tunis Bros. Co., Inc. v. Ford Motor Co., 763 F.2d 1482, 1489 (3d Cir. 1985)) (emphasis added). Thus, to state plausibly a rule of reason claim under the antitrust laws, the plaintiff must plausibly plead, among other things, a definition of the relevant market. Int'l Constr. Prod. LLC v. Caterpillar Inc., No. CV 15-108-RGA, 2016 WL 4445232, at *4 (D. Del. Aug. 22, 2016); MBR Const. Servs., Inc. v. City of Reading, No. 11-CV-07218, 2012 WL 4478384, at *8 n.37 (E.D. Pa. Sept. 28, 2012).

### b. Per Se

"[C]ertain agreements or practices are so 'plainly anticompetitive' and so often lack any redeeming virtue that they are conclusively presumed anticompetitive per se, without need for further examination." In re Processed Egg, 206 F.Supp.3d at 1044 (quoting Broad. Music, Inc. v. Columbia Broad. Sys., Inc., 441 U.S. 1, 8 (1979)). The Third Circuit Court of Appeals has explained:

> A restraint among competitors—called "horizontal," as opposed to "vertical" restraints on market participants at different points in a product's supply chain—is more rigorously scrutinized for an antitrust violation because it could more easily facilitate competitive harms, such as the exclusion of rivals, price fixing, or the consolidation of market power. See Areeda & Hovenkamp, Fundamentals, supra, § 14.11[A].

> In particular, "when a firm exercises monopsony power pursuant to a conspiracy, its conduct is subject to more rigorous scrutiny ...." West Penn, 627 F.3d at 103. "[U]nlike independent action, concerted activity inherently is fraught with anticompetitive risk insofar as it deprives the marketplace of independent centers of decisionmaking that competition assumes and demands." Id. (internal quotation marks omitted).

Indeed, some horizontal restraints, including price fixing and market division, are considered anticompetitive by their very nature. NYNEX Corp., 525 U.S. at 133-34, 119 S.Ct. 493 (citing United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 218, 60 S.Ct. 811, 84 L.Ed. 1129 (horizontal price-fixing), and Palmer v. BRG of Ga., Inc., 498 U.S. 46, 49-50, 111 S.Ct. 401, 112 L.Ed.2d 349 (1990) (per curiam) (horizontal market division) ). These are treated as per se Sherman Act Section 1 violations. Id.

Lifewatch Servs. Inc. v. Highmark Inc., 902 F.3d 323, 335-36 (3d Cir. 2018). The per se violation condemnation of an antitrust claim lightens a plaintiff's litigation burden. In re Processed Egg, 206 F.Supp.3d at 1051. "[T]he significance of a *per se* analysis is that the Court presumes the anticompetitive and unlawful character of the agreement which must otherwise be proven under the rule of reason." Id. at 1052. If, however, "the plaintiff chooses to so limit his claims, and the Court holds on summary judgment that per se treatment of the restraint is improper, he risks the possibility that his claim may be dismissed." Id. at 1051.

### c. Quick Look

A horizontal restraint may "facilitate the creation of new products, improve efficiencies, or lead to lower consumer costs[,]" and, thus, may not be "clearly harmful to competition." Lifewatch, 902 F.3d at 336. Id. Under those circumstances, the horizontal restraint is not per se unreasonable and would be "analyzed under some form...of a 'rule of reason' burden-shifting framework, which seeks to determine whether the restraint's harmful effects are outweighed by any procompetitive justifications and, if so, whether there are less restrictive alternatives." Id. A *complete* rule of reason analysis in those circumstances is not always warranted; rather, a "quick look" analysis may be conducted. The Third Circuit Court of Appeals has explained:

A quick look "presum[es] competitive harm without detailed market analysis" because "the anticompetitive effects on markets and consumers

are obvious." <u>Deutscher Tennis Bund</u>, 610 F.3d at 832. It is inappropriate if " 'the contours of the market' ... are not 'sufficiently well-known or defined to permit the court to ascertain without the aid of extensive market analysis whether the challenged practice impairs competition ....' " <u>Id.</u> (quoting <u>Worldwide Basketball & Sport Tours, Inc. v. Nat'l Collegiate Athletic Ass'n.</u>, 388 F.3d 955, 961 (6th Cir. 2004) ).

<u>Lifewatch</u>, 902 F.3d at 336 n.8. In other words, a quick look analysis falls between the rule of reason and per se condemnation. <u>eBay</u>, 968 F.Supp.2d at 1037.

### d. Application of Per Se Analysis

Here, defendants argue that plaintiffs' claim should be dismissed because the claim is subject to a rule of reason analysis and plaintiffs did not allege the relevant market in the consolidated class action complaint. (ECF No. 124-1 at 9.) Plaintiffs respond that they adequately alleged a per se violation of the antitrust laws, and, therefore, they are not required to plead a relevant market. (ECF No. 152 at 13-19.) At this stage of the proceedings, plaintiffs have the better view on this issue.

One treatise has recognized that a growing number of courts are using a two-step analysis to determine whether an alleged antitrust violation is per se unreasonable and explained:

> [T]he court first asks whether the challenged conduct truly involves a "horizontal" restraint between actual or potential competitors allocating markets or customers, reducing output, or otherwise restricting competition between them, and, if so, whether the restraint is devoid of plausible procompetitive justification (i.e., is "naked") or is instead plausibly ancillary and necessary to some larger, procompetitive integrative activity.

> If the answer to the first question is "no," then the restraint is assessed under the rule of reason as a vertical nonprice restraint. If the answer to the first question is "yes," and the restraint is naked (either because no justification is put forth, or because the one presented is simply not credible), then the per se rule is applied.

> If, however, it appears plausible that the restraint is ancillary and necessary to achieve some larger procompetitive activity or other legally

protected objective, such that the restraint cannot be said to be manifestly anticompetitive, then the more flexible rule of reason (or at least the quick look) is applied.

WILLIAM HOMES & MELISSA MANGIARACINA, ANTITRUST LAW HANDBOOK § 2:13 (2018-2019 ed.) (footnotes omitted).

In this case, based upon the allegations in the consolidated class action complaint, the answer to the first question, i.e., whether the challenged conduct truly involves a "horizontal" restraint between actual or potential competitors allocating markets or customers, reducing output, or otherwise restricting competition between them, would be "yes." The Supreme Court of the United States has explained: "One of the classic examples of a per se violation of § 1 is an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition." United States v. Topco Assocs., Inc., 405 U.S. 596, 608 (1972). "Antitrust law does not treat employment markets differently from other markets." eBay, 968 F.Supp.2d at 1039. Indeed, one treatise has explained: "An agreement among employers that they will not compete against each other for the services of a particular employee or prospective employee is, in fact, a service division agreement, analogous to a product division agreement." XII PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 2013b at 148 (3d ed. 2012).

Here, plaintiffs allege that Wabtec, Knorr, and Faiveley N.A. along with their subsidiaries were the largest railroad industry suppliers, i.e., they were at the same level of the market, and they agreed to not hire each other's employees, i.e., they entered into an agreement to allocate their employees to minimize competition for the employees.

Thus, plaintiffs plausibly alleged that defendants' agreements constituted horizontal restraints of competition with respect to defendants' employees.

Plaintiffs also plausibly alleged that defendants' horizontal product division agreements are "naked agreements." A naked agreement is an agreement "among competitors with no plausible efficiency justifications." 1 JOHN J. MILES, HEALTH CARE & ANTITRUST LAW § 3:2 (2018). Plaintiffs in the consolidated class action complaint do not allege any basis upon which the court could reasonably infer that the agreements had any procompetitive results or were somehow ancillary to a proper business dealing or purpose. Under those circumstances, plaintiffs plausibly alleged that the "no-poach" agreements described in the consolidated class action complaint were horizontal service division agreements, which, like product division agreements would be, are per se unlawful under the antitrust laws. Plaintiffs, therefore, are not required to plead the requirements of a rule of reason analysis, e.g., relevant market.

The court's decision that the agreements alleged by plaintiff are plausibly per se violations of the antitrust laws is supported by the case law and the position of the DOJ, which was articulated by the government at the hearing on the motion to dismiss. Other courts[6] that have considered similar "no-poach" agreements have held that the

---

[6]     Plaintiffs in the notice of supplemental authority cite Conrad v. Jimmy John's Franchise, LLC, Case No. 3:18-cv-00133-NJR-RJD (S.D. Ill. May 21, 2019) (ECF No. 189-1), and Blanton v. Domino's Pizza Franchising LLC, Case No. 2:18-cv-13207-VAR-DRG (E.D. Mich. May 24, 2019) (ECF No. 198-2). Plaintiffs attached the Conrad and Blanton decisions to their notice of supplemental authority. The court will, therefore, use this case's ECF docket citation when discussing each of those decisions.
     In Conrad, the plaintiff sued the defendants under the Sherman Act for their alleged "practice of including no-poach clauses in its franchise contracts." (ECF No. 189-1 at 2.) The defendants filed a motion to dismiss, which was denied with respect to the plaintiff's Sherman Act claim. (Id. at 3.) The judge presiding over the case at the time held that plaintiff stated a plausible Sherman Act claim and the court could not

agreements may be per se violative of the antitrust laws. For example, in <u>United States v. Kemp & Associates, Inc.</u>, Crim. Action No. 16-403, 2019 WL 763796 (D. Utah Feb. 21, 2019), the defendant was charged in a criminal indictment with criminal conspiracy in violation of § 1 for entering into a horizontal customer allocation agreement. The district court held that the agreement in issue should be subject to a rule of reason analysis and dismissed the indictment as barred by the statute of limitations. The government appealed. The Court of Appeals for the Tenth Circuit held that: (1) the indictment was not barred by the statute of limitations; and (2) it did not have interlocutory appellate jurisdiction to review the district's court's decision to apply the rule of reason analysis to the charge in the indictment and mandamus was not warranted with respect to that issue.

---

decide at the pleading stage of the litigation which analysis would apply to the case, i.e., the rule of reason, the per se approach, or the quick look analysis. (<u>Id.</u> at 3-4.) The judge then retired and the case was reassigned. The defendants filed another motion to dismiss that was "extremely similar to the one that the prior judge already adjudicated." (<u>Id.</u> at 2.) The newly assigned judge applied the law of the case doctrine and denied the defendant's motion to dismiss the complaint. (<u>Id.</u> at 6.)

In <u>Blanton</u>, the plaintiff alleged that the defendants "violated the Sherman Antitrust Act by orchestrating an employee no-hire agreement among their nationwide network of franchisees." (ECF No. 189-2 at 2.) The defendant filed a motion to dismiss and argued that the plaintiff failed to state a § 1 claim under the rule of reason. The court disagreed; it held that plaintiff stated a plausible § 1 claim and that the plaintiff's failure to apply the rule of reason was not fatal to his claim. The court explained that "[m]ore factual development…[was] necessary[,]" and at that stage the plaintiff set forth factual allegations sufficient to show plausibly he was entitled to relief under § 1. (<u>Id.</u> at 10.)

Defendants argue that the court should disregard plaintiffs' notice of supplemental authority because the courts in the foregoing decisions did not hold that horizontal no-poach agreements are always subject to the per se rule. (ECF No. 190 at 1.) The court finds <u>Conrad</u> and <u>Blanton</u> persuasive to the extent the courts in those decisions held that the plaintiffs set forth factual allegations sufficient from which the court could plausibly infer that the per se rule would apply, and, therefore, the plaintiffs were not required to plead a rule of reason analysis in their complaints. The court agrees with defendants that the courts in those decisions did not hold that all horizontal no-poach agreements will be per se violative of the antitrust laws.

<u>United States v. Kemp & Assocs., Inc.</u>, 907 F.3d 1264, 1272, 1276 (10th Cir. 2018). The

court of appeals, however, cautioned the district court:

> To be sure, were the merits of the rule of reason order before us we
> might very well reach a different conclusion than did the district court. After
> all, "an agreement to allocate or divide customers between competitors
> within the same horizontal market, constitutes a per se violation of § 1 of
> the Sherman Act," <u>Suntar Roofing, Inc.</u>, 897 F.2d at 473 (10th Cir. 1990),
> and Defendants' efforts to distinguish their agreement from a traditional
> customer allocation agreement are mostly unpersuasive. Despite
> Defendants' arguments otherwise, it is immaterial whether a customer
> allocation agreement applies to new or existing customers, <u>Palmer v. BRG
> of Georgia, Inc.</u>, 498 U.S. 46, 49–50, 111 S.Ct. 401, 112 L.Ed.2d 349
> (1990), and there is no rule that allocation agreements are only subject to
> the per se rule if customers are divided geographically, <u>see</u> <u>United States
> v. Cadillac Overall Supply Co.</u>, 568 F.2d 1078, 1088 (5th Cir. 1978). Nor
> does it matter that the alleged agreement would only affect a small number
> of potential customers, <u>cf.</u> <u>United States v. Reicher</u>, 983 F.2d 168, 170 (10th
> Cir. 1992) (holding that a conspiracy to rig a single bid, and therefore affect
> only a single customer, is subject to per se analysis), and any lack of judicial
> familiarity with the Heir Location Services industry is largely irrelevant,
> <u>Arizona v. Maricopa Cty. Med. Soc'y</u>, 457 U.S. 332, 346, 102 S.Ct. 2466,
> 73 L.Ed.2d 48 (1982).

<u>Id.</u> at 1277.

After the case was remanded, the government filed a motion for reconsideration

of the district court's decision to dismiss the indictment because of the rule of reason

analysis. <u>Kemp</u>, 2019 WL 763796, at *1. The court granted the motion for

reconsideration and held that the per se approach was applicable in the case. The court

explained that the agreement in issue was a horizontal customer allocation agreement,

which is subject to the per se approach, and it could not discern any basis upon which

to find the per se approach inapplicable to the case. <u>Id.</u> at *2-3.

In <u>AYA Healthcare v. AMN Healthcare</u>, Civ. Action No. 17-205-MMA, 2018 WL

3032552 (S.D. Cal. June 19, 2018), the plaintiffs sued the defendants under § 1. The

plaintiffs and the defendants sold medical-traveler services to hospitals, i.e., they provided

nurses to understaffed hospitals around the United States. The defendants were the dominate providers of the nurses in the country and employed other providers as subcontractors. The plaintiffs sued defendants because the defendants required the subcontractor-providers "to accept unilateral no-poaching agreements[,]" which forbade the defendants' rivals, i.e., the subcontractor providers, from initiating job offers or otherwise soliciting the nurses employed by defendants. Id. at *2. The defendants filed a motion to dismiss arguing, among other things, that the plaintiffs failed to state a claim under § 1 under all three rules of analysis, i.e., per se, quick look, and rule of reason.

