**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE: RAILWAY INDUSTRY EMPLOYEE NO-POACH ANTITRUST LITIGATION | ) | Master Docket Misc. No. 18-798 |
| | ) | MDL No. 2850 |
| This Document Relates to: ALL ACTIONS. | ) | |

**CONSOLIDATED AMENDED COMPLAINT**

**REDACTED PUBLIC VERSION**

## TABLE OF CONTENTS

**Page**


I. SUMMARY OF THE ACTION ..... 1
II. JURISDICTION AND VENUE ..... 2
III. THE PARTIES ..... 3
- A. Plaintiffs ..... 3
- B. Defendants ..... 4
  - 1. Wabtec Defendants ..... 4
  - 2. Knorr Defendants ..... 5

IV. FACTUAL ALLEGATIONS ..... 6
- A. Defendants' No-Poach Conspiracy ..... 6
  - 1. Wabtec – Knorr Agreements ..... 6
  - 2. Knorr – Faiveley Agreement ..... 9
  - 3. Wabtec – Faiveley Agreement ..... 10
- B. Labor Markets Are Imperfectly Competitive, Particularly For Jobs In Which Railway Industry Experience Or Skills Are Valuable ..... 12
- C. Defendants Maintained Compensation Structures That Tethered Together Pay of Employees. ..... 16
- D. The Compensation Structures for Defendants' Unionized Employees Contributed to the Common Impact of Defendants' Conspiracy ..... 23
- E. Top-Down Pay Control Also Resulted In Common Impact Across The Class ..... 26
- F. Effects on Interstate Commerce ..... 27
- G. Defendants Concealed Their Conspiracy and Anticompetitive Conduct ..... 27

V. CLASS ACTION ALLEGATIONS ..... 29
FIRST CLAIM FOR RELIEF (Violation Of The Sherman Act, § 1) ..... 32
PRAYER FOR RELIEF ..... 32

## I. SUMMARY OF THE ACTION

1. This class action challenges an illegal conspiracy among the world's dominant rail equipment suppliers to restrain competition and reduce compensation for their railway industry employees. Plaintiffs are former employees of Defendants and bring this suit on behalf of themselves and the Proposed Class to obtain damages for the harm they suffered and to prevent Defendants from retaining the benefits of their unlawful conspiracy.

2. Defendants Westinghouse Air Brake Technologies Corporation and Knorr-Bremse AG and their respective co-Defendant subsidiaries (referred to collectively as "Wabtec" and "Knorr," respectively herein) are the largest suppliers of rail equipment used in freight and passenger rail applications. They compete with one another to hire and retain employees throughout the United States.

3. However, beginning in 2009, Defendants entered into express agreements not to compete for employees by refraining from soliciting or hiring each other's employees without the consent of the current employer. These "no-poach" agreements spanned several years and were monitored and enforced by Defendants' senior executives.

4. The no-poach agreements were not reasonably necessary to any legitimate business transaction or lawful collaboration among the companies. Rather, Defendants' conspiracy was an ideal tool to suppress their employees' compensation that was simple to implement and easy to enforce.

5. The no-poach agreements accomplished their purpose. They reduced competition for Defendants' employees and suppressed Defendants' employee compensation below competitive levels. The conspiracy disrupted the efficient allocation of labor that would have

resulted if Defendants had competed for, rather than colluded against, their current and prospective employees.

6. In addition to reducing compensation, Defendants' agreements also denied their employees access to better job opportunities, restricted their mobility, and deprived them of competitively significant information that they could have used to negotiate for better terms of employment.

7. The conspiracy was first revealed publicly on April 3, 2018, with an announced action and proposed stipulated judgment by the United States Department of Justice ("DOJ").

## II. JURISDICTION AND VENUE

8. Plaintiffs bring this action to recover damages and obtain injunctive relief, including treble damages, costs of suit, and reasonable attorneys' fees arising from Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

9. The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337.

10. Venue is proper in this judicial district pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391(b), (c), and (d) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this district and a substantial portion of the affected interstate trade and commerce was carried out in this district.

11. Defendants are subject to the jurisdiction of this Court because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) participated in an illegal Conspiracy throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and (d) was engaged in

an illegal Conspiracy that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

## III. THE PARTIES

### A. Plaintiffs

12. Stephen Baldassano was employed by Defendant Knorr Brake from approximately March 1998 to December 2012, and from approximately January 2017 to October 2017. Plaintiff Baldassano performed his duties as a Project Manager and Manager of Systems and Sales for Knorr Brake in and is a citizen and resident of the State of Maryland.

13. John Brand was employed by Defendant NY Air Brake as a Senior Manager of Systems and Software Engineering from approximately May 2013 to August 2016. Plaintiff Brand performed his duties as a NY Air Brake employee in and is a citizen and resident of the State of Texas.

14. David Escalera was employed by Defendant Wabtec as a Field Service Technician from approximately July 2011 to January 2015, in the State of California. Plaintiff Escalera is a citizen and resident of the State of Massachusetts.

15. Brian Lara was employed by Defendant Wabtec as a Machinist from approximately November 2011 to January 2017. Plaintiff Lara performed his duties as a Wabtec employee in and is a citizen and resident of the State of Pennsylvania.

16. Patricia Lonergan was employed by Wabtec as a Positive Train Control Manager from approximately October 2013 to April 2015. Plaintiff Lonergan performed her duties as a Wabtec employee in and is a citizen and resident of the State of Colorado.

