**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| IN RE: RAILWAY INDUSTRY EMPLOYEE NO-POACH ANTITRUST LITIGATION | ) ) ) ) | Master Docket Misc. No. 18-798 |
|  | ) | MDL No. 2850 |
| This Document Relates to: ALL ACTIONS | ) ) ) ) | |

**PLAINTIFFS' OPPOSITION TO WABTEC DEFENDANTS' MOTION TO STRIKE
CLASS ALLEGATIONS**

**[PUBLIC REDACTED COPY]**

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.   LEGAL STANDARD ......................................................................................... 3

III.  ARGUMENT ...................................................................................................... 4

      A.    Plaintiffs' Amended Class Definition Is Sufficiently Precise at the
            Pleading Stage ......................................................................................... 4

      B.    Class Definitions Are Routinely Refined Subsequent to Discovery .................... 8

      C.    Plaintiffs Have Made a Prima Facie Showing That Common Issues Will
            Predominate ........................................................................................... 11

            1.    Compensation Schedules Are Not the Only Way to Establish
                  Compensation Structures ............................................................... 12

            2.    Plaintiffs Explain How Defendants' Conspiracy Commonly
                  Impacted the Class ......................................................................... 14

            3.    Discovery Will Substantiate Plaintiffs' Common Impact
                  Allegations .................................................................................... 17

IV.   CONCLUSION ................................................................................................. 20

## **TABLE OF AUTHORITIES**

**Page**

**Cases**

*Abdeljalil v. Gen. Elec. Capital Corp.*,
  306 F.R.D. 303 (S.D. Cal. 2015) ............................................. 9

*Bouton v. Ocean Props., Ltd.*,
  322 F.R.D. 683 (S.D. Fla. 2017)............................................. 9

*Byrd v. Aaron's, Inc.*,
  784 F.3d 154 (3d Cir. 2015) ......................................... 5, 6, 7

*Carrera v. Bayer Corp.*,
  727 F.3d 300 (3d Cir. 2013) ............................................. 5, 6

*City Select Auto Sales Inc. v. BMW Bank of N. Am., Inc.*,
  867 F.3d 434 (3d Cir. 2017) ............................................... 7

*Ctr. City Periodontists, P.C. v. Dentsply Int'l, Inc.*,
  321 F.R.D. 193 (E.D. Pa. 2017)........................................... 8

*Dieter v. Aldi, Inc.*,
  No. 18-00846, 2018 WL 6191586 (W.D. Pa. Nov. 28, 2018)........... 3

*Durso v. Samsung Elecs. Am., Inc.*,
  No. 2:12-cv-05352, 2013 WL 5947005 (D.N.J. Nov. 6, 2013)............ 4

*Finberg v. Sullivan*,
  634 F.2d 50 (3d Cir. 1980) ............................................... 9

*Garybo v. Leonardo Bros.*,
  No. 15-cv-1487-DAD-JLT, 2019 WL 2325564 (E.D. Cal. May 31, 2019) ........... 11

*Gold v. Lumber Liquidators, Inc.*,
  No. 14-cv-5373-TEH, 2017 WL 2688077 (N.D. Cal. Jun. 22, 2017) ........ 9

*Gonzalez v. Corning*,
  317 F.R.D. 443 (W.D. Pa. 2016) ......................................... 8

*Grandalski v. Quest Diagnostics, Inc.*,
  767 F.3d 175 (3d Cir. 2014) ............................................... 7

*Hayes v. Wal-Mart Stores, Inc.*,
  725 F.3d 349 (3d Cir. 2013) ............................................... 8

*Hull v. Viega, Inc.*,
  No. 12-cv-2086-JAR-TJJ, 2014 WL 896621 (D. Kan. Mar. 6, 2014)............ 11

*In re Animation Workers Antitrust Litig.*,
  No. 14-cv-4062-LHK, Dkt. 121 ¶ 195 (N.D. Cal. May 15, 2015) ......... 10

*In re Catfish Antitrust Litig.*,
  826 F. Supp. 1019 (N.D. Miss. 1993)..................................... 13

*In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*,
  906 F.2d 432 (9th Cir. 1990) ............................................... 1

**TABLE OF AUTHORITIES**
(continued)

Page

*In re High-Tech Empl. Antitrust Litig.*,
  985 F. Supp. 2d 1167 (N.D. Cal. 2013) ................................................. 6, 9, 10, 13

*In re Linerboard Antitrust Litig.*,
  305 F.3d 145 (3d Cir. 2002) ................................................................. 12

*In re Monumental Life Ins. Co.*,
  365 F.3d 408 (5th Cir. 2004) ............................................................... 8

*In re Polyurethane Foam Antitrust Litig.*,
  No. 1:10 MD 2196, 2014 WL 6461355 (N.D. Ohio Nov. 17, 2014) .................... 13

*In re Rubber Chems. Antitrust Litig.*,
  232 F.R.D. 346 (N.D. Cal. 2005)........................................................... 13

*In re Urethane Antitrust Litig.*,
  237 F.R.D. 440 (D. Kan. 2006) ............................................................. 13

*In re: Domestic Drywall Antitrust Litig.*,
  322 F.R.D. 188 (E.D. Pa. 2017) ............................................................ 13

*Knudsen v. Liberty Mut. Ins. Co.*,
  411 F.3d 805 (7th Cir. 2005) ............................................................... 8

*Landsman & Funk PC v. Skinder-Strauss Assocs.*,
  640 F.3d 72 (3d Cir. 2011) ................................................................. 3

