**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| | ) | |
| IN RE: RAILWAY INDUSTRY | ) | Master Docket Misc. No. 18-798 |
| EMPLOYEE NO-POACH ANTITRUST | ) | |
| LITIGATION | ) | MDL No. 2850 |
| | ) | |
| This Document Relates to: | ) | |
| ALL ACTIONS | ) | |
| | ) | |

**DECLARATION OF DEAN M. HARVEY IN SUPPORT OF MOTION FOR**
**PRELIMINARY APPROVAL OF PROPOSED CLASS SETTLEMENTS AND TO**
**DIRECT NOTICE TO THE PROPOSED SETTLEMENT CLASS**

I, Dean M. Harvey, declare as follows:

1.      I am a Partner at the law firm of Lieff Cabraser Heimann & Bernstein, LLP ("Lieff Cabraser").  I was appointed by the Court to serve as Interim Co-Lead Class Counsel in this action, along with Roberta D. Liebenberg of Fine, Kaplan and Black.  I make this Declaration in support of Plaintiffs' Motion for Preliminary Approval of Proposed Class Settlements and to Direct Notice to the Proposed Settlement Class.  I have personal knowledge of the following facts and, if called as a witness, I could competently testify to these matters.

### Summary of Litigation

2.      On November 27, 2018, Defendants moved to dismiss the Consolidated Class Action Complaint, arguing that Plaintiffs had failed to plead a *per se* violation of the Sherman Act and moved, in the alternative, to strike Plaintiffs' class action allegations.  Dkt. 129. Plaintiffs filed an opposition brief on January 11, 2019 (Dkt. 152), and Defendants filed a reply brief on February 12, 2019.  Dkt. 163.  Oral argument was held on February 25, 2019.  On June 20, 2019, the Court held that Plaintiffs had plausibly alleged a conspiracy and rejected Defendants' argument that the rule of reason, rather than *per se* review, applied to the alleged conspiracy.  Dkt. 193.  However, the Court granted the Motion to Strike Class Allegations, without prejudice to Plaintiffs amending their Complaint to address certain class definition issues.  Dkt. 193.

3.      On July 31, 2019, Plaintiffs filed the Consolidated Amended Complaint ("CAC"), narrowing the class definition from all employees to those employees "who worked in job families in which railway industry experience or skills were valuable."  Dkt. 199 at ¶104.  In response, on August 30, 2019, Wabtec once again moved to strike the class allegations.  Dkt. 208, 209.  Plaintiffs filed an opposition brief on September 30, 2019 (Dkt. 219, 220) and

thereafter, Wabtec filed a Reply Memorandum in support of its Motion to Strike on October 15, 2019.  Dkt. 227.

4.      The parties served and responded to substantial discovery while this motion practice was ongoing, as discovery commenced immediately after the Case Management Conference held by the Court on November 7, 2018 pursuant to Federal Rule of Civil Procedure 16.  In the span of little over one year, the parties exchanged over 250 formal letters (115 of which were sent before the Knorr Settlement, and all but one of which were sent before the Wabtec Settlement) and many more e-mails as part of the discovery meet-and-confer process. Telephonic meet-and-confers were often held on a weekly or bi-weekly basis.

5.      Defendants produced over 194,000 documents and extensive compensation data. Plaintiffs produced over 3,600 documents.  Additionally, 19 third parties produced over 10,400 documents.

6.      By the time Knorr and Interim Co-Lead Counsel reached an agreement in principle on the key terms of the Knorr Settlement on August 13, 2019, Defendants had produced and Plaintiffs had reviewed over 38,000 documents regarding key issues necessary to evaluate liability and damages in the case, including key liability evidence and substantial evidence concerning Knorr's internal compensation structures, organizational charts, job titles and job descriptions, and employee payroll data for estimating damages throughout the class period.  These documents included everything the Defendants had previously provided to the United States Department of Justice.  Subsequent productions of additional documents and data—cumulatively totaling over 194,000 documents—confirmed Interim Co-Lead Counsel's analysis at the time the deal with Knorr was reached.  Interim Co-Lead Counsel also worked

closely with their consulting experts to analyze the documentary and data production and establish damages projections to inform negotiations with Knorr.

