<div style="border">

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| | ) | |
| IN RE: RAILWAY INDUSTRY | ) | Master Docket Misc. No. 18-798 |
| EMPLOYEE NO-POACH ANTITRUST | ) | |
| LITIGATION | ) | MDL No. 2850 |
| | ) | |
| This Document Relates to: | ) | |
| ALL ACTIONS | ) | |
| | ) | |

</div>

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION**
 **FOR FINAL APPROVAL OF PROPOSED CLASS SETTLEMENTS**

2009950.1

# TABLE OF CONTENTS

<div align="right"><strong>Page</strong></div>

I.     INTRODUCTION ................................................................................................ 1

II.    STATEMENT OF FACTS ................................................................................. 2

    A.     Procedural Background .......................................................................... 2

    B.     Notice Program ..................................................................................... 4

    C.     Claims ................................................................................................... 7

    D.     Opt-Outs and Objections ....................................................................... 8

III.   LEGAL STANDARD ....................................................................................... 8

IV.    ARGUMENT .................................................................................................. 10

    A.     The Proposed Settlements Merit Final Approval ................................. 10

        1.     Plaintiffs and Co-Lead Counsel Adequately Represented the Class ....... 11

        2.     The Settlements Are Presumptively Fair ................................. 12

        3.     The *Girsh* Factors Favor Approval ...................................... 13

            a.     Complexity and Duration of the Litigation ................................. 13

            b.     The Reaction of the Class to the Settlement ................................. 13

            c.     The Stage of the Proceeding and Amount of Discovery Completed ................................................................. 14

            d.     The Risks of Establishing Liability, Proving Damages, and Maintaining the Class Action Through Trial ............................. 16

            e.     Defendants' Ability to Withstand a Greater Judgment ................ 17

            f.     The Range of Reasonableness of the Settlements in Light of the Best Possible Recovery and the Attendant Risks of Litigation ................................................................. 18

        4.     The Allocation Plan Fairly Compensates Settlement Class Members Based on the Degree of Harm ................................. 22

    B.     The Notice Program Effectively Apprised Class Members of Their Rights ....... 24

    C.     The Court Should Confirm Certification of the Settlement Class ...................... 24

V.     CONCLUSION ................................................................................................ 25

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Bell Atl. Corp. v. Bolger,*
2 F.3d 1304 (3d Cir. 1993)...................................................................... 21

*Cole's Wexford Hotel, Inc. v. UPMC & Highmark Inc.,*
Case No. 2:10-cv-01609-JFC, 2016 WL 6236892 (W.D. Pa. July 16, 2016) ............... 9, 13, 14

*Frederick v. Range Res.-Appalachia , C.A.*
No. 08-288 Erie, 2010 WL 11561286 (W.D. Pa. Oct. 13, 2010) ........................... 15

*Girsh v. Jepson,*
521 F.2d 153 (3d Cir. 1975)................................................................... 9, 16

*Hickton v. Enter. Rent-A-Car Co.,*
No. 2:09-mc-00210, 2013 WL 12137726 (W.D. Pa. Aug. 28, 2013)............................... 14, 16

*In re Aetna Inc. Sec. Litig.,*
MDL No. 1219, 2001 WL 20928 (E.D. Pa. Jan. 4, 2001) .................................... 18

*In re Aremis Soft Corp. Sec. Litig.,*
210 F.R.D. 109 (D.N.J. 2002)................................................................. 16

*In re Auto. Refinishing Paint Antitrust Litig.,*
MDL No. 1426, 2004 WL 6248154 (E.D. Pa. Sept. 27, 2004) ........................... 20, 21

*In re Cendant Corp. Litig.,*
264 F.3d 201 (3d Cir. 2001).............................................................. 9, 14, 17

*In re Chambers Dev. Sec. Litig.,*
912 F. Supp. 822 (W.D. Pa. 1995).............................................................. 13

*In re Domestic Airline Antitrust Litig.,*
MDL No. 2656 (D.D.C.)................................................................... 11, 21

*In re Elec. Carbon Prods. Antitrust Litig.,*
447 F. Supp. 2d 389 (D.N.J. 2006) ........................................................... 15

*In re Flonase Antitrust Litig.,*
291 F.R.D. 93 (E.D. Pa. 2013)................................................................. 23

*In re Generic Pharmaceuticals Pricing Antitrust Litigation,*
MDL No. 2724 (E.D. Pa.)...................................................................... 11

*In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.,*
55 F.3d 768 (3d Cir. 1995).................................................................. 14, 16

*In re High-Tech Employee Antitrust Litigation,*
No. 11-cv-2509-LHK (N.D. Cal.)......................................................... 11, 12, 23

*In re Linerboard Antitrust Litig.,*
321 F. Supp. 2d 619 (E.D. Pa. 2004) ...................................................... 20, 21

*In re Nat'l Football League Players Concussion Injury Litig.,*
821 F.3d 410 (3d Cir. 2016).............................................................. 9, 12, 13

*In re Processed Egg Prods. Antitrust Litig.,*
284 F.R.D. 249 (E.D. Pa. 2012) .............................................................. 21

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions,*
148 F.3d 283 (3d Cir. 1998)............................................................. 10, 13, 18

## TABLE OF AUTHORITIES
### (continued)

Page

*In re Prudential Ins. Co. of Am. Sales Practices Litig.*,
  962 F. Supp. 450 (D. N.J. 1997) ....................................................................... 24
*In re Rent-Way Sec. Litig.*,
  305 F. Supp. 2d 491 (W.D. Pa. 2003) ........................................................ 14, 24
*In re Ry. Indus. Emp. No-Poach Antitrust Litig.*,
  395 F. Supp. 3d 464 (W.D. Pa. 2019) .............................................................. 16
*In re Urethane (Polyether Polyols) Antitrust Litig.*,
  768 F.3d 1245 (10th Cir. 2014) ........................................................................ 11
*In re Warfarin Sodium Antitrust Litig.*,
  391 F.3d 516 (3d Cir. 2004) ..................................................................... 8, 9, 13
*Jackson v. Wells Fargo Bank, N.A.*,
  136 F. Supp. 3d 687 (W.D. Pa. 2015) ........................................................ 14, 17
*Lazy Oil v. Witco Corp.*,
  95 F. Supp. 2d 290 (W.D. Pa. 1997) .......................................................... 17, 18
*Mehling v. N.Y. Life Ins. Co.*,
  248 F.R.D. 455 (E.D. Pa. 2008) ....................................................................... 15
*Meijer, Inc. v. 3M*,
  Civ. A. No. 04-58712006 WL 2382718 (E.D. Pa. Aug. 14, 2006).................... 14
*Nitsch v. DreamWorks Animation SKG Inc.*,
  315 F.R.D. 270 (N.D. Cal. 2016)...................................................................... 19
*Nitsch v. DreamWorks Animation SKG Inc.*,
  No. 14-cv-04062-LHK (N.D. Cal.)..................................................................... 19
*Rossini v. PNC Fin. Servs. Grp., Inc.*,
  No. 2:18-cv-1370, 2020 WL 3481458 (W.D. Pa. June 26, 2020) ................. 8, 14
*Seaman v. Duke University*,
  No. 15-cv-462 (M.D.N.C.)....................................................................... 11, 19, 23
*Sullivan v. DB Invs., Inc.*,
  667 F.3d 273 (3d Cir. 2011)............................................................................... 18
*United States v. Knorr-Bremse AG*,
  No. 1:18-cv-00747, Dkts. 1 & 3 (D.D.C. Apr. 3, 2018) .................................... 15
*Zanghi v. Freightcar Am., Inc.*,
  No. 3:13-cv-146, 2016 WL 223721 (W.D. Pa. Jan. 19, 2016) ................ 10, 13, 18