The court found that the agreements alleged were horizontal market allocation agreements, which typically constitute a per se violation of § 1. Id. at *12. The court determined that the plaintiffs plausibly alleged that the agreements were not reasonably ancillary to the subcontractor agreements because, among other reasons, the agreements lasted beyond the subcontractor relationship had ended and the defendants were not subject to the same restrictions. Under those circumstances, the plaintiffs' allegations were sufficient to allege a type of restraint subject to per se treatment. The motion to dismiss was denied on that basis with respect to that issue. Id. at *12-13.

In United States v. eBay, Inc., 968 F.Supp.2d 1030 (N.D. Cal. 2013), the government asserted a § 1 claim against eBay, Inc. ("eBay") and alleged that eBay entered into an agreement with Intuit, Inc. ("Intuit"), "which restricted eBay and Inuit's ability to recruit or hire candidates from one another." Id. at 1032. eBay filed a motion to dismiss and argued, among other things, that the government "failed to state an unreasonable restraint of trade because it fails to include any allegations sufficient to state a rule of reason claim." Id. at 1037. The government admitted that it did not include in the

complaint any allegations with respect to the rule of reason, but argued that it was not required to do so because it only intended to pursue claims under the per se and quick look rules. Id.

The court recognized that the government set forth factual allegations sufficient to show plausibly that eBay and Intuit entered into a horizontal market allocation agreement. Id. at 1039. The court explained that a horizontal "market allocation agreement or any other restraint traditionally subject to per se treatment will only be found to be per se illegal if it 'facially appears to be one that would almost always tend to restrict competition and decrease output[.]'" eBay, 968 F.Supp.2d at 1039 (quoting Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma, 468 U.S. 85, 100 (1984)). Under those circumstances, the court was charged with considering "factual evidence relating to the agreement's formation and character" to determine "whether the alleged no-solicitation/no hire agreement…[was] ancillary to a procompetitive business purpose." Id. At the pleading stage of the litigation, however, the court could not "determine with certainty the nature of the restraint, and by extension, the level of analysis to apply." Id. at 1040. In other words, "taking the allegations in the Complaint as true, the court…[could not] determine as a matter of law that per se treatment…[would] be inappropriate." Id. The court denied the motion to dismiss with respect to that issue on that basis. Id.

Defendant relied on decisions[7] which do not warrant the application of the rule of reason in this case. In Eichorn v. AT & T Corp., 248 F.3d 131, 143 (3d Cir. 2001), the

_____

[7] Defendant cites the following decisions from courts outside the Third Circuit in support of its argument that the rule of reason should be applied to the alleged horizontal restraints in this case. Those decisions, however, are easily distinguishable from this case. See Deslandes v.McDonald's USA, LLC, Civ. Action No. 17-4857, 2018 WL 3105955, at *7 (N.D. Ill. June 25, 2018) (holding "the restraint alleged in plaintiff's

court of appeals held that the district court properly applied the rule of reason to analyze the "no-hire agreement" at issue in the case because the "no-hire agreement" was a covenant not to compete, i.e., a legitimate *ancillary* restraint on trade executed upon the legitimate transfer of ownership of a business. Here, at this stage of the proceedings, the court cannot discern that the alleged "no-poach" agreements would be legitimate ancillary restraints on trade executed with some other proper business purpose.

In Weisfeld v. Sun Chemical Corp., 210 F.R.D. 136, 143 (D.N.J. 2002), the court relied upon Eichorn to conclude that the rule of reason applied to a § 1 claim based upon the three largest manufacturers in the ink printing industry conspiring not to hire each other's employees for a period of four years. On appeal, the Third Circuit Court of Appeals in dicta explained that Eichorn was distinguishable from the facts of Weisfeld:

> As we have recognized, the "Supreme Court has been cautious in extending the per se approach to claims that fall outside certain previously enumerated categories of liability." Eichorn, 248 F.3d at 143 (citations

---

complaint cannot be deemed unlawful per se…[b]ecause the restraint alleged in plaintiff's complaint is ancillary to an agreement with a procompetitive effect"); In re High-Tech Employee Antitrust Litig., 856 F.Supp.2d 1103 n.9 (N.D. Cal. 2012) (acknowledging that the "horizontal agreements between competitors in restraint of trade" were "either *per se* unlawful…or…prima facie anticompetitive under the rule of reason analysis" but not deciding the issue because the plaintiffs plead their claim under the rule of reason); Bogan v. Hodgkins, 166 F.3d 509, 515 (2d Cir. 1999) (holding the agreement in issue did not trigger per se treatment because "while the Agreement may constrain General Agents to some degree, it does not allocate the market for agents to any meaningful extent"); Phillips v. Vandygriff, 711 F.2d 1217 (5th Cir. 1983) (holding the agreement in issue was not subject to per se analysis because it was "at least potentially reasonably ancillary" to a proper business purpose); UARCO Inc. v. Lam, 18 F.Supp.2d 1116 (D. Haw. 1998) (analyzing an "unclean hands" defense in deciding a motion for preliminary injunction and holding that companies' agreements to not hire each other's employees must be analyzed under the rule of reason without recognizing that no-hire agreements are horizontal market allocation agreements which receive per se treatment under the antitrust laws); Coleman v. Gen. Elec. Co., 643 F. Supp. 1229 (E.D. Tenn. 1986) (holding the per se analysis did not apply to the agreement in issue because "there was no stifling of competition for the services of these employees" and the impact of the agreement on the employment market was nothing more than "incidental").

omitted). In Eichorn, we held that the no hire agreement at issue did not constitute a per se violation and, in fact, did not constitute an unreasonable restraint of trade at all. Id. at 144, 145-146. But the facts in Eichorn are different than those here. In Eichorn, AT & T adopted a policy not to allow employees of Paradyne Corp., an AT & T affiliate, to transfer to other divisions of AT & T. The purpose of the policy was to make Paradyne more attractive to potential buyers. Shortly thereafter, Paradyne was sold, and AT & T entered into a post-closing agreement in which it agreed not to hire, solicit or rehire any Paradyne employee or consultant whose compensation exceeded $50,000 for a period of 245 days (8 months). Id. at 136-37. In this case, however, Weisfeld alleges that the three largest manufacturers in the ink printing industry conspired not to hire each others' employees for a period of four years.

Weisfeld v. Sun Chem. Corp., 84 F. App'x 257, 260 n.2 (3d Cir. 2004). The court of appeals, however, did not directly decide the issue. In any event, defendants' citations to Eichorn and Weisfeld do not persuade the court to conclude that the rule of reason would apply to this case; rather, the dictum in Weisfeld supports plaintiffs' argument that a conspiracy to not hire or solicit employees between employers who compete with one another may be a per se violation of § 1 of the Sherman Act.

The court's decision in this respect is supported by the government's explanation in its statement of interest and at the hearing on the motion to dismiss. It explained that the federal agencies charged with enforcing the antitrust laws consider naked no-poach agreements per se violations of the Sherman Act and the DOJ will proceed criminally against those who enter into those kinds of agreements. (ECF No. 158 at 9, 11, 13 (citing Federal Trade Commission, Department of Justice Antitrust Division, Antitrust Guidance for Human Resource Professionals, at 3 (Oct. 2016)).

The motion to dismiss will, therefore, be denied without prejudice with respect to this issue. Defendants may raise this issue if warranted in a motion for summary judgment.

### 3. Plausibility of Claim for Antitrust Conspiracy

Section 1 of the Sherman Act provides, in pertinent part:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.

15 U.S.C. § 1. "To state a Section 1 claim, then, a plaintiff must allege (1) an agreement (2) to restrain trade unreasonably." Lifewatch, 902 F.3d at 331 (quoting In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 315 (3d Cir. 2010)). "A private plaintiff suing under the Clayton Act must also allege antitrust standing, including that its 'injury [is] of the type the antitrust laws were intended to prevent and ... flows from that which makes defendants' acts unlawful.'" Lifewatch, 902 F.3d at 331 (quoting In re Ins. Brokerage Antitrust Litig., 618 F.3d at 331 n.9).

The prohibition in § 1 on "every contract, combination..., or conspiracy" that unreasonably restrains trade is a prohibition on an "agreement" that unreasonably restrains trade. Lifewatch, 902 F.3d at 332-33. "An agreement may be shown by either direct or circumstantial evidence." Id. at 333 (citing W. Penn Allegheny Health Sys., Inc. v. UPMC, 627 F.3d 85, 99 (3d Cir. 2010)). "'Unilateral activity by a defendant, no matter the motivation, cannot give rise to a [S]ection 1 violation.'" Id. at 332-33 (quoting InterVest, Inc. v. Bloomberg, L.P., 340 F.3d 144, 159 (3d Cir. 2003)). To show plausibly the defendants made an "agreement," "a plaintiff must plead 'some form of concerted action ..., in other words, a unity of purpose or a common design and understanding or a meeting of minds or a conscious commitment to a common scheme ....'" Id. (quoting Ins. Brokerage, 618 F.3d at 315)). The Third Circuit Court of Appeals has explained:

> For circumstantial evidence of an agreement, then, a plaintiff must allege both parallel conduct and something "more," which we have sometimes

called a "plus factor." Ins. Brokerage, 618 F.3d at 321. This "more" could include evidence (1) "that the defendant had a motive to enter into a ... conspiracy," (2) "that the defendant acted contrary to its interests," or (3) "implying a traditional conspiracy." Id. at 321-22 (quoting In re Flat Glass Antitrust Litig., 385 F.3d 350, 360 (3d Cir. 2004) ).

Lifewatch, 902 F.3d at 333.

The Supreme Court of the United States has explained:

In applying these general standards to a § 1 claim, we hold that stating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made. Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.

Twombly, 550 U.S. at 556.

Defendants in their joint motion to dismiss the consolidated class action complaint argue plaintiffs did not set forth factual allegations to show plausibly the "three distinct bilateral agreements are part of a single, overarching conspiracy among the Defendants." (ECF No. 124-1 at 14.) Plaintiffs respond that "[t]he Complaint never refers to a 'single' or 'overarching conspiracy[;]'" rather, plaintiffs plausibly alleged that "each Defendant participated in bilateral combinations to restrain competition in the market for employees." (ECF No. 152 at 19-20.) According to plaintiffs, each member of the proposed class was harmed by each bilateral agreement because each bilateral agreement "disrupted the normal bargaining and price-setting mechanisms that apply in the labor market...[which] suppress[ed] compensation levels generally." (Id. at 20.) Plaintiffs also argue that "it is certainly plausible that Defendants acted in concert with knowledge of, and in reliance on, the other express agreements to further the purposes of the [overarching] conspiracy." (Id. at 21.)

Here, plaintiffs allege that the defendants entered into three bilateral agreements:

(1) beginning no later than **2009 and lasting at least until 2016**, **Wabtec's** and **Knorr's** senior executives entered into an express no-poach agreement and then actively managed it with each other through direct communications;

(2) beginning no later than **2011 and lasting until at least 2015**, senior executives at **Knorr** and **Faiveley N.A.** reached an express no-poach agreement that included a commitment to contact one another before pursuing an employee of the other company and actively managed the agreement through direct communications; and

(3) beginning no later than **2014 and lasting at least until the companies merged in 2016**, senior executives at **Wabtec** and **Faiveley N.A.** entered into a no-poach agreement in which the companies agreed not to hire each other's employees without approval from the other company and actively managed and enforced the agreement through direct communications.

The foregoing allegations plausibly show that there existed three bilateral agreements to restrain competition for employees in the railway equipment supplier industry. Issues remain, however, about: (1) whether plaintiffs set forth factual allegations to show plausibly that Wabtec, Knorr, and Faiveley N.A. were members of an overarching conspiracy; and (2) if so, when the overarching conspiracy began.

Plaintiffs plausibly alleged that by **2014** Wabtec, Knorr, and Faiveley N.A. were engaged in three separate bilateral conspiracies. Plaintiffs, however, did not set forth factual allegations from which the court could conclude it is plausible that Wabtec in 2009 up until 2014 knew about Knorr and Faiveley N.A.'s agreement, Knorr knew about Wabtec and Faiveley N.A.'s agreement, or Faiveley N.A. knew about Wabtec and Knorr's agreement. Plaintiffs, however, may prove the existence of an overarching conspiracy via circumstantial evidence. Plaintiffs' allegations are sufficient to support a reasonable inference that at least by 2014 when all three competitors had entered into no-poach agreements they were engaged in conduct that would limit competition for the employees

of each company, i.e., it is plausible they each entered into an overarching agreement to refrain from competing for employees with their top rivals.

Plaintiffs also plausibly alleged "something more" from which a reasonable inference can be drawn that by 2014, Wabtec, Knorr, and Faiveley N.A. were members of an overarching conspiracy to refrain from competing against each other with respect to employees. First, plaintiffs assert that Wabtec, Knorr, and Faiveley N.A. each had a motive to enter into an overarching agreement. Plaintiffs allege:

- Wabtec, Knorr, and Faiveley N.A. were the three largest rail equipment suppliers and some of the largest employers in the rail industry;

- there is a high demand for and limited supply of skilled employees who have rail industry experience;

- directly soliciting employees from other rail industry employers is a particularly efficient and effective method of competing for qualified employees;

- in a properly functioning and lawfully competitive labor market, rail industry employers compete with one another to attract highly-skilled talent for their employment needs; and

- the competition benefits employees because it increases the available job opportunities and improves an employee's ability to negotiate for a better salary and other terms of employment.

Based upon the foregoing allegations, it is plausible to infer that by 2014, Wabtec, Knorr, and Faiveley N.A. each had a motive to join an *overarching conspiracy* because: (1) they were each other's biggest competitors for skilled employees; and (2) they each entered into bilateral agreements *with* their two largest competitors. An overarching agreement among all three of the largest rail equipment suppliers would place Wabtec, Knorr, and Faiveley N.A. on equal footing with respect to competition for employees from their largest

competitors. In any event, the 2016 acquisition of Faiveley by Wabtec resulted in Faiveley N.A. becoming part of the bilateral conspiracy between Wabtec and Knorr.

Plaintiffs set forth factual allegations sufficient to show plausibly that the entry into the bilateral agreements was contrary to the competitive interests of Wabtec, Knorr, and Faiveley N.A.: "By soliciting and hiring employees from other rail industry employers, a company is able to take advantage of the efforts its rival has expended in identifying and training the employees, while simultaneously inflicting a cost on the rival by removing an employee on whom the rival may depend." (ECF No. 88 ¶ 35.) By entering into the bilateral agreements, Wabtec, Knorr, and Faiveley N.A. forfeited the advantages gained from soliciting and hiring their competitors' employees. A reasonable inference is that they would enter into such agreements in exchange for promises that their top competitors would not solicit or hire each other's employees. Thus, the top rivals would be on equal footing in the competition for employees.