**B. Defendants**

**1. Wabtec Defendants**

17. Defendant Westinghouse Air Brake Technologies Corporation ("Wabtec Corp.") is a Delaware corporation with its headquarters in Wilmerding, Pennsylvania. Wabtec Corp. is the world's largest provider of rail equipment and services with global sales of $3.9 billion in 2017. Wabtec Passenger Transit is a business unit of Wabtec Corp. that develops, manufactures, and sells rail equipment and services for passenger rail applications. It is based in Spartanburg, South Carolina. Wabtec Global Services is a business unit of Wabtec Corp. that offers maintenance, repair, and support services. It has several locations throughout the United States.

18. Defendant Wabtec Railway Electronics, Inc. ("Wabtec Railway") is a Delaware corporation with its headquarters in Germantown, Maryland. It designs, develops, manufactures, and repairs electronic products used to improve railroad operations and safety. Wabtec Railway is a wholly-owned subsidiary of Wabtec Corp.

19. Defendant Railroad Controls, L.P., is headquartered in Fort Worth, Texas, and is one of the largest railroad signal construction companies in the United States. It is a wholly-owned subsidiary of Wabtec Corp.

20. Defendant Xorail Inc. provides engineering, design, systems integration, and construction services for signaling, communications and Positive Train Control (PTC). It is a wholly-owned subsidiary of Wabtec Corp.

21. Defendant Faiveley Transport, S.A. ("Faiveley") was a French société anonyme based in Gennevilliers, France. On November 30, 2016, Wabtec Corp. acquired Faiveley, making Faiveley a wholly-owned subsidiary of Wabtec Corp. Before the acquisition, Faiveley was the world's third-largest rail equipment supplier behind Wabtec and Knorr. Faiveley had

employees in 24 countries, including at six U.S. locations. It developed, manufactured, and sold passenger and freight rail equipment to customers in Europe, Asia, and North America, including the United States, with revenues of approximately €1.2 billion in 2016.

22. Defendant Faiveley Transport North America Inc. ("Faiveley NA") was a wholly-owned subsidiary of Faiveley. Prior to its acquisition by Wabtec, Faiveley conducted business in the United States primarily through Faiveley N.A. Faiveley N.A. is a New York corporation headquartered in Greenville, South Carolina and is now a wholly-owned subsidiary of Wabtec Corp.

### 2. Knorr Defendants

23. Defendant Knorr-Bremse AG is a privately-owned German company with its headquarters in Munich, Germany. Knorr-Bremse is the world's second largest provider of rail and commercial vehicle equipment. In 2017, Knorr-Bremse had annual revenues of approximately $7.7 billion. Knorr-Bremse holds several wholly-owned subsidiaries in the United States.

24. Defendant Knorr Brake Company LLC ("Knorr Brake") is a Delaware corporation with its headquarters in Westminster, Maryland. It manufactures train control, braking, and door equipment used on passenger rail vehicles. Knorr Brake is a wholly-owned subsidiary of Knorr-Bremse.

25. Defendant New York Air Brake LLC ("NY Air Brake") is a Delaware corporation with its headquarters in Watertown, New York. It manufactures railway air brakes and other rail equipment used on freight trains. NY Air Brake is a wholly-owned subsidiary of Knorr-Bremse.

26. Upon information and belief, co-conspirators presently unknown to Plaintiffs performed acts and made statements in furtherance of the conspiracy and the alleged

anticompetitive conduct. Plaintiffs reserve the right to name some or all of these persons and entities at a later date when their identities become known to Plaintiffs.

## IV. FACTUAL ALLEGATIONS

### A. Defendants' No-Poach Conspiracy

27. Over a period spanning several years, Wabtec, Knorr, and Faiveley entered into no-poach agreements to eliminate competition among them for employees. These agreements were executed and enforced by the companies' senior executives and included the companies' U.S. subsidiaries. The no-poach agreements were not reasonably necessary to any separate, legitimate business transaction or collaboration among the companies.

#### 1. Wabtec – Knorr Agreements

28. Wabtec and Knorr entered into pervasive no-poach agreements that spanned multiple business units and jurisdictions. Senior executives at the companies' global headquarters and their respective U.S. passenger and freight rail businesses entered into no-poach agreements that involved promises and commitments not to solicit or hire one another's employees.

29. Beginning no later than January 2009, Wabtec's and Knorr's senior executives entered into an express no-poach agreement and then actively managed it with each other through direct communications. [redacted]

30. Although the no-poach agreement was between Wabtec and Knorr's U.S. passenger rail subsidiary, it was well-known to senior executives at the parent companies,

including top Knorr executives in Germany who were included in key communications about the no-poach agreement.

31.     In furtherance of their agreement, Wabtec and Knorr informed their outside recruiters not to solicit employees from the other company.  For example, Knorr Brake used Bendix, a Knorr subsidiary and Knorr Brake sister company, as a recruiter for certain employment needs.  Knorr Brake directed the Bendix recruiters to refrain from soliciting employees from Wabtec.

32.     Wabtec's and Knorr's no-poach agreement also foreclosed the consideration of unsolicited applicants employed by Wabtec or Knorr without prior approval of the other firm.  In a 2010 internal communication, a senior executive at Knorr Brake stated that he would not even consider a Wabtec candidate who applied to Knorr Brake without the permission of his counterpart at Wabtec.