*Marcus v. BMW of N. Am., LLC*,
  687 F.3d 583 (3d Cir. 2012) ............................................................... 8

*Martino v. Ecolab, Inc.*,
  No. 14-cv-4358-PSG, 2016 WL 614477 (N.D. Cal. Feb. 16, 2016) .................... 6

*McRobie v. Credit Protection Ass'n*,
  No. 18-cv-566, 2019 WL 1469097 (E.D. Pa. Apr. 3, 2019)............................ 9

*Microsoft Corp. v. Baker*,
  137 S.Ct. 1702 (2017) ...................................................................... 3

*Nitsch v. Dreamworks Animation SKG Inc.*,
  315 F.R.D. 270 (N.D. Cal. 2016)....................................................... 6, 10, 13

*Roach v. T.L. Cannon Corp.*,
  No. 10-cv-591, 2015 WL 10818750 (N.D.N.Y. Sept. 4, 2015)........................ 6

*Robidoux v. Celani*,
  987 F.2d 931 (2d Cir. 1993) ............................................................... 9

*Sanchez v. Wells Fargo & Co.*,
  No. C 07-05923 WHA, 2008 WL 1817292 (N.D. Cal. Apr. 22, 2008)................. 11

*Seaman v. Duke Univ.*,
  No. 15-cv-462, 2018 WL 671239 (M.D.N.C. Feb. 1, 2018) ........................ 6, 10, 13

*Simpson v. Ramada Worldwide, Inc.*,
  No. 12-5029, 2012 WL 5988644 (N.D. Cal. Nov. 29, 2012) .......................... 5

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Swank v. Wal-Mart Stores, Inc.*,
   No. 2:13-cv-1185, 2015 WL 1508403 (W.D. Pa. Mar. 31, 2015) ............................................. 4

*Trunzo v. Citi Mortgage*,
   No. 11-01124, 2018 WL 741422 (W.D. Pa. Feb. 7, 2018) ........................................................ 5

*Weisfeld v. Sun Chemical Corporation*,
   84 F. App'x 257 (3d Cir. 2004) ...................................................................................... 19, 20

**Rules**

Fed. R. Civ. P. 12(b)(6) ................................................................................................................ 4

Fed. R. Civ. P. 23 .............................................................................................................. 4, 8, 14

Fed. R. Civ. P. 23(b)(3) .............................................................................................................. 11

**Treatises**

5C Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1383 (3d
   ed. 2018) ................................................................................................................................... 4

ABA, *Econometrics: Legal, Practical, and Technical Issues* 355 (2d ed. 2014) ........................ 15

George Milkovich, et al., *Compensation* 658 (10th ed. 2010) ................................................ 2, 19

William B. Rubinstein, 4 *Newberg on Class Actions* § 7:22 (5th ed. 2019) ........................... 4, 11

## I.   __INTRODUCTION__

Wabtec[1] no longer contests that Plaintiffs have adequately alleged an unlawful

conspiracy among the world's top three suppliers of railway equipment to eliminate competition

for each other's workers.  This is for good reason.  Contemporaneous business records confirm

that the conspiracy occurred precisely as alleged.  It is unusual in an antitrust conspiracy case to

find even a single "smoking gun" that provides direct evidence of the misconduct.  *See, e.g., In

re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 906 F.2d 432, 439 (9th

Cir. 1990) ("direct evidence will rarely be available").  There is no such paucity of direct, highly

incriminating evidence here.  Consolidated Am. Compl. ("CAC") ¶¶ 27-55.  For example,



*Id.* ¶ 33.  Similarly,

*Id.* ¶ 34.

The issue now before the Court is not whether the conspiracy has been plausibly alleged,

but whether the CAC adequately alleges a proposed class of employees who were harmed by

Defendants' unlawful "no-poach" agreements.  Defendants' prohibition on competition applied

to all employees.  Defendants agreed not to compete for each other's ▮▮▮▮▮ *id.* ¶¶ 29, 33,

▮▮▮▮▮ *id.* ¶¶ 34, 35, 38, 43, 44, and ▮▮▮▮ *id.* ¶¶ 39, 48.  Plaintiffs have not seen a

single example of Defendants carving out an exception for any employee type or category.

Plaintiffs have nonetheless narrowed the proposed class in the CAC to only those who are most

likely to have been impacted by Defendants' unlawful agreements: those who worked in job

---

[1] "Wabtec" refers to the Wabtec family of Defendants: Westinghouse Air Brake Technologies Corporation, Wabtec Railway Electronics, Inc., Railroad Controls, L.P., Xorail Inc., Faiveley Transport, S.A. ("Faiveley"), and Faiveley Transport North America Inc. ("Faiveley NA"). Similarly, "Knorr" refers to the Knorr family of Defendants: Knorr-Bremse AG, Knorr Brake Company LLC, and New York Air Brake LLC.  "Defendants" refers to both the Wabtec and Knorr Defendants.

families[2] in which railway industry experience or skills were valuable.  *Id.* ¶ 104.  For example, a job family for railway equipment engineers would be included, but job families for food service workers or custodial staff would not be.  Thus, the proposed class is confined to only those employees who worked in job families that valued experience or skills in the industry Defendants dominated.  *Id.*

In support, Plaintiffs provide detailed explanations of how labor markets work and the importance of competition, particularly for jobs in which railway industry experience or skills are valuable.  *Id.* ¶¶ 56-68.  Plaintiffs also explain that Defendants created compensation structures that tethered together the pay of their employees, how Defendants maintained those structures, and how those structures suppressed pay across the class, particularly over time.  *Id.* ¶¶ 69-85.  Plaintiffs further allege how pay structures for unionized class members contributed to common impact across the class, *id.* ¶¶ 86-91, and how Defendants' top-down decisions regarding how to adjust those pay structures involved the very individuals who entered into and maintained the conspiracy, *id.* ¶¶ 92-94.  These allegations are more than sufficient at the pleading stage.  Plaintiffs should be permitted to complete discovery, and then to provide additional support, analyses, expert declarations, and evidence with their class certification motion.