7.      The evidentiary record was even more robust by the time of the Wabtec Settlement five months later.  Over 155,485 additional documents had been produced by Defendants, Wabtec had completed its production of data and custodial documents, and Plaintiffs had completed review and analysis of virtually all of the more than 194,000 documents that were produced in the case.  Interim Co-Lead Counsel worked with their consulting experts to analyze the additional information to inform the negotiations with Wabtec.

**The Settlement Negotiations**

8.      Interim Co-Lead Counsel, Roberta D. Liebenberg and I, and counsel for Knorr first discussed settlement in March 2019.  The hard-fought negotiations occurred over the course of four months, including an in-person meeting and many telephonic conference calls.  They were conducted in good faith and at arms'-length.  The parties ultimately agreed to the key terms of the settlement on August 13, 2019.  Their Memorandum of Understanding ("MOU") was entered into two weeks after the filing of the CAC and, because of the agreement in principle, Knorr did not file an Answer or other pleading in response to the CAC.  Interim Co-Lead Counsel and Knorr negotiated the final terms of the Knorr Settlement over the next two months, executing it on October 16, 2019.  The Settlement Class definition deletes the CAC's reference to United States railway employees of Knorr Bremse AG and its subsidiaries because there are no such railway employees besides those working for Knorr Brake Company LLC and New York Air Brake LLC.

9.      In the Fall of 2019, while Wabtec's Motion to Strike the class allegations in the CAC was *sub judice*, Interim Co-Lead Counsel began to pursue settlement negotiations with

Wabtec.  Both sides recognized that they faced substantial risks with respect to class certification, which served as an inducement to pursue settlement.  A first mediation with former Third Circuit Judge Thomas Vanaskie was held on November 21, 2019.  Prior to that date, the parties each submitted detailed and confidential mediation memoranda to Judge Vanaskie. During the mediation, which lasted almost 6 hours, the parties provided Judge Vanaskie with additional information.  On December 10, 2019, the parties held a second in-person mediation session with Judge Vanaskie.  Subsequent to that second mediation, the parties continued extensive negotiations both through Judge Vanaskie and with each other directly, holding several telephonic meetings and eventually coming to an agreement in principle on January 10, 2020. An MOU containing the central terms of the settlement was signed on January 21, 2020, and a long-form settlement agreement was finalized and executed on February 24, 2020.  Like the Knorr settlement negotiations, the Wabtec negotiations were conducted at arms'-length and in good-faith, and entailed considerable back-and-forth demands and offers.  *See* Declaration of Honorable Thomas I. Vanaskie for a further description of the settlement negotiations between Interim Co-Lead Counsel and Wabtec.

10.     All parties in both settlements were represented by experienced and highly-skilled antitrust class action counsel acting in the interests of their respective clients.  The parties had sufficient information to value the case as well as appreciate the strengths and weaknesses of their claims and defenses with respect to liability and damages.  Both sides were also cognizant of the substantial risks, delays, burdens, and expense of ongoing class action litigation. Attorney's fees were not discussed or negotiated.  Furthermore, the settlement terms do not include any signs of collusion nor any disparate treatment of Settlement Class Members.

### The Settlements

11.     Knorr agreed to pay $12 million to the Settlement Class, and also to provide extensive cooperation with respect to Plaintiffs' then-ongoing litigation against Wabtec.  These cooperation provisions provided valuable assistance to Plaintiffs and set the stage for the subsequent settlement with Wabtec.  The Knorr settlement was the "icebreaker" that helped to induce Wabtec to settle.  The two lengthy in-person mediation sessions in November and December 2019, the ongoing communications and exchanges of demands and offers through Judge Vanaskie, and the additional negotiations that took place through January 2020 all occurred against the backdrop of the Knorr settlement.  As a result, Wabtec agreed to pay an additional $36.95 million, more than 3 times as much as Knorr.