**Rules**
Fed. R. Civ. P. 23(e)(1)(B) ................................................................................. 24
Fed. R. Civ. P. 23(e)(2)................................................................................... 9, 12
Fed. R. Civ. P. 23(e)(2)(A)-(D) .......................................................................... 10
Fed. R. Civ. P. 23(e)(2)(D) ................................................................................. 23

**Other Authorities**
Federal Trade Commission, *Consumers and Class Actions: A Retrospective and Analysis of
  Settlement Campaigns* (Sept. 2019) ................................................................. 8

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

Newberg on Class Actions § 13:52 (5th ed. 2015) ........................................................................ 8

I.    **INTRODUCTION**

Plaintiffs seek final approval of the Settlements with the Knorr[1] and Wabtec[2] defendants totaling $48.95 million to which not a single Settlement Class Member has objected.  The Settlements resolve this antitrust class action alleging a conspiracy among the world's dominant rail equipment suppliers to restrain competition and reduce compensation for their railway industry employees.  The Settlements are excellent.  Together, they will provide for substantial relief with an average gross recovery of over $7,000 per Settlement Class Member claimant, before taking into consideration attorneys' fees, class representative service awards, costs, and taxes.  This amount exceeds the per capita recovery in almost all prior cases in which an employee class asserted antitrust claims, and does so at a much earlier stage in the case, when more litigation risk remains.

The Court preliminarily approved the proposed Settlements on March 19, 2020.  Dkt. 262.  Since then, the Parties and the Notice Administrator, KCC Class Action Services, LLC ("KCC"), successfully implemented the Court-approved Notice Program and have received an overwhelmingly positive response to the Settlements from Settlement Class Members.  Over 6,800 Settlement Class Members will be receiving cash payments, only four Settlement Class Members requested exclusion from the Settlements and no Class Member objected.

---

[1] "Knorr" is used herein to refer to Knorr-Bremse AG and its U.S. subsidiaries that are also named Defendants in the litigation: Knorr Brake Company LLC, New York Air Brake LLC.  *See* Consol. Am. Compl. ("CAC") ¶¶ 23-25.

[2] "Wabtec" is used herein to refer to Westinghouse Air Brake Technologies Corporation, the world's largest provider of rail equipment and services, and its subsidiaries that are also named Defendants in the litigation:  Wabtec Railway Electronics, Inc., Railroad Controls, L.P., Xorail Inc., Faiveley Transport SA and Faiveley Transport North America, Inc.  CAC ¶¶ 17-22.

For the reasons explained below, Plaintiffs respectfully submit that the Settlements meet the required criteria for final approval, and therefore the motion should be granted.

## II.     STATEMENT OF FACTS

### A.     Procedural Background

The case began in April 2018 when numerous cases were filed around the country against the world's dominant rail equipment suppliers—Wabtec, Knorr, and Faiveley[3]—alleging that they conspired to restrain competition and reduce compensation for their railway industry employees.  The cases were consolidated and assigned to this Court by the Judicial Panel on Multidistrict Litigation in August 2018, and, on November 6, 2018, this Court appointed Dean Harvey of Lieff Cabraser Heimann & Bernstein, LLP and Roberta D. Liebenberg of Fine, Kaplan and Black, R.P.C. as Interim Co-Lead Counsel.  Dkt. 106.

Over a year of hard-fought litigation followed, with the parties vigorously disputing the sufficiency of the allegations, *see* Dkt. 193 (order regarding Defendants' first motion to dismiss); Dkts. 209, 219, 227 (briefing on Wabtec's motion to strike class allegations in CAC).  In addition, the parties engaged in wide-ranging discovery that led to the production of over 194,000 documents by Defendants and extensive compensation data, over 3,600 documents by Plaintiffs, and over 10,400 documents by 19 third-parties.  The detailed procedural history of this case is set forth in Plaintiffs' Motion for Preliminary Approval and pending Motion for Approval of Attorneys' Fees.  *See* Dkt. 244 at 3-9 and Dkt. 271 at 1-6.

While the sufficiency of the Complaint's allegations was being litigated, Plaintiffs and Knorr began negotiations in March 2019 over a prospective settlement, including an in-person

---

[3] "Faiveley" is used herein to refer to Faiveley Transport, S.A. and its wholly-owned subsidiary Faiveley Transport North America.  Before it was acquired by Wabtec on November 30, 2016, Faiveley was the world's third-largest provider of rail equipment and services.  CAC at ¶¶ 21-22.

meeting and many telephonic conference calls, signing a memorandum of understanding on August 13, 2019 and a full settlement agreement on October 16, 2019.  Declaration of Dean M. Harvey in Support of Preliminary Approval ¶ 8 (Dkt. No. 245) (hereinafter "Harvey Decl.").  Knorr agreed not only to stipulate to certification of a Settlement Class and to pay $12 million into a non-reversionary common fund, but also to provide significant cooperation in the then-ongoing litigation against Wabtec.  Harvey Decl. ¶ 11.

Subsequent to the Knorr Settlement, and while Wabtec's motion to strike the class allegations in the CAC was still pending, Wabtec and Plaintiffs began to pursue settlement negotiations with the assistance of a mediator, former Third Circuit Judge Thomas I. Vanaskie.  Harvey Decl. ¶ 9.  A formal mediation was held on November 21, 2019, preceded by the submission of detailed mediation briefs from the parties.  *Id.*  This mediation lasted over six hours, followed by a second in-person mediation on December 10, 2019, and then direct and mediated negotiations that led to a memorandum of understanding on January 21, 2020.  *Id.*  The terms of that agreement were finalized on February 24, 2020.  *Id.*  Under the agreement, Wabtec agreed to pay $36.95 million into a non-reversionary common fund.  *Id.*

To determine the job titles to be included in the Settlement Class, Interim Co-Lead Counsel engaged in a rigorous expert-informed analysis of the extensive documents and data produced by Defendants.  Knorr produced data for employees of Knorr Brake Company LLC and New York Air Brake LLC.  Wabtec produced data for employees of Westinghouse Air Brake Technologies Corporation, Wabtec Railway Electronics, Inc., Railroad Controls, L.P., Xorail Inc., Faiveley Transport, S.A. and Faiveley Transport North America, Inc.  From this data, job titles were reviewed to remove categories of employees that were: (1) explicitly excluded from the proposed Settlement Class (*e.g.*, senior executives, human resources, and legal

personnel) and (2) lacking specific rail-industry value or skills (*e.g.*, administrative assistants and janitors).  For the remaining job families and job titles, job descriptions and job postings were reviewed to clarify the skills required.  Harvey Decl. ¶¶ 14-20.