Plaintiffs set forth sufficient factual allegations to show plausibly that there were similarities between the three bilateral agreements from which a reasonable inference may be drawn that the three bilateral agreements evolved into to an overarching agreement when Wabtec and Faiveley N.A. (no later than 2014) entered into the third bilateral agreement described in the consolidated class action complaint. Plaintiff alleges:

- the three bilateral agreements were entered into within a six-year time period and by the time Wabtec and Faiveley N.A. entered into their agreement in 2014, the other two bilateral agreements between Wabtec & Knorr and Knorr & Faiveley N.A. were effective and being enforced;

- the three bilateral agreements were executed and enforced by the companies' senior executives;

- the parties to each of the bilateral agreements agreed to not poach each other's employees and to not hire each other's employees prior to receiving approval from the other party to the agreement; and

- the executives of Wabtec, Knorr, and Faiveley N.A. managed and enforced the bilateral agreements via direct communication with each other.

Based upon the foregoing, plaintiffs set forth factual allegations to show plausibly four conspiracies to restrain competition for employees in the railway equipment supplier industry: (1) beginning no later than 2009, Wabtec and Knorr; (2) beginning no later than 2011, Knorr and Faiveley N.A.; (3) beginning no later than 2014, Wabtec and Faiveley N.A.; and (4) beginning at the earliest 2014, the overarching conspiracy among Wabtec, Knorr, and Faiveley.

Plaintiffs and defendants cite to three decisions in support of their positions with respect to whether the allegations in the consolidated complaint are sufficient to plausibly show an overarching conspiracy among Wabtec, Knorr, and Faiveley: In re Insurance Brokerage Antitrust Litigation, 618 F.3d 300 (3d Cir. 2010); In re High-Tech Employee Antitrust Litigation, 856 F.Supp.2d 1130 (N.D. Cal. 2012); and In re Iowa Ready-Mix Concrete Antitrust Litigation, 768 F.Supp.2d 961, 972 (N.D. Iowa 2011).

Defendants argue that this case "is like In re Insurance Brokerage Antitrust Litig., in which the Third Circuit Held that alleged parallel kickback conspiracies among defendants, although not necessarily 'praiseworthy—or even lawful,' did not plausibly suggest a 'global conspiracy' among the defendants." (ECF No. 124-1 at 15.) In Insurance Brokerage, the plaintiffs, who were "purchasers of commercial and employee benefit insurance," sued the defendants, who were "insurers and insurance brokers that deal[t] in those lines of insurance." Insurance Brokerage, 618 F.3d at 308. The plaintiffs sued the defendants alleging the defendants "entered into unlawful, deceptive schemes to

allocate purchasers among particular groups of defendant insurers." Id. The plaintiffs explained: "conspiring brokers funneled unwitting clients to their co-conspirator insurers, which were insulated from competition; in return, the insurers awarded the brokers contingent commission payments—concealed from the insurance purchasers and surreptitiously priced into insurance premiums—based on the volume of premium dollars steered their way." Id. The agreements between brokers and insurers at issue in Insurance Brokerage were vertical agreements. Id. The plaintiffs also alleged that a "global conspiracy" existed among the brokers to conceal the existence of the alleged conspiracy and commission agreements. Id. at 313. The plaintiffs labeled the global conspiracy as a "horizontal restraint." Id. at 348.

The defendants filed a motion to dismiss arguing, among other things, that the plaintiffs failed to set forth factual allegations sufficient to show plausibly a global, horizonal conspiracy existed among the brokers or among the insurers. The plaintiffs in response explained that in a normal market, a broker would explain to customers that another broker's rates are too high. Because of the conspiracy, however, a broker could not explain to a potential client that another broker's rates were too high without exposing himself or herself and his or her participation in the conspiracy and commission agreements. The plaintiffs in support of the global conspiracy theory pointed to parallel conduct by the brokers and insurers, i.e., "the similar nature of each broker-centered conspiracy, as well as the allegedly similar confidentiality agreements the brokers inserted into the vertical contracts with each of their partner insurers." Id. at 350-51.

The district court granted the motion to dismiss with respect to the global conspiracy and held that the "complaints' factual allegations fail[ed] to plausibly imply

horizontal non-disclosure agreements among the defendant brokers or the defendant insurers." Insurance Brokerage, 618 F.3d at 348. The district court explained: "While Plaintiffs present facts to support the possibility of inadequate disclosures by the brokers to the insureds, the Complaints are bereft of allegations to demonstrate that this was more than brokers adopting sub-par disclosure methods to protect their own, lucrative agreements." Id. at 351.

The court of appeals relied upon Twombly to affirm the decision of the district court. The court of appeals explained:

> Twombly makes clear that a claim of conspiracy predicated on parallel conduct should be dismissed if "common economic experience," or the facts alleged in the complaint itself, show that independent self-interest is an "obvious alternative explanation" for defendants' common behavior. For our present purposes, we find this guidance sufficient.

Insurance Brokerage, 618 F.3d at 325. The court found that although the plaintiffs alleged parallel conduct, i.e., the brokers used industry-standard disclosure language in their agreements with customers and did not disclose their participation in the vertical agreements with insurers to their customers, the brokers' independent self-interest provided an obvious alternative explanation for their failure to disclose the vertical agreements to customers. The court of appeals explained: "Reaping 'enormous profits' from their own furtive use of contingent commission agreements, the brokers had no desire to upset the apple cart." Id. at 349.

The court of appeals found that the plaintiffs did not otherwise set forth factual allegations, i.e., "plus factors," to "plausibly imply a horizontal agreement among the brokers." Id. at 349-50. For example, the brokers' use of industry standard disclosure

practices was not a "plus factor" from which a horizontal conspiracy could be reasonably inferred. Id. The court of appeals explained:

> Plaintiffs' attack on the pervasive use of contingent commissions to exploit insurance brokers' power over their clients—and the use of similar techniques to disguise this activity—may allege a "pernicious industry practice," but they do not plausibly imply an industry-wide conspiracy.

Id. at 350.

Insurance Brokerage is distinguishable from this case. First, plaintiffs allege members of three horizontal bilateral agreements to not poach each other's employees were members of one overarching horizontal agreement to not poach each other's employees, i.e., the members and subject-matter of the agreements were the same. In Insurance Brokerage, however, the plaintiffs argued that *vertical* agreements between brokers and insurers were evidence of *horizontal* agreements between brokers and between insurers to not disclose the contents of the vertical agreements. In other words, the parties to the horizontal agreements were different than the parties to the vertical agreements and the subject-matters of the agreements were related but not the same.

Second, the plaintiffs in Insurance Brokerage heavily relied upon the industry-standard disclosure language to show that the brokers were engaged in horizontal agreements to not disclose their vertical agreements with insurers. The court of appeals rejected that argument because although the reliance on the industry-standard language may be evidence of a "pernicious industry practice," it did not show that the brokers were engaged in a horizontal agreement to violate the antitrust laws. Id. at 351. Here, however, there is no evidence that the alleged agreements by Wabtec, Knorr, and Faiveley to not poach each other's employees were industry practice. As discussed above, plaintiffs set forth factual allegations that constitute "plus factors" and circumstantially support that by

at least 2014, Wabtec, Knorr, and Faiveley were members of an overarching conspiracy to not poach each other's employees.

The parties also cite to In re High-Tech Employee Antirust Litigation, 856 F.Supp.2d 1103 (N.D. Cal. 2012). In High-Tech, the plaintiff-employees alleged the defendant-companies, who were all high-tech companies with a principal place of business in Silicon Valley, conspired to fix and suppress employee compensation to restrict employee mobility. Id. at 1108. The plaintiffs alleged that the conspiracy consisted of six bilateral agreements among the defendants to not poach each other's employees. Id. at 1110-11. The plaintiffs also alleged that all defendants were members of an "overarching conspiracy." Id. at 1115. The defendants argued that the plaintiffs failed to set forth factual allegations sufficient to show plausibly there was an overarching conspiracy among all defendants. Id.

The district court determined the factual allegations in the complaint plausibly showed the defendants were a part of the overarching conspiracy because the plaintiffs "alleged facts beyond mere parallel conduct[,]" which "tend…to exclude the possibility of independent action." Id. at 1117. The court explained the plaintiffs alleged: (1) the six bilateral agreements were negotiated by senior executives; (2) "at all relevant times, at least one of three [senior] executives 'had significant influence over at least one party to each of the six bilateral agreements[;]" (3) the six bilateral agreements, which were reached in secrecy over a span of two years, were identical; and (4) one of the senior executives (Steve Jobs) "exerted significant influence over companies involved in four of the bilateral" agreements. Id. at 1116-17. The court concluded: "The fact that all six identical bilateral agreements were reached in secrecy among seven Defendants in a

span of two years suggests that these agreements resulted from collusion, and not from coincidence." Id. at 1120.

The factual allegations in support of an overarching conspiracy in this case are not as strong as the factual allegations in High-Tech; indeed, plaintiffs in this case do not allege that a) Wabtec, Knorr, or Faiveley N.A. shared senior executives or board members b) senior executives or board members had influence over another party to the bilateral agreements, c) the agreements were reached within a span of two years (here it was approximately 5 years), or d) the agreements were identical. Plaintiffs do allege, however, that beginning in 2014, the three largest railroad equipment suppliers were all engaged with each other in bilateral agreements to not poach each other's employees. The agreements, like the agreement in High-Tech, were company-wide in the United States and included the same essential terms. Wabtec, Knorr, and Faiveley N.A. would have been motivated to enter into an overarching agreement to ensure that the other two companies also agreed to not poach each other's employees and obtain any advantage in the marketplace. Under those circumstances, there is a reasonable expectation that discovery will reveal evidence that at least beginning in 2014 (when Wabtec and Faiveley N.A. entered into their no poach agreement) there was an overarching conspiracy among Wabtec, Knorr, and Faiveley N.A. to not poach each other's employees. Like the plaintiffs in High-Tech, plaintiffs in this case set forth factual allegations sufficient to show parallel conduct and something "more" to show defendants were acting pursuant to an overarching conspiracy.

Defendants also cite to In re Iowa Ready-Mix Concrete Antitrust Litigation, 768 F.Supp.2d 961, 972 (N.D. Iowa 2011), in support of their argument that plaintiffs failed to

set forth factual allegations sufficient to show plausibly Wabtec, Knorr, and Faiveley N.A. were members of an overarching conspiracy. In Ready-Mix, the plaintiffs, purchasers of ready-mix concrete, sued the defendants, producers and sellers of ready-mix concrete and certain of their officers, directors, owners, and employees, "alleging an antitrust conspiracy to suppress and eliminate competition by fixing the price of ready-mix concrete in the 'Iowa region.'" Id. at 963. According to the plaintiffs, "the defendants and their co-conspirators conspired to set and reached agreements to set agreed-upon prices, to set agreed-upon price increases, and to submit non-competitive and rigged bids for ready-mix concrete sold in the Northern District of Iowa and elsewhere." Id. at 965-66. The defendants filed a motion to dismiss in which they argued that "the plaintiffs…alleged no facts to support a direct agreement among any of the defendants other than the three separate and discrete agreements admitted in the individual defendant's plea agreements to criminal antitrust charges[.]" Id. at 971. More specifically, the defendants argued: "defendants contend that the allegations of an industry-wide conspiracy in the entire (and undefined) 'Iowa region' over a four-plus year period are inconsistent with the discrete agreements admitted in the plea agreements and, thus, must be disregarded." Id. at 972.

The court agreed with the defendants and held that the plaintiffs included in the complaint only conclusory allegations about the defendants allegedly entering into an industry-wide conspiracy in the Iowa region. Id. at 974. The court explained:

> Here, as the defendants contend, the Amended Consolidated Complaint does not even allege parallel conduct, but skips straight to conclusory allegations of an agreement among the defendants. See Amended Consolidated Complaint at ¶¶ 42–51. Such "a naked assertion of conspiracy in a § 1 complaint ... gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility of 'entitle[ment] to relief.' " Bell Atlantic, 550 U.S. at 557, 127 S.Ct. 1955 (citing DM Research, Inc. v. College of Am.

Pathologists, 170 F.3d 53, 56 (1st Cir.1999), as stating, "[T]erms like 'conspiracy,' or even 'agreement,' are border-line: they might well be sufficient in conjunction with a more specific allegation-for example, identifying a written agreement or even a basis for inferring a tacit agreement, ... but a court is not required to accept such terms as a sufficient basis for a complaint"). There is no "further factual enhancement" in the Amended Consolidated Complaint to push the allegations of an antitrust conspiracy across the line between possible and plausible. Indeed, allegations that, for the purpose of forming and effectuating their combination and conspiracy, the defendants and their co-conspirators "did those things which they combined and conspired to do, including, among other things, discussing, forming and implementing agreements to raise and maintain at artificially high levels the prices for Ready–Mix Concrete," Amended Consolidated Complaint at ¶ 44, is, as the defendants contend, merely a tautology, not an allegation of additional facts. Even the plaintiffs' allegations that, throughout the class period, the defendants and their co-conspirators conspired to set and reached agreements to set agreed-upon prices, to set agreed-upon price increases, and to submit non-competitive and rigged bids for ready-mix concrete sold in the Northern District of Iowa and elsewhere, id. at ¶¶ 51–52, are merely conclusory allegations of an agreement, not allegations of facts from which an agreement can reasonably be inferred. Similarly, allegations that the defendants concealed their agreement through secret meetings, id. at 56–57, are merely conclusory allegations providing no factual enhancement.

The defendants are correct that the only facts about the nature and operation of the alleged conspiracy to be gleaned from the Amended Consolidated Complaint are the facts in the plea agreements of the individual defendants. Even then, it is only by recourse to the plea agreements referenced in the Amended Consolidated Complaint that one can learn any factual details of antitrust conspiracies, and then only as to certain bilateral agreements.

On the other hand, the plaintiffs are correct that the Packaged Ice decision on which the defendants rely held that civil antitrust litigation cannot be "circumscribed or defined by the boundaries of the criminal investigation or plea agreements" of some of the alleged participants in the civil antitrust conspiracy. 723 F.Supp.2d at 1011–12. That decision also held that "taken as part of the larger picture, and considering the parallel internal investigations that have resulted in the suspension of key executives, these guilty pleas [of certain alleged participants in the civil conspiracy] do enhance the expectation that discovery might lead to evidence of a nationwide illegal agreement among these same actors, one of whom is under active government investigation and admittedly does not sell product in southeastern Michigan." Id. at 1011. What is missing in this case,

however, is the "larger picture" from which inferences of a wider conspiracy can be drawn from guilty pleas to separate bilateral conspiracies.