33.     ███████████████████████████████████████████
███████████████████████████████████████

34.     ███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████

35.     Wabtec's and Knorr's no-poach agreements also reached the companies' U.S. freight rail businesses.  ██████████████████████████████
███████████████████████████████████████████
████████████████████████████████

36.     ███████████████████████████████████████████
██████████████████████████████

37. [redacted]

38. [redacted]

39. [redacted]

40. Wabtec's and Knorr's senior executives actively policed potential breaches of their companies' no-poach agreements and directly communicated with one another to ensure adherence to the agreements. [redacted]

[redacted]

41. [redacted]

2. **Knorr – Faiveley Agreement**

42. Beginning no later than June 2010, senior executives at Knorr and Faiveley reached an express no-poach agreement that included a commitment to contact one another before pursuing an employee of the other company.

43. [redacted]

44. [redacted]

45. Executives at Knorr Brake and Faiveley NA actively managed the agreement through direct communications. For example, in or about 2012, a senior executive at Knorr Brake discussed the companies' no-poach agreement with an executive at Faiveley NA while at a trade show in Berlin, Germany.

46. [REDACTED]

47. [REDACTED]

48. Knorr and Faiveley continued their no-poach agreement until Faiveley merged with Wabtec in November 2016. [REDACTED]

**3. <u>Wabtec – Faiveley Agreement</u>**

49. Beginning no later than January 2013, senior executives at Wabtec and Faiveley NA entered into a no-poach agreement in which the companies agreed not to hire each other's employees without approval from the other company.

50.

51.

52.

53.

54.



55. In July 2015, Wabtec and Faiveley publicly announced their intent to merge. Wabtec closed its acquisition of Faiveley on November 30, 2016. Presently, Faiveley is a wholly-owned subsidiary of Wabtec.

**B. Labor Markets Are Imperfectly Competitive, Particularly For Jobs In Which Railway Industry Experience Or Skills Are Valuable**

56. Labor markets are far from perfectly competitive. They do not function like commodity markets where market-wide demand and supply determines a single market price. Defendants do not simply pay a "market wage" for a particular employee as one might buy a pound of silver on a metals exchange. Instead, market participants determine prices through interacting with each other. This is particularly true for jobs in which specialized experience or skills are valuable, such as railway industry experience or skills. Market frictions result when, as here: (1) workers are not fully informed about all alternatives available to them; (2) it is costly for workers to move between employers; and (3) workers do not have a large choice of essentially identical positions.

57. These market frictions are well-recognized in labor economics. For instance, the 2010 Nobel Prize in Economics was awarded to Peter A. Diamond, Dale T. Mortensen, and Christopher A. Pissarides, "for their analysis of markets with search frictions." Almost all of their research (what is known as the search and matching framework) was about the analysis of frictions in labor markets caused by limited information.

58. "Price discovery" refers to the process by which a market searches for prices when information about supply and demand is imperfect. Class members worked in an environment characterized by such imperfect information, and thus the price discovery framework is appropriate here. The speed at which price discovery operates depends on the manner in which, and how rapidly, information is disseminated among employers and employees.

59. Employees with experience or skills in the railway industry were harmed by Defendants' no-poach agreements in part because Defendants are the market leaders in their

fields. Wabtec and Knorr are the world's two largest rail equipment suppliers and each other's top rival in the development, manufacture, and sale of equipment used in freight and passenger rail applications. Until its acquisition by Wabtec in 2016, Faiveley was the world's third largest supplier.

60. Defendants also are some of the largest employers in the rail industry. For example, by the end of 2017, Wabtec and its subsidiaries employed approximately 18,000 full-time employees worldwide. In 2016, Wabtec added approximately 5,700 employees through the acquisition of Faiveley. By the end of 2017, Knorr and its subsidiaries employed approximately 27,700 employees worldwide, including approximately 5,000 employees in the Americas.

61. There is high demand for and limited supply of employees who have rail industry experience or skills. As a result, critical jobs in the rail industry can remain vacant for months while firms try to recruit and hire individuals with the requisite skills, training, and experience for a job opening. Employees within the rail industry, like those working for the Defendants, are key sources of potential talent to fill these openings.

62. Defendants employ a variety of recruiting techniques, including using internal and external recruiters and staffing agencies to identify, solicit, recruit, and otherwise help hire employees. Defendants also receive direct applications from individuals interested in employment opportunities.

63. Directly soliciting employees from other rail industry employers is a particularly efficient and effective method of competing for qualified employees. Soliciting involves communicating directly—whether by phone, email, social and electronic networking, or in person—with another firm's employee who has not otherwise applied for a job opening. Such direct solicitation can be performed by individuals of the company seeking to fill the position or

by outside recruiters retained to identify potential employees on the company's behalf. Firms in the rail industry rely on direct solicitation of employees of other rail companies because those individuals have specialized experience and may be unresponsive to other methods of recruiting.

64. In a properly functioning and lawfully competitive labor market, rail industry employers compete with one another to attract talent for their employment needs. It is this competition among employers for workers that determines the level of compensation. While employers would like to pay low wages for high quality workers, competition increases the available job opportunities and requires employers to make the best offer possible to prospective employees. It also improves employees' ability to continue to negotiate for better salaries and other terms of employment. Soliciting and hiring employees from other rail industry employers is attractive to companies like Defendants because these employees have training and experience that are lacking in entry-level hires or hires from a different industry. Hiring employees directly out of a training program or from a different industry requires the company to invest significant resources in identifying, assessing, and training new employees. For these reasons and others, lateral hiring within the rail industry is a key form of competition.