Wabtec contends that Plaintiffs should now be required to provide a list of class job titles so that class membership can be precisely ascertained.  But this cannot occur until Defendants have first provided those job titles to Plaintiffs, which Defendants are currently in the process of doing.  Both Knorr and Wabtec have agreed to provide Plaintiffs with employee data that

---

[2]  A "job family" is "[a] group of jobs involving work of the same nature but requiring different skill and responsibility levels (e.g., computing and account recording are a job family; bookkeeper, accounting clerk, and teller are jobs within that family)."  George Milkovich, et al., *Compensation* 658 (10th ed. 2010).

includes fields for both job titles and job families.  Harvey Decl. ¶ 1.  Plaintiffs have agreed to review this data and other information and provide a list of job titles that fit within the proposed class.  *Id.*  Plaintiffs will provide this list to the Court as part of their forthcoming motion for preliminary approval of the proposed settlement with Knorr.  These job titles will provide complete clarity and certainty over who is included in the proposed settlement class, and who is included in the proposed class for litigation purposes going forward.[3]

The CAC has cured the deficiencies identified by this Court in its June 20, 2019 decision concerning the class definition (Dkt. 192).  Thus, Wabtec's motion to strike should be denied.

## II.  <u>LEGAL STANDARD</u>

This Court previously held that Plaintiffs need only make a "prima facie" showing that class certification requirements can be met after discovery.  Dkt. 192 at 63.  *See also Landsman & Funk PC v. Skinder-Strauss Assocs.*, 640 F.3d 72, 93 n.30 (3d Cir. 2011) (class allegations in a complaint should be struck only in the "rare" case "where the complaint itself demonstrates that the requirements for maintaining a class action cannot be met"); *Dieter v. Aldi, Inc.*, No. 18-00846, 2018 WL 6191586, at *6 (W.D. Pa. Nov. 28, 2018) (Conti, C.J.) ("In this circuit, 'class allegations [are] stricken prior to a motion for certification only when class certification is a clear impossibility.'") (quoting 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1383 (3d ed. 2018) (alteration in original)).

"An order striking class allegations is functionally equivalent to an order denying class certification and therefore appealable under Rule 23(f)."  *Microsoft Corp. v. Baker*, 137 S.Ct. 1702, 1711 n.7 (2017) (citation and quotation omitted).  It is widely recognized that "the timing of the motion" will "alter the defendant's burden. . . ."  William B. Rubinstein, 4 *Newberg on*

---

[3] Plaintiffs reserve the ability to further narrow the proposed class with their class certification motion, as the evidence warrants.  Plaintiffs will not expand the proposed litigation class in any way beyond the job titles that will be included in the proposed settlement class.

*Class Actions* § 7:22 (5th ed. 2019) ("*Newberg*"). "[I]f the defendant makes an anticertification motion prior to the conclusion of discovery, it generally faces a more difficult and nuanced burden of proof than if it makes the motion after the close of the discovery." *Id.* For that reason, courts apply Rule 12(b)(6) standards when evaluating preemptive motions to strike class allegations at the pleading stage. *Durso v. Samsung Elecs. Am., Inc.*, No. 2:12-cv-05352, 2013 WL 5947005, at *3 (D.N.J. Nov. 6, 2013) ("When evaluating a motion to strike allegations of a complaint, the court must accept as true all factual allegations in the complaint and view all reasonable inferences in the light most favorable to Plaintiffs, just as on a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)."). In these circumstances, "it is only when no amount of discovery or time will allow for plaintiffs to resolve deficiencies in class definitions under Rule 23, that a motion to strike class allegations should be granted." *Swank v. Wal-Mart Stores, Inc.*, No. 2:13-cv-1185, 2015 WL 1508403, at *2 (W.D. Pa. Mar. 31, 2015).

## III.   **ARGUMENT**

### A.   **Plaintiffs' Amended Class Definition Is Sufficiently Precise at the Pleading Stage**

On June 20, 2019, the Court granted Defendants' Motion to Strike allegations of an all employee class, without prejudice to Plaintiffs amending the complaint to narrow the class definition. Dkt. 192. In light of the Court's Order, Plaintiffs limit their amended class definition to employees "who worked in job families in which railway industry experience or skills were valuable." CAC ¶¶ 104-105.

In order to advance beyond the pleadings, Wabtec now insists that Plaintiffs must do the impossible and provide a list of job titles—that have not yet been produced—that satisfy the amended class definition. Wabtec is wrong. At the *class certification* stage, Plaintiffs must show that: "(1) the class is 'defined with reference to objective criteria'; and (2) there is 'a

reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition.'" *Byrd v. Aaron's, Inc.*, 784 F.3d 154, 163 (3d Cir. 2015) (holding that "household members" were ascertainable where public records could identify them) (quoting *Carrera v. Bayer Corp.*, 727 F.3d 300, 355 (3d Cir. 2013)). "The ascertainability requirement consists of nothing more than these two inquiries.  And it does not mean that a plaintiff must be able to identify all class members at class certification—instead, a plaintiff need only show that 'class members *can* be identified.'" *Id.* (quoting *Carrera*, 727 F.3d at 308 n.2) (emphasis added by *Byrd*).  The ascertainability requirement does *not* require plaintiffs to identify all class members at the *pleading* stage.