12.     The monetary component of the settlements provides an average recovery of approximately $5,830 per member of the Settlement Class before taking into consideration attorneys' fees, class representative service awards, and costs.  This amount exceeds the per capita recovery in most prior cases in which an employee class asserted antitrust claims, and does so at a much earlier stage in the case, when more litigation risks remain.  Further, the settlements represent about 2.5% of total class compensation, the second-highest proportion ever in an employee "no poach" antitrust case.  See Exhibit E, paragraph 32, *infra*.

13.     When the Knorr and Wabtec Settlements are considered together, this result is excellent, particularly in light of the stage of the proceedings, while many litigation risks still remained.  By comparison, in *Seaman v. Duke University* ("*Duke*"), No. 15-cv-462 (M.D.N.C.), the most recent no-poach case to settle, the parties had completed all fact and expert discovery, litigated class certification, litigated one interlocutory appeal and an attempted appeal from the court's class certification order, filed and fully argued 26 briefs regarding summary judgment

and *Daubert* issues, and were only a few months shy of trial before they settled nearly four years after the case was filed.  Similarly, in *In re: High-Tech Employees Antitrust Litigation* ("*High-Tech*"), No. 11-cv-2509-LHK (N.D. Cal.), the parties fully litigated class certification and summary judgment before a settlement was reached with the remaining defendants after several years of litigation.

**Process for Selecting Class Member Job Titles**

14.     Defendants' records identify all Knorr employees who held eligible job titles (except for 52 employees who worked for Knorr Brake Company before January 1, 2011); all Wabtec employees who held eligible job titles on or after January 1, 2016; and all Faiveley employees who held eligible job titles on or after November 1, 2016.  For earlier time periods in which Defendants did not retain structured data identifying the job titles associated with particular employees, the data can confirm whether particular individuals were employed by Defendants during that time, and how much they were compensated.

15.     The list of eligible job titles, which is attached hereto as **Exhibit C,** paragraph 30, *infra*, contains the same titles Defendants use in their own compensation databases.  As part of its cooperation, Knorr made a human resources employee and other detailed employee data available to aid Interim Co-Lead Counsel in determining the job titles that fit the class definition, and has since confirmed that they do.  Wabtec has also confirmed that the job titles it provided fit the class definition.

16.     To determine the job titles to be included in the Settlement Class, Interim Co-Lead Counsel engaged in a rigorous expert-informed analysis of the documents and data produced by Defendants.  In the presently available data, there were 1,471 unique job titles for Knorr falling under 253 job families, and 1,746 unique job titles for Wabtec falling under 444

job families.  Job titles explicitly excluded from the class definition were identified and removed: Senior Executives (Senior VP and higher); Human Resources/Payroll titles; and Legal titles.  To accomplish that, Interim Co-Lead Counsel performed an individualized review of all job titles, resulting in exclusion of titles like "President and CEO," "Executive Vice President, Corporate Development," "Chief Operating Officer," "HR Manager," "Payroll Administrator," "Corporate Attorney," and so on.

17.     Interim Co-Lead Counsel then reviewed the remaining job families and job titles to identify the types of roles that did not appear to involve railroad-specific skills or experience. Each title was reviewed in conjunction with the job family and occupation classification under which it fell.  When the names of job titles and/or job families alone did not provide a clear indication of the type of role at issue, Defendants' document productions were reviewed to locate job descriptions or job postings.  The goal of document analysis was to determine whether the job role required rail industry-specific experience and skills, or was one in which an employee was likely to acquire rail industry-specific skills over time even if not required at the outset.