As described in Motion for Preliminary Approval, Defendants' compensation data included compensation information for all employees during the class period, but contained job title information for only a portion of the class period: Defendants' data does not identify the job titles for employees who worked for Wabtec prior to January 1, 2016, for Faiveley prior to November 1, 2016, or for Knorr Brake Company prior to January 1, 2011.  Dkt. 244 at 8-9, 20-21.  However, their data does contain last-known mailing addresses and total compensation allowing Plaintiffs to send notice to all potential class members.  Thus, Plaintiffs had a list of Settlement Class job titles that allowed most members of the Settlement Class to be identified, and all to receive notice of the settlement and to receive a share of the common fund that is proportional to the compensation each Settlement Class member received during the class period (*i.e.*, proportional to each Settlement Class member's likely damages).

Plaintiffs moved for preliminary approval of the Settlements on February 24, 2020, Dkt. 243, which the Court granted on March 19, 2020, Dkt. 262.

### B.    Notice Program

In its Order granting preliminary approval, the Court directed that notice be provided (1) directly to Settlement Class members by mail and e-mail; (2) by posting the relevant notices and other case material on a case-specific website; and (3) through publication in *Progressive Railroading*, a leading industry news and information publication with a print circulation of over 25,000 and over 115,000 unique online visitors.  Dkt. 262 at 4.

KCC carried out the Court-approved notice program.  *See* Declaration of Derek Smith on Behalf of Notice Administrator Regarding Compliance with Notice Requirements ¶¶ 2-7

(hereinafter "Smith Decl.").  Before sending the notices, KCC updated mailing addresses through the National Change of Address database.  *Id.* ¶ 3.  On April 20, 2020, KCC established the settlement website at www.railwaynopoach.com, with links to each form of notice approved by the Court, copies of the Settlement Agreements, a copy of the Court's Preliminary Approval Order, and a copy of the Consolidated Amended Complaint.  *Id.* ¶ 6.  In addition, the settlement website included a helpful page titled "Am I Eligible?," an "FAQs" section with common questions, a link to the online claim form, a page titled "Releases" explaining what claims would be released by class members if they did not opt-out, and two separate links to lists of the eligible job titles at Wabtec and Knorr.  *Id.*  The website also provided information concerning the date, time and location of the fairness hearing and had a contact page with contact information for the Notice Administrator and Co-Lead Counsel (mail, e-mail, and telephone).  *Id.*

On April 20, 2020, KCC sent e-mail and mail notice to 5,842 confirmed Class Members with addresses available and 3,356 potential class members, utilizing the names, mail, and e-mail addresses provided by Defendants.  Smith Decl. ¶ 2.  KCC subsequently mailed notice to 32 additional confirmed Class Members after locating their addresses.  *Id.* ¶ 4.  Two different versions of the long-form and e-mail notices were utilized.  The confirmed Class Members, who could be definitively identified based on Defendants' records, received versions of the notice informing them that they did not need to submit a claim to receive a payment.  *Id.* ¶ 3.  However, as noted above, because Defendants' data does not identify the job titles for employees who worked for Wabtec prior to January 1, 2016, for Faiveley prior to November 1, 2016, or for Knorr Brake Company prior to January 1, 2011, employees who worked for Defendants during these times received versions of the notices that explained how to file a timely claim online to participate in the Settlements.  *Id.*  It bears emphasis that Class Members are current and former

employees in a tight-knit railway industry at just a handful of companies, and the Settlements received considerable publicity.[4]

KCC also arranged for the publication of a full-page, Court-approved notice in the May 2020 edition of *Progressive Railroading*, a copy of which has been filed with the Court.  Smith Decl. ¶ 7.  *Progressive Railroading* also prominently placed a banner notice on its website for four weeks in May.  *Id.*

In addition, the Notice Administrator timely updated the website with relevant court filings, including Plaintiffs' motion for attorneys' fees, costs, and service awards and supporting exhibits and declarations.  Smith Decl. ¶ 6.  The website was also updated to reflect the subsequently filed Notice of Errata.  *Id.*  (A copy of the instant motion for final approval and supporting documentation will be posted shortly after filing.)

As of July 8, 2020, the settlement website has received 4,660 unique visits, and KCC responded to 786 questions submitted by email or phone.  Smith Decl. ¶ 8.  Further, dozens of Class Members and potential Class Members contacted Co-Lead Class Counsel with questions, through email and phone calls.  Harvey and Liebenberg Joint Decl. ¶ 2.  KCC and Co-Lead Class Counsel responded to all of these inquiries and provided the requested information.  *Id.*

For instance, twelve individuals contacted KCC or Co-Lead Counsel for clarification regarding whether the Settlement Class includes individuals who worked for several Wabtec

---

[4] *See, e.g.*, Anya Litvak, *Wabtec agrees to pay $37 M in no-poach class action*, Pittsburgh Post-Gazette (Feb. 26, 2020), https://www.post-gazette.com/business/powersource/2020/02/26/North-Shore-rail-products-Wabtec-37M-no-poach-class-action-Knorr-Bremse-Faively-Transport-wages-hire/stories/202002260167;  Mike Leonard, *Wabtec, Knorr Settle Railway No-Poach Suit for $49 Million*, Bloomberg Law (Feb. 25, 2020), https://news.bloomberglaw.com/mergers-and-antitrust/wabtec-knorr-settle-railway-no-poach-suit-for-49-million; Julia Mericle, *Wabtec to pay $37 million*, Pittsburgh Business Times (Feb. 27, 2020), https://www.bizjournals.com/pittsburgh/news/2020/02/27/wabtec-to-pay-37-million-in-lawsuit-settlement.html.

subsidiaries that were not named in the CAC or class definition, and whose job families and job titles were not analyzed or included in Appendix A to the Court's Preliminary Approval Order (Dkt. 262).  Smith Decl. ¶ 8; Harvey and Liebenberg Joint Decl. ¶ 3.  As approved by Defendants, KCC and Co-Lead Counsel directly informed each such person that the Settlement Class includes only employees working for entities named as Defendants, and that they were not in the Settlement Class if they had not worked for a named Defendant.  *Id.*  To ensure that there would be no confusion or ambiguity on this point, KCC added clarification to the settlement website, in consultation with Co-Lead Counsel and as approved by Defendants.  Smith Decl. ¶ 8. *See* Proposed Final Judgment ¶ 9.