Id.

The court: (1) rejected the application of a "hub and spoke" conspiracy to the case because the plaintiffs did not allege a vertical conspiracy, which is a requirement of a "hub and spoke" conspiracy; (2) recognized the plaintiffs did not set forth any "allegation of facts supporting the existence of an overall plan to fix prices or that each defendant had knowledge that others were involved in the conspiracy[;]" and (3) found the allegations about the geographical area of the conspiracy, i.e., an undefined "Iowa region," implausible because "[a]s alleged, ready-mix concrete must be produced and delivered within a limited geographical area, such that it is not clear how all of the defendants could compete within an entire undefined 'Iowa region[.]'" Id. at 975-76.

Defendants rely upon Ready-Mix and argue that like the plaintiffs in Ready-Mix, the "[p]laintiffs [in this case] do not offer any factual allegations that would connect the separate bilateral agreements." (ECF No. 124-1 at 15.) Plaintiffs' allegations in this case, however, rise above the conclusory and implausible allegations set forth by the plaintiffs in Ready-Mix. As discussed above, by 2014, the three largest railroad equipment suppliers had all entered into bilateral agreements to not poach each other's employees. Those agreements were reached and managed by the senior executives of the three largest railroad equipment suppliers and the agreements applied company-wide throughout the United States. Under those circumstances, there is a reasonable expectation that discovery will reveal evidence that beginning no later than 2014, Wabtec, Knorr, and Faiveley N.A. were members of an overarching conspiracy to restrain competition for employees.

Based upon the foregoing, plaintiffs set forth factual allegations sufficient to show plausibly that: (1) Wabtec, Knorr, and Faiveley N.A. entered into three bilateral no-poach agreements to not poach each other's employees; and (2) beginning in at least 2014, the three bilateral no-poach agreements were part of an overarching conspiracy among Wabtec, Knorr, and Faiveley N.A. to not poach each other's employees. Defendants' motion to dismiss will be denied on that basis.

### 4. Ricon and Bendix will be dismissed without prejudice from the consolidated class action complaint.

Defendants argue that the complaint filed by the DOJ in the underlying criminal action did not name Bendix or Ricon as defendants and the factual allegations with respect to Bendix (a subsidiary of Knorr) and Ricon (a subsidiary of Wabtec) "are particularly sparse[.]" (ECF No. 124-1 at 16.) With respect to Ricon, defendants argue that "[t]he single reference to Ricon in the Complaint comes in the paragraph in which Plaintiffs describe Ricon as a defendant." (Id. at 17.) "Plaintiffs make no allegation that Ricon's products are principally for the 'railway industry.'" (Id.) Plaintiffs "do not oppose Defendants' request to dismiss the claims against Ricon." (ECF No. 152 at 24 n.7.) Plaintiffs request the court dismiss the claims against Ricon without prejudice "to Plaintiffs' ability to request leave to amend in the future." (Id.) The motion to dismiss will be granted without prejudice with respect to Ricon, and Ricon will be dismissed without prejudice as a defendant.

With respect to Bendix, defendants explain that plaintiffs "allege a no-poach conspiracy restraining competition for 'railway industry employees[,]" but Bendix is a manufacturer of braking systems for trucks, i.e., tractor trailers and similar commercial vehicles, and not rail cars. (ECF No. 124-1 at 16.) In other words, plaintiffs do not allege

that Bendix had any railway employees, who are in issue in this case. (Id. at 17.) Plaintiffs in the consolidated class action complaint set forth the following allegations against Bendix:

> Defendant Bendix Commercial Vehicle Systems LLC ("Bendix") is a Delaware corporation with its headquarters in Elyria, Ohio. Bendix develops and supplies active safety technologies, air brake charging and control systems, and components for commercial vehicles. Bendix is a wholly-owned subsidiary of Knorr-Bremse. Bendix served as a recruiter for Knorr Brake for certain employment needs.
> …
> In furtherance of their agreement, Wabtec and Knorr informed their outside recruiters not to solicit employees from the other company. For example, Knorr Brake used Bendix, a Knorr subsidiary and Knorr Brake sister company, as a recruiter for certain employment needs. Knorr Brake directed the Bendix recruiters to refrain from soliciting employees from Wabtec.

(ECF No. 88 ¶¶ 27, 45).

To state a § 1 claim against Bendix, plaintiffs must set forth factual allegations sufficient to plausibly show that Bendix had "unity of purpose or a common design and understanding or a meeting of minds or a conscious commitment to a common scheme" with Wabtec to divide the market in the employee rail equipment supplier industry. Insurance Brokerage, 618 F.3d at 315. Plaintiffs, however, are not required to show that Bendix "knew of or participated in every transaction in furtherance of or related to the alleged conspiracy." In re Magnesium Oxide Antitrust Litig., No. CIV. 10-5943 DRD, 2011 WL 5008090, at *17 (D.N.J. Oct. 20, 2011) (citing decisions). Allegations that Bendix *knew* about the conspiracy—without more—are insufficient to show plausibly that Bendix was a member of an alleged conspiracy in this case. Id. Plaintiffs must set forth factual allegations to show plausibly: (1) Bendix had knowledge of the agreement between Wabtec and Knorr; and (2) Bendix intended to join the agreement. Id. (citing In re Vitamins Antitrust Litig., 320 F.Supp.2d 1, 15 (D.D.C. 2004)). "'[A] party progresses form mere

knowledge of an endeavor to intent to join it when there is 'informed and interested cooperation, stimulation, instigation. And there is also a stake in the venture which, even if it may not be essential, is not irrelevant to the question of conspiracy.'" Id. (quoting Direct Sales Co. v. United States, 319 U.S. 703, 713 (1943)).

Here, plaintiffs allege Bendix, a wholly-owned subsidiary of Knorr, acted as Knorr's recruiter for "certain employment needs" and that Knorr directed Bendix to refrain from soliciting employees from Wabtec. (ECF No. 88 ¶¶ 27, 45.) Those allegations, however, are not sufficient to raise a reasonable expectation that discovery will reveal evidence that Bendix knew Knorr agreed with Wabtec to restrict competition for employees and that Bendix intended to join the agreement. Plaintiffs' allegations against Bendix amount to no more than allegations that Bendix aided and abetted Knorr in violating the antitrust laws. The Sherman Act, however, does not establish liability for a wholly-owned subsidiary who aids and abets its parent-corporation in violating the antitrust laws; rather, "to state a valid antitrust claim against…[a wholly-owned subsidiary], the…[plaintiff] must assert conduct by [the wholly-owned subsidiary] that is directly forbidden by the Sherman Act." MCI Telecommunications Corp. v. Graphnet, Inc., 881 F. Supp. 126, 130 (D.N.J. 1995). In other words, "aiding and abetting is not an independent theory of civil liability under the Sherman Act." Top Rank, Inc. v. Haymon, No. CV154961JFWMRWX, 2015 WL 9948936, at *16 (C.D. Cal. Oct. 16, 2015) (citing MCI Telecommunications, 881 F.Supp. at 129). The motion to dismiss with respect to Bendix will, therefore, be granted, and Bendix will be dismissed without prejudice[8] as a defendant.

---

[8] In the alternative to plaintiffs' argument that the allegations against Bendix are sufficient, they request leave to amend the consolidated class action complaint to set forth additional factual allegations against Bendix. (ECF No. 152 at 26 n.9.) To the extent

### B. Motion to Strike Class Allegations

#### 1. Applicable Law

Here, defendants argue the class allegations should be stricken from the consolidated class action complaint under Federal Rule of Evidence 12(f). (ECF No. 129 at 7.) Defendants also acknowledge that Federal Rule of Civil Procedure 23(c)(1)(A) and (d)(1)(D) provides "statutory authority for Defendants' pleading-stage motion to strike." (ECF No. 129 at 19.) Courts have reached different conclusions about whether Rule 12(f), Rule 23, or both[9] Rule 12(f) and Rule 23 provide a court the authority to strike class allegations from the complaint. For the reasons explained below, defendants' motion to strike class allegations will be considered and analyzed under Rule 23(d)(1)(D).

#### a. Rule 12(f)

Rule 12(f) provides, in pertinent part, that "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." FED. R. CIV. P. 12(f). The moving party bears the burden to show allegations should be stricken from a pleading. Staro Asset Mgmt., LLC v. Soose, No. CIV.A. 02-886, 2005 WL 2179781, at *3 (W.D. Pa. Aug. 17, 2005). "'The purpose of a motion to strike is to clean up the pleadings, streamline litigation, and avoid unnecessary forays into immaterial matters.'" Landau v. Lamas, Civ. Action No. 15-1327, 2018 WL 3126396, at *2 (M.D. Pa.

---

plaintiffs want to amend their consolidated class action complaint, they should do so in accordance with Federal Rule of Civil Procedure 15.

9    For example, in Bell v. Cheswick Generating Station, Genon Power Midwest, L.P., Civ. Action No. 12-929, 2015 WL 401443, at *2 (W.D. Pa. Jan. 28, 2015), the court explained that Rule 12(f) and Rule 23(c)(1)(A) "together, provide authority for the Court to strike the class allegations from Plaintiffs' Complaint, if appropriate, even before Plaintiffs move for class certification."

June 26, 2018) (quoting <u>McInerney v. Moyer Lumber and Hardware, Inc.</u>, 244 F.Supp.2d 393, 402 (E.D. Pa. 2002). "While courts possess considerable discretion in weighing Rule 12(f) motions, such motions are not favored and will generally be denied unless the material bears no possible relation to the matter at issue and may result in prejudice to the moving party." <u>Miller v. Group Voyagers, Inc.</u>, 912 F.Supp. 164, 168 (E.D. Pa. 1996). "Motions to strike factual allegations will be denied when, although the averments state no independently actionable claim, they 'are so connected with the subject matter of the suit that it might be deemed to present a question of law or fact that the court ought to hear.'" <u>In re Westinghouse Sec. Litig.</u>, No. CIV. A. 91-354, 1998 WL 119554, at *2 (W.D. Pa. Mar. 12, 1998) (quoting <u>River Rd. Dev. Corp. v. Carlson Corp.- Ne.</u>, No. CIV. A. 89-7037, 1990 WL 69085, at *1 (E.D. Pa. May 23, 1990)).

It is unlikely that a defendant can show the class allegations constitute "an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter[,]" [10]

---

[10]    One court in this district defined the relevant terms of Rule 12(f) as follows:

"Redundant"—The statement of facts which are wholly foreign to the issue intended to be denied or the needless repetition of material averments.

"Immaterial"—having no essential or important relationship to the averment intended to be denied. A statement of unnecessary particulars in connection with, and as descriptive of, what is material.

"Impertinent"—A statement of matters applied to facts which do not belong to the matter in question, and which is not necessary to the matter in question.

"Scandalous"—Unnecessary matter or facts criminatory of a party referred to in the pleading.

<u>Burke v. Mesta Mach. Co.</u>, 5 F.R.D. 134, 138 (W.D.Pa.1946) (cited by <u>DirecTV, Inc. v. Weikel</u>, No. CIV. 03-5300 (JBS), 2005 WL 1243378, at *2 (D.N.J. May 25, 2005)).

FED. R. CIV. P. 12(f), that should be stricken from the complaint. See Timothy A. Daniels,

Challenging Class Certification at the Pleading Stage: What Rule Should Govern and

What Standard Should Apply?, 56 S. Tex. L. Rev. 241, 264 (2014) ("A complaint seeking

class certification certainly does not raise an 'insufficient defense,' nor does it typically

contain 'redundant,' 'impertinent,' or 'scandalous' matters."). It is recognized, however,

that "[a]n order granting a motion to strike class allegations is tantamount to a denial of

class certification after a motion to certify.'" Smith v. Merial Ltd., No. 10-cv-439, 2012 WL

2020361, at *6 (D.N.J. June 5, 2012) (quoting 1 JOSEPH M. MCLAUGHLIN, MCLAUGHLIN ON

CLASS ACTIONS § 3:4 (15th ed. 2018)); Richardson v. Verde Energy USA, Inc., 354

F.Supp.3d 639, 654 (E.D. Pa. 2018) ("[A] motion to strike is 'for all practical purposes,

identical to an opposition to a motion for class certification.'") (quoting Korman v. The

Walking Co., 503 F.Supp.2d 755, 762-63 (E.D. Pa. 2007)); Scott v. Family Dollar Stores,

Inc., 733 F.3d 105, 110 n.2 (4th Cir. 2013) ("[W]e have jurisdiction to review the district

court's grant of Family Dollar's motion to dismiss or strike the class allegations because

the district court's ruling is the functional equivalent of denying a motion to certify the case

as a class action.") (citing In re Bemis Co., Inc., 279 F.3d 419, 421 (7th Cir. 2002) (holding

the rejection of a position in an answer with respect to whether class treatment was

suitable in a case was the "functional equivalent" of denying a motion for class

certification)). Thus, a court's consideration of a motion to strike class allegations should

not be analyzed under Rule 12(f) under which the movant the burden of proof; rather, a

court should consider a motion to strike class allegations under the pertinent provisions

of Rule 23, which governs class certification.

### b. Rule 23

Rule 23(c)(1)(A) provides that "[a]t an early practicable time…the court must determine by order whether to certify the action as a class action[,]" FED. R. CIV. P. 23(c)(1)(A), and Rule 23(d)(1)(D) provides that "the court may issue orders that…require that the pleadings be amended to eliminate allegations about representation of absent persons and that the action proceed accordingly[,]" FED. R. CIV. P. 23(d)(1)(D). The Supreme Court of the United States has recognized that "[s]ometimes the issues are plain enough from the pleadings to determine whether" class certification is appropriate in a given case. Gen. Tel. Co. of the Sw. v. Falcon, 457 U.S. 147, 160 (1982). The Third Circuit Court of Appeals has acknowledged that in a "rare few" cases "the complaint itself demonstrates that the requirements for maintaining a class action cannot be met" and a court may strike class allegations contained in a complaint. Landsman & Funk PC v. Skinder-Strauss Assocs., 640 F.3d 72, 93 n.30 (3d Cir. 2011) (citing Rios v. State Farm Fire & Cas. Co., 469 F. Supp. 2d 727, 740 (S.D. Iowa 2007)). In Landsman, the court noted, however, that in all other cases (the majority of cases) "[t]o determine if the requirements of Rule 23 have been satisfied, a district court must conduct a 'rigorous analysis.'" Landsman, 640 F.3d at 93 (quoting In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 309 (3d Cir. 2008)). The court of appeals explained:

> In [conducting a rigorous analysis], a "court may 'delve beyond the pleadings to determine whether the requirements for class certification are satisfied.'" In re Hydrogen Peroxide, 552 F.3d at 316 (quoting Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 167 (3d Cir.2001)). . . . In most cases, some level of discovery is essential to such an evaluation. In Weiss v. Regal Collections, 385 F.3d 337 (3d Cir.2004), we emphasized the importance of discovery as part of the class certification process. "It seems appropriate," we said, "that the class action process should be able to 'play out' according to the directives of Rule 23 and should permit due deliberation by the parties and the court on the class certification issues." Weiss, 385 F.3d at 347-48 (footnote omitted). Accordingly, "[a]llowing time for limited discovery supporting certification motions may . .