65. Competition for workers via lateral hiring has a significant impact on compensation in a variety of ways. First, competition facilitates an important flow of information about opportunities and compensation. For example, an employee who is solicited by a rival company or who is interviewed or receives a job offer is given insight into how other companies value her work and experience and what compensation and benefits these other companies typically pay or are willing to pay to lure her from her current employer. This information is not otherwise readily available to employees who rely mostly on these encounters and word-of-mouth from peers and colleagues, as opposed to employers (including Defendants),

who often hire private consulting firms to provide information about market compensation rates. No-poach agreements restrain employees' access to this information by eliminating or reducing the job events that foster the flow of information. While it was typical in the rail industry for recruiters who worked for Defendants to share pay and benefit information with those employees they solicited, the no-poach restrictions meant that this information was not being provided to employees at Defendants' companies. Employees would have used that information to negotiate higher pay at their current job, or to switch employers for a superior offer. Indeed, empirical economic research confirms that employees who change jobs voluntarily typically have faster wage growth than those who remain in the same job. Employees would have also shared this information with their co-workers, multiplying the impact of each offer as the information would have spread through worker social networks.

66. Second, the threat of losing employees to competitors encourages employers to preemptively increase and maintain appropriately high compensation to ensure high morale, productivity, and retention. Absent appropriate compensation, employees will seek positions that offer more generous compensation and benefits elsewhere, be receptive to recruiting by a rival employer, and/or reduce their productivity and morale. Once an employee has received an offer from a rival, retaining the employee may require a disruptive increase in compensation for one individual, if retention is possible at all, and cascading pressures on compensation of other employees where internal equity and fair pay analysis would demand similar raises. Employers therefore have an incentive to preempt lateral departures by paying employees well enough that they are unlikely to seek or pursue outside opportunities. Preemptive retention measures thus lead to increased compensation for employees.

67. Third, because many rail industry workers are integrated into teams, some workers who move to positions at different companies may bring others with them. Just as competition forces employers to preemptively or reactively raise compensation to retain employees who might otherwise seek employment elsewhere, it also encourages increased compensation for these related workers. Thus, increased movement of one category of employee not only increases the compensation for those employees, but also for the categories of employees who are likely to move with them or to seek parallel lateral positions.

68. Defendants' conspiracy restrained competition for employees and disrupted the normal bargaining and price-setting mechanisms that apply in the labor market. This disruption and resultant suppression of compensation was not limited to particular individuals who would otherwise have been solicited or sought alternative employment. Instead, the effects of eliminating solicitation and lateral hiring, pursuant to agreement, caused widespread impact on employees of the participating companies by eliminating or reducing the flow of information and the need for preemptive and reactive increases to the compensation structures that determined Class pay.

### C. Defendants Maintained Compensation Structures That Tethered Together Pay of Employees.

69. The role of compensation is to attract candidates to work for a company, prevent them from leaving for jobs elsewhere (because turnover is costly), and motivate them to perform their jobs well. Employees generally leave their jobs if they find other ones that pay better. In addition, fairness concerns relate to compensation and affect a range of employee behavior, from motivation to perform jobs to decisions to search for new jobs. In short, employees' perceptions of unfair compensation are disruptive to productivity, morale, and retention.

70. In this context, what constitutes "fair" is based on comparisons that employees draw between themselves and other employees at their company and in their field. For example, it is generally not considered fair for there to be pay differentials for workers doing the same work at the same level based solely on the fact that a few of these employees may have received an outside solicitation or offer of alternate employment. However, employees do not care only about how they are paid compared to employees doing the same work, but also how much they make in comparison to those they work with, even if the jobs are not similar.

71. Thus, Defendants had an incentive to ensure that their employees felt that their compensation was fair, based on broad comparisons across job descriptions and titles. This principle, referred to as "internal equity," requires that pay differentials be perceived as based on objective criteria. Defendants fostered internal equity by maintaining formal compensation systems with standardized features, such as job analysis, job evaluation, the use of market surveys and external market data, market pay lines, and salary bands, zones, grades, and ranges. These compensation structures restrict discretionary pay decisions and ensure objectivity and perceived fairness.

72. The design of a formal compensation system generally has three steps: (1) the formulation of standardized job descriptions to identify the requirements and demands of all jobs; (2) a job evaluation to value those requirements and demands consistently across jobs to calculate holistically a wage or wage range for each job; and (3) sorting jobs into clusters or hierarchies ("job families") reflecting the organizational hierarchy and advancement pathways.

73. Pay levels are generally first set by benchmarking wage levels for equivalent jobs in the labor market. Jobs that are similar at other employers are referred to as "benchmark" jobs,

and wages for those jobs form the foundation of a pay system. The rail industry has a great many benchmark jobs because there are many occupations that are similar across employers.

74. The next step involves addressing concerns about fairness in pay levels across jobs that are otherwise similar but differ in experience levels. For example, a senior project manager with ten years of rail experience will generally be paid more than a project manager with no rail experience.

75. Finally, there are concerns about the structure of pay across different job titles: employees in different jobs who nevertheless have similar relative skills or value to Defendants, or who work together in teams or on projects. These employees care about their compensation relative to their professional peers, even if they are not performing similar work. Pay structures meet those concerns by implementing pay bands for disparate jobs that move together in a way that ensures that the differentials among these co-workers and team members remain largely consistent even as pay itself changes, so fairness is maintained. In fact, Defendants commonly move their entire pay structures all at once, at least annually. Thus, movement in one part of the structure impacts the structure at large.