Courts have not hesitated to deny motions to strike class allegations at the pleading stage on ascertainability grounds as premature where, as in this case, it appeared that production of the defendant's business records in discovery would enable plaintiffs to define an ascertainable class at the certification stage.  For example, in *Trunzo v. Citi Mortgage*, No. 11-01124, 2018 WL 741422, at *7-8 (W.D. Pa. Feb. 7, 2018), Judge Hornak denied an ascertainability challenge raised on a motion to strike class claims because he deemed plausible the allegations by plaintiffs that defendant's business records could identify class members.  *See also Simpson v. Ramada Worldwide, Inc.*, No. 12-5029, 2012 WL 5988644, at *3 (N.D. Cal. Nov. 29, 2012) ("Class discovery will serve to refine the class and the allegations and to aid the court in determining whether class certification is appropriate.  At this stage, Plaintiff's complaint is not so obviously flawed as to require striking the class allegations.").

Plaintiffs here will easily satisfy the ascertainability standard at class certification. Plaintiffs will not simply demonstrate that class members "can" be identified, *Byrd*, 784 F.3d at 163; Plaintiffs *will identify* each and every member of the class by job title.  This is how

litigation classes are defined in no-poach cases, and this case should be no different.  *See, e.g., In re High-Tech Empl. Antitrust Litig.*, 985 F. Supp. 2d 1167, 1177 (N.D. Cal. 2013) (at class certification, plaintiffs identified job titles of class members who worked in the "technical, creative, and/or research and development fields") (citation omitted); *Nitsch v. Dreamworks Animation SKG Inc.*, 315 F.R.D. 270, 281 (N.D. Cal. 2016) (at class certification, plaintiffs identified job titles of relevant animation and visual effects employees); *Seaman v. Duke Univ.*, No. 15-cv-462, 2018 WL 671239, at *11 (M.D.N.C. Feb. 1, 2018) (certifying a class of "faculty member[s] with an academic appointment at the Duke or UNC Schools of Medicine").

A class definition keyed to job titles will meet the two-fold requirements for ascertainability under *Byrd* and *Carrera*.  First, job titles are "objective criteria."  *See, e.g., Martino v. Ecolab, Inc.*, No. 14-cv-4358-PSG, 2016 WL 614477, at *10-11 (N.D. Cal. Feb. 16, 2016) (finding no ascertainability issues with employee class defined by job title).  Further, class member job titles will be the same as those in Defendants' own personnel data and records.  This method is "reliable and administratively feasible, and permits [Defendants] to challenge the evidence used to prove class membership."  *Carrera*, 727 F.3d at 308; *see also Roach v. T.L. Cannon Corp.*, No. 10-cv-591, 2015 WL 10818750, at *4 (N.D.N.Y. Sept. 4, 2015) (employee class ascertainable by defendants' employment records).

Wabtec criticizes Plaintiffs' approach as "subjectivity squared" because Plaintiffs will supposedly use "subjective criteria and subjective, one-sided opinions to determine class membership."  Mot. at 8.  Wabtec mistakenly conflates two different issues: Plaintiffs' reasons for choosing a particular class definition, and whether the individuals that fall within that class definition can be identified with reference to "objective criteria."  Only the latter is relevant here, as the ascertainability analysis focuses solely on the class definition itself, not Plaintiffs' reasons

for choosing it.  *See City Select Auto Sales Inc. v. BMW Bank of N. Am., Inc.*, 867 F.3d 434, 439

(3d Cir. 2017) (ascertainability requires that "the class is '*defined* with reference to objective

criteria'") (quoting *Byrd*, 784 F.3d at 163 (emphasis added)); *Grandalski v. Quest Diagnostics,*

*Inc.*, 767 F.3d 175, 184 (3d Cir. 2014) ("[T]he ascertainability requirement focuses on whether

individuals fitting *the class definition* may be identified without resort to mini-trials . . . .")

(emphasis added) (citation and quotation omitted).  At the class certification stage, if Wabtec

objects to the job titles Plaintiffs select, it will have ample opportunity to present its arguments in

opposition to the certification motion.

Wabtec professes not to understand what the terms "railway industry experience or

skills" or "valuable" mean.  Mot. at 9.  But Wabtec knows full well what those terms mean.  For

example, Wabtec's own job postings often state that railway industry experience is required or

preferred.  *See*, *e.g.*, Harvey Decl., Ex. A (WABTEC_MDL0084198 at 84199) (█████████

████████████████████████████

███████); *id.*, Ex. B (WABTEC_MDL0084213 at 84214) (███████

████████████); Ex. C (WABTEC_MDL0085244) (████████████

███████████████████████████).  Further,

Wabtec, Knorr, and Plaintiffs have already agreed to custodians and search terms designed to

find relevant evidence.  *Id.* ¶ 2.  The amended class definition does nothing to alter those

obligations, and the parties remain committed to completing production by the dates provided to

the Court during the June Status Conference.  June 20, 2019 Status Conference Hearing Tr. 5:2-5

(document production should be complete by October, 2019); Harvey Decl., Ex. E (September

17, 2019 letter confirming Wabtec expects to complete production in October).  It is noteworthy

that Knorr has not raised any concern about its ability to find and produce relevant documents.