18.     In contrast, other categories did not appear to require rail-industry specific skills and were excluded, including: Administrative Assistants and Receptionists; IT, Database Administration, and Network Support; and Janitors, and Cleaning Staff.  These titles were removed.  Job titles suggesting that employees handled rail equipment directly and were assigned specific tasks, such as "Teardown," "Welder," and "Buff and Clean," were not excluded because they appear to have specialized skills and rail industry-specific value.

19.     After determining which categories of employees were appropriate for exclusion, Interim Co-Lead Counsel followed a two-step process.  First, they reviewed the list of all job families.  For each job family, they determined whether it fell under one of the roles identified

above as not involving rail-industry specific skills.  Second, each individual job title was reviewed because some job families were broad and a categorical classification therefore was not necessarily appropriate.  Further, sometimes, identical job titles appeared in multiple job families.  Those job titles were excluded if they occurred more frequently in job families that were flagged for exclusion.  To illustrate this process, the "Assembly" and "Assembly Operator" job families at Knorr were included because Knorr's documents describe the role as "[p]erforms revolving mechanic, electronic or electro-mechanical assembly operations, in an assembly operation environment in a plant."[1]

20.     Based on this comprehensive and detailed analysis, there are approximately 8,396 members of the Settlement Class, 2,270 of whom worked for Knorr and 6,126 of whom worked for Wabtec.  Plaintiffs' Interim Co-Lead Counsel have assembled a list of Settlement Class job titles that allows each member of the Settlement Class to be identified, to receive notice of the settlement, and to receive a share of the common fund that is proportional to the compensation each Settlement Class member received during the class period (*i.e.*, proportional to each Settlement Class member's likely damages).

**Settlement Administration and Notice Plan**

21.     Interim Co-Lead Counsel solicited competitive bids from three notice administrators and selected KCC LLC ("KCC") as Notice Administrator after evaluating each proposal, because KCC was the most competitive, taking into consideration the services to be provided and prior experiences with the administrator.  KCC is qualified and has significant experience administering settlements and notice in large class action cases, including the *High-Tech* no-poach case.  KCC estimates that the cost of notice and claims administrative will be approximately $105,000.

---

[1]  KBC-MDL-CAM-00004443 at tab "Manuf. Role Descr."

22.     Defendants' data conclusively determines the majority of Settlement Class members' eligibility and share of the common fund.  These individuals will automatically be sent a check without requiring any submission of a claim form or any other affirmative action on their part, unless they opt-out of the Settlement Class.  For Settlement Class Members who worked for Wabtec between January 1, 2009 and December 31, 2015 but not thereafter, for Faiveley between June 1, 2020 and October 31, 2016 but not thereafter, or for Knorr Brake Company from January 1, 2009 to December 31, 2010 but not thereafter, Defendants' data does not allow conclusive linking of individuals with job titles.  However, the data does contain last known-mailing addresses and total compensation.  This group of former employees will receive a separate e-mail and long-form Notice explaining the process for participating in the settlements, including providing their job title(s) to the Notice Administrator.  The Notice Administrator will set up a webpage that will allow these individuals to easily fill out an electronic claim form verifying their job title and eligibility.  Once this verification window is closed (90 days after preliminary approval), the Notice Administrator will have all the information it needs to distribute the settlement funds to the Settlement Class after Final Approval.

23.     Interim Co-Lead Counsel will provide the Notice Administrator with the relevant data already obtained from Defendants that include Settlement Class member mailing addresses.  Direct mail and email will be sent to all potential Settlement Class members, and notice of the settlements will also be published.

24.     The Notice Administrator will arrange for publication notice in *Progressive Railroading*, the leading rail industry news and information publication with a print circulation of over 25,000 and over 115,000 unique online visitors.  That is the same publication in which the Department of Justice published notice of its consent decree with Knorr and Wabtec.