      **C.**    **<u>Claims</u>**

Significantly, 5,874 confirmed Class Members were automatically entitled to receive a payment from the Settlements without having to file a claim form.  Because approximately 3,356 additional employees could not be conclusively confirmed as class members based on Defendants' records alone, the notice gave them all an opportunity to file claims if they believed they met the eligibility criteria and informed them that they would release their claims if they failed to submit a claim by the deadline.  Of the 3,356 potential Class Members, the Notice Administrator has received 996 timely claims and 22 untimely claims, which will be treated as timely, for a total of 1,018 claims.  Smith Decl. ¶ 9.

After review, the Settlement Administrator determined that 933 of 1,018 claims were valid and approved, 32 were invalid, and 53 remain under review pending receipt of additional information from the claimant.  Smith Decl. ¶ 10.  Thus, there are 6,807 Class Members who will be receiving proceeds from the Settlements at this time (5,874 confirmed Class Members plus the 933 who filed valid claims).  *Id.*  If the 53 pending claims are determined to be valid, that number could rise to 6,860 Class Members.  *Id.*

This is a participation rate of over 73 percent, as there were 9,230 employees (5,874 confirmed Class Members and 3,356 potential Class Members), and is more than seven times higher than the average rate according to a recent study, underscoring the efficacy of this notice program.  *See* Federal Trade Commission, *Consumers and Class Actions: A Retrospective and Analysis of Settlement Campaigns*, at 11 (Sept. 2019) (finding that the median claims rate was 9% and the weighted mean was 4%);[5] *see also Rossini v. PNC Fin. Servs. Grp., Inc.*, No. 2:18-cv-1370, 2020 WL 3481458, at *14 (W.D. Pa. June 26, 2020) (approving settlement with 4% claim rate).

### D.    Opt-Outs and Objections

As noted above, there have been no objections to the Settlements.  Smith Decl. ¶ 11. Only four Class Members, or less than a fraction of one percent, have opted out.  *Id.* ¶ 12.

## III.   LEGAL STANDARD

"[T]here is an overriding public interest in settling class action litigation, and it should therefore be encouraged."  *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 535 (3d Cir. 2004).  Indeed, "the law favors settlements, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation."  *Id.* (citation omitted); *see also* Newberg on Class Actions § 13:52 (5th ed. 2015) ("Thus, while the judicial system always favors settlement, it especially welcomes settlement in complex cases such as class suits, and even more so, the more complex the class action.").

As explained in the motion for preliminary approval, class action settlements are presumptively fair where "(1) the settlement negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation;

---

[5] https://www.ftc.gov/system/files/documents/reports/consumers-class-actions-retrospective-analysis-settlement-campaigns/class_action_fairness_report_0.pdf.

and (4) only a small fraction of the class objected." *Warfarin*, 391 F.3d at 535 (quoting *In re*

*Cendant Corp. Litig.*, 264 F.3d 201, 232 n.18 (3d Cir. 2001)).  *See also In re Nat'l Football*

*League Players Concussion Injury Litig.*, 821 F.3d 410, 436 (3d Cir. 2016); *Cole's Wexford*

*Hotel, Inc. v. UPMC & Highmark Inc.*, Case No. 2:10-cv-01609-JFC, 2016 WL 6236892, at *2

(W.D. Pa. July 16, 2016) (Conti, C.J.).

Courts approve class action settlements that are "fair, reasonable, and adequate."  Fed. R.

Civ. P. 23(e)(2).  In determining whether a settlement is fair, reasonable, and adequate, courts in

the Third Circuit consider the *Girsh* factors:

> (1) the complexity, expense, and likely duration of the litigation;
> (2) the reaction of the class to the settlement; (3) the stage of the
> proceedings and the amount of discovery completed; (4) the risks
> of establishing liability; (5) the risks of establishing damages;
> (6) the risks of maintaining the class action through trial; (7) the
> ability of the defendants to withstand a greater judgment; (8) the
> range of reasonableness of the settlement fund in light of the best
> possible recovery; (9) the range of reasonableness of the settlement
> fund to a possible recovery in light of all the attendant risks of
> litigation.

*Warfarin*, 391 F.3d at 534-35 (quoting *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975)).  In

*Cole's Wexford Hotel*, the Court found, in words equally applicable here, as follows:

> [A] presumption of fairness applies because the Settlement was
> negotiated at arm's length with an accomplished neutral at a Court-
> ordered mediation; the Parties were represented by reputable
> counsel with substantial class action, antitrust, and complex
> litigation experience; there was sufficient formal and informal
> discovery and both the Parties and counsel were knowledgeable
> about the facts of the case and the potential risks of continued
> litigation; and no Class Member objected to the Settlement and
> only two Class Members opted out.

2016 WL 6236892, at *2.

The proponents of a settlement bear the burden of proving that consideration of the *Girsh*

factors on balance warrants approval of the proposed settlement.  *Cendant*, 264 F.3d at 232.

The Third Circuit has stressed that the most relevant consideration is whether the proposed settlement is within a "range of reasonableness" in light of the costs, risks and delay of continued litigation; that is, the test is whether the proposed settlement is fair and reasonable under the circumstances. *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 322 (3d Cir. 1998). In assessing these risks, the Court should consider the opinions of experienced counsel, who have researched the issues and are familiar with the facts of the litigation. *Zanghi v. Freightcar Am., Inc.*, No. 3:13-cv-146, 2016 WL 223721, at *15 (W.D. Pa. Jan. 19, 2016) ("Significant weight should be attributed to the belief of experienced counsel that settlement is in the best interest of the class.") (citation omitted).

Rule 23(e)(2) also requires that courts take into consideration the following factors: (1) whether "the class representatives and class counsel have adequately represented the class"; (2) whether the settlement "was negotiated at arm's length"; (3) whether "the relief provided for the class is adequate"; and (4) whether the settlement "treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(A)-(D). All factors are discussed below, including Factors 1 and 3, which are subsumed by the *Girsh* factors.

## IV.   ARGUMENT

### A.   The Proposed Settlements Merit Final Approval

As explained below, Plaintiffs and Co-Lead Counsel adequately and vigorously represented the Class; the Settlements are entitled to a presumption of fairness; and the *Girsh* factors unequivocally demonstrate that the proposed Settlements are fair, reasonable, and adequate.