. be necessary for sound judicial administration." Id. at 347 n. 17. These concerns were the basis for setting down a "rigorous analysis" requirement in Hydrogen Peroxide, where we recognized that changes in Rule 23 reflected the need "for a thorough evaluation of the Rule 23 factors." In re Hydrogen Peroxide, 552 F.3d at 318.

Landsman, 640 F.3d at 93.

With respect to certification of a class, the proponent of the class bears the burden of proof to show by a preponderance of the evidence that the four requirements of Rule 23(a) are satisfied and that the class fits in one of the three categories listed in Rule 23(b)(1)-(3). In re Hydrogen Peroxide, 552 F.3d at 309 n.6. Here, the parties dispute which party has the burden of proof with respect to defendants' motion to strike class allegations. According to plaintiffs, defendants must "satisfy the very heavy burden of establishing that class certification is a 'clear impossibility.'" (ECF No. 152 at 8 (quoting Dieter v. Aldi, Inc., No. 18-cv-846, 2018 WL 6191586, at *6 (W.D. Pa. Nov. 28, 2018).) According to defendants, however, "[o]n a motion to strike, the burden remains with the plaintiff to show that they can meet the Rule 23 requirements." (H.T. 2/25/2019 (ECF No. 176) at 17.) Defendants' motion to strike the class allegations is based upon only the allegations contained in the consolidated class action complaint, i.e., neither party offered any evidence in support of their positions. Thus, the court's consideration of defendants' argument that class certification is impossible as a matter of law is constrained by the applicable law and the allegations in the consolidated class action complaint.

Courts have recognized that with respect to whether class allegations should be stricken "'the plaintiff bears the burden of advancing a prima facie showing that the class action requirements of Fed. R. Civ. P. 23 are satisfied or that discovery is likely to produce substantiation of the class allegations.'" Trunzo v. Citi Mortgage, Civ. Action No. 11-1124,

2018 WL 741422, at * 4 (W.D. Pa. Feb. 7, 2018) (quoting <u>Mantolete v. Bolger</u>, 767 F.2d 1416, 1424 (9th Cir. 1985)); <u>Noye v. Yale Assocs., Inc.</u>, No. 1:15-CV-2253, 2017 WL 2813293, at *3 (M.D. Pa. June 29, 2017); <u>Swank v. Wal-Mart Stores, Inc.</u>, No. 2:13-CV-01185, 2015 WL 1508403, at *2 (W.D. Pa. Mar. 31, 2015); <u>Bell v. Cheswick Generating Station, Genon Power Midwest, L.P.</u>, Civ. Action No. 12-929, 2015 WL 401443, at *3 (W.D. Pa. Jan. 28, 2015) ("accelerating the class certification question does not alter the traditional Rule 23 burdens…."). "Absent such a showing, a trial court's refusal to allow class discovery is not an abuse of discretion." <u>Trunzo</u>, 2018 WL 741422, at *4 (citing <u>Mantolete</u>, 767 F.2d at 1424). Stated another way, "courts grant motions to strike under Rule 23(d)(1)(D) before class discovery only in 'the rare few [cases] where the complaint itself demonstrates that the requirements for maintaining a class action cannot be met[.]'" <u>Id.</u> (quoting <u>Goode v. LexisNexis Risk & Info. Analytics Grp., Inc.</u>, 284 F.R.D. 238, 246 (E.D.Pa. 2012)). Thus, plaintiffs have the burden to allege sufficient facts in the consolidated class action complaint to make a prima facie showing that the requirements of Rule 23 are satisfied or that at least discovery is likely to produce substantiation of the class allegations.

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" <u>Comcast Corp. v. Behrend</u>, 569 U.S. 27, 33 (2013). In order to become certified, a class must satisfy the four requirements of Rule 23(a): (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. FED. R. CIV. P. 23(a). In addition to satisfying the four requirements set forth in Rule 23(a), the class must fit within one of the three types of class actions set forth in Rule 23(b). <u>Mielo v. Steak 'n Shake Operations, Inc.</u>, 897 F.3d 467, 482 (3d Cir.

2018). Plaintiffs' consolidated class action complaint pleads the class claims pursuant to Rule 23(a), 23(b)(2) and 23(b)(3). (ECF No. 88 ¶ 65). Defendants argue that the consolidated class action complaint shows that plaintiffs will not be able to satisfy the Rule 23(a)(3) requirement of typicality and the Rule 23(b) requirement of predominance and they challenge plaintiffs' class definition as overbroad. Each of the arguments will be addressed below.

### 2. Rule 23(a)(3) Typicality Analysis

Typicality[11] is designed to "'screen out class actions in which the legal or factual position of the representatives is markedly different from that of other members of the

---

[11] One treatise has recognized that "[t]he typicality inquiry assumes an added dimension of complexity when multiple parties are named as defendants." 1 WILLIAM B. RUBENSTEIN, ALBA CONTE, HERBERT NEWBERG, NEWBERG ON CLASS ACTIONS § 3:48 (5th ed. 2012). "The question is whether a plaintiff who has been affected by the conduct of one of the defendants may name all those who engaged in the challenged conduct as the defendants—and thereby represent a class of all those affected by any single defendant—even though the named plaintiff has had no contact with some of those defendants." Id. The Third Circuit Court of Appeals has explained that "where no nominal plaintiff has standing on any issue against one of multiple defendants, a suit for damages may not be maintained as a class action against that defendant." Haas v. Pittsburgh Nat'l Bank, 526 F.2d 1083 (3d Cir. 1975). The court of appeals acknowledged two exceptions to that general rule:

> (1) situations in which the injuries are the result of "a conspiracy or concerted schemes between the defendants at whose hands the class suffered injury," or (2) instances in which all defendants are juridically related and a single disposition of the entire dispute would be expeditious.

Id. at 1095 n.15 (quoting La Mar v. H & B Novelty & Loan Co., 489 F.2d 461 (9th Cir. 1973)).

Here, plaintiffs, who are employees of Knorr, Wabtec, and certain of their respective wholly-owned subsidiaries, seek to represent a class of employees of Knorr, Wabtec, and certain of their respective wholly-owned subsidiaries. Plaintiffs set forth factual allegations to show plausibly that their injuries are the result of conspiracies entered into by Knorr, Wabtec, and Faiveley N.A. Thus, the first Haas exception to the general rule that a plaintiff cannot assert claims on behalf of a class against a defendant with whom the plaintiff has had no contact is applicable to this case.

class even though common issues of law or fact are present.'" Marcus v. BMW of N. Am., LLC, 687 F.3d 583, 598 (3d Cir. 2012) (quoting 7A CHARLES ALAN WRIGHT, ARTHUR R. MILLER, MARY KAY KANE, RICHARD L. MARCUS, A. BENJAMIN SPENCER & ADAM N. STEINMAN, FEDERAL PRACTICE & PROCEDURE § 1764 (3d ed. 2005)). "The criterion acts as a bar to class certification only when 'the legal theories of the named representatives potentially conflict with those of the absentees.'" Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 183 (3d Cir. 2001), as amended (Oct. 16, 2001) (quoting Georgine v. Amchem Products, Inc., 83 F.3d 610, 631 (3d Cir. 1996)). Typicality "ensur[es] that the class representatives are sufficiently similar to the rest of the class—in terms of their legal claims, factual circumstances, and stake in the litigation--so that certifying those individuals to represent the class will be fair to the rest of the proposed class." In re Schering Plough Corp. ERISA Litig., 589 F.3d 585, 597 (3d Cir. 2009).

There exists a "low threshold for satisfying" the requirement of typicality. Newton, 259 F.3d at 183. The factual and legal bases of each class members' claim may differ. Id. "If the claims of the named plaintiffs and putative class members involve the same conduct by the defendant, typicality is established regardless of factual differences." Id. at 183-84 (citing Barnes v. Am. Tobacco Co., 161 F.3d 127, 141 (3d Cir. 1998)). "[E]ven relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories." Baby Neal for and by Kanter v. Casey, 43 F.3d 48, 58 (3d Cir. 1994). "If a plaintiff's claim arises from the same event, practice or course of conduct that gives rise to the claims of the class members, factual differences will not render that claim atypical if it is based on the same legal theory as the claims of

the class." Marcus, 687 F.3d at 598 (citing Hoxworth v. Blinder, Robinson & Co., 980 F.2d 912, 923 (3d Cir.1992)).

"Where an action challenges a policy or practice, the named plaintiffs suffering one specific injury from the practice can represent a class suffering other injuries, so long as all the injuries are shown to result from the practice." Baby Neal, 43 F.3d at 58. The Third Circuit Court of Appeals has explained:

> Our jurisprudence "assures that a claim framed as a violative practice can support a class action embracing a variety of injuries so long as those injuries can all be linked to the practice." Baby Neal, 43 F.3d at 63 (discussing Falcon, 457 U.S. 147, 102 S.Ct. 2364). As a result, we have concluded that the requirement "does not mandate that all putative class members share identical claims," Barnes, 161 F.3d at 141, because " 'even relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories' or where the claim arises from the same practice or course of conduct." Prudential, 148 F.3d at 311 (quoting Baby Neal, 43 F.3d at 58); Hoxworth II, 980 F.2d at 923.

Newton, 259 F.3d at 184.

To determine whether a named plaintiff's claims are typical of the claims of the proposed class members, courts focus on three concerns:

> (1) The claims of the class representative must be generally the same as those of the class in terms of both (a) the legal theory advanced and (b) the factual circumstances underlying that theory; (2) the class representative must not be subject to a defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation; and (3) the interests and incentives of the representative must be sufficiently aligned with those of the class.

In re Schering Plough, 589 F.3d at 599.

The parties' arguments with respect to typicality raise only the first issue[12] whether the claims of the named plaintiffs are generally the same in legal theory and fact. Defendants conceded that the "underlying legal theory of Plaintiffs' claims may apply class-wide." (ECF No. 124-1 at 23.) Defendants argue, however, that the factual underpinnings of the claims, e.g., terms of employment, would be individually-negotiated or employee-specific with respect to an employee who has special skills in the industry as opposed to an employee without skills specific to the industry. (Id.) Plaintiffs' claims and the claims of the proposed class are all based upon Knorr, Wabtec, and Faiveley N.A. agreeing to restrain competition for all levels of employees, which allegedly caused the suppression of their employees' compensation and deprived the employees of free and fair competition in the market for their services (ECF No. 88 ¶ 78.) A fair reading of the consolidated class action complaint is that the agreements by Knorr, Wabtec, and Faiveley N.A. applied to all defendants' employees, whether highly skilled in the railway equipment supply industry or without skills specific to that industry.

The Third Circuit Court of Appeals has explained: "If a plaintiff's claim arises from the same event, practice or course of conduct that gives rise…to the claims of the class members, factual differences will not render that claim atypical if it is based on the same legal theory as the claims of the class." Marcus, 687 F.3d at 598. Plaintiffs allege that defendant's antitrust violation was the same for all members of the proposed classes, i.e., defendants entered into three bilateral agreements and one overarching conspiracy to

---

[12]    All defenses that might be raised appear to be applicable to many members of the class. Defendants do not argue that the interests or incentives of the representative plaintiffs are not sufficiently aligned with those of the class. Plaintiffs and proposed members of the class were all employees of defendants or their wholly-owned subsidiaries.

restrain competition for *all* their employees, which resulted in the suppression of compensation for all members of the proposed class. The legal theory for plaintiffs and the proposed classes and the factual basis for those claims are generally the same. The factual differences about each plaintiff cited by defendant do not defeat a finding of typicality at this stage of the case. See Id.

In Marcus, the defendants argued the plaintiff's claims were not typical of the class because the plaintiff purchased only one kind of product that was at issue in the case and the proposed class included purchasers of a variety of different products. Marcus, 687 F.3d at 599. The court rejected the defendants' argument and explained: "When a class includes purchasers of a variety of different products, a named plaintiff that purchases only one type of product satisfies the typicality requirement if the alleged misrepresentations or omissions apply uniformly across the different product types." Id. The named plaintiff's allegations about the defendants' conduct in the case with respect to the products in issue was the same for all products purchased by the members of the proposed class. Id. The court of appeals affirmed the district court's conclusion that typicality was satisfied on that basis. Id.

Defendants cite Semenko v. Wendy's International, Inc., Civ. Action No. 12-0836, 2013 WL 1568407 (W.D. Pa. Apr. 12, 2013), in support of their argument that typicality is not satisfied in this case. Semenko, however, is distinguishable from this case. In Semenko, the plaintiff sued her former employer, Wendy's, for, among other things, failing to accommodate her under the American with Disabilities Act, 42 U.S.C. § 12101, et seq. (the "ADA"). The plaintiff also sought to represent a class of individuals. The court found that the plaintiff's claims were not typical of the class because "the facts and evidence

needed to prove the claims of each member of the proposed class…[would] be unique to each claimant." Id. at *9. For example, a determination whether each member of the proposed class was entitled to recovery under the ADA would be a "highly individualized inquiry" and proof of the plaintiff's claims would "not prove the claims of other class members." Id. The court explained: "'If proof of the representatives' claims could not necessarily prove all of the proposed class members' claims, the representatives are not typical of the proposed members' claims.'" Id. (quoting Liberty Lincoln Mercury v. Ford Mktg. Corp., 149 F.R.D. 65, 77 (D.N.J. 1996)).