76. For example, if there is too small a gap between the pay of a project manager and a technician on that team, the project manager might feel that his or her work is being undercompensated in light of his or her professional skills, education, and contribution to the company. This is referred to as "compression". Conversely, a very large discrepancy between the project manager's pay and the technician's pay may result in the technician believing that his or her contributions to the company are not being rewarded proportionately. Thus, raises of technician pay would lead to parallel raises in project manager pay, to prevent compression, or a convergence of pay levels that may create feelings of inequity. Similarly, raises in project

manager pay create an upward pressure on technician pay, even though the two positions perform different work, have different levels of education and skill, and fall within different pay bands.

77. Thus, pay systems adjust pay levels across job titles and pools of employees to maintain internal equity to better foster morale and motivation across a company's labor force. For example, if changes in the supply and demand within specific labor markets raise the pay of benchmark jobs and Defendants respond by raising the pay of those jobs to prevent employees in them from leaving, formal compensation systems also activate pay increases to other jobs to maintain equity. That is because benchmark jobs with external referents are often grouped together with other jobs that do not necessarily have parallel analogs in the market.

78. The following chart is a visual illustration of how pay bands work, and how they establish a pay structure across job titles within a company that are tied to market rates outside the company. In this chart, the company's internal pay structure appears on the horizontal axis consisting of jobs A through P. Jobs B, F, G, H, J, M, and P are benchmark jobs that are matched to external market data. The other jobs (A, C, D, E, I, K, L, N, and O) do not have direct matching jobs in the external market survey, but, under the firm's internal structure, are grouped with other benchmark jobs. The vertical axis reflects the salaries paid by relevant competitors for the benchmark jobs based on a market survey. The firm's pay structure—the means by which the firm structures pay across job titles while maintaining a relationship between each pay decision—is expressed in terms of the "pay-policy line" and the "pay ranges" (as depicted by grayed out boxes).




79. Raising the pay of one employee in order to retain them leads to pay raises for not only those who perform similar work (and thus are within the same pay bands or grades), but for a wider swath of employees who base their notions of fair compensation on certain degrees of differentials between themselves and those other employees. Formalized pay systems with such an element of rigidity are a mechanism by which a raise or diminution in the pay of one group of employees is transmitted to other employees.

80. It is important to note here that outside benchmarking does not determine employee pay levels on its own. Once the shape of the pay structure is determined, actual pay levels are determined by the pay-policy line, often with reference to a desired percentile. Defendants' senior executives and human resource professionals selected percentile targets that

applied to pay decisions across a variety of job families. For example, a pay policy line could be placed to coincide with the 50th percentile of external benchmark pay. This choice is critical and necessary to determine actual pay levels, and it is made in light of expected competitive threats. If a company anticipates increased competition for its employees, it will move the pay-policy line to coincide with a higher percentile of the external benchmark, increasing pay systematically across its workforce. If a company eliminates those competitive threats through secret no-poach agreements, as Defendants did here, the pay policy line will not increase, suppressing pay systematically.

81. Pay for Defendants' employees was organized by job family and job position, with each job position associated with a pay band. Each employee in a particular job position and salary band could have his or her pay adjusted up or down, but only within that range. At New York Air Brake, for example, there was typically an approximately 20% difference in salary from one job level to the next, with each job level associated with a pay band. To maintain internal equity, starting pay for new employees was typically set at approximately 90% of the 50th percentile within that employee's pay band. This pay structure meant that year-to-year, the salary of co-workers in the same job family on would move together. Similarly, Wabtec subsidiary Xorail maintained strict "Pay Bracket Range[s]" that were associated with each position. These ranges provided a strict dollar amount of pay for Xorail employees.

82. Because annual pay increases were also provided as a percentage of the prior year's pay, the annual pay increases of co-workers in the same job families and positions also moved together. [redacted]

1816644.6

[redacted]

83. Defendants also adjusted pay "off-cycle" in response to specific offers, but did so carefully. Off-cycle pay adjustments were authorized in order to retain employees who received offers of higher pay from rival employers. But before those pay adjustments were made, Defendants scrutinized equity relationships across employee peers and throughout the organization, knowing that any adjustments would have an impact throughout the pay structure. Indeed, Defendants' senior executives and finance staff reviewed off-cycle retention requests because of the systematic impact these adjustments would soon have on overall pay structures and budgets.

84. Equity comparisons were particularly important for job families in which railway experience or expertise was valuable. For instance, a retention offer to a project manager would first put pressure on pay relationships with other project managers, and then to other employees within the same job family who compare their pay against each other for consistency and fairness. Equity pressure from such a retention offer would be less relevant for jobs families in which railway experience or expertise was not valuable, such as food service. Jobs that do not value railway experience or expertise are paid primarily based upon external benchmarking, with much less of an emphasis on internal equity comparisons beyond their job family. For instance, a retention offer to a food service worker would have put pressure on other food service worker pay, but would have had less of an impact on the pay of engineers or electricians with railway experience or expertise. Indeed, in the specific examples alleged above, Defendants enforced their no-poach agreements regarding job families in which railway industry experience or skills

were valuable. This is where Defendants put their focus, and it is where the impact of their misconduct would have been more clearly felt.