Harvey Decl. ¶ 2.  Plaintiffs have also met and conferred with Wabtec with respect to the discovery concerns expressed in the motion to strike, and Wabtec has not presented a single example of how the amended class definition will prevent it from meeting its discovery commitments.  *Id.*

The consumer cases cited by Wabtec are plainly inapposite in several significant respects because they involved proposed class definitions on certification motions (not the pleading stage) where there was no feasible means to identify class members.  *See Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 592-94 (3d Cir. 2012) (class definition was ambiguous and there was no evidence defendants' records could identify those who fell into it); *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 354-56 (3d Cir. 2013) (defendant's records did not identify class members); *Gonzalez v. Corning*, 317 F.R.D. 443, 504-06 (W.D. Pa. 2016) (plaintiffs failed to show that defendants' records identified eligible class members); *Ctr. City Periodontists, P.C. v. Dentsply Int'l, Inc.*, 321 F.R.D. 193, 214 (E.D. Pa. 2017) (no method to identify which water source potential class members connected to allegedly defective dental device).  These cases are irrelevant because a list of job titles drawn from Defendants' own data will identify all class members with certainty.

**B.**     **Class Definitions Are Routinely Refined Subsequent to Discovery**

Class certification motions are not filed until after discovery has occurred and the facts relevant to the Rule 23 criteria have been fleshed out.  Thus, it is not only routine for Plaintiffs to refine their class definition at class certification, it is encouraged.  *See*, *e.g.*, *Knudsen v. Liberty Mut. Ins. Co.*, 411 F.3d 805, 806 (7th Cir. 2005) (observing that "Plaintiffs routinely amend their . . . proposed class definitions"); *In re Monumental Life Ins. Co.*, 365 F.3d 408, 414 (5th Cir. 2004) (prohibiting plaintiffs from narrowing their proposed class definition "would ignore the ongoing refinement and give-and-take inherent in class action litigation, particularly in the

formation of a workable class definition"); *McRobie v. Credit Protection Ass'n*, No. 18-cv-566, 2019 WL 1469097, at *5 (E.D. Pa. Apr. 3, 2019) (agreeing there was "no improper 'gamesmanship' behind [plaintiff's] decision to narrow her class definition" to persons with strongest claims); *Abdeljalil v. Gen. Elec. Capital Corp.*, 306 F.R.D. 303, 306 (S.D. Cal. 2015) (plaintiff moved to certify "a narrower version of the class definition presented in the [complaint], which is allowable"); *Bouton v. Ocean Props., Ltd.*, 322 F.R.D. 683, 693 (S.D. Fla. 2017) ("Although a plaintiff may seek to certify a class definition *narrower* than the one proposed in the operative pleading without a new claim for relief, the converse is not allowed."); *Gold v. Lumber Liquidators, Inc.*, No. 14-cv-5373-TEH, 2017 WL 2688077, at *4 (N.D. Cal. June 22, 2017) ("[I]t would not make sense to prohibit a plaintiff from narrowing their class definition . . . ."); *see also Finberg v. Sullivan*, 634 F.2d 50, 64, n.9 (3d Cir. 1980) (noting that district courts should not deny class certification before considering whether "a more specific or narrower definition of classes" may be possible); *Robidoux v. Celani*, 987 F.2d 931, 937 (2d Cir. 1993) ("A court is not bound by the class definition proposed in the complaint and should not dismiss the action simply because the complaint seeks to define the class too broadly"); *Newberg* § 7:27 ("[S]everal circuits have held that a court *should* alter the class definition in lieu of rejecting class certification, if possible.") (emphasis in original).

Such refinement is the norm when employee classes are involved, as the review of a defendant's records and evidence, in conjunction with expert analysis of economic data, will guide the class certification inquiry.  This has been true in no-poach cases in particular. *Compare* Consolidated Am. Comp., *In re: High-Tech Emp. Antitrust Litig.*, No. 11-cv-2509-LHK, Dkt. 65 ¶ 30 (N.D. Cal. Sept. 13, 2011) (seeking to represent all persons "employed . . . on a salaried basis") *with In re High-Tech Emp. Antitrust Litig.*, 985 F. Supp. 2d at 1177 (seeking to

certify only a class of employees in the "technical, creative, and/or research and development fields," identified in an appended list of eligible job titles); *compare* Second Consolidated Am. Class Action Compl., *In re Animation Workers Antitrust Litig.*, No. 14-cv-4062-LHK, Dkt. 121 ¶ 195 (N.D. Cal. May 15, 2015) (alleging class of "all persons who worked [for defendants]") *with Nitsch*, 315 F.R.D. at 281 (seeking to certify a class of "animation and visual effects employees" only as identified by "a list of job titles compiled by Plaintiffs' expert"); *compare* Compl., *Seaman  v. Duke Univ.*, No. 15-cv-462, Dkt. 1 (M.D.N.C. Sep. 9, 2015) (seeking to represent all persons employed "as a faculty member, physician, nurse, or other skilled medical employee") with *Seaman  v. Duke Univ.*, No. 15-cv-462, 2018 WL 671239, at *11 (M.D.N.C. Feb. 1, 2018) (certifying only a class of "faculty member[s] with an academic appointment").

Wabtec claims that it has "no method for investigating and evaluating the allegations of class-wide harm prior to receiving Plaintiffs' opening class certification report, thus preventing timely, effective, and efficient rebuttal."  Mot. at 8, n.3.  This claim is just as unfounded as Wabtec's claim not to understand the meaning of the industry terms used in the class definition.