Publication notice will include a full-page advertisement in a print edition of the magazine, a draft of which is attached as **Exhibit J**, paragraph 37, *infra*. *Progressive Railroading* publishes advertisements by calendar month; therefore, the advertisements will be published either in the month following preliminary approval or the next month, depending on when preliminary approval is granted (*e.g.*, if preliminary approval is granted in late March 2020, publication would commence in May 2020). In addition, a site-wide image ad on the magazine's website will run for one full calendar month and will link to the settlement website. The Notice Administrator will maintain a case-specific website with relevant court documents and contact information, and will operate a case-specific toll-free phone number and email address that Settlement Class members may use to pose questions.

25.     The proposed Notices clearly describe the nature of the action, both of the proposed settlements, the definition of the Settlement Class, how to file a claim form (for those Settlement Class members who are required to file claim forms), the legal issues, Settlement Class members' right to enter an appearance through an attorney, Settlement Class members' right to exclude themselves from the Settlement Class, the time and manner for requesting exclusion, the binding effect of a class judgment, the scope of the releases, and Settlement Class Members' right to object to the settlements. The proposed Notices also state the date and time of the fairness hearing, the formula for calculating each Settlement Class member's recovery, and information about the attorney's fees and expenses and class representative service awards that will be requested. Finally, the proposed Notices explain the straightforward process for objecting.

26.     The proposed Notices will inform the Settlement Class that Plaintiffs' Counsel will seek reimbursement of approximately $715,000 in litigation expenses and up to one-third of

the Settlement Fund for attorneys' fees.  The Notices also state that each of the five named Plaintiffs may request a service award up to $15,000, for a total of $75,000.  Each plaintiff has invested significant time and energy into collecting evidence, responding to discovery requests and reviewing draft interrogatory responses, and assisting counsel's efforts to draft complaints (including the CAC).  Additionally, the named Plaintiffs took the risk of retaliation upon themselves, which is particularly pronounced in the employment context.  The class representatives have no interests that conflict with those of the Settlement Class, have been actively involved in the litigation of this case, and have each reviewed and approved the proposed settlements.

27.     Other than the Knorr and Wabtec Settlements, there are no other agreements between Knorr or Wabtec and Plaintiffs or Interim Co-Lead Counsel to disclose.

## Exhibits

28.     Attached hereto as **Exhibit A** is a true and correct copy of Plaintiffs' final, executed Settlement Agreement with Knorr, with redactions applied to the blow-out provision. An unredacted copy will be filed under seal once the Court has ruled on Plaintiffs' pending motion for leave to file under seal.  Dkt. 240.

29.     Attached hereto as **Exhibit B** is a true and correct copy of Plaintiffs' final, executed Settlement Agreement with Wabtec, with redactions applied to the blow-out provision. An unredacted copy will be filed under seal once the Court has ruled on Plaintiffs' pending motion for leave to file under seal.  Dkt. 240.

30.     Attached hereto as **Exhibit C** is a true and correct copy of the list of Settlement Class job titles.

31.     Attached hereto as **Exhibit D** is a true and correct copy of the Declaration of the Honorable Thomas I. Vanaskie regarding Interim Co-Lead Counsel's settlement negotiations with Wabtec.

32.     Attached hereto as **Exhibit E** is a chart summarizing the results obtained in the instant settlements with Knorr and Wabtec in comparison to settlements in other employment antitrust class actions.

33.     Attached hereto as **Exhibit F** is a true and correct copy of the parties' proposed e-mail Notice to confirmed Settlement Class Members.

34.     Attached hereto as **Exhibit G** is a true and correct copy of the parties' proposed e-mail Notice to unconfirmed Settlement Class Members.

35.     Attached hereto as **Exhibit H** is a true and correct copy of the parties' proposed long-form Notice to confirmed Settlement Class Members.

36.     Attached hereto as **Exhibit I** is a true and correct copy of the parties' proposed long-form Notice to unconfirmed Settlement Class Members.

37.     Attached hereto as **Exhibit J** is a true and correct copy of the parties' proposed Publication Notice.

*       *       *

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on the 24th day of February, 2020, in San Francisco, California.

Respectfully submitted,

 /s/  *Dean M. Harvey*
        Dean M. Harvey