2009950.1

### 1.    **Plaintiffs and Co-Lead Counsel Adequately Represented the Class**

Rule 23(e)(2)'s requirement that "the class representatives and class counsel have adequately represented the class" is satisfied as all counsel are highly-experienced in class action litigation and antitrust cases in particular. Dkt. 24. Fine Kaplan, for example, has been involved in many of the country's most significant antitrust and class action cases, serving as Lead Counsel for the End-Payer Class in *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.), and Co-Lead Counsel in a 12-year price-fixing action which culminated in a 4-week jury trial, a verdict in excess of $400 million, and a judgment for $1.06 billion after trebling, which was affirmed on appeal. *See In re Urethane (Polyether Polyols) Antitrust Litig.*, 768 F.3d 1245 (10th Cir. 2014). Dkt. 24-2. Fine Kaplan also defended Southwest Airlines in a major antitrust class action. *In re Domestic Airline Antitrust Litigation*, MDL No. 2656 (D.D.C.).

Lieff Cabraser also has substantial experience litigating antitrust class actions, including several no-poach cases, such as *In re High-Tech Employee Antitrust Litigation*, No. 11-cv-2509-LHK (N.D. Cal.), and *Seaman v. Duke University*, No. 15-cv-462 (M.D.N.C.), and is currently co-lead counsel in several class cases challenging no-poach agreements among fast food restaurants. Dkt. 24-1. Thus, Co-Lead Counsel were familiar with the issues important to such litigation, common obstacles, the relative strengths and weaknesses of this case, and their obligations to vigorously advocate for the class's best interests.

Mark H. Hamer, counsel for Knorr, is Global Chair of Baker McKenzie's Antitrust & Competition Practice Group and has over 25 years of litigation experience. He has served as defense counsel in many MDL antitrust class action proceedings over the last two decades. He also has handled several successful antitrust trials, including both as plaintiff's counsel while at

the Antitrust Division of the U.S. Department of Justice and as defense counsel in private practice.

David Kiernan, counsel for Wabtec, is the Partner-in-Charge of Jones Day's Northern California region and head of litigation at its San Francisco office, and previously represented defendants in the watershed no-poach antitrust class action, *In re High-Tech Employee Antitrust Litigation*, No. 11-cv-2509-LHK (N.D. Cal.).

As discussed in connection with Plaintiffs' pending Motion for Attorneys' Fees, Costs, and Service Awards, each of the Class Representatives vigorously pursued the Class's interests, including expending substantial time and effort assisting Class Counsel with prosecution of the Class's claims, collecting evidence, responding to discovery requests, reviewing draft interrogatory responses, imaging and searching their personal electronic devices and social media accounts, producing over 3,600 documents, and sharing their industry knowledge to assist with Class Counsel's investigation. *See* Dkt. 271 at 18-22; *see also* Lara Decl. ¶ 8; Lonergan Decl. ¶ 8; Escalera Decl. ¶ 8; Brand Decl. ¶ 8; Baldassano Decl. ¶ 8.

## 2. The Settlements Are Presumptively Fair

Moreover, the Settlements were negotiated at arms' length and in good faith. Fed. R. Civ. P. 23(e)(2). The Knorr Settlement involved the exchange of extensive information and resulted from numerous in-person and telephonic meetings over the course of four months. Harvey Decl. ¶ 8. As stated in the previously filed Declaration of Judge Vanaskie, the Wabtec settlement negotiations over which he presided were conducted at arms' length and in good faith and included in-person mediation sessions and telephonic meetings over the course of three months. Dkt. 246. The Settlements are thus entitled to a presumption of fairness. *See Nat'l Football League*, 821 F.3d at 436-37.

### 3.      The *Girsh* Factors Favor Approval

#### a.      Complexity and Duration of the Litigation

The first *Girsh* factor addresses "the probable costs, in both time and money, of continued litigation." *Nat'l Football League*, 821 F.3d at 437.  A settlement is favored when "continuing litigation through trial would have required additional discovery, extensive pretrial motions addressing complex factual and legal questions, and ultimately a complicated, lengthy trial." *Warfarin*, 391 F.3d at 536.  "[T]his factor weighs in favor of final approval" where "[c]ontinuing litigation in this matter would result in a complicated trial with inevitable post-trial motions and appeals that would prolong the litigation [and] reduce the value of any recovery to the class . . . ." *Zanghi*, 2016 WL 223721, at *16.  For example, in finally approving a class action settlement in *Cole's Wexford Hotel,* this Court stated that "[c]ontinued litigation will be significantly complex and expensive for both sides, and the Parties each would face significant risk were the case to continue . . . .   In contrast, the Settlement provides valuable and immediate consideration to Class Members."  2016 WL 6236892, at *2.

Here, continued litigation would entail a lengthy and expensive battle that could have resulted in no relief to the Settlement Class or delayed relief for many years, and would have imposed further burden on judicial resources and the litigants.  Given this uncertainty, a "bird in the hand in this litigation is surely worth more than whatever birds are lurking in the bushes." *In re Chambers Dev. Sec. Litig.*, 912 F. Supp. 822, 838 (W.D. Pa. 1995).

#### b.      The Reaction of the Class to the Settlement

The second factor, the reaction of the class, "attempts to gauge whether members of the class support the settlement." *Prudential*, 148 F.3d at 318.  No Settlement Class Member objected to any aspect of the Settlements and only four Class Members opted out.  Smith Decl. ¶¶ 11-12.  Also, as discussed above, the claims rate is much higher than in most cases.

"This total absence of objections, coupled with such a low opt-out rate, argues in favor of the proposed Settlement[s]." *Meijer, Inc. v. 3M*, Civ. A. No. 04-5871, 2006 WL 2382718, at *13 (E.D. Pa. Aug. 14, 2006); *see also Cendant*, 264 F.3d at 235 ("The vast disparity between the number of potential class members who received notice of the Settlement and the number of objectors creates a strong presumption that this factor weighs in favor of the Settlement . . . ."); *Rossini*, 2020 WL 3481458, at *14  (no objections and 148 opt-outs supports finding of favorable class member reaction); *Cole's Wexford* Hotel, 2016 WL 6236892, at *3 ("No objections to the Settlements were made by Class Members."); *Jackson v. Wells Fargo Bank, N.A.*, 136 F. Supp. 3d 687, 701-02 (W.D. Pa. 2015) (10 objections and 354 opt-outs constituting less than a fraction of one-percent of class size "are a positive indicator"); *Hickton v. Enter. Rent-A-Car Co.*, No. 2:09-mc-00210, 2013 WL 12137726, at *3 (W.D. Pa. Aug. 28, 2013) (Conti, C.J.) ("No objections to the Settlement were received by the Court."); *In re Rent-Way Sec. Litig.*, 305 F. Supp. 2d 491, 501-02 (W.D. Pa. 2003) (finding that two opt-outs and one objector from a class of 8,600, plus a large number of filed claims, indicated "overwhelming class-wide support" for the settlement and weighed in favor of approval).