The district court in Semenko, however, read too narrowly the Court of Appeals for the Third Circuit's jurisprudence with respect to typicality. The court of appeals has instructed that "[t]he typicality requirement is intended to preclude certification of those cases where the legal theories of the named plaintiffs potentially conflict with those of absentees." Georgine, 83 F.3d at 631. The correct inquiry is "whether the named plaintiffs have incentives that align with those of absent class members so that the absentees' interests will be fairly represented." Id. Typicality does not require that "all putative class members share identical claims." Barnes v. Am. Tobacco Co., 161 F.3d 127, 141 (3d Cir. 1998). Factual differences, even "'relatively pronounced'" factual differences, between the named plaintiff's claims and the claims of the putative class are acceptable so long as "'there is a strong similarity of legal theories.'" Id. (quoting Baby Neal, 43 F.3d at 58). The Third Circuit Court of Appeals in its assessment of typicality does not require proof of the named plaintiffs' claims to prove the claims of the putative class. In this case, the factual differences between the named plaintiffs and the members of the putative class may be "relatively pronounced" but defendants do not argue that those factual differences create

a conflict between the interests of the named plaintiffs and the interests of the putative class members. The factual differences, therefore, do not render the named plaintiffs' claims atypical of the claims of the proposed class members.

Plaintiffs in the consolidated class action complaint rely upon the same factual allegations to show the named plaintiffs *and* the proposed class were injured by defendants' three bilateral agreements and one overarching agreement, which are per se violative of § 1 of the Sherman Act. Here, based upon the factual allegations in the consolidated class action complaint, plaintiffs' claims arise "from the same event, practice or course of conduct that gives rise to the claims of the class members[.]" Marcus, 687 F.3d at 598. The factual differences emphasized by defendants, e.g., employees highly skilled in the railway equipment supply industry versus employees without skills specific to that industry, do "not render…[plaintiffs' claims] atypical" because the claims are "based on the same legal theory as the claims of the class[,]" i.e., a violation of § 1 of the Sherman Act. Id. In Semenko, however, Wendy's conduct in failing to provide reasonable accommodations would necessarily be different with respect to each member of the class because of the individualized inquiry required with respect to a person's disability and his or her need for accommodation. The court, therefore, is not persuaded by defendants' citation to Semenko because the individualized inquiries in an ADA claim are not present in this case.

Defendants also cite to dictum from Todd v. Exxon Corp., 275 F.3d 191 (2d. Cir. 2001), in support of their argument that plaintiffs cannot satisfy the typicality requirement of Rule 23. In Todd, a former employee of Exxon on behalf of herself and a proposed class sued Exxon and thirteen other "major companies in the integrated oil and

petrochemical industry" alleging that they "violated § 1 of the Sherman Act by regularly sharing detailed information regarding compensation paid to nonunion managerial, professional, and technical…employees and using this information in setting the salaries of these employees at artificially low levels." Id. at 195. The members of the plaintiff's proposed class included, among others, accountants, lawyers, and chemical engineers. Id. at 201. The defendants filed a motion to dismiss under Rule 12(b)(6). The district court granted the motion and the plaintiff appealed. Id. at 198.

The court of appeals recognized that the plaintiff did not assert a claim alleging "an actual agreement among defendants to fix salaries[,]" which would be a per se violation of the antitrust laws; rather, the plaintiff set forth a claim alleging the defendants unlawfully exchanged information, which is subject to the rule of reason analysis. Id. at 199. The court explained that the "basic framework for the rule of reason" for an information-exchange claim under § 1 was as follows: "'A number of factors including most prominently the structure of the industry involved and the nature of the information exchanged are generally considered in divining the procompetitive or anticompetitive effects of this type of interseller communication.'" Todd, 275 F.3d at 199 (quoting United States v. United States Gypsum, Co., 438 U.S. 422, 441 n.16 (1978)). The court of appeals explained that under Gypsum, an important factor to consider in a "data exchange" case was the market power of the defendants, which may include defining the relevant market and showing the defendants' percentage share of that market. Id. The district court found that the plaintiff did not plead a plausible market because she did not show that the products at issue, i.e., the employees, were "reasonably interchangeable or that there…[was] a cross-elasticity of demand for potential substitutes." Id. at 201.

The court of appeals disagreed with the district court because the relevant inquiry in a case involving a buyer-side conspiracy is the market power of the buyers, i.e., the defendant companies in Todd, and not the interchangeability of the sellers' products, i.e., the plaintiff-employees in Todd. Id. at 201-02 (agreeing with the plaintiff that "the proper focus is…the commonality and interchangeability of the buyers, not the commonality or interchangeability of the sellers."). The court of appeals explained:

> The question is not the interchangeability of, for example, lawyers with engineers. At issue is the interchangeability of, from the perspective of an…employee, of a job opportunity in the oil industry with, for example, one in the pharmaceutical industry.

Todd, 275 F.3d at 202. On that basis and for other reasons explained in the opinion that are not relevant to this case, the court of appeals found that the plaintiff set forth factual allegations sufficient to plead a plausible product market. Id. at 206.

In a footnote the Todd court explained that the district court's conclusions about the interchangeability of the prospective jobs may have implications in whether the plaintiff could satisfy her burden under Rule 23 to show typicality and predominance. The court of appeals commented:

> The observation by the district court and defendants about the large differences among the various MPT jobs is better understood not as speaking to interchangeability, but as indicating that not all MPT employees are affected by the conspiracy in the same way—thus creating potential difficulties with class certification. While interchangeability of the different types of employees is not an element of market definition in an oligopsony, the different types of employees will differ in how they must prove the interchangeability among employers. For example, as the district court and defendants point out, oil industry employers may not be interchangeable with pharmaceutical industry employers from the standpoint of a petroleum geologist, but the two may be more interchangeable from the standpoint of a labor lawyer. More importantly, the means of proof may be quite different; at trial the geologists must present evidence of the relative job prospects for geologists outside the oil industry, while the lawyers must explore the legal job market. That this large class might have difficulty meeting the

predominance and typicality requirements for Rule 23 certification, however, does not indicate that plaintiff fails to state a claim upon which relief can be granted.

Todd, 275 F.3d at 202 n.5. First, the foregoing passage is dictum. Second, the court noted that the named plaintiffs "might have difficulty meeting the…typicality" requirement but did not foreclose the possibility that the named plaintiffs could establish that their claims were typical of the putative class members' claims. Id. Third, the foregoing passage is consistent with the law set forth by this court in this opinion. As explained above, the existence of factual differences between the claims of the named plaintiff and the claims of the members of the putative class is relevant to the court's assessment of typicality. If the claims of the named plaintiffs and the claims of the putative class are based upon the same course of conduct by the defendant, however, the factual differences between the named plaintiffs' claims and the claims of the putative class members might not render the named plaintiff's claims atypical unless the factual differences create a conflict of interest between the named plaintiff and members of the putative class. The footnote from Todd cited above, therefore, is not inconsistent with this court's understanding of the typicality requirement under Rule 23.

At this stage, plaintiffs allege that defendants violated § 1 of the Sherman Act when they entered into three bilateral agreements and one overarching agreement to not poach each other's employees, which included all employees of the defendants and their wholly-owned subsidiaries. Plaintiffs allege that those agreements impacted the compensation of *all employees* of defendants and their wholly-owned subsidiaries. There may be factual differences among the various kinds of employees in the putative class, but, at this stage, the court cannot conclude that those differences create a conflict of interest

between the named plaintiffs and the members of the putative class that render the claims of the named plaintiffs atypical compared to the claims of the putative class. 7A CHARLES ALAN WRIGHT, ARTHUR R. MILLER, MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1764 (3d ed. 2005) ("In general, the requirement [of typicality] may be satisfied even though varying fact patterns support the claims or defenses of individual class members...or there is a disparity in the damages claimed by the representative parties and the other class members.") (citing, e.g., In re Orthopedic Bone Screw Prod. Liab. Litig., 176 F.R.D. 158, 175 (E.D. Pa. 1997) ("[T]he fact that individual class members may recover varying amounts from the settlement fund does not defeat typicality.")).

Based upon the foregoing, the court is satisfied that the factual allegations in the consolidated class action complaint show that it is likely that discovery will reveal evidence that the claims of the named plaintiffs are typical of the claims of the putative class.

### 3. Rule 23(b) Predominance Requirement

"The predominance inquiry tests whether the proposed class is sufficiently cohesive to warrant adjudication by representation." In re Cmty. Bank of N. Virginia, 418 F.3d 277, 308–09 (3d Cir. 2005). One court has explained:

> "Issues common to the class must predominate over individual issues." Hydrogen Peroxide, 552 F.3d at 311. "Individual questions need not be absent.... [Rule 23(b)(3) ] requires only that those questions not predominate over the common questions affecting the class as a whole." Messner v. Northshore Univ. HealthSystem, 669 F.3d 802, 815 (7th Cir.2012). "Because the nature of the evidence that will suffice to resolve a question determines whether the question is common or individual, a district court must formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case." Hydrogen Peroxide, 552 F.3d at 311 (internal quotation marks and citation omitted). "If proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable."

Id. (citing <u>Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>, 259 F.3d 154, 172 (3d Cir.2001)).

<u>In re Flonase Antitrust Litig.</u>, 284 F.R.D. 207, 219 (E.D. Pa. 2012). "An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'" <u>Tyson Foods, Inc. v. Bouaphakeo</u>, 136 S.Ct. 1036, 1045 (2016) (quoting 2 WILLIAM B. RUBENSTEIN, ALBA CONTE, HERBERT NEWBERG, NEWBERG ON CLASS ACTIONS § 4:50 (5th ed. 2012)).

"The analysis of whether questions of law or fact common to class members predominate begins with the elements of the underlying cause of action." <u>In re Lithium Ion Batteries Antitrust Litig.</u>, No. 13-MD-2420 YGR, 2017 WL 1391491, at *8 (N.D. Cal. Apr. 12, 2017) (citing <u>Erica P. John Fund, Inc. v. Halliburton Co.</u>, 563 U.S. 804 (2011)). "The three relevant elements of an antitrust claim that must be capable of common proof for the class to be certified under Rule 23(b)(3) are: (1) violation of antitrust laws, (2) antitrust impact, and (3) measurable damages." <u>In re: Domestic Drywall Antitrust Litig.</u>, 322 F.R.D. 188, 201 (E.D. Pa. 2017) (citing <u>Hydrogen Peroxide</u>, 552 F.3d at 311–12). As discussed above, plaintiffs set forth factual allegations sufficient to show plausibly that the defendants engaged in three bilateral agreements and an overarching conspiracy to not poach each other's employees, which means there could be an antitrust violation which might be common to all members of a properly defined class who were employees of defendants or their wholly-owned subsidiaries. The issue whether there was a violation of the antitrust laws could be, therefore, common to the class.

With respect to the second element, i.e., antitrust impact, one court explained:

Antitrust impact refers to injury—that is, each plaintiff must show that it suffered injury as a result of the defendants' unlawful behavior. Id. (citing Bogosian v. Gulf Oil Corp., 561 F.2d 434, 454 (3d Cir. 1977)). Though plaintiffs need not prove the element of antitrust impact at the class certification stage, they must "demonstrate that the element of antitrust impact is capable of proof at trial through evidence that is common to the class rather than individual to its members." Id.

Domestic Drywall, 322 F.R.D. at 201. Antitrust impact refers to the "fact of damage…as opposed to the extent of damage." In re Flonase Antitrust Litig., 284 F.R.D. 207, 220 (E.D. Pa. 2012). The Third Circuit Court of Appeals has explained: "In antitrust cases, impact often is critically important for the purpose of evaluating Rule 23(b)(3)'s predominance requirement because it is an element of the claim that may call for individual, as opposed to common, proof." Hydrogen Peroxide, 552 F.3d at 311. "[F]or cases involving antitrust violations, common issues do not predominate unless the issue of impact is also susceptible to class-wide proof." In re High-Tech Employee Antitrust Litig., 289 F.R.D. 555, 566 (N.D. Cal. 2013) ("High-Tech I") (collecting decisions).

Here, defendants argue that plaintiffs will not be able to satisfy their burden to show predominance with respect to antitrust impact because the "expansive class definition will require the Court to consider each employee's contract, salary history, professional qualifications, geographic location and willingness to relocate, and fungibility within labor markets, when determining proof of both antirust injury and damages." (ECF No. 124-1 at 26.) Plaintiffs argue in opposition that defendants failed to satisfy their burden to show that it is a "'clear impossibility'…that predominance requirements can be met in the instant case." (ECF No. 152 at 30 (quoting Dieter, 2018 WL 6191586, at *6.)

As discussed above, however, plaintiffs in the first instance have the "'burden of advancing a prima facie showing that the class action requirements of Fed. R. Civ. P. 23

are satisfied or that discovery is likely to produce substantiation of the class allegations.'" Trunzo, 2018 WL 741422, at *4 (quoting Mantolete, 767 F.2d at 1424). Plaintiffs point out that in the consolidated class action complaint they alleged that defendants' agreements applied to all employees regardless of title, position, or status and that each agreement harmed each plaintiff regardless of his or her employer because every agreement "'disrupted the normal bargaining and price-setting mechanisms that apply in the labor market,' causing 'suppressed compensation levels generally.'" (ECF No. 152 at 20, 27.) Plaintiffs' allegations in this respect are mostly conclusory but may show plausibly that all defendants' employees were subject at some point in time to the overarching conspiracy and the bilateral agreements entered into by Wabtec, Knorr, and Faiveley N.A., and that employees may have been harmed by those agreements. Plaintiffs, however, do not set forth sufficient factual allegations to advance a prima facie showing that antitrust impact is capable of proof on a class-wide basis for a class comprised of all employees or that at the least discovery is likely to produce evidence to substantiate plaintiffs' conclusory allegations with respect to predominance.

The Third Circuit Court of Appeals has rejected "the notion that antitrust injury in an employee boycott or no hire context can never be proven by common evidence." Weisfeld v. Sun Chem. Corp., 84 F. App'x 257, 256 (3d Cir. 2004). The court of appeals recognized that evidence showing that compensation of the class members was correlated over time may be evidence to show that antitrust injury in a wage suppression case may be proven on a classwide basis. Id. at 264. Other courts in wage suppression or no-hire cases have certified classes and found antitrust impact could be proven on a class-wide basis when there is evidence that the class members' wages were correlated

and the defendant-employers emphasized internal or external equality, which ensured "individuals performing similar jobs are compensated on a similar level." Nitsch v. Dreamworks Animation SKG, Inc., 315 F.R.D. 270, 293 (N.D. Cal. 2016); Seaman v. Duke Univ., No. 1:15-CV-462, 2018 WL 671239, at *8 (M.D.N.C. Feb. 1, 2018); In re: High-Tech Employee Antitrust Litigation, 985 F.Supp.2d 1167 (N.D. Cal. 2013) ("High-Tech II"). Plaintiffs in this case, however, failed to set forth any factual allegations about defendants' compensation structures to make prima facie showing that antitrust impact is capable of proof on a class-wide basis for all employees or that at least it is likely that discovery will reveal evidence that antitrust impact is capable of proof on a class-wide basis for all employees.