85. Another important aspect of Defendants' pay structures was their behavior over time. Individual retention offers impacted Defendants' pay structures systematically, at the time if appropriate, or at the very least during the next annual pay review and determination process. Defendants' no-poach agreements were in place for several years. The no-poach agreement between Wabtec and Knorr, for example, continued for approximately nine years (2009-2018). Year after year, pay cycle after pay cycle, Defendants' pay structures were artificially suppressed because Defendants knew they could reduce pay increases without increasing retention risks. Further, employee pay does not fluctuate like the prices of consumer products, where there may be a sale on one day and not on another, with prices going up and down in response to short-term market conditions. Employee pay is much more stable, and generally works like a one-way ratchet. A raise in one year creates the baseline for the next. Thus even small losses of pay in one year resulting from Defendants' no-poach agreements suppressed employee pay throughout entire subsequent careers. Defendants understood this well, and that is why their senior executives entered into their clandestine no-poach agreements.

### D. The Compensation Structures for Defendants' Unionized Employees Contributed to the Common Impact of Defendants' Conspiracy

86. A portion of Defendants' employees were unionized and subject to collective bargaining agreements. These collective bargaining agreements were yet another mechanism by which Defendants' unlawful agreements commonly suppressed the pay of Defendants' employees who worked in job families in which railway industry experience or skills were valuable.

87. For example, units of employees at different facilities owned and/or operated by the Wabtec Defendants were unionized during the class period. This included employees of Wabtec Corporation at its Wilmerding, Pennsylvania and Greensboro, Pennsylvania plants, represented by the United Electrical, Radio and Machine Workers of America, Local 610. The Wabtec facility in Bensenville, Illinois that, among other things, repaired compressors for locomotive braking systems, also had unionized employees, represented by the Automobile Mechanics Union Local 701, International Association of Machinists and Aerospace Workers, AFL-CIO.

88. The existence of unions and collective bargaining agreements enhanced the impact of the no-poach agreements across Defendants' workers because the collective bargaining agreements themselves provided a wage structure. Collective bargaining agreements fix minimum compensation ranges for employees with similar job titles, classifications, levels of experience or time worked for the company. The agreements also set compensation differentials based on varying positions, levels of experience, or time worked for the company.

89. The wage scales act as a minimum, or a floor, from which employees may negotiate upwards. As an example, a union collective bargaining agreement during the Class period between Wabtec Corporation, Triangle Engineered Products Division and employees at a Bensenville, Illinois facility identifies various contractual minimum hourly wage rates for different classifications, with differentials within classifications based on, *inter alia*, date of hire. A section of this collective bargaining agreement, which had an effective date of December 12, 2014, and an expiration date of December 11, 2017, is as follows:

**ARTICLE 2 – WAGES / CLASSIFICATIONS**
Wage increases listed below will be to each employee's wage rate and to contract minimum wage rates.

| **CLASSIFICATIONS:** | | **EFF. 12/12/14** | **EFF. 12/12/15** | **EFF. 12/12/16** |
|---|---|---|---|---|
| **Foreman** | Tier 1 | $0.20<br>$22.47 | $0.15<br>$22.62 | $0.65<br>$23.27 |
| | Tier 2 | $0.20<br>$16.72 | $0.15<br>$16.87 | $0.65<br>$17.52 |
| **Prod. Worker "A"** | Tier 1 | $0.20<br>$22.01 | $0.15<br>$22.16 | $0.65<br>$22.81 |
| | Tier 2 | $0.20<br>$16.37 | $0.15<br>$16.52 | $0.65<br>$17.17 |
| **Prod. Worker "B"** | Tier 1 | $0.20<br>$20.17 | $0.15<br>$20.32 | $0.65<br>$20.97 |
| | Tier 2 | $0.20<br>$14.99 | $0.15<br>$15.14 | $0.65<br>$15.79 |
| **Laborer** | Tier 1 | $0.20<br>$13.40 | $0.15<br>$13.55 | $0.65<br>$14.20 |
| | Tier 2 | $0.20<br>$11.41 | $0.15<br>$11.56 | $0.65<br>$12.21 |

90. These wage minimums provide a range of pay for select employees with a particular skill set and credentials. But the value to a firm of a high-performing employee can be higher than these minimums. Attempts by another employer to hire a high-performing worker (or to a worker that is otherwise in high demand) recognize his or her higher value. Such hiring attempts create a bidding war that allows that employee to negotiate his or her compensation much closer to his or her value. Furthermore, if the high-performing employee increases the top of the scale for his or her particular position, given the internal equity and the compensation structure factors referenced above, it would likely lead to higher pay for other employees as well.

91. One of the primary purposes of a wage structure such as the wage classifications in collective bargaining agreements is to maintain internal equity among employees. That is, as

explained above, Defendants paid employees who worked in similar jobs similarly. Defendants used formal compensation structures such as the collective bargaining agreements to ensure that employees were paid similarly for comparable work, and to establish relatively fixed pay grades between groups of employees with increasing responsibilities.

**E. Top-Down Pay Control Also Resulted In Common Impact Across The Class**

92. As explained above, pay levels of Defendants' employees were not a collection of unrelated, one-off negotiations. No large sophisticated company operates that way, and Defendants were no exception. Instead, Defendants' pay structures were carefully created, maintained, and adjusted from the top-down, by teams of human resource professionals, working under the direction and supervision of Defendants' most senior executives—the same senior executives who entered into and enforced the no-poach agreements.

93. Labor costs played an enormous role in Defendants' profitability. Accordingly, Defendants' senior executives paid close attention to employee pay issues and overall labor budgets. The purpose of Defendants' no-poach agreements was to artificially suppress labor costs in order to boost profits.