First, the CAC sets forth detailed allegations concerning class-wide harm.  These are allegations that go far beyond what plaintiffs in any other no-poach case have provided prior to class certification.  Wabtec is thus in a better position than any no-poach defendant at this early stage in the proceedings to prepare to oppose class certification, when the time comes.  Wabtec is represented by able counsel, including attorneys with substantial experience in prior no-poach cases.  The liability, common impact, and damages theories Plaintiffs are pursuing in this case are no surprise.  They are very similar to those litigated in prior cases, including *High-Tech*, *Animators*, and *Duke*.  Wabtec is no doubt well-prepared to investigate, evaluate, and defend against Plaintiffs' forthcoming class certification motion.

Second, Courts recognize that refining the proposed class definition following discovery only benefits defendants. *See Sanchez v. Wells Fargo & Co.*, No. C 07-05923 WHA, 2008 WL 1817292, at *2 (N.D. Cal. Apr. 22, 2008) (no prejudice where narrowed class "substantially reduc[ed] the number of class members"); *Hull v. Viega, Inc.*, No. 12-cv-2086-JAR-TJJ, 2014 WL 896621, at *9 (D. Kan. Mar. 6, 2014) ( "Defendants will benefit from the amendment by the significant reduction of the putative class and resulting potential exposure."); *Garybo v. Leonardo Bros.*, No. 15-cv-1487-DAD-JLT, 2019 WL 2325564, at *2, n.1 (E.D. Cal. May 31, 2019) (finding narrower class definition "does not prejudice [defendant]").

Third, there is nothing unusual about a defendant preparing a rebuttal expert report after receiving plaintiffs' opening expert report. That is by definition how a rebuttal works: it comes after the submission it rebuts. If Wabtec has a concern with having sufficient time to respond to Plaintiffs' class certification motion, that is simply a scheduling matter. The solution is to provide an appropriate amount of time between Plaintiffs' class certification motion and Wabtec's opposition. It is not to strike class claims at the pleading stage.

Fourth, as a practical matter, Wabtec will receive a list of job titles that fit within the class definition when Plaintiffs move for preliminary approval of the Knorr settlement. This will occur well before the close of discovery and well before Plaintiffs' class certification motion.

**C.**    **Plaintiffs Have Made a Prima Facie Showing That Common Issues Will Predominate**

Wabtec argues that Plaintiffs' class allegations fail to satisfy Rule 23(b)(3)'s predominance requirement because "[t]here are no specific factual allegations in the Amended Complaint regarding the various compensation structures of [the Wabtec Defendants]." Mot. at 12. To the contrary, as explained below, Plaintiffs have alleged that Wabtec, along with Knorr, maintained compensation structures that commonly suppressed Class members' pay. CAC

11

¶¶ 71-77, 81.  Plaintiffs have not identified specific Wabtec documents because Wabtec has not yet completed production of evidence regarding its compensation policies and employee payroll data.  That is what discovery is for.  Thus, as will be outlined below, Plaintiffs have made a prima facie showing that discovery is "likely to produce substantiation of the class allegations."  Dkt. 192 at 49.

### 1.   Compensation Schedules Are Not the Only Way to Establish Compensation Structures

Underlying Wabtec's arguments is the premise that a "compensation structure" can only be proven by the existence of formal, written compensation schedules for all employees at all defendants.  Mot. at 12.  That premise is faulty, because the term "compensation structure" is the no-poach analog of the concept of "price structure," which is commonplace in antitrust law.  A common approach to establishing the existence of such a structure is multivariate regression analysis of pricing data (or, here, employee payroll data).  ABA, *Econometrics: Legal, Practical, and Technical Issues* 355 (2d ed. 2014).  With such an analysis, plaintiffs commonly argue that "even if pricing is to some extent customer specific, a change in the price structure will impact all members of the class because of the largely fixed differences in prices among customers over time, which is a 'rising tide raises all boats' argument."  *Id.* at 354-55.  In no-poach terms, even if wages or salaries are to some extent employee-specific, a change in the overall compensation structure will impact all employees because there are largely stable relationships between the compensation of certain groups of employees.

Courts regularly hold that predominance can be satisfied in antitrust class actions where such a pricing structure is established through econometric analysis, notwithstanding individual differences in prices paid by class members or other diverse factors.  *See, e.g.*, *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 153-54 (3d Cir. 2002) (pricing structure supporting class-wide

impact established by correlation of product prices containing linerboard); *In re: Domestic Drywall Antitrust Litig.*, 322 F.R.D. 188, 216 (E.D. Pa. 2017) (pricing structure established through "a correlation analysis which shows that the prices charged by the drywall manufacturers are highly correlated with each other"); *In re Polyurethane Foam Antitrust Litig.*, No. 1:10 MD 2196, 2014 WL 6461355, at *65 (N.D. Ohio Nov. 17, 2014) (predominance satisfied where "actual prices for the same products tended to move together over time, which is indicative of a pricing structure"); *In re Urethane Antitrust Litig.*, 237 F.R.D. 440, 450-51 (D. Kan. 2006) (existence of pricing structure supported class-wide impact notwithstanding product-specific and customer-specific pricing disparities); *In re Rubber Chems. Antitrust Litig.*, 232 F.R.D. 346, 352-53 (N.D. Cal. 2005) (same); *In re Catfish Antitrust Litig.*, 826 F. Supp. 1019, 1040-41 (N.D. Miss. 1993) (statistical analysis of computerized price data showed "a structure to prices in the catfish processing industry" supporting class-wide impact).