### c.      The Stage of the Proceeding and Amount of Discovery Completed

The third factor examines "the degree of case development that class counsel [had] accomplished prior to settlement.  Through this lens, courts can determine whether counsel had an adequate appreciation of the merits of the case before negotiating." *Cendant*, 264 F.3d at 235 (quoting *In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 813 (3d Cir. 1995).

By the time Knorr and Plaintiffs reached an agreement in principle on the key terms of the Knorr Settlement on August 13, 2019, Defendants had produced and Plaintiffs had reviewed

over 38,000 documents, including key liability evidence, organizational structure documents, and human resources material about Defendants' compensation systems.  Harvey Decl. ¶ 6.  These documents included everything the Defendants had previously provided to the United States Department of Justice.  The Plaintiffs also had the DOJ's summaries of the alleged misconduct. *See* Compl. & Competitive Impact Statement, *United States v. Knorr-Bremse AG*, No. 1:18-cv-00747, Dkts. 1 & 3 (D.D.C. Apr. 3, 2018).  The evidentiary record was even more robust by the time of the Wabtec Settlement five months later, as Wabtec had completed its production of data and custodial documents, and Plaintiffs had completed review and analysis of  over 194,000 documents that were produced.  Harvey Decl. ¶ 7.  Co-Lead Counsel retained the services of consulting economic experts who analyzed the data to make damages estimates guiding the mediation process.  Harvey Decl. ¶¶ 6-7.

Additionally, at the time of each settlement, both Knorr and Wabtec had already produced data concerning their employees and their compensation throughout the class period. Harvey Decl. ¶¶ 6-7.  *See Frederick v. Range Res.-Appalachia*, C.A. No. 08-288 Erie, 2010 WL 11561286, at *5 (W.D. Pa. Oct. 13, 2010) (observing that settlement was reached "at a sufficiently advanced stage in the litigation to have allowed the parties to engage in discovery and explore the strengths and weaknesses of their respective claims and defenses prior to reaching the agreement"); *Mehling v. N.Y. Life Ins. Co.*, 248 F.R.D. 455, 460 (E.D. Pa. 2008) ("Given the amount of discovery completed, the Court finds that both parties had sufficient evidence to conduct meaningful, arms-length negotiations reflecting the relative strengths of the claims."); *In re Elec. Carbon Prods. Antitrust Litig.*, 447 F. Supp. 2d 389, 400 (D.N.J. 2006) (concluding that where negotiations follow "meaningful discovery, the maturity and correctness of the settlement become all the more apparent").

In short, the Settlements came only after substantial development of the underlying factual and legal issues.  This factor therefore weighs in favor of approval.

### d.      The Risks of Establishing Liability, Proving Damages, and Maintaining the Class Action Through Trial

The fourth through sixth *Girsh* factors "examine what the potential rewards (or downside) of the litigation might have been had class counsel elected to litigate the claims rather than settle them." *GMC*, 55 F.3d at 814.  The factors include: (4) the risks of establishing liability; (5) the risks of establishing damages; and (6) the risks of maintaining the class action through trial.  *Girsh*, 521 F.2d at 157.  The "court should avoid conducting a mini-trial and must, to a certain extent, give credence to the estimation of the probability of success proffered by class counsel." *In re Aremis Soft Corp. Sec. Litig.*, 210 F.R.D. 109, 124-25 (D.N.J. 2002) (citations and quotation omitted).  For example, in *Hickton*, this Court held that "in light of the significant possibility that Defendants could prevail before a jury on the merits or in summary judgment . . . it is clear that the Settlement falls well-within the range of settlement terms that would be considered fair, reasonable and adequate."  2013 WL 12137726, at *3.

Although Plaintiffs are confident in their claims, success is far from certain.  Plaintiffs here, as in any complex class action, face enormous risks.  Further, this case raised important and complex questions of law, as reflected by the Court's 81-page Opinion on Defendants' motion to dismiss.  *In re Ry. Indus. Emp. No-Poach Antitrust Litig.*, 395 F. Supp. 3d 464 (W.D. Pa. 2019).  The Third Circuit has never reviewed a no-poach antitrust case, so there would be risks on appeal if the case continued to be litigated through summary judgment and/or trial.  The Plaintiffs also faced the challenge of producing sufficient evidence that members of the proposed Class had their compensation suppressed by the alleged no-poach agreements.  *Id.* at n.15 (acknowledging that "[h]ere, plaintiffs' task is more difficult [than in other no poach cases]").

-16-

Moreover, Wabtec's pending motion to strike the class action allegations set forth some of the challenges that Plaintiffs would have faced here on a litigated class certification motion and potential Rule 23(f) appeal.

In sum, the risks of establishing liability, establishing damages and maintaining the class action through trial and ultimately through appeals, strongly favor final approval.

### e.   Defendants' Ability to Withstand a Greater Judgment

The Third Circuit interprets this factor to be "concerned with whether the defendants could withstand a judgment for an amount significantly greater than the settlement." *In re Cendant*, 264 F.3d at 240.  "However, just because defendants *could* pay more does not necessarily mean they should *have to* pay more than the parties negotiated to settle these claims." *Jackson*, 136 F. Supp. 3d at 705.  For example, in *Lazy Oil*, the Court concluded that the fact that a settling defendant had the financial resources to pay a larger judgment did not weigh against settlement "in light of the risks that Plaintiffs would not be able to achieve any greater recovery at trial . . . ." *Lazy Oil v. Witco Corp.*, 95 F. Supp. 2d 290, 318 (W.D. Pa. 1997).

The fact that Defendants may have the financial resources to pay a larger judgment does not necessarily weigh against approval when considered along with the size of the Settlements within the context of the litigation.  This is especially true here where the per capita monetary recovery is the third largest of any antitrust employment no-poach class action, exceeding the vast majority by several thousand dollars.  Harvey & Liebenberg Joint Decl., Ex. A.[6]  In light of these facts, including the real possibility of recovering less or nothing at all, this factor weighs in favor of final approval.

---

[6] A version of this chart was previously submitted in connection with Plaintiffs' motion for attorneys' fees.  *See* Dkt. 272-1.  This version has been updated to reflect new information about the number of claims that were received and verified.