In Nitsch, former employees of animation and visual effects studios on their own behalf and on behalf of a proposed class sued the studios alleging they conspired to fix and suppress employee compensation and to restrict employee mobility under § 1 of the Sherman Act. Nitsch, 315 F.R.D. at 274. The named plaintiffs were "artists and engineers who were previously employed by four of the name Defendants." Id. at 275. The plaintiffs defined the proposed class as follows:

> All animation and visual effects employees employed by defendants in the United States who held any of the jobs listed in Ashenfelter Report Appendix C during the following time periods: Pixar (2001-2010), Lucasfilm Ltd., LLC (2001-2010), DreamWorks Animation SKG, Inc. (2003-2010), The Walt Disney Company (2004-2010), Sony Pictures Animation, Inc. and Sony Pictures Imageworks, Inc. (2004-2010), Blue Sky Studios, Inc. (2005-2010) and Two Pic MC LLC f/k/a ImageMovers Digital LLC (2007-2010). Excluded from the Class are senior executives, members of the board of directors, and persons employed to perform office operations or administrative tasks.

Id. at 281. The plaintiffs filed a motion for class certification. Id. at 274. The court addressed, among other things, whether common questions would dominate with respect

to antitrust impact, i.e., "whether Plaintiffs have presented a sufficiently reliable theory to demonstrate that common evidence can be used to demonstrate impact." Id. at 292. The court—after a review of the "extensive documentary evidence, economic theory, data, and expert statistical modeling"—found the plaintiffs satisfied their burden to prove predominance. Id.

The court provided the following summary with respect to the plaintiffs' evidence of class-wide antitrust impact:

> First, Plaintiffs present evidence that Defendants' anti-solicitation agreements and collusion over compensation policies would have had the effect of directly suppressing compensation for some class members. Second, Plaintiffs present evidence that because of the ways in which Defendants determined compensation for employees generally, including the use of formal compensation structures that are not inherently collusive, the collusive suppression of compensation for certain class members would have spread throughout the class and suppressed compensation to anti-competitive levels classwide.

Nitsch, 315 F.R.D. at 292. The plaintiffs alleged that the defendant-employers' agreement to stop cold-calling each other's employees and collusion with respect to compensation suppressed the compensation of class members. The plaintiffs in support of those allegations presented documentary and expert evidence to show that:

- "cold-calling" was a "recruitment tool that Defendants viewed as likely to yield the most valuable recruits" and caused the dissemination of information about salaries and benefits of one defendant-employer to the employees' of another defendant-employer;

- the defendant-employers' agreement to stop cold-calling each other's employees restricted the dissemination of the information with respect to salaries and benefits; and

- the defendant-employers colluded to suppress compensation by exchanging compensation information.

Id. at 292-93. The plaintiffs also presented evidence to the court to show that the compensation suppression "spread throughout the class" because the defendant-employers had "compensation structures that prioritized 'internal' and 'external' equity." Id. at 293. The compensation structures "organize[d] employees by job titles whose compensation ranges were evaluated by reference to all other job titles within each company." Id. Thus, the "upward pressure" placed on the salaries of the employees who received the cold-calls would impact all other salaries of each defendant. Nitsch, 315 F.R.D. at 293. Because the defendant-employees shared compensation information, the suppression of one employee's salary would impact the salaries of employees in a similar position and employed by all defendants. Id.

The court in Nitsch explained:

> Plaintiffs argue that Defendants' alleged antitrust violations would have directly suppressed compensation for some class members. Then, as a result of Defendants' emphasis on internal equity, compensation suppression would have spread beyond the employees directly affected by the antitrust violations to impact all class members within each Defendant. At the same time, Defendants' goal of maintaining external equity would have spread the effects of compensation suppression between Defendants. This is the same approach to showing classwide antitrust impact approved by this Court in High–Tech. See High–Tech, 985 F.Supp.2d at 1206 (describing the approach to demonstrating classwide antitrust impact by showing direct impact to some class members combined with evidence of internal and external equity).

Nitsch, 315 F.R.D. at 293. The court held that based upon the foregoing, the plaintiffs satisfied their burden to show that the common questions predominated over individualized questions with respect to the issue of antitrust impact. Id. at 303-04.

In High-Tech, the plaintiffs sued their employers who were seven high-tech companies. High-Tech II, 985 F.Supp.2d at 1171. The plaintiffs alleged that the defendants "conspired to suppress, and actually did suppress, employee compensation

to artificially low levels by agreeing not to solicit each other's employees" in violation of § 1 of the Sherman Act. Id. The plaintiffs had filed a motion to certify a class, which the court in a previous decision (High-Tech I) denied because the plaintiffs did not satisfy their burden to show that common issues predominated over individualized issues with respect to antitrust impact. High-Tech I, 289 F.R.D. at 583. The court in High-Tech I held, however, that common issues predominated over individualized issues with respect to the antitrust violation and damages. Id. The plaintiffs in their first motion to certify the class proposed a class definition that covered all the defendants' employees and a second class definition that covered only technical employees. Id. The plaintiffs' evidence heavily focused on the proposed class of all employees. Id.

The plaintiffs in High-Tech I offered an expert to opine about whether antitrust impact could be proven on a class-wide basis. The district court held that the plaintiffs' expert's theories showed that common proof could be used to show that the defendants' "anti-solicitation agreements suppressed compensation broadly[,]" i.e., across the class. High-Tech I, 289 F.R.D. at 570. The court explained the expert's theories as follows:

> Essentially, Dr. Leamer opines that, by virtue of the interplay between information economics and considerations of internal equity, cold-calls would have transmitted information to, and put competitive pressure on, [Redacted]. See Reply at 16; see also Leamer Rep. ¶ 104. Dr. Leamer further hypothesizes that, by virtue of entering into the anti-solicitation agreements, firms are able to be more relaxed in maintaining competitive compensation packages because such agreements: (1) "suppress competition directly;" (2) "reduce the risk of employees becoming aware of pay practices elsewhere;" and (3) "otherwise eliminate competition for 'passive' employees." Leamer Rep. ¶ 106.

Id. at 569 (redactions in original). "A key component" of the plaintiffs' expert's opinion was that the wage structure of the defendants was rigid, i.e., "compensation for employees with entirely different titles would necessarily move together through time such that a

detrimental impact to an employee with one job title would necessarily result in an impact to other employees in entirely different jobs (i.e., that any impact would ripple across the entire salary structure)." Id. at 577-78. The court explained that while the plaintiffs' expert's *theory* showed that antitrust impact was susceptible to common proof, that "theory" is not sufficient to satisfy the predominance requirements of Rule 23. The court had to consider the "reliable evidence" upon which the plaintiffs' expert relied to arrive at his theory. Id. at 570 ("Plaintiff must provide 'properly analyzed, reliable *evidence*' that a common method of proof exists to prove impact on a class-wide basis'") (quoting In re Graphics Processing Units Antitrust Litig., 253 F.R.D. 478 (N.D. Cal. 2008)).

The court determined that the evidence available to the plaintiffs at the time they filed the motion for class certification did not support the plaintiffs' expert's theory that antitrust impact could be proven on a class-wide basis, and, therefore, common issues with respect to the impact of antitrust violation on all employees or all technical employees would predominate under Rule 23. For example, the evidence did not show that the wage structures of the defendants were sufficiently rigid so that an impact on the wages of one member of the class would "ripple across the entire salary structure." Id. at 577-78 ("Thus, these charts shed little light on whether compensation for more disparate title (*e.g.*, a custodian at an Intel office in Texas and an engineer at an Intel office in California) moved together over time."). The court did find, however, that the plaintiffs' expert's opinion that damages could be proven on a class-wide basis was supported by reliable evidence. Id. at 582. The court explained:

> The Court is generally persuaded that the Conduct Regression is capable of: (1) showing that, while the anti-solicitation agreements were in effect, Defendants' total expenditures on compensation were less than they should have been, and (2) providing an estimate of the net amount by which

> Defendants were under-compensating their employees (class-wide damages).
>
> …
>
> [T]he Conduct Regression does provide a method of estimating the aggregate undercompensation to Defendants' employees on a year-by-year and defendant-by-defendant basis.

High-Tech I, 289 F.R.D. at 579, 582. The court concluded that the plaintiffs' expert's method of calculating damages was consistent with the plaintiffs' theory of liability, and the plaintiffs established a plausible method for providing an estimate of damages for the all-employee proposed class and the technical proposed class. Id. at 582. The court held that under those circumstances, plaintiffs satisfied their burden to show predominance with respect to damages. Id. at 582-83.

The court, however, explained that it would deny the motion for certification because it had "concerns": (1) about "whether the evidence will be able to show that Defendants maintained such rigid compensation structures that a suppression of wages to some employees would have affected all or nearly all Class members[;]" and (2) that "Plaintiffs' proposed classes may be defined so broadly as to include large numbers of people who were not necessarily harmed by Defendants' allegedly unlawful conduct." Id. at 583.

Underlying the court's opinion in High-Tech I, however, were issues with respect to discovery. *After* the hearing on the motion for class certification, the defendants "produce[d] significant amounts of discovery" (over ten thousand documents) and "[made] key witnesses available for depositions" (fifty high-ranking employees) Id. at 584. Additionally, the defendants' response to the motion for class certification "relied heavily on declarations from Defendants' current employees, some of whom were not timely disclosed and whose documents were not produced to Plaintiffs." High-Tech I, 289

F.R.D. at 584. On that basis, the court concluded that "some of the recently produced discovery may affect Plaintiffs' ability to satisfy the predominance requirement for one or both of their proposed Classes." Id. Specifically, the court explained its "belief" that "with the benefit of the discovery that has occurred since the hearing on this motion, Plaintiffs may be able to offer further proof to demonstrate how common evidence will be able to show class-wide impact to demonstrate why common issues predominate over individual ones." Id. at 583.

The plaintiffs in High-Tech I filed a supplemental motion for class certification, which was addressed in High-Tech II. High-Tech II, 985 F.Supp.2d at 1171. The plaintiffs in the supplemental motion "moved to certify only the Technical Class[,]" which consisted of: "salaried technical, creative, and research and development employees who worked for any Defendant while that Defendant participated in at least one anti-solicitation agreement with another Defendant." Id. at 1177 n.5. The plaintiffs excluded from their class definition "retail employees" among others. Id. at 1177. The members of the proposed class consisted of fourteen different job titles of technical employees. Id. at 1177-78.

The court in its discussion of predominance and antitrust impact in High-Tech II recognized that the plaintiffs set forth "substantial evidence, including documentary evidence and expert reports using statistical modeling, economic theory, and data, to demonstrate that common questions will predominate over individual questions in determining the impact of the antitrust violations." Id. at 1192. The court found that the evidence "paint[ed] a picture of Defendants' business practices and the market in which Defendants operate that suggests that common proof could be used to demonstrate the

impact of Defendants' actions on Technical Class members." Id. Under those circumstances and after a "rigorous" review of the evidence, the court concluded that plaintiffs' proposed methodology satisfied the predominance standard. Id. The court explained:

> Specifically, the record suggests that all technical employees—not just those who would have received cold calls but for the anti-solicitation agreements—may have been impacted by the agreements. Plaintiffs note that cold calling, a recruitment tool that Defendants viewed favorably, has the effect of spreading information about salaries and benefits from recruiters of one firm to employees of another. Leamer Rep. ¶ 71–76. Such information could then spread to other employees within a firm and beyond, leading to widespread increases in employee compensation across the labor market due to increased access to information. Id.
>
> Further, Plaintiffs contend that Defendants had company-wide compensation structures, which organized employees into job groups, levels, and families that were evaluated and paid in relationship to all other groups. Suppl. Mot. at 15–22. In addition, Defendants valued internal equity (the idea that similarly situated employees should be compensated similarly) within their firms. Id. Because of a desire to maintain equity between employees, the upward pressure that cold calls placed on the salaries of individual employees who would have received the calls would have also affected other employees who were part of the same salary structure. As such, variances in individual employees' salaries would affect other employees who were in a similar position. Each Defendant's compensation structure could then have been influenced by the other Defendants' structures as Defendants saw each other as competitors for the same labor pool.
>
> Finally, Plaintiffs point to the fact that Defendants were motivated to retain their employees. This, Plaintiffs contend, would have motivated each Defendant to provide financial incentives to employees to respond to and to prevent poaching by other Defendants. Leamer Rep. ¶ 105. Yet, because of the anti-solicitation agreements, Defendants did not need to initiate such measures, which would have benefitted the entire Technical Class.

High-Tech II, 985 F.Supp.2d at 1192. The court concluded that "the extensive documentary evidence, economic theory, data, and expert statistical modeling" supported the plaintiffs' expert's theory of proving common impact. Id. Under those circumstances,

the class was certified because, among other things, the plaintiffs satisfied their burden to show that common issues with respect to antitrust impact predominated in the case. Id.

In Seaman, the plaintiff, who was an assistant professor of radiology at Duke University ("Duke"), on behalf of herself and a putative class sued Duke and the University of North Carolina ("UNC") under § 1 of the Sherman Act. Seaman, 2018 WL 671239, at *1. The plaintiff alleged that Duke entered into an agreement with UNC "not to permit lateral moves of faculty between Duke and UNC." Id. The plaintiff and UNC settled the case. Id. at *2. The plaintiff sought to certify "a class of faculty, physicians, nurses, and skilled medical staff that worked for the defendants." Id. Duke opposed the motion for class certification arguing that the plaintiff could not satisfy the predominance requirement of Rule 23(b). Id. The court found that the parties' evidence with respect to the "antitrust violation" element of a § 1 claim was a "common question that...[would] be addressed with common proof for all proposed class members." Seaman, 2018 WL 671239, at *4.

The plaintiff alleged that the UNC and Duke no-poach agreement suppressed compensation in two ways: (1) UNC and Duke did not have to provide faculty "preemptive compensation increases...to ensure employee retention[;]" and (2) the "internal equity structures[13]...spread the individual harm of decreased lateral offers and corresponding lack of retention offers to all faculty, thus suppressing compensation faculty-wide." Id. at *4. Although the plaintiff proposed a class comprised of faculty and non-faculty members, the evidence she presented in support of her motion for class certification was different

---

[13]    The court defined "internal equity structures" as "policies and practices that are alleged to have ensured relatively constant compensation relationships between employees." Seaman, 2018 WL 671239, at *4.

for faculty than it was for non-faculty. The court, therefore, court addressed separately the plaintiff's evidence to prove antitrust impact and damages for faculty and non-faculty.