94. Defendants' annual pay processes began and ended with senior executive direction and approval. At the start, senior executives determined the amount by which overall pay rates increased, in response to anticipated competition for employees in the following year. If Defendants' senior executives anticipated fierce competition for their employees, they would have allocated more of their overall budgets to pay increases, in order to retain their employees. These increases would have lifted entire pay structures, as explained above. In other words, a rising tide of competition would have lifted all boats. But Defendants colluded with each other to eliminate this competition, and maintained those agreements for years. As a result, the same

senior executives who entered into the no-poach agreements directed fewer total resources to pay increases, which commonly impacted the amount by which Defendants' pay structures moved at the end of each annual pay review process. In this way, Defendants increased their profits substantially by depriving their own employees of the competitive value of their labor.

**F. Effects on Interstate Commerce**

95. During the relevant time period, Defendants employed members of the Proposed Class throughout the United States, including in this judicial district.

96. The Conspiracy substantially reduced competition for labor in the rail industry and suppressed the efficient movement and compensation of rail industry employees, harming Plaintiffs and members of the Proposed Class. The harm extended not only to those who did or would otherwise have sought to change companies, but also to those who had no intention of seeking other employment because the no-poach agreements enabled Defendants to maintain suppressed compensation levels generally.

97. Thus, Defendants' no-poach agreements and related conduct substantially affected interstate commerce for employee services and caused antitrust injury throughout the United States.

**G. Defendants Concealed Their Conspiracy and Anticompetitive Conduct**

98. Members of the Proposed Class did not and could not have discovered through the exercise of reasonable diligence that Defendants were engaged in secret no-poach agreements until April 3, 2018, when the DOJ publicly filed its complaint and settlement of its investigation against Defendants.

99. Defendants conducted their no-poach agreements in a manner deliberately designed to avoid detection. Knowledge of the agreements was closely held by senior executives

and recruiters of the Defendant companies who relied on direct and non-public communications with one another to manage and enforce the no-poach agreements, including in-person discussions and private email communications. None of the relevant communications within and among Defendants alleged herein were public before the DOJ filing.

100. Additionally, rather than disclose their agreed-upon refusal to hire employees of a rival company without that company's permission, Defendants devised internal procedures by which implicated applicants could be discreetly flagged. Once flagged, the company President decided whether to seek permission from the rival company to hire the individual. The applicant was not told, much less consulted, about this process.

101. Knorr's Code of Conduct, which was provided to and applies to all of its worldwide employees, misleadingly states that Knorr is "committed to observing the regulations on fair competition. In particular, in order to avoid infringing anti-trust legislation, it is not permitted to conclude agreements with competitors on [i] prices, margins, costs, volumes, production performance, tendering, sales or other factors that influence the behavior of the company, [ii] non-competition, false tendering or [iii] apportionment out of customers, markets, areas, production programs etc."

102. Wabtec Global Services also states in its Policies and Procedures that: "Wabtec recognizes that its employees are our most important asset and that the products and services that we provide to our customers are only as good as the employees who produce them. Therefore, it is in the best interest of Wabtec, its customers and its shareholders to maintain the most talented and motivated employees available. It is our sincere belief that the key ingredient to developing and maintaining such a skilled and motivated workforce is the fair and equitable treatment of employees in the workplace. We believe that each employee is entitled to respect as an

individual. We expect our employees to treat their fellow employees with the same respect and consideration that they would expect."

103. Defendants' secretive maintenance and enforcement of the Conspiracy and misleading and false statements to current and prospective employees deliberately and effectively concealed their misconduct until DOJ's public announcement of its investigation and complaint.

## V. CLASS ACTION ALLEGATIONS

104. Plaintiffs bring this action on behalf of themselves and all others similarly situated (the "Proposed Class") pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), as follows:

> all natural persons who worked in job families in which railway industry experience or skills were valuable and were employed in the United States by one or more of the following: (a) from January 1, 2009 through April 3, 2018, Westinghouse Air Brake Technologies Corporation or its subsidiaries, including Wabtec Railway Electronics, Inc., Railroad Controls, L.P., and Xorail Inc.; (b) from January 1, 2009 through April 3, 3018, Knorr-Bremse AG or its subsidiaries, including Knorr Brake Company LLC and New York Air Brake LLC; or (c) from June 1, 2010 through April 3, 2018, Faiveley Transport, S.A. or Faiveley Transport North America Inc. Excluded from the Class are senior executives and personnel in the human resources, recruiting, and legal departments of the Defendants.

105. If appropriate, Plaintiffs propose the following subclasses:

> **Wabtec Subclass:** all natural persons who worked in job families in which railway industry experience or skills were valuable and were employed in the United States by one or more of the following, from January 1, 2009 through April 3, 2018, Westinghouse Air Brake Technologies Corporation or its subsidiaries, including Wabtec Railway Electronics, Inc., Railroad Controls, L.P., and Xorail Inc. Excluded from the Wabtec Subclass are senior executives and personnel in the human resources, recruiting, and legal departments.

**Knorr Subclass:** all natural persons who worked in job families in which railway industry experience or skills were valuable and were employed in the United States by one or more of the following, from January 1, 2009 through April 3, 3018, Knorr-Bremse AG or its subsidiaries, including Knorr Brake Company LLC and New York Air Brake LLC. Excluded from the Knorr Subclass are senior executives and personnel in the human resources, recruiting, and legal departments.

**Faiveley Subclass:** all natural persons who worked in job families in which railway industry experience or skills were valuable and were employed in the United States by one or more of the following, from June 1, 2010 through April 3, 2018: Faiveley Transport, S.A. or Faiveley Transport North America Inc. Excluded from the Faiveley Subclass are senior executives and personnel in the human resources, recruiting, and legal departments.