The same principles apply to this no-poach case.  As this Court has already recognized, courts have found predominance satisfied in no-poach cases when a similar "compensation structure" tying all class members' wages together could be demonstrated through econometric analysis and documentary evidence.  Dkt. 192 at 64-76 (discussing *Animators*, 315 F.R.D.at 293; *Duke*, *supra*; and *In re: High-Tech Emp.*, *supra*).  Even in the absence of formal or explicit compensation policies linking employees' compensation to one another, economic analysis may prove that increases or decreases in the wages of employees within a company are closely correlated.  There is thus no legal or economic reason to think that, as a matter of law, a "compensation structure" can *only* be proven through documentary compensation schedules. Econometric analysis is another means to do so, just as in other antitrust cases.

It bears reiteration that, as this Court previously recognized, Plaintiffs need only make a prima facie showing at this juncture that Rule 23 requirements will be met after discovery. They have plainly done so, and discovery and econometric analysis will establish class compensation structures.

2. <b><u>Plaintiffs Explain How Defendants' Conspiracy Commonly Impacted the Class</u></b>

The Amended Complaint includes over 15 pages of allegations concerning the effect of labor competition on wages and Defendants' pay practices. CAC ¶¶ 56-94. These allegations more than satisfy a "prima facie showing that antitrust impact is capable of proof on a class-wide basis for all employees or that at least it is likely that discovery will reveal evidence that antitrust impact is capable of proof on a class-wide basis for all employees." Dkt. 192 at 64.

<u>How Labor Competition Works</u>. The Amended Complaint explains that in a functioning labor market, railway industry employers compete with one another to attract talent for their employment needs; the level of competition among employers, in turn, determines the level of compensation. CAC ¶ 64. Unlike commodity markets, labor markets have substantial imperfections because the price of labor is typically determined through "price discovery," which occurs only when employers and prospective employees interact with one another. CAC ¶¶ 56-58. That such exchanges are infrequent due to the costs associated with changing jobs and the lack of a high number of essentially identical positions highlights the importance of price discovery to the labor market. *Id.* ¶ 65.

Because of these inefficiencies, any reduction in the level of labor competition directly impacts compensation in at least three ways. First, it impedes the flow of information to employees (who otherwise do not readily have access to it) regarding market compensation rates. CAC ¶ 65. Second, it diminishes employers' incentives to preemptively raise and maintain high

14

compensation to ensure morale, productivity, and retention, which they normally would do to counteract the threat of losing employees.  *Id.* ¶ 66.  Third, because increased movement of one category of employees often affects the other employees who are integrated into the same teams, a decrease of movement for just a subset has a ripple effect on others.  *Id.* ¶ 67.  Defendants' no-poach agreements thus disrupted the normal bargaining and price-setting mechanisms that applied, lowering pay across the class.  *Id.* ¶¶ 59-60, 68.

Defendants Acted Consistently With Industry Standards.  The Amended Complaint explains that in the field of human resources, compensation's role is "to attract candidates to work for a company, prevent them from leaving for jobs elsewhere (because turnover is costly), and motivate them to perform their jobs well."  CAC ¶ 69.  Important to those goals is responding to employee concerns about "fairness" in compensation, not only amongst people performing similar work but also amongst colleagues with dissimilar jobs.  *Id.* ¶ 70.  Based on these principles, "Defendants had an incentive to ensure that their employees felt that their compensation was fair, based on broad comparisons across job descriptions and titles," and Defendants "fostered [this sense of] internal equity by maintaining formal compensation systems with standardized features, such as job analysis, job evaluation, the use of market surveys and external market data, market pay lines, and salary bands, zones, grades, and ranges."  *Id.* ¶ 71.  The Amended Complaint explains the steps involved in designing such formal compensation systems.  *Id.* ¶¶ 72-77.

Formalized Pay Systems Link Employee Compensation.  The Amended Complaint also explains that "[p]ay structures . . . implement[] pay bands for disparate jobs that move together in a way that ensures that the differentials among these co-workers and team members remain largely consistent even as pay itself changes, so fairness is maintained."  *Id.* ¶ 75.  This applies

even "across different job titles" to "employees in different jobs." *Id.* Indeed, "Defendants commonly move their entire pay structures all at once, at least annually. Thus, movement in one part of the structure impacts the structure at large." *Id.* The structure is typically designed by comparing "benchmark" jobs within a company to external market rate data for the same job. *Id.* ¶ 78. The following chart provides an example of such pay structures, taken from George Milkovich, et al., *Compensation* 265 (10th ed. 2010), and recreated at CAC ¶ 78.



Thus, as a matter of labor economics and basic human resource management, "[i]f a company anticipates increased competition for its employees, it will move the pay-policy line to coincide with a higher percentile of the external benchmark, increasing pay systematically across its workforce. If a company eliminates those competitive threats through secret no-poach agreements, as Defendants did here, the pay policy line will not increase, suppressing pay systematically." *Id.* ¶ 80.

Defendants Were Just Like Any Other Sophisticated Employer—They Implemented
Formalized Pay Structures.  Plaintiffs allege that "[p]ay for Defendants' employees was
organized by job family and job position, with each job position associated with a pay band."
CAC ¶ 81.  Defendants' own employee data contain fields that identify job families and job
titles.  The Amended Complaint describes two illustrative examples at New York Air Brake and
Wabtec-subsidiary Xorail.  *Id.*

Further, Plaintiffs allege that "Defendants also adjusted pay 'off-cycle' [*i.e.*, not during
annual pay increases] in response to specific offers," but only after "scrutiniz[ing] equity
relationships across employee peers and throughout the organization, knowing that any
adjustments would have an impact throughout the pay structure."  CAC ¶ 83.  With respect to
Defendants' employees who were unionized, the collective bargaining agreements themselves
were a means by which Defendants maintained a pay structure.  *Id.* ¶¶ 86-91.  All of these
various systems were overseen by Defendants' senior executives, who paid close attention to
labor costs and profitability.  *Id.* ¶¶ 92-94.  These were the very same individuals who wrote
each other to confirm, maintain, and enforce their unlawful no-poach conspiracy.  They were
perfectly placed to implement the intended benefits of their unlawful misconduct: to make more
money by suppressing labor costs systematically.