-17-

**f.      The Range of Reasonableness of the Settlements in Light of the Best Possible Recovery and the Attendant Risks of Litigation**

"The last two *Girsh* factors evaluate whether the settlement represents a good value for a weak case or a poor value for a strong case.  These factors test two sides of the same coin: reasonableness in light of the best possible recovery and reasonableness in light of the risks the parties would face if the case went to trial." *Zanghi*, 2016 WL 223721, at *19 (citation omitted). "The reasonableness of a proposed settlement is assessed by comparing 'the present value of the damages plaintiffs would likely recover if successful [at trial], appropriately discounted for the risk of not prevailing . . . with the amount of the proposed settlement.'" *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 323-24 (3d Cir. 2011) (quoting *Prudential*, 148 F.3d at 322).  "While the court is obligated to ensure that the proposed settlement is in the best interest of the class members by reference to the best possible outcome, it must also recognize that settlement typically represents a compromise and not hold counsel to an impossible standard." *In re Aetna Inc. Sec. Litig.*, MDL No. 1219, 2001 WL 20928, at *6 (E.D. Pa. Jan. 4, 2001); *see also Lazy Oil*, 95 F. Supp. 2d at 338-39 (stating that a court "should not make a proponent of a proposed settlement 'justify each term of settlement against a hypothetical or speculative measure of what concessions might have been gained; inherent in compromise is a yielding of absolutes and abandoning of highest hopes'" (citation omitted)).

The Settlements here are excellent particularly when viewed in light of the litigation risks in this case.  Under the Settlements, Knorr and Wabtec together will pay $48.95 million, and at least 6,807 Settlement Members will be receiving checks as a result of the claims process.  Thus, the average gross recovery will be $7,191.13, before taking into consideration attorneys' fees, class representative service awards, costs and before deductions for taxes.

-18-

The per capita monetary recovery is the third largest of any antitrust employment no-poach class action, exceeding the vast majority by several thousand dollars.  Harvey & Liebenberg Joint Decl., Ex. A.  This result is behind only *Nitsch v. DreamWorks Animation SKG Inc.*, No. 14-cv-04062-LHK (N.D. Cal.) ("*Animators*") and *Seaman v. Duke University, et al.*, No. 15-cv-462 (M.D.N.C.) ("*Duke*"), both of which were litigated through class certification, and the latter of which reached the summary judgment stage before settlement.  In contrast, here, Co-Lead Counsel obtained settlements that will put real money into Class Members' pockets during these difficult economic times, while avoiding the risk associated with Wabtec's still-unresolved motion to strike the class allegations of the Consolidated Amended Complaint, and the substantial risks and delays entailed in subsequent motions for class certification, summary judgment, trial and potential appeals on class certification and the merits.  There has been no antitrust employment class action ever litigated that has achieved such a substantial recovery this efficiently.

The Settlements are also excellent when considered as a proportion of Class Members' income.  In that regard, this result is the second largest ever.  Harvey & Liebenberg Joint Decl., Ex. A.  Only *Animators* involved a larger per capita recovery, and in that case, not only was there direct evidence of compensation-fixing that does not exist here, but the case was also litigated through class certification.  *Nitsch v. DreamWorks Animation SKG Inc.*, 315 F.R.D. 270 (N.D. Cal. 2016).

Each Settlement is also fair, reasonable, and adequate standing on its own.  For example, Knorr settled first by agreeing to pay the Settlement Class $12 million and providing extensive and valuable cooperation.  That amount was significant considering that the Knorr Settlement was only partial, and Wabtec continued to be jointly and severally liable for the totality of the

class's damages.  Given that the Knorr Settlement was at the time a partial settlement, it is appropriate to review its strength in relation to Knorr's "share" of the relevant industry (railway labor) and harm caused.  *See*, *e.g.*, *In re Auto. Refinishing Paint Antitrust Litig.*, MDL No. 1426, 2004 WL 6248154, at *8 (E.D. Pa. Sept. 27, 2004) (approving partial settlement's fairness in consideration of the defendant's market share).  Based on the information available to Plaintiffs at the time of the Knorr Settlement, each Defendant family's "share" of Settlement Class Members and Settlement Class compensation was as follows:

| Defendant Family | Number of Settlement Class Members | Percent Share of Class | Total Compensation | Percent Share of Total Settlement Class Compensation |
|---|---|---|---|---|
| Knorr | 2,270 | 27% | $540,270,432 | 27.67% |
| Wabtec | 6,126 | 73% | $1,412,480,046 | 72.33% |
| **Total:** | 8,396[7] | -- | $1,952,750,478 | -- |

Thus, the $12 million Knorr Settlement is equal to approximately 2.2% of the total compensation Knorr paid to Settlement Class Members during the class period.  *See Auto. Refinishing*, 2004 WL 6248154, at *8 (approving partial settlement totaling 2% of settling defendants' share of sales); *In re Linerboard Antitrust Litig.*, 321 F. Supp. 2d 619, 627 (E.D. Pa. 2004) (approving settlement totaling 1.62% of settling defendants' sales).

---

[7] This was the estimated number of Class Members at the time of the Knorr Settlement.  As noted above, there were 9,230 potential Class Members.  As noted, at least 6,807 employees (5,874 confirmed Class Members plus 933 who filed valid claims) will be receiving funds through the Settlements.

In settling with Knorr and guaranteeing at least a $12 million recovery, the Settlement Class also preserved the opportunity to pursue the full balance of damages to which it was entitled from Wabtec.  Wabtec continued to be jointly and severally liable for all damages to the class caused by all Defendants' conduct, including Knorr's.  *See Auto. Refinishing*, 2004 WL 6248154, at *8 (noting that the remaining defendants "face joint and several liability"); *In re Linerboard Antitrust Litig.*, 203 F.R.D. 197, 208 (E.D. Pa. 2001) (same).

Further, the non-monetary provisions of the Knorr Settlement considerably strengthened Plaintiffs' hand against Wabtec and conferred substantial additional benefits upon the Settlement Class.  *Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1311 (3d Cir. 1993) ("[N]onpecuniary benefits . . . may support a settlement.").  In particular, Knorr agreed to important cooperation provisions with Plaintiffs, including a proffer of all relevant facts in its knowledge, responding to reasonable follow-up questions, making its employees available for interviews, depositions, declarations, and trial testimony, assisting with the authentication of evidence, and aiding Class Counsel in locating former employees who may have relevant information.  Knorr Settlement ¶ 54.

Such cooperation was valuable to the Settlement Class as Plaintiffs continued to litigate against Wabtec, and would have continued benefitting the Settlement Class if Wabtec had not subsequently settled.  *See In re Processed Egg Prods. Antitrust Litig.*, 284 F.R.D. 249, 275 (E.D. Pa. 2012) (recognizing that the defendant's "agreement to cooperate with Plaintiffs throughout the course of pre-trial proceedings and trial is valuable consideration in light of the risks in proceeding with this suit against the remaining Defendants").  Knorr's promise of cooperation under this "ice-breaker settlement" "ha[d] significant value" and "increase[d] the likelihood of future settlements."  *In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 631, 643 (E.D. Pa. 2003).  *Accord In re Domestic Airline Travel Antitrust Litig.*, 378 F. Supp. 3d 10, 29 (D.D.C. 2019)

-21-

(approving "ice breaker" settlement and citing numerous other cases approving icebreaker settlements and emphasizing the importance of cooperation provisions "to the Plaintiffs in their continued prosecution of their claims against the non-settling Defendants" (citation omitted)).