With respect to the faculty, the court held the plaintiff's evidence, which included testimony, expert reports, and documentation, supported her argument that the defendants' agreement caused the suppression of compensation for faculty, which could be proven on a class-wide basis. Id at *4. The court held that the plaintiff's "preemptive compensation" theory as applied to the faculty-only class was a "class-wide theory supported with class-wide proof." Id. The court explained that the evidence showed that the medical schools of Duke and UNC were each other's main competitors for faculty and the expert evidence showed that "lateral hiring affects compensation generally and…encourage[d] the defendants to preemptively increase compensation to retain faculty." Id. at *5.

The court held that the plaintiff's "internal equity structures" theory as applied to faculty, was also a "class-wide theory supported by class-wide proof." Seaman, 2018 WL 671239, at *6. The court explained that the expert evidence showed that UNC and Duke would "reactively increase compensation in response to a competing offer or to address overall attrition rates[,]" and "the lack of competing offers and corresponding individual compensation suppressed was spread to all faculty members through the defendants' internal equity structures." Id. at *5. The evidence also showed that the suppression of a faculty member's compensation caused by the lack of competing offers of employment was "spread" to all members of the faculty-only class via the defendants' internal equity structures. Id. The court explained:

> [The plaintiffs' experts] explain the general economic theory of how lateral hiring increases compensation for employees throughout an organization

when that organization manages employee compensation to maintain parity within employment categories or to achieve compensation relationships between employee categories (e.g., Associate Professors to Assistant Professors).

Id. at *5. The court described the evidence with respect to the defendants' internal equity structures as follows:

> Dr. Seaman provides documentary and testimonial evidence that Duke and UNC maintain internal equity structures for faculty. The evidence shows that the UNC defendants have policies that "set[ ] out identical salary ceilings across 18 departments by professor level" and expects departments "to work towards or maintain average salary profiles by academic rank ...; enable recruitment and retention ...; [ ] promote a good morale and sense of fair treatment amongst the faculty;" and consider "internal equity among groups of otherwise similarly-situated individuals in the [medical school] department." Doc. 151 at ¶¶ 33–39 (summarizing evidence). The UNC defendants also perform annual "Salary Equity Review[s]" to "identify[ ] instances of potential salary inequity amongst like subsets of faculty" and requires an explanation or remedial plan for any inequality that is discovered. Id. at ¶ 39.
>
> While the evidence at Duke is less direct, it shows that the Dean of the School of Medicine "signs off" on all department head compensation decisions. See, e.g., Doc. 151 at ¶¶ 46, 49. For both new faculty and adjustments to current faculty's compensation, there is documentary evidence and testimony to support the assertion that internal equity is considered in setting and adjusting compensation, particularly within each department. See, e.g., Doc. 151 at ¶¶ 46–51, 54; Doc. 150 at ¶¶ 31, 33, 44–48; Doc. 94 at ¶¶ 91, 93, 97–98, 100; Doc. 95 at ¶¶ 54, 58(d), (e).

Seaman, 2018 WL 671239, at *5. One of the plaintiff's experts performed a regression analysis to show that "an individual faculty member's compensation moved in relationship to other faculty compensation." Id. With respect to damages for faculty, the court found the regression analysis proffered by the plaintiff's expert also satisfied the predominance requirement of Rule 23(b). Id.

With respect to the evidence about non-faculty, the court held that the plaintiff's theory that the suppression of compensation to faculty caused the suppression of

compensation for non-faculty presented common questions for the putative class of nonfaculty "because proving the theory for a single non-faculty class member would prove it for all." Id. at *6. The court explained that the plaintiff's evidence with respect to the non-faculty theory of proving antitrust impact, i.e., a regression analysis analyzing compensation metrics for non-faculty and a regression analysis analyzing the relationship between the compensation of faculty and non-faculty, showed that antitrust impact could be proven on a class-wide basis for the non-faculty class.[14] Id. The court also found that the plaintiff's expert's calculation of damages for the non-faculty class were based upon a theory and evidence that was common to the class. Id. at *7.

The court after discussing the other pertinent requirements of Rule 23, however, held it would certify a class comprised of only faculty. Id. at 8. The court rejected the plaintiff's invitation to certify a class comprised of faculty and non-faculty. Id. The court explained:

> Dr. Seaman's theories and evidence differ between faculty and non-faculty class members. It is apparent from the briefing on this motion and on the plaintiff's motion to exclude defendants' experts that the inclusion of faculty and non-faculty in the same class is likely to cause significant confusion. Disputes already have arisen as to whether witnesses are talking only about faculty, only about non-faculty, or both. See Doc. 163 at 22–23. And there are extra steps required for a finding of anti-trust impact and damages as to non-faculty as compared to faculty; these are not minor steps, but include detailed and complicated expert statistical analyses and additional fact witnesses. Moreover, the evidence as to non-faculty is substantially weaker, at least on this record, since it is based on several inferences-on-inferences;

---

[14] The court found that the plaintiff's theory that that "the no-hire agreement affected a subset of non-faculty more directly because they missed out on compensation increases associated with lateral moves undertaken in connection with a faculty-lead team" was not supported by any evidence. Seaman, 2018 WL 671239, at *7 n.8. The court explained that the evidence did not "provide any indication or confirmation that faculty seek compensation increases for non-faculty during lateral moves." Id. The court also found that the plaintiff did not set forth a theory or evidence to calculate damages based upon that theory. Id.

this gives rise to the possibility that the strength of the faculty claim or the weakness of the non-faculty claim might tend to bleed over to the other claim in the jury's mind. Finally, the plaintiff has put forth one theory as to non-faculty that seems to be driven by individualized evidence.

Collectively these problems—different evidence, the likelihood of substantial confusion, potential for unfairness at trial, and the possibility of individual issues as to non-faculty—will make it very difficult to manage the class. Trial of the relatively straightforward faculty claims would be unduly complicated and there is a real potential for unfairness to both the class members and the defendant. For these reasons the Court finds that including non-faculty in the class would defeat predominance and superiority….Reiter, 442 U.S. at 345 (recognizing the district court's discretionary authority to refuse to certify potentially cumbersome class actions with manageability issues).

Seaman, 2018 WL 671239, at *8. The court explained that the "[n]on-faculty class members…[could] pursue a separate class action and obtain the corresponding economics of time, effort, and expense, and uniformity of decision." Id. at *8 n.11.

As discussed above, the Third Circuit Court of Appeals has not foreclosed the possibility that a class maybe certified in a no-poach wage suppression case. Weisfeld, 84 F. App'x at 256. The foregoing discussion, however, shows that in order for a plaintiff in a no-poach wage suppression case to satisfy the requirement of predominance with respect to antitrust impact, there must be evidence that the compensation structures of the defendants in the pertinent industry were so rigid that the compensations of *all* class members were tethered together.[15] This case, unlike those just discussed, is not yet at the certification stage. Here, at the motion to strike stage, the burden on plaintiffs is less

---

[15] Satisfying the predominance requirement in a no-poach case, i.e., proving antitrust impact is capable of proof on a class-wide basis, may be an easier task when the putative class is comprised of a narrow, well-defined subset of employees. Here, plaintiffs' task is more difficult because they seek to represent an expansive class of all defendants' employees, which includes employees highly skilled in the railway equipment supply industry and employees without skills specific to that industry.

than at the certification stage. The court must determine only whether plaintiffs satisfied their burden to set forth factual allegations to advance a prima facie showing of predominance or that at least it is likely that discovery will reveal evidence that antitrust impact may be proven on a class-wide basis for all employees, e.g., evidence that the compensation structures for all defendants were so rigid that the compensation of all class members, including employees with skills specific to the railway equipment supply industry and employees without skills specific to that industry, were tethered together. Based upon the factual allegations in the consolidated class action complaint, plaintiffs failed to satisfy their burden with respect to predominance for a class of all defendants' employees. The allegations for a class of all employees are conclusory in that respect and the court cannot discern from the allegations anything about the compensation structures of defendants.

The motion to strike class allegations will be granted on that basis without prejudice. If plaintiffs are able to plead sufficient facts about the likelihood that discovery will reveal structured compensation schedules that affected all employees, plaintiff may seek to amend the consolidated class action complaint to include those allegations or to plead a class for which predominance may be shown.

### 4. Whether Plaintiffs' Class Definition is Overbroad

Even if defendants satisfied their burden at this stage with respect to predominance, their class definition is overbroad and the court would require it to be replead. "An order that certifies a class action must define the class…." FED. R. CIV. P. 23. The definition of the class is a matter within the broad discretion of the district court." Clarke v. Lane, 267 F.R.D. 180, 194 (E.D. Pa. 2010) (citing Battle v. Commw. of Pa., 629

F.2d 269, 271 n.1 (3d Cir. 1980)). "Defining the class is of critical importance because it identifies the persons (1) entitled to relief, (2) bound by a final judgment, and (3) entitled under Rule 23(c)(2) to the 'best notice practicable' in a Rule 23(b)(3) action." MANUAL FOR COMPLEX LITIGATION (FOURTH) § 21.222 (2004) (quoting FED. R. CIV. P. 23(c)(2)(B)). Rule 23 is "silent" with respect to the sufficiency of a class definition, Jackson v. Se. Pa. Transp. Auth., 260 F.R.D. 168, 182 (E.D. Pa. 2009) (citing 5 JAMES W. MOORE, MOORE'S FEDERAL PRACTICE § 23.21[1] (3d ed. 2019), but the court has a "responsibility to 'protect absentees by blocking unwarranted or overbroad class definitions[,]" Sullivan v. CB Investments, Inc., 667 F.3d 275, 291 (3d Cir. 2011) (quoting In re Cmty. Bank of N. Va., 622 F.3d 275, 291 (3d Cir. 2010)). "The definition must be precise, objective, and presently ascertainable." MANUAL FOR COMPLEX LITIGATION (FOURTH) § 21.222 (2004). "All class certification orders are conditional and 'the court retains the authority to re-define or decertify the class until the entry of final judgment on the merits.'" Clarke, 267 F.R.D. at 194 (quoting In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig., 55 F.3d 768, 793 n.14 (3d Cir. 1995)).

Plaintiffs in the consolidated class action complaint define the putative class as follows:

> All natural persons employed by, or hired through staffing agencies or vendors to work for, Defendants or their wholly owned subsidiaries, in the United States, at any time from the start of the conspiracy (no later than 2009) to the present. Excluded from the class are senior executives and personnel in the human resources, recruiting, and legal departments of the Defendants, and employees hired outside of the United States to work outside of the United States.

(ECF No. 88 ¶ 65.) Plaintiffs intend to represent one class comprised of all persons employed by any defendant beginning in 2009. The court finds this class definition lacks

precision based upon the allegations of the consolidated class action complaint. <u>Duffy v.</u> <u>Massinari</u>, 202 F.R.D. 437, 440 (E.D. Pa. 2001) ("At this stage in the litigation, the Court also agrees that the proposed class definition is an appropriate one given the allegations and claims contained in the Amended Complaint.").

The reasonable inference drawn from the allegations of the consolidated class action complaint shows plausibly that the overarching conspiracy among Knorr, Wabtec, and Faiveley N.A. commenced in 2014 (at the earliest) when Wabtec and Faiveley N.A. formed the third bilateral conspiracy. Prior to 2014, there existed only two bilateral conspiracies: (1) between Knorr and Wabtec, formed no later than 2009; and (2) between Knorr and Faiveley N.A., formed no later than 2011. Based upon the allegations in the consolidated class action complaint, persons employed by Faiveley N.A. did not enter into a conspiracy until approximately 2011. Thus, plaintiffs' class definition that includes all defendants' employees from 2009 to the present is overbroad and lacks precision. Even if plaintiffs had satisfied their burden with respect to predominance, the court would require the class definition to be amended. <u>See</u> FED. R. CIV. P. 23(d)(1)(D) ("[T]he court may issue orders that…require that the pleadings be amended to eliminate allegations about representation of absent persons and that the action proceed accordingly.").

Plaintiffs' failure to set forth a precise class definition, however, is not fatal to their class action. The Third Circuit Court of Appeals has explained:

> Federal Rule of Civil Procedure 23(c)(5) states that "[w]hen appropriate, a class action may be divided into subclasses that are each treated as a class under this rule." An advisory committee note for Rule 23(c) indicates that subclasses are appropriate "[w]here a class is found to include subclasses divergent in interest." Accordingly, "[a] district court hearing a class action has the discretion to divide the class into subclasses and certify each subclass separately." <u>In re Cendant Corp. Sec. Litig.</u>, 404 F.3d 173, 202 (3d

Cir.2005). We have explained that the option to utilize subclasses "is designed to prevent conflicts of interest in class representation." Id.

In re Ins. Brokerage Antitrust Litig., 579 F.3d 241, 271 (3d Cir. 2009). Plaintiffs may seek to file an amended consolidated class action complaint in accordance with Rule 15. Plaintiffs may include additional factual allegations to make a prima facie showing that the class allegations are sufficient, i.e., factual allegations from which the court could reasonably infer that all defendants were engaged in an overarching conspiracy by at least 2009 or to define a class corresponding to the overarching conspiracy beginning at the earliest in 2014 and three subclasses corresponding to the three bilateral conspiracies.[16]

### 5. Summary

For the reasons set forth above, defendants' motion to strike must be granted without prejudice to plaintiffs in accordance with Federal Rule of Civil Procedure 15 being able to file an amended consolidated class action complaint setting forth amended class allegations sufficient to show it is likely discovery will substantiate that antitrust impact on a class-wide basis can be shown by a common method of proof and to amend the class definition.

### V.  Conclusion

The motion to dismiss (ECF No. 124) will be denied with respect to defendants' arguments that the horizontal market allocation agreements alleged in the consolidated

---

[16]     The predominance issue may also impact the breadth of the class, i.e., all employees or only certain kinds of employees.  See Seaman, 2018 WL 671239, at *8 (granting class certification for a faculty class but denying class certification for a class including faculty and non-faculty).

class action complaint must be plead under the rule of reason. The motion to dismiss is granted without prejudice with respect to Bendix and Ricon.

The motion to strike (ECF No. 124) is granted without prejudice with respect to striking the class allegations because plaintiffs did not make a prima facie showing in the consolidated class action complaint that discovery is likely to substantiate that the common issues of the proposed class of all employees predominate over the individual questions. The motion to strike is also granted to the extent plaintiffs will be required to amend the class definition, which is overbroad and lacks precision.

An appropriate order will be entered.

BY THE COURT,

Dated: June 20, 2019            /s/ JOY FLOWERS CONTI
Joy Flowers Conti
Senior United States District Judge