106. There are thousands of Class and Subclass members. Joinder of all members of the Class or Subclasses, therefore, is not practicable.

107. The Class and Subclasses are precisely ascertainable from Defendants' records. Based upon these records and expert analysis, Plaintiffs will determine what job families included jobs in which railway experience or skills were valuable. These job families will define the precise job titles that will determine Class membership.

108. Plaintiffs' claims are typical of the claims of the Proposed Class and Subclasses as they arise out of the same course of conduct by Defendants and the same legal theories.

109. Plaintiffs will fairly and adequately represent the interests of the Proposed Class and Subclasses and have no conflict with the interests of the Proposed Class or Subclasses.

110. Plaintiffs have retained counsel experienced in antitrust, employment, and class action litigation to represent them and the Proposed Class/Subclasses.

111. The case raises common questions of law and fact that are capable of class-wide resolution, including, but are not limited to:

a. whether Defendants agreed not to solicit or hire each other's employees;

b. whether such agreements were *per se* violations of the Sherman Act;

c. whether Defendants have fraudulently concealed their misconduct;

d. whether and the extent to which Defendants' conduct suppressed compensation below competitive levels for railway employees;

e. whether Plaintiffs and the Proposed Class and Subclasses suffered antitrust injury as a result of Defendants' agreements;

f. the type and measure of damages suffered by Plaintiffs and the Proposed Class and Subclasses; and

g. the nature and scope of injunctive relief necessary to restore a competitive market.

112. These common questions of law and fact predominate over any questions affecting only individual members of the Proposed Class and Subclasses.

113. Defendants have acted on grounds generally applicable to the Proposed Class and Subclasses, thereby making final injunctive relief appropriate with respect to the Proposed Class and Subclasses as a whole.

114. This class action is superior to any other form for resolving this litigation. Separate actions by individual Class or Subclass members would be enormously inefficient and would create the risk of inconsistent or varying judgments. There will be no material difficulty in the management of this action as a class action.

**FIRST CLAIM FOR RELIEF**
**(Violation Of The Sherman Act, § 1)**

115. Plaintiffs reallege and incorporate by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

116. Defendants, by and through their officers, directors, employees, or other representatives, entered into and engaged in unlawful agreements in restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Specifically, Defendants agreed to restrict competition for Class and Subclass members' services through refraining from soliciting or hiring each other's employees, thereby fixing and suppressing the compensation of Class and Subclass members.

117. Defendants' agreements have included concerted action and undertakings among the Defendants with the purpose and effect of: (a) fixing the compensation of Plaintiffs and the Class and Subclasses at artificially low levels; and (b) eliminating, to a substantial degree, competition among Defendants for rail industry employees.

118. Defendants' combinations and conspiracy injured Plaintiffs and the members of the Proposed Class and Subclasses by suppressing their compensation and depriving them of free and fair competition in the market for their services.

119. Defendants' conduct and agreements are *per se* violations of Section 1 of the Sherman Act.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually, and on behalf of a Class and Subclasses of all others similarly situated, request that the Court enter judgment against Defendants, including:

A. This action is certified as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, with Plaintiffs as the designated Class and Subclass representatives;

B. Defendants have engaged in a conspiracy in violation of Section 1 of the Sherman Act, and Plaintiffs and the members of the Proposed Class and Subclasses have been damaged and injured in their business and property as a result of this violation;

C. Plaintiffs and the members of the Proposed Class and Subclasses recover threefold the damages determined to have been sustained by them as a result of the conduct of Defendants;

E. Plaintiffs and the members of the Proposed Class and Subclasses recover the costs of suit, including reasonable attorneys' fees and expenses, as well as, prejudgment and post-judgment interest as provided for by law or allowed in equity;

G. Injunctive relief, declaring the no-hire agreement among Defendants unlawful and enjoining Defendants from enforcing the agreement or entering into similar agreements going forward; and

H. All other relief to which Plaintiffs and the Class and Subclasses may be entitled at law or in equity.

**JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a jury trial for all claims and issues so triable.

Dated: July 31, 2019

Respectfully submitted,

*/s/ Dean M. Harvey*
Kelly M. Dermody (*pro hac vice*)
Dean M. Harvey (*pro hac vice*)
Lin Y. Chan (*pro hac vice*)
Yaman Salahi (*pro hac vice*)
LIEFF CABRASER HEIMANN &BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008
kdermody@lchb.com
dharvey@lchb.com
lchan@lchb.com
ysalahi@lchb.com

Kathleen M. Konopka (*pro hac vice*)
LIEFF CABRASER HEIMANN &BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, New York 10013-1413
Telephone: (212) 355-9500
Facsimile: (212) 355-9592
kkonopka@lchb.com

*Counsel for Plaintiffs and the Proposed Class*

*/s/ Kelly K. Iverson*
Kelly K. Iverson (307175)
CARLSON LYNCH, LLP
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
412-322-9243
kiverson@carlsonlynch.com

*Liaison Counsel for Plaintiffs and the Proposed Class*

*/s/ Roberta D. Liebenberg*
Roberta D. Liebenberg (*pro hac vice*)
Gerard A. Dever (*pro hac vice*)
Adam J. Pessin (*pro hac vice*)
FINE, KAPLAN AND BLACK, R.P.C.
One South Broad Street, Suite 2300
Philadelphia, PA 19107
Telephone: (215) 567-6565
Facsimile: (215) 568-5872
rliebenberg@finekaplan.com
gdever@finekaplan.com
apessin@finekaplan.com