### 3.    Discovery Will Substantiate Plaintiffs' Common Impact Allegations

Discovery will substantiate that the no-poach agreements succeeded and systematically
reduced class member compensation; indeed, that was the agreements' purpose.  CAC ¶¶ 85, 93.
Based on discovery adduced prior to the filing of the CAC, Plaintiffs were able to describe some
of the evidence produced to date substantiating the existence of pay structures.  *Id.* ¶ 81 (New
York Air Brake and Xorail maintained pay bands guaranteeing that compensation of people in
the same job family moved together); *id.* ¶ 82 (same re: Knorr); *id.* ¶ 89 (identifying pay scale

for unionized Wabtec workers).  Several other documents produced in discovery thus far further support the existence of pay structures.  For example ███████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

███████████████████████████████████████████████

Harvey Decl., Ex. F (NYAB-MDL-CEC-00000374, slide 69).  ███████████████

████████████████████████████████████  CAC ¶ 78.  As an additional

example, ██████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

████████████████████████████████████████  Harvey Decl.,

Ex. G (NYAB-MDL-ART-00025829, slide 4).  █████████████████████████

███████████████ :



*Id.* (slide 7).  Ultimately, ███████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████  *Id.*  (slide 13). ████████████████████████████████████  *Id.* (slide

12).  Plaintiffs anticipate that Defendants' further document productions, depositions of

Defendants' employees, and Defendants' structured payroll data will yield substantially more

evidence that the no-poach conspiracy here succeeded: it suppressed pay systematically across

the class.

In support of its motion, Wabtec cites *Weisfeld v. Sun Chemical Corporation*, 84 F.

App'x 257 (3d Cir. 2004), for the proposition that multiple pay bands cut against a finding that

common issues predominate.  Mot. at 14.  That case is inapposite, however, because the plaintiff

submitted a cursory, *three-page* expert declaration in support of class certification which

included "no actual analysis," "no discussion of the evidence," "no studies or findings," and

which was "silent as to whether the salaries for all members of the proposed class exhibit any

sort of correlation over time." *Weisfeld*, 84 F. App'x at 264.  Also, *Weisfeld* involved a class

certification motion filed *after* discovery, not a motion to strike class allegations at the pleadings

stage.  Unlike the plaintiff in *Weisfeld*, Plaintiffs here will submit substantial evidence in support

of class certification.  Further, *Weisfeld* explicitly "reject[ed] the notion that antitrust injury in an

employee boycott or no hire context can never be proven by common evidence . . . ." *Id.* at 263.

Indeed, it recognized that common issues could predominate where, as here, a pricing structure

exists that ties all class members together:

> If the price structure in the industry is such that nationwide the
> conspiratorially affected prices . . . *fluctuated within a range*
> which, though different in different regions, was higher in all
> regions than the range which would have existed in all regions
> under competitive conditions, it would be clear that all members of
> the class suffered some damage, notwithstanding that there would
> be variations . . . .

*Id.* (citation and quotation omitted).  Plaintiffs have alleged just such pricing structures.

## IV.   CONCLUSION

For the reasons above, Plaintiffs respectfully submit that the Court should deny Wabtec's

motion to strike.

20

Dated:  September 30, 2019                           Respectfully submitted,


 /s/ *Dean M. Harvey*                                 /s/  *Roberta D. Liebenberg*
Kelly M. Dermody (*pro hac vice*)                 Roberta D. Liebenberg (*pro hac vice*)
Dean M. Harvey (*pro hac vice*)                    Gerard A. Dever (*pro hac vice*)
Lin Y. Chan (*pro hac vice*)                         Adam J. Pessin (*pro hac vice*)
Yaman Salahi (*pro hac vice*)                       FINE, KAPLAN AND BLACK, R.P.C.
Jeremy J. Pilaar (*pro hac vice*)                    One South Broad Street, Suite 2300
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP    Philadelphia, PA  19107
275 Battery Street, 29th Floor                       Telephone:  (215) 567-6565
San Francisco, CA  94111-3339                       Facsimile:  (215) 568-5872
Telephone:  (415) 956-1000                          rliebenberg@finekaplan.com
Facsimile:  (415) 956-1008                           gdever@finekaplan.com
kdermody@lchb.com                                   apessin@finekaplan.com
dharvey@lchb.com
lchan@lchb.com
ysalahi@lchb.com
jpilaar@lchb.com

*Counsel for Plaintiffs and the Proposed Class*


 /s/  *Kelly K. Iverson*
Kelly K. Iverson (307175)
CARLSON LYNCH, LLP
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
412-322-9243
kiverson@carlsonlynch.com

*Liaison Counsel for Plaintiffs and the
Proposed Class*

21

## **CERTIFICATE OF SERVICE**

The undersigned attorney certifies that the foregoing pleading was filed electronically with the Clerk of the Court using the CM/ECF system on this Monday, September 30, 2019, and served electronically on all counsel of record.

/s/ *Kelly K. Iverson*