And that is precisely what happened.  Against the backdrop of the Knorr Settlement, Plaintiffs and Wabtec ultimately reached an agreement five months later, in which Wabtec agreed to pay $36.95 million into a common fund, raising the proposed Settlement Class's total monetary recovery to $48.95 million.  Standing alone, the Wabtec Settlement is also impressive: it is more than three times the amount paid by Knorr and represents 2.6% of the total compensation Wabtec paid to Settlement Class Members during the class period.

In sum, the Knorr and Wabtec Settlements, considered alone at the time each was made and also considered together, provide an excellent recovery for the Settlement Class which is fair, reasonable, and adequate.  Indeed, the absence of any objections and only four opt-outs, coupled with the very high claims rate, underscores the strength of the Settlements and the substantial benefits they have conferred on Class Members.

### 4.      The Allocation Plan Fairly Compensates Settlement Class Members Based on the Degree of Harm

The Court already "preliminarily approve[d] the plan of allocation proposed by Plaintiffs, subject to further consideration at the Final Approval Hearing."  Dkt. 262 at 2.  The Notice program apprised the Settlement Class of the proposed allocation plan and provided them with an opportunity to object or comment.  None objected and none commented.  Smith Decl. ¶ 11. The Court should now approve the plan.

Under the proposed plan, the Notice Administrator will first calculate the Net Settlement Fund amount by subtracting any Court-approved award of attorneys' fees and costs, class representative service awards, and settlement administration costs from the combined Settlement

Fund of $48.95 million, plus accrued interest.  The Net Settlement Fund amount will be shared

by the confirmed Settlement Class Members and potential Settlement Class Members who filed

valid claims (approximately 6,807), with each Settlement Class Member's share calculated by

multiplying the Net Settlement Fund by the following ratio:

$$\frac{\text{(Each Settlement Class Member's Eligible Knorr/Wabtec/Faiveley Compensation During Class Period)}}{\text{(Sum of All Settlement Class Members' Eligible Knorr/Wabtec/Faiveley Compensation During Class Period)}}$$

Thus, each Settlement Class Member's recovery will be calculated in approximate proportion to

their alleged harm, consistent with Plaintiffs' damages theory.  This formula accounts for the fact

that Settlement Class Members who earned more or worked longer were harmed more than those

who worked for a shorter period or earned lower compensation.  This allocation is fair and

reasonable, and is the same allocation plan previously approved in the no-poach settlements in

*High-Tech* and *Duke*.  *See In re High-Tech Emp. Antitrust Litig.*, No. 11-cv-02509-LHK, 2015

WL 5159441, at *6 (N.D. Cal. Sept. 2, 2015) (approving identical plan because it "provides a

neutral and uniform metric by which to allocate the Settlement"); *Duke*, No. 15-cv-462, Dkt. 387

at 5 (M.D.N.C. Sept. 24, 2019) (same).  *See also In re Flonase Antitrust Litig.*, 291 F.R.D. 93,

107 (E.D. Pa. 2013) ("In general, a plan of allocation that reimburses [Settlement] class members

based on the type and extent of their injuries is reasonable.") (citation and quotation omitted)).

The allocation plan "treats class members equitably relative to each other."  Fed. R. Civ. P.

23(e)(2)(D).

No class member objected to the allocation plan.  The Court should adopt the proposed

pro-rata distribution plan as fair and reasonable.

### B.   The Notice Program Effectively Apprised Class Members of Their Rights

As described above, Section II.B, *supra*, the Notice Program comported with the

requirements of Rule 23 and due process.  *See* Fed. R. Civ. P. 23(e)(1)(B) (notice must be given

"in a reasonable manner"); *see also In re Rent-Way Sec. Litig.*, 305 F. Supp. 2d at 511 (holding

similar notice satisfied due process); *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962

F. Supp. 450, 527-28 (D. N.J. 1997) (holding individual and publication notice met due process

requirement that notice be "reasonably calculated, under all of the circumstances, to apprise

interested parties of the pendency of the settlement proposed and to afford them an opportunity

to present their objections").

### C.   The Court Should Confirm Certification of the Settlement Class

At preliminary approval, the Court conditionally certified the Settlement Class after

finding that it "meets all prerequisites for class certification under Rule 23(a) and (b) of the

Federal Rules of Civil Procedure, including that: (a) the Settlement Class is ascertainable; (b) the

Settlement Class is so numerous that joinder of all members is impracticable; (c) there are

questions of law and fact common to the Settlement Class; (d) Plaintiffs and their counsel are

capable of fairly and adequately protecting the interests of the Settlement Class; (e) common

questions of law and fact predominate over questions affecting only individual Settlement Class

Members; and, (f) certification of the Settlement Class is superior to other available methods for

the fair and efficient resolution of the claims of Settlement Class Members."  Dkt. 262 at 5.  The

Court appointed Plaintiffs as Class Representatives and the undersigned as Co-Lead Counsel for

the Settlement Class.  *Id.*

The notice program for the Settlements is complete, and no new information has

developed to suggest that certification under Rule 23 would be improper.  Accordingly, for the

same reasons outlined in Plaintiffs' motion for preliminary approval, Dkt. 244 at 25-34, the

Court should grant final certification of the Settlement Class per the attached proposed Final

Judgment.

## V.     CONCLUSION

Plaintiffs respectfully request that the Court grant final approval of the proposed

Settlements and allocation plan and enter Final Judgment.


Dated: July 17, 2020                                    Respectfully submitted,


 */s/ Dean M. Harvey*                                    */s/ Roberta D. Liebenberg*
Dean M. Harvey (*pro hac vice*)                  Roberta D. Liebenberg (*pro hac vice*)
Lin Y. Chan (*pro hac vice*)                         Gerard A. Dever (*pro hac vice*)
Yaman Salahi (*pro hac vice*)                       Adam J. Pessin (*pro hac vice*)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP     FINE, KAPLAN AND BLACK, R.P.C.
275 Battery Street, 29th Floor                      One South Broad Street, Suite 2300
San Francisco, CA  94111-3339                      Philadelphia, PA  19107
Telephone:  (415) 956-1000                         Telephone:  (215) 567-6565
Facsimile:  (415) 956-1008                          Facsimile:  (215) 568-5872
dharvey@lchb.com                                    rliebenberg@finekaplan.com
lchan@lchb.com                                       gdever@finekaplan.com
ysalahi@lchb.com                                     apessin@finekaplan.com

*Co-Lead Class Counsel*

 */s/  Kelly K. Iverson*
Kelly K. Iverson (307175)
CARLSON LYNCH, LLP
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Telephone: (412) 322-9243
kiverson@carlsonlynch.com


*Liaison Counsel for the Settlement Class*